**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**Tallahassee Division**

UPSIDE FOODS, INC.,

     Plaintiff,

v.

WILTON SIMPSON, in his official capacity as
Commissioner of the Florida Department of
Agriculture and Consumer Services; ASHLEY
MOODY, in her official capacity as Florida
Attorney General; JACK CAMPBELL, in his official
capacity as State Attorney for the Second Judicial
Circuit; BRUCE L. BARTLETT, in his official
capacity as State Attorney for the Sixth Judicial
Circuit; ANDREW A. BAIN, in his official capacity
as State Attorney for the Ninth Judicial Circuit;
and KATHERINE FERNANDEZ RUNDLE, in her
official capacity as State Attorney for the
Eleventh Judicial Circuit,

     Defendants.

Civil Action No.
4:24-cv-316

---

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

**INTRODUCTION**

1.      This case is a constitutional challenge to Florida's recently enacted SB

1084, a law that prohibits the sale of safe, innovative food products. Plaintiff UPSIDE

Foods, Inc., (UPSIDE) is a start-up based in Berkeley, California, and a leading producer

of cultivated meat. Unlike conventional meat, which is harvested from animals that are

raised for slaughter, UPSIDE cultivated-meat products are produced by growing real

animal cells in clean and controlled facilities that are regulated and inspected by the U.S.

Department of Agriculture (USDA) and the Food and Drug Administration (FDA).

Using this technology, UPSIDE is able to reproduce the taste and texture of conventional

meat without the necessity of butchering animals.

2.      UPSIDE has distributed its cultivated chicken products at restaurants and

tasting events throughout the country, including in Florida. Consumers are drawn to

UPSIDE's product because it offers an ethical alternative to conventional meat, while

providing a taste and texture they view as superior to plant-based meat alternatives.

Simply put, consumers and restaurateurs like UPSIDE's product because it tastes like

chicken, which isn't surprising, since it's made from chicken cells.

3.      But on May 1, 2024, Florida enacted SB 1084, becoming the first state in

the nation to ban the manufacture, distribution, and sale of cultivated meat. In doing so,

Florida did not cite concerns that cultivated meat is less healthy or safe than conventional

meat. Instead, Governor DeSantis announced that Florida was "fighting back" against

the "authoritarian goals" of the "global elite," who he alleged would force consumers to

eat cultivated meat. The governor also announced that the law was part of his

administration's "focus on investing in our local farmers and ranchers" and an effort to

"save our beef." Florida's Commissioner of Agriculture echoed these statements,

describing the law as "protect[ing] our incredible farmers" and as a means to "keep

Florida's agricultural industry strong and thriving."

4.      UPSIDE doesn't want to force anyone to eat cultivated meat. But it does want the opportunity to distribute its product to willing consumers, so that those consumers can decide for themselves whether UPSIDE's product is worth eating. And UPSIDE has a right to do so, because SB 1084 is unconstitutional.

5.      SB 1084 violates the Supremacy Clause because it is expressly preempted by federal laws regulating meat and poultry products. SB 1084 separately violates the dormant aspect of the Commerce Clause, because it was enacted with the express purpose of insulating Florida agricultural businesses from innovative, out-of-state competition like UPSIDE. This Court should thus declare SB 1084 unconstitutional and enjoin its operation.

## JURISDICTION

6.      Plaintiff brings this civil-rights lawsuit under the Supremacy Clause and Commerce Clause of the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgments Act, 28 U.S.C. § 2201. Plaintiff seeks injunctive and declaratory relief against the enforcement of the State's ban on the manufacture, distribution, or sale of cultivated meat, Fla. Stat. § 500.542.; its implementing rules and regulations; and the practices and policies of the Florida Attorney General and the Florida Department of Agriculture and Consumer Services, which facially and as applied violate Plaintiff's right to sell safe products in interstate commerce.

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

3

## VENUE

8.      Venue lies in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

9.      Plaintiff UPSIDE Foods, Inc., is a corporation organized under Delaware law and based in Berkeley, California.

10.     Defendant Wilton Simpson is the Commissioner of the Florida Department of Agriculture and Consumer Services. Under Fla. Stat. § 500.452, the Department is charged with imposing civil penalties for violations of Florida's ban on the manufacture, distribution, or sale of cultivated meat. Plaintiff sues the Commissioner in his official capacity and seeks only prospective declaratory and injunctive relief against him.

11.     Defendant Ashley Moody is the Florida Attorney General and is responsible for representing the state's interests in "all suits or prosecutions, civil or criminal or in equity, in which the state may be a party, or in anywise interested, in the Supreme Court and district courts of appeal of" Florida. Fla. Stat. § 16.01. By law, she is also charged with the "general superintendence and direction over the several state attorneys." Fla. Stat. § 16.08. Plaintiff sues the Attorney General in her official capacity and seeks only prospective declaratory and injunctive relief against her.

