# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

UPSIDE FOODS, INC.
      Plaintiff,

v.

WILTON SIMPSON, et al.
      Defendants.

Civil Action No.
4:24-cv-00316-MW-MAF

---

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

---

## INTRODUCTION

This case is a constitutional challenge to Florida's recently enacted SB 1084, a law that prohibits the sale of safe, innovative food products. Plaintiff UPSIDE Foods, Inc. (UPSIDE) is a start-up based in Berkeley, California, and a leading producer of cultivated chicken. Unlike conventional chicken, which is harvested from birds that are raised for slaughter, UPSIDE's cultivated chicken product is produced by growing real chicken cells in clean and controlled facilities that are regulated and inspected by the USDA and the FDA. Using this technology, UPSIDE is able to reproduce the taste and

texture of conventional chicken without the necessity of butchering chickens.

UPSIDE has distributed its cultivated chicken products at restaurants and tasting events throughout the country, including in Florida. Consumers are drawn to UPSIDE's product because it offers an ethical alternative to conventional meat, while providing a taste and texture they view as superior to plant-based meat alternatives. Simply put, consumers and restaurateurs like UPSIDE's product because it tastes like chicken, which isn't surprising, since it's made from chicken.

But on May 1, 2024, Florida enacted SB 1084, becoming the first state in the nation to ban the manufacture, distribution, or sale of cultivated meat. In doing so, Florida did not cite concerns that cultivated meat is less healthy or safe than conventional meat. Instead, Governor DeSantis announced that Florida was "fighting back" against the "authoritarian goals" of the "global elite," whom he alleged would force consumers to eat cultivated meat. The governor also announced that the law was part of his administration's "focus on investing in our local farmers and ranchers" and an effort to "save our beef." Florida's Commissioner of Agriculture echoed these statements,

describing the law as "protect[ing] our incredible farmers" and as a means to "keep Florida's agricultural industry strong and thriving."[1]

UPSIDE doesn't want to force anyone to eat cultivated meat. But it does want the opportunity to distribute its product to willing consumers, so that those consumers can decide for themselves whether UPSIDE's product is worth eating. And UPSIDE has a right to do so, because SB 1084 is unconstitutional.

This Court should preliminarily enjoin SB 1084 because it violates the Supremacy Clause of Article VI of the Constitution. Under this clause, the Constitution and laws enacted under its authority are the "supreme law of the land." This constitutional principle manifests in the doctrine of federal preemption, under which state laws that conflict with validly enacted federal laws may be declared void.

Here, SB 1084 directly conflicts with the Poultry Products Inspection Act, which expressly preempts state laws that impose requirements that differ from, or exceed, those established by federal law with regard to (1) the

---

[1] News Release, *Governor DeSantis Signs Legislation to Keep Lab-Grown Meat Out of Florida* (May 1, 2024), https://www.flgov.com/2024/05/01/ governor-desantis-signs-legislation-to-keep-lab-grown-meat-out-of-florida/.

ingredients that can be lawfully used to produce poultry products or (2) the premises, facilities, or operations of any establishment in which those products are produced. Florida's law does both. Federal law authorizes the use of cultivated cells as ingredients in meat and poultry products, and it regulates the facilities in which cultivated meat and poultry products are processed. Florida law contravenes these requirements by forbidding the use of cultivated cells in the production of meat and poultry and by prohibiting federally regulated facilities from producing cultivated meat and poultry products. Because SB 1084 directly forbids the use of ingredients as well as production processes and other operations that federal law allows, it is preempted, and UPSIDE thus has a likelihood of success on the merits.

UPSIDE also satisfies the other preliminary injunction factors. The company faces irreparable harm due to SB 1084 not only because it cannot recover its economic losses against the state due to Eleventh Amendment immunity, but also because it is suffering a variety of ongoing irreparable harms including loss of customer goodwill, damage to its industry's reputation, and the loss of irreplaceable business and marketing opportunities that are critical to startups in emerging industries. The state

and the public, by contrast, stand to suffer no harm at all if this Court grants a preliminary injunction. The state has no valid interest in enforcing an unconstitutional law, while consumers have a strong interest in both the free flow of goods in the interstate market and the freedom to decide for themselves what foods they wish to eat.

This Court should thus grant Plaintiff's motion for preliminary injunction to allow UPSIDE to distribute and sell cultivated meat in Florida while this lawsuit moves forward.

## STATEMENT OF FACTS

### I. UPSIDE and Cultivated Meat

UPSIDE Foods, Inc., is a start-up company based in Berkeley, California, and founded in 2015 by Uma Valeti, a cardiologist and the company's CEO. Valeti Decl. ¶¶ 3–4, 9. Dr. Valeti first became interested in alternatives to conventional meat in the mid-1990s while he was still in training to become a cardiologist. *Id*. ¶¶ 5–8. While running the student kitchen at his medical school, he had to take a trip to a local slaughterhouse to buy several hundred pounds of meat. *Id*. ¶ 7. The experience left him convinced that there had to be a better way to produce meat. *Ibid*. Two

decades later, Dr. Valeti founded Memphis Meats, which has since been renamed UPSIDE, which was the first company in the United States to sell "cultivated" meat. *Id.* ¶¶ 9–10.