12.     Defendants Jack Campbell, Bruce L. Bartlett, Andrew A. Bain, and Katherine Fernandez Rundle are the State Attorneys for the Second, Sixth, Ninth, and Eleventh Judicial Circuits. They are the prosecuting officers of all trial courts in their

respective circuits. Fla. Const. art. V, § 17. By law, "[e]ach state attorney to whom the [Department of Agriculture and Consumer Services] or its designated agent reports any violation of this chapter shall cause an appropriate proceeding to be instituted in the proper court without delay and to be prosecuted in the manner required by law." Fla. Stat. § 500.178. Plaintiff sues the State Attorneys in their official capacity and seeks only prospective declaratory and injunctive relief against them.

## STATEMENT OF FACTS

### UPSIDE Foods and Cultivated Meat

13.    UPSIDE Foods, Inc., is a start-up company based in Berkeley, California, and founded in 2015 by Uma Valeti, a cardiologist and the company's CEO.

14.    Dr. Valeti first became interested in alternatives to conventional meat in the mid-1990s while he was still in training to become a cardiologist. While running the student kitchen at his medical school, he had to take a trip to a local slaughterhouse to buy several hundred pounds of meat. The experience left him convinced that there had to be a better way to produce meat.

15.    Two decades later, Dr. Valeti founded Memphis Meats, which has since been renamed UPSIDE Foods and which was the first company in the United States to sell "cultivated" meat.

16.    Cultivated (or "cultured") meat consists of animal cells that are grown directly, rather than being grown inside an animal.

17.     To produce cultivated meat, the manufacturer acquires and banks animal cells, then places these cells within a vessel known as a cultivator.

18.     Inside the cultivator, the cells are supplied with the same sort of nutrients that they would receive in an animal's body. This allows the cells to grow into meat.

19.     Once grown, these cells can be harvested and formulated into products that replicate the sensory and taste profile of conventional meat.

20.     UPSIDE is a leading innovator and producer of cultivated meat in the nation. It produced the world's first cultivated chicken and duck meat, and it has also innovated various cultivated beef products, including the world's first cultivated beef meatball in 2016.

21.     For consumers with ethical, environmental, or health concerns relating to conventional meat, cultivated meat offers a number of benefits.

22.     Most obviously, cultivated meat does not require the large-scale slaughter of animals that is necessary for the production of conventional meat.

23.     Because producing cultivated meat does not require the raising of live animals, it also limits many of the environmental costs associated with the production of conventional meat. These include costs associated with producing and transporting animal feed, as well as raising and transporting livestock to processing facilities. They also include things like greenhouse-gas emissions created by livestock and the pollution created by animal waste.

24.     Cultivated meat also avoids some of the health risks posed by conventional meat.

25.     Because cultivated meat is grown in highly controlled environments that are subject to constant monitoring, and because it is never exposed to animal waste, it poses fewer risks of environmental contamination, whether by pathogens or disease-causing microorganisms.

26.     Because cultivated meat does not require raising large numbers of animals in confined spaces, it also mitigates against risks associated with zoonotic diseases and antibiotic-resistant infections.

27.     Because it is made from animal cells, cultivated meat allows consumers to enjoy these ethical, environmental, and health benefits without having to sacrifice the taste and texture of conventional meat.

28.     Finally, some consumers may simply like the idea of cultivated meat because they are turned off by the idea of eating animal flesh or because they enjoy trying new food products or are excited to experience these cutting-edge products for themselves.

### Federal Regulation of Cultivated Meat

29.     Pursuant to its power under the Commerce Clause of Article I, section 8 of the Constitution, Congress has enacted a variety of laws that regulate the interstate market for food, including specifically meat and poultry products.

30.     For cultivated meat, regulatory oversight is divided between the USDA's Food Safety and Inspection Service (FSIS) and the FDA.

31.     In March of 2019, the USDA and the FDA announced a formal agreement outlining how the federal government would apply those laws to the manufacture, distribution, and sale of cultivated meat and poultry. U.S. FDA, *USDA and FDA Announce a Formal Agreement to Regulated Cell-Cultured Food Products from Cell Lines of Livestock and Poultry* (Mar. 7, 2019), https://www.fda.gov/news-events/press-announcements/usda-and-fda-announce-formal-agreement-regulate-cell-cultured-food-products-cell-lines-livestock-and.