Cultivated (or "cultured") meat consists of animal cells that are grown directly, rather than being grown inside an animal. *Id.* ¶ 10. To produce cultivated meat, the manufacturer acquires and banks animal cells, then places these cells within a vessel known as a cultivator. *Id.* ¶ 11. Inside the cultivator, the cells are supplied with the same sort of nutrients that they would receive in an animal's body. *Ibid.* This allows the cells to grow into meat. *Ibid.* Once grown, these cells can be harvested and formulated to replicate the sensory and taste profile of conventional meat. *Id.* ¶ 12.

UPSIDE is a leading innovator and producer of cultivated meat. It produced the world's first cultivated chicken and duck meat, and it has also innovated various cultivated beef products, including the world's first cultivated beef meatball in 2016. *Id.* ¶ 15. For consumers with ethical, environmental, or health-related reasons to avoid consuming conventional meat, cultivated meat offers a number of benefits. *Id.* ¶¶ 16–20. Most

obviously, cultivated meat does not require the large-scale slaughter of animals that is necessary for the production of conventional meat. *Id.* ¶ 16.

Because producing cultivated meat does not require the raising of live animals, it also limits many of the environmental costs associated with the production of conventional meat. *Id.* ¶ 17. These include costs associated with producing and transporting animal feed, as well as raising and transporting livestock to processing facilities. *Ibid.* They also include things like greenhouse-gas emissions created by livestock and the pollution created by animal waste. *Ibid.*

Cultivated meat also offers a variety of potential health benefits over conventional meat. *Id.* ¶ 18. For example, because cultivated meat is grown in clean and controlled environments that are subject to constant monitoring and control, and because it is never exposed to animal waste, it poses fewer risks of environmental contamination, whether by pathogens or disease-causing microorganisms. *Id.* ¶¶ 18–19.

Besides appealing to consumers who have these concerns, cultivated meat also appeals to consumers who simply enjoy trying new food products and are excited to experience cutting-edge products like UPSIDE's for

themselves. *Id*. ¶ 21. And because cultivated meat is made from animal cells, it allows consumers to enjoy these benefits without having to sacrifice the taste and texture of conventional meat. *Id*. ¶ 12.

## II.      Federal Regulation of Cultivated Meat

Exercising its power under the Commerce Clause of Article I, section 8 of the Constitution, Congress has enacted a variety of laws that regulate the interstate market for food, including specifically meat and poultry products.

For cultivated meat, regulatory oversight is divided between the U.S. Department of Agriculture's (USDA) Food Safety and Inspection Service (FSIS) and the U.S. Department of Health and Human Services' Food and Drug Administration (FDA). In March 2019, the USDA and the FDA announced a formal agreement for how the federal government would apply existing laws to the manufacture, distribution, and sale of cultivated meat and poultry. FDA, *USDA and FDA Announce a Formal Agreement to Regulate Cell-Cultured Food Products from Cell Lines of Livestock and Poultry* (Mar. 7, 2019), https://www.fda.gov/news-events/press-announcements/usda-and-

fda-announce-formal-agreement-regulate-cell-cultured-food-products-cell-lines-livestock-and.

Under that formal agreement, the FDA oversees cell collection, cell banks, and cell growth and differentiation. *Formal Agreement Between the U.S. Dep't of Health & Hum. Servs. FDA & U.S. Dep't of Agric. Off. of Food Safety*, https://www.fsis.usda.gov/sites/default/files/media_file/2020-07/Formal-Agreement-FSIS-FDA.pdf (last visited Aug. 23, 2024). When cultivated livestock and poultry cells are harvested, oversight transfers from FDA to FSIS, which then oversees the production and labeling of human food products derived from the cells of livestock and poultry. *Id.*

FSIS is responsible for enforcing two federal laws that are particularly relevant to the production of cultivated meat and poultry products: the Federal Meat Inspection Act (FMIA), 21 U.S.C. §§ 601–95, and the Poultry Products Inspection Act (PPIA), 21 U.S.C. §§ 451–73. In passing the FMIA and the PPIA, Congress sought to facilitate a nationwide market of safe-to-consume meat and poultry products. For that reason, Congress explicitly provided that both the FMIA and PPIA would preempt state regulatory

provisions that exceed or differ from federal regulations promulgated pursuant to those Acts.

Two of those preemption provisions are relevant here. First, both Acts provide that states "may not . . . impose[]" any "ingredient requirements in addition to, or different than, those made under [the FMIA or PPIA]." 21 U.S.C. §§ 467e, 678. Second, both Acts provide that states "may not . . . impose" any "[r]equirements . . . with respect to premises, facilities and operations of any establishment at which inspection is provided under [the FMIA or PPIA], which are in addition to, or different than those made under [the FMIA or PPIA]." 21 U.S.C. §§ 467e, 678.

Under its existing statutory authority, the USDA has promulgated ingredient requirements that govern the use of ingredients in meat and poultry products, including cultivated meat and poultry products. *See, e.g.*, U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat & Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/sites/default/files/media_file/ documents/7800.1.pdf (providing, in part, that "[i]ngredients listed as approved for meat in 9 CFR 424.21(c) or FSIS Directive 7120.1 may be used

in cell-cultured meat food products, and ingredients listed as approved for poultry may be used in cell-cultured poultry food products, provided the intended use is consistent in terms of the application . . . product type . . . and any other criteria listed"). The USDA has also stated that its existing inspectional regime for facilities that produce meat or poultry products is "immediately applicable" to facilities that produce cultivated meat and poultry products. U.S. Dep't of Agric., *Human Food Made with Cultured Animal Cells* (Aug. 17, 2023), https://www.fsis.usda.gov/inspection/ compliance-guidance/labeling/labeling-policies/human-food-made-cultured-animal-cells; *see also* FSIS Notice 31-23, *Updated Cell-Cultured Meat & Poultry Food Products Sampling Program* (June 29, 2023), https:// www.fsis.usda.gov/sites/default/files/media_file/documents/31-23.pdf (providing instructions to inspection program personnel on sampling and inspections at facilities that produce cultivated meat and poultry).