32.     Under that formal agreement, the "FDA oversees cell collection, cell banks, and cell growth and differentiation." *Id.*

33.     When cultivated livestock and poultry cells are harvested, oversight transfers from FDA to FSIS, which then oversees "the production and labeling of human food products derived from the cells of livestock and poultry." *Id.*

34.     FSIS is responsible for enforcing two federal laws that are particularly relevant to the production of cultivated meat and poultry products: the Federal Meat Inspection Act, 21 U.S.C. §§ 601–95 (FMIA), and the Poultry Products Inspection Act, 21 U.S.C. §§ 451–73 (PPIA).

35.     In passing the FMIA and PPIA, Congress sought to facilitate a nationwide market of safe-to-consume meat and poultry products. For that reason, Congress explicitly provided that both the FMIA and PPIA would preempt state regulatory

provisions that exceed or differ from federal regulations promulgated pursuant to those Acts. Two of those preemption provisions are relevant here.

36.     First, both Acts expressly provide that states "may not . . . impose[]" any "ingredient requirements . . . in addition to, or different than, those made under [the FMIA or PPIA]." 21 U.S.C. §§ 467e, 678.

37.     Second, both Acts expressly provide that states "may not . . . impose[]" any "[r]equirements . . . with respect to premises, facilities and operations of any establishment at which inspection is provided under [the FMIA or PPIA], which are in addition to, or different than those made under [the FMIA or PPIA]." 21 U.S.C. §§ 467e, 678.

38.     Under its existing statutory authority, the USDA has promulgated ingredient requirements that govern the use of ingredients in meat and poultry products. *See, e.g.*, U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat & Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/sites/default/files/media_file/documents/7800.1.pdf (providing, in part, that "[i]ngredients listed as approved for meat in 9 CFR 424.21(c) or FSIS Directive 7120.1 may be used in cell-cultured meat food products, and ingredients listed as approved for poultry may be used in cell-cultured poultry food products, provided the intended use is consistent in terms of the application . . . product type . . . and any other criteria listed").

39.     The USDA has also stated that its existing regime of inspections for facilities in which meat or poultry products are processed are "immediately applicable" to cultivated products. U.S. Dep't of Agric., *Human Food Made with Cultured Animal Cells* (Aug. 17, 2023), https://www.fsis.usda.gov/inspection/compliance-guidance/labeling/labeling-policies/human-food-made-cultured-animal-cells.

**UPSIDE Gets the Green Light to Distribute Its Product in the Interstate Market**

40.     In July 2023, UPSIDE became the first manufacturer of cultivated meat or poultry to sell its product in the United States after passing three significant regulatory milestones.

41.     These milestones relate to a cultivated chicken product that looks, cooks, and tastes like a conventional boneless, skinless chicken cutlet.

42.     First, on November 16, 2022, UPSIDE became the first cultivated meat producer to successfully complete the FDA's pre-market consultation process. As part of that process, the FDA evaluated UPSIDE's pre-harvest process. At the end of that evaluation, the FDA issued a scientific memorandum as well as a "no questions" letter to UPSIDE, stating that the FDA had no questions regarding the safety of UPSIDE's pre-harvest production process or the safety of foods composed of or containing cultivated chicken resulting from UPSIDE's production process. *See* Memorandum from Jeremiah Fasano to Administrative File, CCC 000002 (Nov. 14, 2022), https://www.fda.gov/media/163261/download; Letter from FDA to Nicole Berzins, Director of Regulatory Affairs, UPSIDE Foods (Nov. 16, 2022), https://www.fda.gov/media/163260/download.

43.     Second, on June 14, 2023, the USDA-FSIS approved UPSIDE's product label pursuant to the PPIA and USDA FSIS's implementing regulations.

44.     Third, on June 21, 2023, the USDA-FSIS issued UPSIDE a Grant of Inspection, allowing the company to begin selling its cultivated poultry product in interstate commerce under federal inspection pursuant to the PPIA and USDA-FSIS's implementing regulations.

45.     As an Inspected Establishment, UPSIDE's facility is subject to routine USDA-FSIS inspection at the same "inspection frequency also required for processing traditional meat and poultry products." USDA-FSIS, *Human Food Made with Cultured Animal Cells*, https://www.fsis.usda.gov/inspection/compliance-guidance/labeling/labeling-policies/human-food-made-cultured-animal-cells (last visited Aug. 12, 2024).

46.     Because UPSIDE has satisfied all applicable regulatory requirements for the sale of its cultivated chicken product, it is lawful for UPSIDE to manufacture its product and distribute it in interstate commerce.

47.     UPSIDE has already begun distributing its cultivated chicken both in California and in the interstate market.

48.     UPSIDE has previously offered its cultivated chicken for sale at a restaurant in California.

49.     UPSIDE has distributed its product in Nevada, Texas, and New York.

50.     Before the law challenged in this case went into effect, UPSIDE had also sold and distributed its product within Florida. It held a tasting event in Miami that took place on June 27, 2024.