### III.     UPSIDE Receives Federal Authorization to Sell Its Cultivated Chicken and Begins Distributing It Nationwide.

In July 2023, UPSIDE became the first manufacturer of cultivated meat or poultry to sell its product in the United States after passing three significant regulatory milestones. These milestones relate to a cultivated

chicken product that looks, cooks, and tastes, like a conventional boneless, skinless chicken cutlet. Valeti Decl. ¶¶ 26–33.

First, on November 16, 2022, UPSIDE became the first cultivated meat producer to successfully complete the FDA's pre-market consultation process. At the end of that evaluation, the FDA issued a scientific memorandum as well as a "no questions" letter to UPSIDE, stating that the FDA had no questions regarding the safety of UPSIDE's pre-harvest production process or the safety of foods composed of or containing cultivated chicken resulting from UPSIDE's production process. *See* Memorandum from Jeremiah Fasano to Administrative File, CCC 000002 (Nov. 14, 2022), https://www.fda.gov/media/163261/download; Letter from FDA to Nicole Berzins, Director of Regulatory Affairs, UPSIDE Foods (Nov. 16, 2022), https://www.fda.gov/media/163260/download; Valeti Decl. ¶¶ 28–29.

Second, on June 14, 2023, the USDA-FSIS approved UPSIDE's product label pursuant to the PPIA and USDA FSIS's implementing regulations. Valeti Decl. ¶ 30.

Third, on June 21, 2023, the USDA-FSIS issued UPSIDE a Grant of Inspection, allowing the company to begin selling its cultivated poultry product in interstate commerce under federal inspection pursuant to the PPIA and USDA-FSIS's implementing regulations. Valeti Decl. ¶ 31. As an Inspected Establishment, UPSIDE's facility is subject to routine USDA-FSIS inspection at the same "inspection frequency also required for processing traditional meat and poultry products." USDA-FSIS, *Human Food Made with Cultured Animal Cells*, https://www.fsis.usda.gov/inspection/compliance-guidance/labeling/labeling-policies/human-food-made-cultured-animal-cells (last visited Aug. 23, 2024); Valeti Decl. ¶ 32.

After achieving these milestones, UPSIDE began distributing its cultivated chicken both in California and in the interstate market. Valeti Decl. ¶ 33. Among other places, UPSIDE has distributed its cultivated chicken for sale at a restaurant in California. *Ibid*. UPSIDE has also sold its product in Nevada, Texas, and New York. *Ibid*.

UPSIDE has also sold and distributed its product within Florida. *Ibid*. It distributed its product at a tasting event in Miami that took place on June 27, 2024 (before Florida's ban went into effect). *Id*. ¶ 34. At that event,

UPSIDE engaged with Florida chefs and businesses to serve its chicken to consumers who were eager to try UPSIDE's innovative product. *Id.* ¶ 35.

Tasting events like these are an important part of UPSIDE's business because they allow UPSIDE to showcase its product for the purpose both of demonstrating cutting-edge innovation and of dispelling false conceptions regarding what cultivated meat represents. *Id.* ¶¶ 36–37. UPSIDE had planned to host another tasting event at the upcoming Art Basel event in Miami, which will take place December 6–8, 2024, and had begun talks with a Miami-based chef to host another tasting event at the South Beach Wine and Food Festival on February 20, 2025. *Id.* ¶¶ 38–39.

Besides these specific events, UPSIDE wishes to continue developing business relations with chefs and distributors located within Florida. *Id.* ¶ 40. However, UPSIDE may no longer distribute its product within Florida, without violating Florida law and thereby exposing itself (and any potential business partners) to criminal penalties. *Id.* ¶¶ 44–46.

## IV.    Florida Bans Federally Authorized Cultivated Meat to Protect In-State Agricultural Interests from Out-of-State Competition

On May 1, 2024, Florida's governor signed SB 1084, making Florida the first state in the country to ban the manufacture, distribution, or sale of

cultivated meat. The law went into effect on July 1, 2024. *See* S.B. 1084, § 50, 2024 Leg., Reg. Sess. (Fla. 2024).

Among other things, that ban makes it a second-degree misdemeanor "for any person to manufacture for sale, sell, hold or offer for sale, or distribute cultivated meat in this state." Fla. Stat. § 500.452. Violating the ban carries a penalty of up to 60 days' imprisonment and $500 in fines. Fla. Stat. §§ 775.082(4)(b); 775.083(1)(e). Food establishments that violate the ban also risk revocation or suspension of their permit, as well as administrative fines of up to $5,000 per violation. Fla. Stat. §§ 500.121(1)(b), 570.971(1)(b).

Any product found to be in violation of the ban is subject to an immediate stop-sale order by the Florida Department of Agriculture and Consumer Services. The Department also has authority to order that products that violate the ban be embargoed or detained and may seek a court order that the product be destroyed. Fla. Stat. §§ 500.172, .452.