51.     At that event, UPSIDE engaged with Florida chefs and businesses to serve its chicken to consumers who were eager to try UPSIDE's innovative product.

52.     UPSIDE does not wish to force or trick anyone into eating its product.

53.     UPSIDE does not wish to force or trick anyone into not eating conventional meat products.

54.     UPSIDE does want to provide willing consumers, including Floridians, the opportunity to try and enjoy its product.

55.     UPSIDE wants to showcase its product around the nation—including Florida—for the purpose both of demonstrating cutting-edge innovation and of dispelling false conceptions regarding what cultivated meat represents.

56.     UPSIDE had planned to distribute its product at the upcoming Art Basel event in Miami, which will take place December 6–8, 2024.

57.     Besides this specific event, UPSIDE wishes to continue developing business relations with chefs and distributors located within Florida.

58.     However, UPSIDE may no longer distribute or offer to sell its product within Florida without violating Florida law and thereby exposing itself (and any potential business partner) to criminal penalties.

**Florida Bans Cultivated Meat to Protect In-State Agricultural Interests**

59.     On May 1, 2024, Florida Governor Ron DeSantis signed SB 1084, making Florida the first state in the country to ban the manufacture, distribution, or sale of cultivated meat. The law went into effect on July 1, 2024.

60.     Among other things, that ban makes it a second-degree misdemeanor "for any person to manufacture for sale, sell, hold or offer for sale, or distribute cultivated meat in this state." Fla. Stat. § 500.452(1).

61.     Violating the ban carries a penalty of up to 60 days' imprisonment and $500 in fines. Fla. Stat. §§ 775.082(4)(b); 775.083(e).

62.     Food establishments that violate the ban risk revocation or suspension of their operating permit, as well as administrative fines of up to $5,000 per violation. Fla. Stat. §§ 500.121(1)(b), 570.971(1)(b).

63.     Any product found to be in violation of the ban is subject to an immediate stop-sale order by the Florida Department of Agriculture and Consumer Services. The Department also has authority to order that products that violate the ban be embargoed or detained and may seek a court order that the product be destroyed. Fla. Stat. §§ 500.172, .452.

64.     Statements at both the signing event for SB 1084 and throughout the legislative history of its enactment make clear that the intent of the law was not to protect the public from any alleged danger posed by cultivated meat. Instead, those statements

reveal that the purpose of SB 1084 was to protect in-state agricultural interests from out-of-state competition.

65.     The signing event took place on May 1, 2024, in a rural Florida county that is known for cattle ranching. Video of the signing event is available at https://thefloridachannel.org/videos/5-1-24-signing-of-sb-1084-department-of-agriculture-and-consumer-services/.

66.     At that event, the governor spoke from behind a podium that featured a sign stating, "SAVE OUR BEEF."

67.     The only people who spoke at the signing event, other than public officials, were representatives of the Florida Cattlemen's Association (president and president-elect), a trade association that represents the interests of the state's cattle producers.

68.     The governor stated that cultivated meat—with its promise of significantly reducing environmental costs of meat production—might spur people to "finger agriculture as the problem" and cause them to "view[] things like raising cattle as destroying our climate."

69.     The governor also positively compared the ban to a different law that "ban[s] the Chinese Communist Party from purchasing land in the state of Florida."

70.     The governor also likened eating cultivated meat to eating insects.

71.     The governor did not voice any food-safety issue regarding cultivated meat products.

72.     Instead, the governor stated that the reason for the ban—and the reason why the signing took place in a rural county, and why "we have all these cattlemen here"—is because Florida has "put down the mark very clearly: We stand with agriculture, we stand with the cattle ranchers, we stand with our farmers."

73.     The governor stated that if cultivated meat sales are allowed in Florida, it would "wipe the people sitting here today out of business."

74.     In the governor's words, "it is really important we stand by our agriculture industry, . . . [and] our cattle ranchers, and that's what we're doing here today [by signing the ban]."

75.     After the governor spoke, Defendant Florida Commissioner of Agriculture Wilton Simpson gave remarks. As he explained, the ban is part of a larger effort to favor in-state agricultural interests.

76.     Like the governor, the commissioner likened the ban to another Florida law that bans foreign governments from purchasing agricultural land.

77.     The commissioner remarked that it is "Californians [who are participating in this crap."

78.     After the commissioner spoke, he was followed by the president and president-elect of the Florida Cattlemen's Association (Pat Durbin and Dale Carlton, respectively).

79.     Both men acknowledged that the purpose of the Ban is to protect their industry from out-of-state competition.

15

80.     Senator Jay Collins, who sponsored the Ban's legislation, also spoke at the signing event.

81.     The senator explained that the ban is an attempt to shield Florida's conventional meat industry from competition. In his words, "[o]ur agricultural community is disproportionately affected by things like NAFTA . . . . We cannot let agriculture fail in the state of Florida."