Although Florida has a robust conventional meat industry, it has no cultivated-meat industry. Valeti Decl. ¶¶ 41–43. All cultivated-meat companies in the United States are currently based outside of Florida. *Id.*

¶ 42. And statements at both the signing event for SB 1084 and throughout the legislative history of its enactment make clear that the intent of the law was to protect Florida's in-state agricultural interests from out-of-state competition.

Start with the signing event, which took place on May 1, 2024. Sherman Decl. ¶ 4. At that event, Governor DeSantis spoke from behind a podium that featured a sign stating, "SAVE OUR BEEF." *Id*. ¶¶ 5, 8. During his remarks, the governor did not suggest that cultivated meat poses any threat to public health or safety. Instead, his remarks focused on the competitive threat that cultivated meat poses to the state's agricultural industry.

The governor stated that cultivated meat—with its promise of significantly reducing environmental costs of meat production—might spur people to "finger agriculture as the problem" and cause them to "view[] things like raising cattle as destroying our climate." *Id*. ¶ 7. The governor stated that the reason for the ban—and the reason the signing took place in a rural county, and why "we have all these cattlemen here"—is Florida has

"put down the marker very clearly: We stand with agriculture, we stand with the cattle ranchers, we stand with our farmers." *Id*. ¶ 8.

The governor went on to state that if cultivated meat sales are allowed in Florida, it would "wipe the people sitting here today out of business." *Id*. ¶ 9. In the governor's words, it was "really important that we stand by our agriculture industry, . . . [and] our cattle ranchers, and that's what we're doing here today [by signing the ban]." *Id*. ¶ 10.

After the governor spoke, Defendant Florida Commissioner of Agriculture Wilton Simpson gave remarks that echoed these sentiments. *Id*. ¶ 11. As he explained, the ban is part of a larger effort to favor in-state agricultural interests. *Ibid*. Among other things, the commissioner remarked that it is "Californians [who] are participating in this crap." *Id*. ¶ 12.

After the commissioner spoke, he was followed by the president and president-elect of the Florida Cattlemen's Association. *Id*. ¶ 13. Both men acknowledged that the purpose of the ban is to protect their industry from out-of-state competition. *Ibid*. Senator Jay Collins, who sponsored the ban's legislation, echoed these remarks. In his words, "[o]ur agricultural

community is disproportionately affected by things like NAFTA . . . . We cannot let agriculture fail in the state of Florida." *Id.* ¶ 15.

Following the senator's comments, Governor DeSantis gave closing remarks. *Id.* ¶ 16. The governor explained that Florida has not banned plant-based meat substitutes (such as the Impossible Burger) because those are not marketed as "real" meat and, therefore, do not pose meaningful competition to Florida's commercial agriculture. *Id.* ¶ 17. By contrast, the governor argued, cultivated meat "is designed to be a threat to agriculture as we know it. . . . [W]e're snuffing this out at the beginning." *Id.* ¶ 18.

These remarks at the signing ceremony were consistent with remarks made throughout the enactment process of SB 1084. For example, at the March 6, 2024 Florida House session, the House sponsor of the ban (Rep. Danny Alvarez) stated: "If you believe that we are doing this because we know that Florida's agriculture can hold us down and provides plenty of safe, quality beef and agricultural products—you are absolutely correct." *Id.* ¶ 20. At that same House session, Representative Dean Black, who is himself a professional cattle rancher, said that if Florida consumers want to

try cultivated meat they should "go to California," but that they "sure as heck" should not be able to get it "here in Florida." *Id.* ¶ 21.

The relevant Senate committee report did not identify any health risk associated with cultivated meat. Instead, the report acknowledged that cultivated meat is produced in a "controlled environment and prepared using conventional food processing and packaging methods." Fla. S. Comm. on Agric., S.B. 1084, 2024 Leg., Reg. Sess. (2024), https://www.flsenate. gov/Session/Bill/2024/1084/Analyses/2024s01084.aeg.PDF, at 19. The report also acknowledged that the FDA and USDA have "a joint regulatory framework for human foods made from cultured cells of livestock and poultry to help ensure that any such products brought to market are safe, unadulterated, and truthfully labeled." *Ibid.*

**V.      Ongoing Irreparable Harm to UPSIDE**

As a result of Florida's ban on cultivated meat, UPSIDE has suffered

and will continue to suffer an array of irreparable harms. Valeti Decl. ¶¶ 50–

57.

Before Florida's ban went into effect, UPSIDE had begun a

partnership with a Miami-based chef to distribute its cultivated-chicken

product in Florida. *Id*. ¶ 44. UPSIDE had identified other chefs in Miami

and Tallahassee who were interested in partnering with UPSIDE to

distribute its product. *Id*. ¶ 45.

Before the ban, UPSIDE had plans to work with this same Miami-

based chef to distribute its product at the upcoming Art Basel exhibition in

Miami, which runs from December 6–8, 2024. *Id*. ¶ 44. UPSIDE had also

begun making plans to work with this chef to host a tasting event at the

South Beach Wine and Food Festival on February 20, 2025. *Ibid*.