82.     After the senator, Governor DeSantis gave closing remarks.

83.     The governor explained that Florida has not banned plant-based meat substitutes (such as the Impossible Burger) because those are not marketed as "real" meat and, therefore, do not pose meaningful competition to Florida's commercial agriculture.

84.     By contrast, the governor explained, "what they're doing with [cultivated meat] is they want to say it's the same as raising cattle and doing it naturally, so there will be then no reason that you have this [conventional meat] industry. So it is designed to be a threat to agriculture as we know it. . . . [W]e're snuffing this out at the beginning."

85.     Florida has a robust conventional meat industry. As the governor stated at the signing event for the Ban, "some people think Florida is theme parks, South Beach, and maybe some oranges, but they don't really understand that we have one of the top cattle industries in the country."

86.     By contrast, there are no Florida-based producers of cultivated meat.

87.     Other evidence for the ban's protectionist purpose can be found in the Ban's legislative history.

88.     For example, at the March 6, 2024 Florida House session, the House sponsor of the ban (Rep. Danny Alvarez) stated: "If you believe that we are doing this because we know that Florida's agriculture can hold us down and provides plenty of safe, quality beef and agricultural products—you are absolutely correct." Video of that House session may be found at https://thefloridachannel.org/videos/3-6-24-house-session/.

89.     At that same House session, Representative Dean Black, who is also a cattle rancher, said that if Florida consumers want to try cultivated meat they should "go to California," but that they "sure as heck" should not be able to get it "here in Florida."

90.     The relevant Senate committee for evaluating the then-proposed Ban was the Florida Senate Appropriations Committee on Agriculture, Environment, and General Government.

91.     The relevant committee report acknowledged that cultivated meat is produced in a "controlled environment and prepared using conventional food processing and packaging methods." Fla. S. Comm. on Agric., S.B. 1084, 2024 Leg., Reg. Sess. (2024), at 19 https://www.flsenate.gov/Session/Bill/2024/1084/Analyses/2024s01084.aeg.PDF.

92.     The report did not identify any health risk associated with cultivated meat.

93.     The report acknowledged that the FDA and USDA have "a joint regulatory framework for human foods made from cultured cells of livestock and poultry

17

to help ensure that any such products brought to market are safe, unadulterated, and truthfully labeled." *Id.*

94.     At the committee hearing, groups that commented in support of the Ban included the Florida Cattlemen's Association, the Florida Poultry Federation, and the Florida Farm Bureau.

95.     At the committee hearing, groups that spoke in opposition included UPSIDE, as well as other cultivated-meat producers—all of whom are based outside of Florida.

96.     At the Florida House Session that took place on March 5, 2024, Representative Anna K. Eskamani introduced an amendment that would replace the Ban with a labeling requirement. That amendment did not pass.

97.     In a news release that accompanied the Ban's signing, Governor DeSantis stated that the Ban represents "investing in our local farmers and ranchers, and we will save our beef." News Release, *Governor DeSantis Signs Legislation to Keep Lab-Grown Meat Out of Florida* (May 1, 2024), https://www.flgov.com/2024/05/01/governor-desantis-signs-legislation-to-keep-lab-grown-meat-out-of-florida/.

*98.*     In the same news release, Defendant Commissioner Simpson stated that the Ban "protect[s] our incredible farmers," as cultivated meat is, in his words, "in direct opposition to authentic agriculture." *Id.*

**Injury to Plaintiff**

99.     Under federal law, it is lawful for UPSIDE to distribute and sell its cultivated chicken product throughout the country.

100.     Before Florida's ban went into effect, UPSIDE had begun a partnership with a Miami-based chef to distribute its cultivated chicken product in Florida. UPSIDE had identified other chefs in Miami and Tallahassee who were interested in partnering with UPSIDE to distribute its product.

101.     Before the ban, UPSIDE planned to distribute its product at the upcoming Art Basel exhibition in Miami, Florida, which runs from December 6–8, 2024. UPSIDE had also begun making plans to work with the same Miami-based chef to host a tasting event at the South Beach Wine and Food Festival on February 20, 2025, in Miami, Florida.

102.     Tasting events like these are an important part of UPSIDE's efforts to market its product to consumers and potential customers. For this reason, UPSIDE is currently working to solidify events in Los Angeles and Chicago for September of this year.

103.     Under the ban, tasting events like these are a crime. If UPSIDE were to distribute its product in Florida, it would expose itself and the local chefs and food establishments with which it wishes to partner to civil and criminal penalties as well as the embargo and destruction of its products.

104.    But for the ban, hundreds of Florida consumers would have the opportunity to try UPSIDE's product at tasting events in 2024, in the first quarter of 2025, and beyond.