As noted, tasting events like these are an important part of UPSIDE's

efforts to market its product to consumers. *Id*. ¶¶ 36, 49. For this reason,

UPSIDE is currently working to solidify events in Los Angeles and Chicago

20

for September of this year. *Id.* ¶ 37. But under the ban, tasting events like these are a crime in Florida. *Id.* ¶¶ 50–51. If UPSIDE were to distribute its product in Florida, it would expose itself—and the local chefs and food establishments with which it wishes to partner—to civil and criminal penalties, as well as the embargo and destruction of its products. *Id.* ¶¶ 46–48.

As a result of the ban, UPSIDE is enduring ongoing harm in the form of missed business and promotional opportunities, reputational damage, loss of consumer goodwill, and lost revenue. *Id.* ¶¶ 50–53. These missed opportunities and promotional events will include one-time-only events, such as the opportunity to distribute its product at the 2024 Art Basel exhibition and the 2025 South Beach Food and Wine Festival. *Id.* ¶¶ 49–50.

UPSIDE is also missing out on opportunities to continue working with local food establishments to distribute its products, because those food establishments would risk losing their operating licenses. *Id.* ¶ 46. This costs UPSIDE not only potential revenue, but critical and irreplaceable opportunities to help grow the nascent market for cultivated meat and poultry by showing consumers how delicious it can taste. *Id.* ¶¶ 50–51.

The ban is also causing UPSIDE to endure ongoing reputational harm. Statements made at the signing ceremony for SB 1084 falsely imply that there is something unwholesome or otherwise wrong with or gross about cultivated meat. Yet the ban deprives UPSIDE of the most straightforward means of dispelling these false implications: allowing consumers to try the product for themselves. *Id*. ¶ 51.

Finally, UPSIDE is enduring irreparable harm because the ban has directly contributed to the fragmentation of the interstate market in meat and poultry. *Id*. ¶ 53. Already, Alabama has followed Florida's lead and banned distribution of cultivated meat. *Ibid. See also* S.B. 23, 2024 Leg., Reg. Sess. (Ala. 2024). Officials in Arizona, Kentucky, Iowa, Michigan, New York, Pennsylvania, Tennessee, Texas, and West Virginia have introduced similar restrictions targeting the cultivated meat industry. Valeti Decl. ¶ 53. *See, e.g.*, H.B. 2121, 2024 Leg., Reg. Sess. (Ariz. 2024).

These conflicting state regulations of cultivated meat make it more difficult for UPSIDE to partner with national meat distributors, who generally prefer products they can lawfully sell in any state. Valeti Decl. ¶ 52. For the same reason, Florida's ban also makes it much more difficult for

UPSIDE to partner with restaurant groups. *Id.* ¶ 47. For example, Florida is the headquarters of the world's largest full-service restaurant company and one of the largest quick service restaurants in the country, both of which are key long-term customer targets of UPSIDE's. *Ibid.* The ban makes it impossible for these potential partners to distribute UPSIDE's products in the third most populous state in the country. *Ibid.*

Absent judicial intervention, UPSIDE will continue suffering these irreparable harms. If the ban were enjoined, however, UPSIDE would immediately resume its partnership with the Miami-based chef with whom it worked previously to offer cultivated chicken at her restaurant, with the goal of making the product available to restaurant patrons on a limited basis by the first quarter of 2025. *Id.* ¶ 56. UPSIDE would also partner with that chef to host tasting events at the 2024 Art Basel exhibition and the 2025 South Beach Wine and Food Festival, where thousands of Florida consumers would have the opportunity to try UPSIDE's product. *Id.* ¶ 55. UPSIDE would continue hosting similar tastings at future events like Art Basel in 2025 and beyond. *Ibid.* And UPSIDE would immediately resume reaching

out to other chefs in other cities in Florida with the same goal of selling its product in the short and longer term. *Id.* ¶ 57.

## ARGUMENT

UPSIDE is entitled to injunctive relief if it can show "(1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable injury unless an injunction issues; (3) this threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction would not be adverse to the public interest." *Honeyfund.com Inc. v. Governor of Florida*, 94 F.4th 1272, 1277 (11th Cir. 2024) (cleaned up). As shown below, UPSIDE satisfies each of these factors.

In Section I, Plaintiff will explain why it is substantially likely to prevail on the merits of its claim that SB 1084 is preempted under federal law. In Section II, Plaintiff will explain why the remaining preliminary injunction factors also weigh in its favor. Finally, in Section III, Plaintiff will explain why this Court, along with granting the requested preliminary injunction, should waive Rule 65's bond requirement.

## I.     UPSIDE Is Substantially Likely to Succeed on the Merits.

The Supremacy Clause of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. As a result, the Clause "preempts—that is, invalidates—state laws that 'interfere with, or are contrary to' federal law." *Aspen Am. Ins. Co. v. Landstar Ranger, Inc.*, 65 F.4th 1261, 1266 (11th Cir. 2023) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)). Although federal preemption may take several forms, the most straightforward is "express preemption," which "occurs when Congress displaces state law by so stating in express terms." *Ibid.* (cleaned up).