105.    As a result of the ban, UPSIDE is enduring ongoing harm in the form of lost revenue, missed business and promotional opportunities, reputational damage, and loss of consumer goodwill.

106.    As a result of the ban, UPSIDE's missed opportunities and promotional events will include one-time-only events, such as the opportunity to distribute its product at the 2024 Art Basel exhibition and the 2025 South Beach Food and Wine Festival.

107.    As a result of the ban, UPSIDE is missing out on opportunities to continue working with local food establishments to distribute its products, because those food establishments would risk losing their licenses.

108.    By not being able to distribute its products through restaurants, UPSIDE loses not only revenue, but critical and irreplaceable opportunities to help grow the nascent market for cultivated meat and poultry by showing consumers how delicious it can taste.

109.    As a result of the ban, UPSIDE is also enduring ongoing reputational harm. In UPSIDE's view, statements made at the signing ceremony for SB 1084 falsely imply that there is something unwholesome or otherwise wrong with or gross about cultivated meat. Yet the ban deprives UPSIDE of the most straightforward means of dispelling these false implications: allowing consumers to try the product for themselves.

110.    The ban is already contributing to the fragmentation of the interstate market in meat and poultry. Already, Alabama has followed Florida's lead and banned distribution of cultivated meat. *See* Ala. Laws Act 2024-252 (S.B. 23), *codified at* Ala. Stat. § 20-1-8. Officials in Arizona, Kentucky, Iowa, Michigan, New York, Pennsylvania, Tennessee, Texas, and West Virginia have introduced similar bans on the manufacture, distribution, and sale of cultivated meat.

111.    This growing patchwork of conflicting state laws governing cultivated meat also harms UPSIDE by making it more difficult for UPSIDE to partner with national meat distributors, who generally will not carry products they cannot lawfully sell in every state.

112.    For the same reason, Florida's ban also makes it much more difficult for UPSIDE to partner with restaurant groups. For example, Florida is the headquarters of the world's largest full-service restaurant company and one of the largest quick service restaurants in the country, both of which are key long-term customer targets of UPSIDE's. The ban makes it impossible for these potential partners to distribute UPSIDE's products in the third most populous state in the country.

113.    Even when these ongoing harms are reducible to a dollar figure, they are irreparable because Florida state entities enjoy sovereign immunity from money damages under the Eleventh Amendment.

114.    But for the ban, UPSIDE would immediately resume its partnership with the Miami-based chef with whom UPSIDE worked previously to offer cultivated chicken

at her restaurant, with the goal of making the product available to restaurant patrons on a limited basis by the first quarter of 2025.

115.     But for the ban, UPSIDE would also partner with that chef to host tasting events at the 2024 Art Basel exhibition and the 2025 South Beach Wine and Food Festival.

116.     But for the ban, UPSIDE would immediately resume reaching out to other chefs in other cities in Florida with the same goal of selling its product in the short and longer term.

117.     But for the ban, UPSIDE would distribute its product to Florida consumers at events like Art Basel and the South Beach Wine and Food Festival in 2025 and beyond.

118.     Absent judicial intervention, UPSIDE will continue suffering these irreparable harms.

## CONSTITUTIONAL VIOLATIONS

### First Claim for Relief

### (Supremacy Clause – Federal Preemption – PPIA Ingredients Clause)

119.     Plaintiff incorporates and realleges the allegations in ¶¶ 1–118 of this complaint as though set forth in this section.

120.     The Supremacy Clause provides that the United States Constitution and the laws of the United States "shall be the supreme Law of the Land; and the Judges in

every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

121.     Through the Poultry Products Inspection Act ("PPIA"), 21 U.S.C. §§ 451–73, Congress has enacted a regulatory framework for the production and distribution of poultry products.

122.     Congress's goal with the PPIA was to facilitate a uniform, nationwide market of safe poultry products.

123.     A patchwork of differing state regulations regarding the ingredients allowable in those products would hinder Congress's goals in enacting the PPIA.

124.     Accordingly, Congress has enacted legislation explicitly providing that states "may not . . . impose[]" on an entity subject to the PPIA any "ingredient requirements in addition to, or different than, those made under [the PPIA]." 21 U.S.C. § 467e.

125.     Pursuant to the PPIA, as well as other federal legislation, USDA, in conjunction with FDA, regulates the production and distribution of cultivated poultry products.

126.     Pursuant to the PPIA, as well as other federal legislation, USDA has established regulations for the safe production and distribution of poultry products, which apply to both conventional and cultivated poultry products.

127.      Under the PPIA, cultivated chicken cells and poultry meat made from such cells are allowable ingredients in poultry food products, and USDA has authorized

the use of such ingredients in certain products, including UPSIDE's cultivated chicken product.