As explained in more detail below, the Poultry Products Inspection Act contains two clauses that expressly preempt SB 1084. First, the PPIA expressly preempts state laws that impose requirements for ingredients in poultry products that exceed or differ from those imposed by federal law. Second, the PPIA expressly preempts state laws that impose requirements on the premises, facilities, or operations of establishments in which poultry products are processed that exceed or differ from those imposed by federal law. Put simply, federal law authorizes the use of cultivated animal cells as

ingredients in poultry products and regulates the facilities in which

cultivated meat and poultry products may be manufactured. Because SB

1084 bans the use of these federally authorized ingredients in the production

of poultry products and prohibits federally regulated facilities from

producing cultivated poultry products they are otherwise permitted to

produce under federal law, the law is preempted under the PPIA

### A. SB 1084 is expressly preempted under the "ingredients" provisions of the PPIA.

The PPIA provides that "ingredient requirements . . . in addition to,

or different than, those made under [the PPIA] may not be imposed by any

State . . . with respect to articles prepared at any official establishment in

accordance with the requirements under the [PPIA.]" 21 U.S.C. §467e. This

provision straightforwardly preempts SB 1084 as it applies to UPSIDE's

cultivated chicken product.

First, UPSIDE's cultivated chicken product is an "article[] prepared

at [an] official establishment in accordance with the requirements of the

PPIA." The PPIA defines "official establishment," in relevant part, as "any

establishment as determined by the Secretary [of Agriculture] at which

inspection of . . . the processing of poultry products[] is maintained under

the authority of [the PPIA]." 21 U.S.C. § 453(p). UPSIDE's federally-regulated production facility, which operates under a USDA Grant of Inspection, is therefore an "official establishment." *See* U.S. Dep't of Agric., *UPSIDE Foods, Inc. – Shellmound Plant*, https://www.fsis.usda.gov/inspection/fsis-inspected-establishments/UPSIDE-foods-inc.-shellmound-plant (last visited Aug. 23, 2024).

Second, the USDA, acting under the authority of the PPIA, has established ingredient requirements that govern cultivated poultry products. For example, the USDA has issued a directive clarifying that "establishments that produce cells for cell-cultured meat or poultry food products may distribute the raw harvested cells in commerce or process the harvested cells into finished products that contain ingredients, such as spices, flavorings, binders, or other ingredients." U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat & Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/sites/default/files/media_file/documents/7800.1.pdf. This same directive provides that ingredients used in cultivated meat and poultry products "must be considered safe and suitable by FSIS" and

"[i]ngredients listed as approved for meat in [certain current USDA regulations and directives] may be used in cell-cultured meat food products, and ingredients listed as approved for poultry may be used in cell-cultured poultry food products . . . ." *Ibid.* In other words, the USDA has established that cultivated poultry cells may be used as an ingredient in finished poultry products, that products containing those cells may be sold in interstate commerce, and that its broader regulatory framework governing the lawful use of ingredients in poultry products applies to cultivated poultry products.

The only remaining question, then, is whether Florida has enacted an "ingredient requirement" that is "different than" the federal requirement. Plainly it has. "Ingredient requirements" refer to "the physical components that comprise a poultry product." *Association des Éleveurs de Canards et d'Oies du Québec v. Becerra*, 870 F.3d 1140, 1147–48 (9th Cir. 2017). Here, although federal law expressly authorizes the use of cultivated cells in poultry products, Florida forbids it. *See* Fla. Stat. § 500.03(k) (defining "cultivated meat" as "any meat or food product produced from cultured animal cells"); *id.* § 500.452 (making it "unlawful for any person to

manufacture for sale, sell, hold or offer for sale or distribute cultivated meat in [Florida]").

Thus, SB 1084 is expressly preempted under the "ingredients" clause of 21 U.S.C. § 467e.

**B. SB 1084 is expressly preempted under the "premises, facilities, and operations" provisions of the PPIA.**

For similar reasons, SB 1084 is also preempted under the PPIA's "Premises, Facilities, and Operations" Clause, which prohibits states from imposing "[r]equirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter." 21 U.S.C. § 467e.

The Supreme Court has expressly examined the Federal Meat Inspection Act's identical clause, holding that it "sweeps widely." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459 (2012). The Court has also held that a state cannot avoid this clause "just by framing [its law] as a ban on the sale of meat produced in whatever way the State disapprove[s]." *Id.* at 464. "That would make a mockery of the FMIA's preemption provision." *Ibid.*

And, here, the PPIA's analogous provision straightforwardly applies to UPSIDE and its chicken product.

First, as established in the previous section, UPSIDE's production facility is an official establishment subject to USDA inspection: UPSIDE has been issued a Grant of Inspection and is subject to routine inspection by USDA-FSIS.

Second, the USDA, acting under the authority of the PPIA, has adopted a variety of requirements for premises, facilities, and operations of establishments at which cultivated chicken products are manufactured. *See* U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat & Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/sites/default/files/media_file/documents/7800.1.pdf.

Third, and finally, Florida has enacted requirements for premises, facilities, and operations that are "different than" the federal requirements. Specifically, by preventing UPSIDE from manufacturing, distributing, and selling cultivated chicken that is produced in accordance with federal requirements for poultry facilities, Florida "reaches into" UPSIDE's

federally regulated facility and "substitutes a new regulatory scheme for the one the FSIS uses," thereby imposing "[r]equirements . . . with respect to premises, facilities and operations of any establishment at which inspection is provided under [the PPIA], which are in addition to, or different than those made under [the PPIA]." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 460, 467 (2012); 21 U.S.C. § 467e; Fla. Stat. § 500.452. And, just as in *National Meat Ass'n*, Florida cannot avoid preemption simply by "framing [its law] as a ban on the sale of meat produced in [a] way the State disapprove[s]." 565 U.S. at 464.

Thus, SB 1084 is expressly preempted under the PPIA's "Premises, Facilities, and Operations" Clause. 21 U.S.C. § 467e.