128.    Florida has prohibited distribution of UPSIDE's product solely because it contains or is made from cultivated chicken cells.

129.    By preventing UPSIDE from distributing its cultivated chicken product solely on the basis that the product contains or is made from cultivated chicken cells (i.e., solely on the basis that the product contains a specific "physical or chemical component"), Florida (and Defendants in their official capacity) is imposing an "ingredient requirement" under section 467e of the PPIA. *See Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra*, 870 F.3d 1140, 1147–48 (9th Cir. 2017) (holding that "ingredient requirements" refer to "the physical components that comprise a poultry product").

130.    Because USDA, through its existing statutory authority, has established ingredient requirements that apply to cultivated poultry products (and has expressly allowed for the use of cultivated chicken cells in UPSIDE's product), *see* FSIS Guideline 7800.1, Florida (and Defendants in their official capacity) is imposing an "ingredient requirement[] in addition to, or different than, those made under [the PPIA]." 21 U.S.C. § 467e.

131.    Therefore, Florida's ban is expressly preempted by federal law and invalid under the Supremacy Clause.

132.     UPSIDE has suffered, and absent judicial intervention will continue to suffer, irreparable harm resulting from Defendants' enforcement of the ban. This includes lost business, sales, and promotional opportunities, as well as ongoing reputational harm.

133.     UPSIDE has no adequate remedy at law for these ongoing harms.

134.     Accordingly, UPSIDE seeks a declaration that the ban violates the Supremacy Clause, and an injunction prohibiting Defendants from enforcing the ban.

**Second Claim for Relief**

**(Supremacy Clause – Federal Preemption – PPIA Facilities Clause)**

135.     Plaintiff incorporates and realleges the allegations in ¶¶ 1–118 of this complaint as though set forth in this section.

136.     The Supremacy Clause provides that the United States Constitution and the laws of the United States "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

137.     Through the Poultry Products Inspection Act ("PPIA"), 21 U.S.C. §§ 451–73, Congress has enacted a regulatory framework for the production and distribution of poultry products.

138.     Congress's goal with the PPIA was to facilitate a uniform, nationwide market of safe poultry products.

139.    A patchwork of differing state regulations regarding the safe production and distribution of those products would hinder Congress's goals in enacting the PPIA.

140.    Accordingly, Congress has explicitly stated that states "may not . . . impose[]" on an entity subject to the PPIA a "[r]equirement[] . . . with respect to premises, facilities and operations of any establishment at which inspection is provided under [the PPIA], which are in addition to, or different than those made under [the PPIA]." 21 U.S.C. § 467e.

141.    The Supreme Court, in examining the materially identical preemption provision of the FMIA, has held that it "sweeps widely" and that it "prevents a State from imposing any additional or different—even if non-conflicting—requirements that fall within the scope of the [FMIA] and concern an [inspected establishment's] facilities or operations." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459–60 (2012).

142.    The Supreme Court, in examining the materially identical preemption provision of the FMIA, has also held that states cannot circumvent its preemptive sweep "just by framing [a law] as a ban on the sale of meat produced in whatever way the State disapproved," for "[t]hat would make a mockery of the FMIA's preemption provision." *Id.* at 464.

143.    Pursuant to the PPIA, as well as other federal legislation, USDA, in conjunction with FDA, regulates the production and distribution of cultivated chicken products.

144.   Pursuant to the PPIA, as well as other federal legislation, USDA has established regulations for the safe production and distribution of poultry products, including cultivated chicken products.

145.   USDA has issued a Grant of Inspection for UPSIDE's manufacturing facility and the facility is subject to routine inspection by USDA-FSIS.

146.   Florida has prohibited distribution of UPSIDE's cultivated chicken product despite the fact that the product is produced in a USDA-inspected facility and in accordance with the operational requirements established by USDA.

147.   By preventing UPSIDE from manufacturing, distributing, and selling cultivated chicken that is produced in accordance with federal requirements for poultry facilities, Florida (and Defendants in their official capacity) is "substitut[ing] a new regulatory scheme for the one the FSIS uses," *Nat'l Meat Ass'n*, 565 U.S. at 460, and therefore is imposing a "[r]equirement[] . . . with respect to premises, facilities and operations of any establishment at which inspection is provided under [the PPIA], which are in addition to, or different than those made under [the PPIA]," 21 U.S.C. § 467e.

148.   Therefore, the ban is expressly preempted by federal law and invalid under the Supremacy Clause.

149.   UPSIDE has suffered, and absent judicial intervention will continue to suffer, irreparable harm resulting from Defendants' enforcement of the ban. This includes lost business, sales, and promotional opportunities, as well as ongoing reputational harm.