\* \* \*

Because SB 1084 is preempted under both the "Ingredients" and "Premises, Facilities, and Operations" Clauses of the PPIA, Plaintiff has demonstrated a likelihood of success on the merits.

## II.    UPSIDE Meets the Remaining Preliminary Injunction Factors.

In addition to having a high likelihood of success on the merits, UPSIDE easily satisfies the remaining elements necessary to secure

injunctive relief. As explained in Section A, without an injunction UPSIDE will continue to suffer irreparable harm. As explained in Section B, an injunction will not harm the interests of either the state or the public.

**A. UPSIDE will be irreparably harmed without an injunction.**

First, UPSIDE has and will continue to suffer an array of irreparable harms without an injunction. Florida's ban on cultivated meat is backed by criminal penalties, and both the Eleventh Circuit and federal district courts in Florida have held that "the threat of criminal prosecution constitutes irreparable harm for purposes of a preliminary injunction." *Farmworker Ass'n of Fla., Inc. v. Moody*, No. 23-cv-22655, 2024 WL 2310150, at *17 (S.D. Fla. May 22, 2024) (cleaned up); *see also Ga. Latino All. for Hum. Rts. v. Governor of Georgia*, 691 F.3d 1250, 1269 (11th Cir. 2012) (holding that irreparable harm existed where "Plaintiffs [were] under the threat of state prosecution for crimes that conflict with federal law").

Besides this threat of criminal punishment, UPSIDE faces a variety of concrete economic harms that are also irreparable. Although economic harms can often be repaired through economic damages, those damages are unavailable here because the state of Florida is immune to damages claims

under the Eleventh Amendment. The Eleventh Circuit considered precisely this situation in *Odebrecht Construction, Inc. v. Secretary, Florida Department of Transportation*, 715 F.3d 1268 (11th Cir. 2013), another case involving federal preemption. There, the court affirmed a preliminary injunction against a Florida law that prohibited companies that did business with Cuba from bidding on certain state or local contracts in Florida. *Id.* at 1272. In addition to agreeing with the district court that Florida's law was preempted by federal law, the court also agreed that the economic harms the plaintiff faced were irreparable because the company would have "no monetary recourse against a state agency like FDOT because of the Eleventh Amendment." *Id.* at 1289. UPSIDE is in exactly the same position: Though it stands to suffer financial harm from Florida's ban, it has no monetary recourse against the state. Thus, its economic harms are irreparable.

UPSIDE also stands to lose unique business opportunities and the ability to participate in one-time only events, such as the upcoming 2024 Art Basel exhibition and the 2025 South Beach Wine and Food Festival, both in Miami. Once those events pass, the opportunity to participate in them will be gone forever. The Eleventh Circuit has specifically held that the loss of

unique business opportunities is a form of irreparable harm. *See Baldwin v. Express Oil Change, LLC*, 87 F.4th 1292, 1311 (11th Cir. 2023) (finding irreparable harm where plaintiff "has already had to forgo at least one business opportunity . . . —one that is no longer available, so the harm from his inability to pursue it has become irreparable").

Finally, from UPSIDE's perspective, one of the most significant irreparable harms the company faces is the damage to their reputation and the lost opportunity to cultivate consumer goodwill. Florida has portrayed their product as something unwholesome or gross—akin to eating bugs. As long as Florida's law is in place, UPSIDE is foreclosed from having tasting events to show customers that, actually, their product is delicious. This reputational damage and loss of consumer goodwill are precisely the sort of injuries that federal courts have found irreparable in a variety of contexts, including federal preemption.[2]

---

[2] *See, e.g.*, *Ferrellgas Partners, L.P. v. Barrow*, 143 F. App'x 180, 190 (11th Cir. 2005) (holding, in a trademark infringement case, that "[g]rounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill"); *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) (holding, in a deceptive trade practices case, that "[l]oss of intangible assets such as reputation and goodwill can constitute irreparable

**B.**     **Neither the state nor the public will be harmed by an injunction.**

Although UPSIDE has and will continue to suffer irreparable harm

without an injunction, the state stands to suffer no harm at all if an injunction

is granted. UPSIDE has already demonstrated that it has a high likelihood of

success on its claim that Florida's ban is expressly preempted by the PPIA

and thus unconstitutional under the Supremacy Clause. And, as the

Eleventh Circuit has repeatedly held, the state "has 'no legitimate interest'

in enforcing an unconstitutional law." *Honeyfund.com Inc. v. Governor of

Florida*, 94 F.4th 1272, 1283 (11th Cir. 2024) (quoting *KH Outdoor, LLC v.

City of Trussville*, 458 F.3d 1261, 1271–72 (11th Cir. 2006)). The Eleventh

Circuit has expressly applied that principle to cases in which state laws were

---

injury"); *Siembra Finca Carmen, LLC v. Sec'y of Dep't of Agric. of P.R.*, 437
F. Supp. 3d 119, 136–37 (D.P.R. 2020) (holding, in a federal preemption
case, that the loss of "unique business opportunities" due to preempted
laws, along with "general harm to . . . goodwill and reputation among . . .
existing business partners" is irreparable harm); *Friends of the East Hampton
Airport, Inc. v. Town of East Hampton*, 152 F. Supp. 3d 90, 106 (S.D.N.Y.
2015) (holding, in a federal preemption case, that "[t]he threat that a
business will suffer a significant loss of 'good will'—a matter not easily
quantified—is particularly suited to a claim for injunctive relief").

preempted by contrary federal laws.[3] Simply put, "if a state law is preempted, then the state can suffer no harm from a court order that enjoins that law." *Farmworker Ass'n of Fla*, 2024 WL 2310150, at \*21.