150.    UPSIDE has no adequate remedy at law for these ongoing harms.

151.    Accordingly, UPSIDE seeks a declaration that the ban violates the Supremacy Clause, and an injunction prohibiting Defendants from enforcing the ban.

### Third Claim for Relief

### (Dormant Commerce Clause)

152.    Plaintiff incorporates and realleges the allegations in ¶¶ 1–118 of this complaint as though set forth in this section.

153.    The Commerce Clause grants Congress the authority to regulate commerce among the states. U.S. Const. art. I, § 8, cl. 3.

154.    Implicit in that grant is a restriction on states from enacting laws that discriminate against, or unduly burden, interstate commerce. This restriction is commonly referred to as the "Dormant" (or "Negative") Commerce Clause.

155.    Even a law that is facially neutral—nominally treating in-state and out-of-state interests the same—may violate the Dormant Commerce Clause if the law's purpose or effect is to discriminate against interstate commerce.

156.    SB 1084 was enacted with a discriminatory purpose and operates with discriminatory effect to benefit in-state agricultural interests at the expense of out-of-state competition.

157.    There are no producers of cultivated meat in Florida. All current producers of cultivated meat, even before the ban was enacted, are located outside Florida.

158.    Florida has a robust agricultural industry that produces conventional meat and poultry.

159.    Cultivated meat and poultry products compete with conventional meat and poultry products by allowing consumers to enjoy the taste of conventional meat and poultry without raising the ethical, environmental, health, or other concerns associated with the large-scale production of conventional meat and poultry.

160.    SB 1084 was enacted with the primary purpose of shielding in-state agricultural interests from this interstate competition. And it operates with discriminatory effect, by banning distribution of a product that is produced solely outside the state and that otherwise would compete with in-state conventional meat producers.

161.    There is no other legitimate justification for SB 1084.

162.    The governor's alleged goal of "fighting back" against the "global elite" who would allegedly "force" consumers to eat cultivated meat is not a legitimate justification for SB 1084 because UPSIDE and companies like it have no power to force consumers to buy or eat foods that they do not like.

163.    Nor does UPSIDE want to force its product on unwilling consumers. It wants only the right to sell or give its product to willing consumers.

164.    SB 1084 is also not supported by any adequate health or safety justification.

165.    The safety and healthfulness of cultivated meat and poultry is subject to the same standards of federal regulation as conventional meat and poultry.

29

166.     If anything, cultivated meat and poultry poses fewer health and safety concerns than conventional meat because it is grown under clean and controlled conditions and thus not exposed to animal waste, animal pathogens, or environmental toxins.

167.     Even if there were a legitimate, nondiscriminatory justification for SB 1084—such as preventing consumer confusion over the nature of UPSIDE's product—Florida has a variety of less burdensome alternatives, such as disclosure requirements for food establishments that ensure cultivated meat or poultry is not sold as conventional meat or poultry.

168.     UPSIDE has suffered, and absent judicial intervention will continue to suffer, irreparable harm resulting from Defendants' enforcement of the ban. This includes lost business, sales, and promotional opportunities, as well as ongoing reputational harm.

169.     UPSIDE has no adequate remedy at law for these ongoing harms.

170.     Accordingly, UPSIDE seeks a declaration that the ban violates the Dormant Commerce Clause and an injunction prohibiting Defendants from enforcing the ban.

### REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests relief as follows:

1.     For entry of judgment declaring that Florida Statute § 500.452, and the rules and regulations promulgated thereunder are unconstitutional on their face and as

applied to the extent they violate the Supremacy Clause and the dormant aspect of the

Commerce Clause.

     2.     For entry of preliminary and permanent injunctions against Defendants,

prohibiting the enforcement of these regulations, laws, rules, and policies;

     3.     For an award of attorneys' fees, costs, and expenses in this action pursuant

to 42 U.S.C. § 1988; and

     4.     For such further legal and equitable relief as the Court may deem just and

proper.

Dated: August 12, 2024

                                   Respectfully submitted,

                                   INSTITUTE FOR JUSTICE

                                   /s/ Ari Bargil
                                   Ari Bargil (FL Bar No. 71454)
                                   2 S. Biscayne Boulevard, Suite 3180
                                   Miami, FL 33131
                                   Tel: (305) 721-1600
                                   Fax: (305) 721-1601
                                   Email: abargil@ij.org

                                   Paul M. Sherman
                                   Suranjan Sen*
                                   INSTITUTE FOR JUSTICE
                                   901 North Glebe Road, Suite 900
                                   Arlington, VA 22203
                                   Telephone: (703) 682-9320
                                   Fax: (703) 682-9321
                                   Email: psherman@ij.org; ssen@ij.org

                                   *Pro hac vice application forthcoming.

                                   *Attorneys for Plaintiff*