Besides that, an injunction will not require the state to expend any resources or obligate any funds; it will simply restore the status quo as it existed before July 1, 2024, under which cultivated meat products could legally be sold in Florida. Because Defendants cannot show "that the *status quo ante* has presented a problem or injured anyone," *ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1311 (S.D. Fla. 2008), Defendants have no significant interest in enforcing the ban during the pendency of this case.

Restoring that status quo would also benefit the public. Because the state has no legitimate interest in enforcing an unconstitutional law, the public has a strong corollary interest in seeing that the Constitution is

---

[3] *See, e.g.*, *Odebrecht Constr.*, 715 F.3d at 1290 (11th Cir. 2013) ("[T]he State's alleged harm is all the more ephemeral because the public has no interest in the enforcement of what is very likely an unconstitutional statute."); *Ga. Latino All. for Hum. Rts.*, 691 F.3d at 1269 ("[E]nforcement of a state law at odds with the federal immigration scheme is neither benign nor equitable."); *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("[W]e discern no harm from the state's nonenforcement of invalid legislation.").

enforced. *See Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019) (holding that "the public interest is served when constitutional rights are protected"); *see also City Walk – Urban Mission Inc. v. Wakulla County*, 471 F. Supp. 3d 1268, 1288 (N.D. Fla. 2020) (holding that "[t]he vindication of constitutional rights . . . serve[s] the public interest almost by definition.").

Besides that, the public has a strong interest in the free flow of goods in the commercial marketplace. A major reason for adopting the U.S. Constitution was to ensure a national common market—in the words of Alexander Hamilton, "[a] unity of commercial, as well as political, interests." The Federalist No. 11 (Alexander Hamilton), available at https://guides.loc.gov/federalist-papers/text-11-20. Indeed, it is no exaggeration to say that *the* driving purpose behind the enactment of the U.S. Constitution was the desire to create a national common market. As Chief Justice John Marshall put it, after independence but before the enactment of the Constitution, states "guided by inexperience and jealousy" began enacting "iniquitous laws and impolitic measures, from which grew up a conflict of commercial regulations, destructive to the harmony of the

States." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 224 (1824). "This was the immediate cause, that led to the forming of [the Constitutional] convention." *Ibid*.

Simply put, consumers benefit when they are allowed to decide for themselves what goods to buy in the interstate market, and they are harmed when state governments unconstitutionally take that choice away from them. Thus, the balance of equities favors granting the injunction.

## III.   The Court Should Waive the Bond Requirement Under Fed. R. Civ. P. 65(c).

Federal Rule of Civil Procedure 65(c) provides that a preliminary injunction be issued only if the applicant gives security in an amount determined by the court. "But it is well-established that the amount of security required by the rule is a matter within the discretion of the trial court, and the court may elect to require no security at all." *Foy v. Fla. Comm'n on Offender Rev.*, No. 4:24-cv-140, 2024 WL 3543771, at *11 (N.D. Fla. July 25, 2024) (cleaned up). Cases raising constitutional issues are particularly appropriate for a waiver of the bond requirement. *Ibid.* Here, a preliminary injunction will not put the state at any risk of financial harm or

require it to obligate any funds. Accordingly, Plaintiff respectfully requests that the court waive the bond requirement.

## REQUEST FOR RELIEF

For the foregoing reasons, the Court should grant Plaintiff's motion for preliminary injunction and enjoin Defendants from enforcing SB 1084 against UPSIDE and against Florida individuals, food establishments, or other businesses through which UPSIDE wishes to distribute or sell its products in Florida. UPSIDE respectfully requests that the Court also waive the bond requirement under Federal Rule of Civil Procedure 65(c).

Dated: August 23, 2024.

Respectfully submitted,

INSTITUTE FOR JUSTICE

/s/ Paul M. Sherman
Paul M. Sherman (VA Bar No. 73410)
Suranjan Sen (TN 038830)*
901 North Glebe Road, Suite 900
Arlington, VA 22203-1854
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: psherman@ij.org; ssen@ij.org

*Pro hac vice application forthcoming.

Counsel for Plaintiff

Ari Bargil (FL Bar No. 71454)
Institute for Justice
2 South Biscayne Boulevard
Tel: (305) 721-1600
Fax: (305) 721-1601
Email: abargil@ij.org

*Local Counsel for Plaintiff*

**LOCAL RULE 7.1**
**CERTIFICATE OF COMPLIANCE**

Under Local Rules 7.1(B), (C) and (F), I hereby certify that:

1.      This brief complies with the attorney-conference requirement

of Local Rule 7.1(B) because counsel for the parties spoke on Wednesday

August 21, 2024 at 2:30pm ET.

2.      This brief complies with the word limit of Local Rule 7.1(F)

because this brief contains <u>6,876</u> words, excluding the parts of the brief

exempted by this rule and the Plaintiff's Motion for Preliminary Injunction

contains <u>1,081</u> words, for a total word count of <u>7,957</u>.

/s/ Paul M. Sherman
Paul M. Sherman (VA Bar No. 73410)
Counsel for Plaintiffs
