IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

UPSIDE FOODS, INC,

 *Plaintiff*,

v.         **Case No.:  4:24cv316-MW/MAF**

WILTON SIMPSON, *et al.*,

 *Defendants*.

_____/

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

 Plaintiff is "a company that specializes in the development and production of cultivated meat." ECF No. 11-3 ¶ 4. Plaintiff's "cultivated chicken product . . . looks, cooks, and tastes like a conventional boneless, skinless chicken cutlet," *id*. ¶ 24, but it is produced from animal cells grown in "a vessel known as a cultivator," *id*. ¶ 11, instead of from animal cells grown in a live animal. In 2024, the Florida Legislature enacted a ban on the sale, offer for sale, distribution, or manufacture for sale of "cultivated meat" in Florida. *See* §§ 500.452(1)–(6), Florida Statutes. Florida defines "cultivated meat" as "any meat or food product produced from cultured animal cells." *Id*. § 500.03(1)(k). Without dispute, Plaintiff can no longer sell, offer to sell, or distribute its cultivated chicken product in Florida.[1] If Plaintiff continues to do so,

---

[1] Plaintiff concedes it does not manufacture cultivated meat in Florida.

it risks criminal and civil penalties. *Id*. § 500.452(2)–(5) (providing that a knowing violation is a second degree misdemeanor, subject to a stop-sale order, and other civil penalties). Plaintiff now seeks to enjoin enforcement of Florida's ban on "cultivated meat," asserting the law is expressly preempted by federal law.

Pending before this Court is Plaintiff's motion for preliminary injunction, ECF No. 11. The parties have fully briefed the matter.[2] This Court considered the parties' briefing and additional arguments on the record at a hearing on October 7, 2024. Although Plaintiff asserted multiple claims for relief in its complaint, ECF No. 1, the parties confirmed on the record that the only claim before this Court at the preliminary-injunction stage is whether the federal Poultry Products Inspection Act (PPIA) expressly preempts Florida's ban on the sale, offer for sale, distribution, or manufacture for sale of "cultivated meat" in Florida. For the reasons set out below, Plaintiff's motion, ECF No. 11, is **DENIED**.

I

Under Rule 65 of the Federal Rules of Civil Procedure, a district court may grant a preliminary injunction "only if the moving party shows that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs

---

[2] At the hearing, the parties agreed this Court adopted their proposed briefing schedule without modification and did not limit their discovery or presentation of their arguments in any way.

whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam). Although a "preliminary injunction is an extraordinary and drastic remedy," it nonetheless should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974)). None of these elements, however, is controlling; rather, this Court must consider the elements jointly, and a strong showing of one element may compensate for a weaker showing of another. *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979).

### A

This Court begins with whether Plaintiff has shown a substantial likelihood of success on the merits. This Court addresses this factor first because, typically, if a plaintiff cannot "establish a likelihood of success on the merits," this Court "need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). And because standing is always "an indispensable part of the plaintiff's case," this Court begins its merits analysis with standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

1

Over time, the Supreme Court has developed a three-part test for determining when standing exists. Under that test, a plaintiff must show (1) that they have suffered an injury-in-fact that is (2) traceable to the defendant and that (3) can likely be redressed by a favorable ruling. *See Lujan*, 504 U.S. at 560–61. And "where a plaintiff moves for a preliminary injunction, the district court . . . should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.' " *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)); *see also Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011). Thus, "a plaintiff cannot 'rest on such mere allegations, [as would be appropriate at the pleading stage] but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true.' " *Cacchillo*, 638 F.3d at 404 (some alteration in original) (quoting *Lujan*, 504 U.S. at 561).

On the record at the hearing, this Court found that Plaintiff had failed to demonstrate a substantial likelihood of establishing standing for preliminary injunctive relief against the Attorney General and the State Attorneys for the Sixth and Ninth Circuits. Starting with the Attorney General, Plaintiff asserted that it named the Attorney General out of an abundance of caution, citing the Attorney

General's supervisory authority over state attorneys as the link to Plaintiff's asserted injury-in-fact. But the Eleventh Circuit has already rejected a similar argument in an earlier case. *See Support Working Animals, Inc. v. Gov. of Fla.*, 8 F.4th 1198, 1205 (11th Cir. 2021) ("We now know that prospective relief against the Attorney General wouldn't aid the plaintiffs because those bills charge other state agencies with enforcing § 32. The Attorney General's role in enforcing § 32 remains 'highly speculative' at best and non-existent at worst."). Standing alone, the Attorney General's supervisory authority is simply not a basis upon which Plaintiff can establish traceability to its asserted injury. Nor would an injunction prohibiting the Attorney General from enforcing the cultivated meat ban redress any injury, because the Attorney General has no enforcement authority, and thus, there would be no state action to enjoin. Plaintiff has not demonstrated standing against the Attorney General for preliminary-injunction purposes.

Turning to the State Attorneys for the Sixth and Ninth Circuits, Plaintiff's standing problem has to do with the evidence it submitted to demonstrate an injury-in-fact. The problem is Plaintiff submitted *no* evidence demonstrating a concrete and particularized injury that is traceable to either Defendant. Although Plaintiff argued to the contrary at the hearing, Plaintiff's generalized assertions that it would offer for sale or distribute its product *throughout* Florida, but for the challenged provision, forces this Court to only speculate where exactly Plaintiff would do so. Plaintiff's

5

complete lack of evidence concerning its plans to act in any of the counties that make up these State Attorneys' jurisdictions stands in stark contrast to the more detailed evidence concerning the Second and Eleventh Circuit State Attorneys, who are also named Defendants in this action. But this Court cannot and will not fill in the blanks for Plaintiff. Plaintiff has not demonstrated standing against the State Attorneys for the Sixth and Ninth Circuits for preliminary-injunction purposes.

2

This leaves the State Attorneys for the Second and Eleventh Circuits and the Commissioner of the Department of Agriculture and Consumer Services, all in their official capacities. Without dispute, each of these Defendants has specific statutory authority to enforce the cultivated meat ban. But these Defendants contend that Plaintiff's evidence still falls short of demonstrating a non-speculative injury that is traceable to their enforcement authority. On this point, this Court disagrees.

Plaintiff has submitted a detailed declaration from its founder, Uma Valeti, describing Plaintiff's previous efforts to promote and distribute its cultivated chicken meat in Tallahassee and Miami and its intentions to continue doing so if this Court were to enjoin the remaining Defendants from enforcing the cultivated meat ban. *See* ECF No. 11-3. The areas that Plaintiff would operate in but for the challenged law are under the jurisdiction of the remaining Defendants. Starting with the remaining State Attorneys, Defendant Campbell's jurisdiction encompasses

multiple counties in North Florida, including Leon County, which is home to the capital city, Tallahassee. Defendant Rundle's jurisdiction encompasses Miami-Dade County, which is home to The 305,[3] Miami. Neither party disputes that these State Attorneys both have the authority to prosecute violations of Florida's criminal laws committed in their respective jurisdictions, including misdemeanor offenses. And a person who knowingly sells, offers for sale, or distributes "cultivated meat" in violation of Florida law, "commits a misdemeanor of the second degree." § 500.452(2), Fla. Stat.

As for the Commissioner, section 500.452 grants his agency state-wide authority to take disciplinary action against any "food establishment that manufactures, distributes, or sells cultivated meat in violation of this section," in addition to issuing "an immediate stop-sale order" for products in violation of the ban. § 500.452(3), (5), Fla. Stat. Additional civil penalties include a license suspension for "any restaurant, store, or other business . . . as provided in the applicable licensing law upon the conviction of an owner or employee of that business for a violation of this section in connection with that business." *Id*. § 500.452(4). And neither side disputes that, in the event Plaintiff's cultivated chicken is sold or otherwise distributed in Florida, it can be subject to an immediate stop-

---

[3] Connie Ogle, *Why is Miami called The 305? We won't make fun of you for asking, bro*, MIAMI HERALD, Sep. 1, 2021, *available at* https://www.miamiherald.com/miami-com/miami-com-news/article225777800.html (last visited Oct. 7, 2024).

sale order and embargo, detention, or disposal pursuant to the Commissioner's authority. *Id*. § 500.452(5); *see also* § 500.172, Fla. Stat.

Plaintiff has demonstrated that it has and will continue to be subject to a concrete injury traceable to the remaining Defendants' enforcement authority. With respect to Tallahassee, Plaintiff's unrebutted evidence demonstrates that it has been in talks with chefs in Tallahassee who were previously interested in partnership with Plaintiff. *Id*. ¶ 45. But because of the ban, Plaintiff has halted its talks with these chefs. *Id*. Likewise, with respect to Miami, Plaintiff's unrebutted evidence similarly demonstrates that it has halted talks with chefs in Miami who are also interested in partnering with Plaintiff to sell or distribute its cultivated chicken. *Id*. Moreover, evidence attached in support of the Attorney General's response[4] demonstrates that Plaintiff has already, in fact, sold its cultivated chicken meat to at least one Miami-based restaurant, and that Plaintiff intends to continue working with a specific Miami-based chef to sell its cultivated chicken product in Florida. *See* ECF No. 35-1 at 4 (identifying revenues generated by sales and naming chefs that Plaintiff intends to work with to sell its cultivated chicken meat).

In addition, Plaintiff's unrebutted evidence demonstrates that Plaintiff has already participated in a tasting event to promote its cultivated chicken in Miami,

---

[4] At the hearing, the parties agreed that this Court can rely on evidence submitted by the Defendants in determining whether Plaintiff has established standing.

and that it planned to do so again at Art Basel in Miami and the South Beach Wine and Food Festival, *id*. ¶¶ 34, 38–39, later this year and early next year. While Florida's ban has put a stop to Plaintiff's efforts to partner with chefs, promote its product, and distribute its cultivated chicken meat in Florida, Plaintiff's unrebutted evidence demonstrates that it will immediately resume efforts to partner with chefs, including the chefs in Tallahassee and Miami, to distribute its cultivated chicken in Florida if this Court enjoins enforcement of the challenged law. *See id*. ¶¶ 54–57.

The remaining Defendants contend that Plaintiff's asserted injury is too speculative insofar as Plaintiff's plans to partner with chefs in Florida requires participation on the part of third parties—namely, the Florida chefs—and Plaintiff has put forth no evidence demonstrating that any third parties have formalized agreements to partner with Plaintiff in the future. But solidifying a partnership to distribute cultivated meat in Florida or making direct-to-consumer sales are not the only ways to run afoul of the challenged law.

With respect to the challenged law's criminal prohibitions, Florida law also recognizes an "attempt" to offer cultivated meat for sale or distribution in Florida as a crime. *See* § 777.04(1), Fla. Stat. ("A person who attempts to commit an offense prohibited by law and in such attempt does any act toward the commission of such offense, but fails in the perpetration or is intercepted or prevented in the execution thereof, commits the offense of criminal attempt . . . ."). Plaintiff's overtures to

Florida chefs and other businesses to sell or distribute their cultivated chicken arguably amounts to "solicitation" to violate the cultivated meat ban. *See id*. § 777.04(2) ("A person who solicits another to commit an offense prohibited by law and in the course of such solicitation . . . encourages . . . or requests another person to engage in specific conduct which would constitute such offense or an attempt to commit such offense commits the offense of criminal solicitation . . . .").

Defendants' suggestion that Plaintiff's evidence must establish something more than past sales or distribution, halted plans to work with Florida chefs, and future intentions to resume efforts to partner with Florida chefs and other businesses would effectively require Plaintiff to submit an admission concerning the commission of a crime under Florida law. But Article III does not require Plaintiff to incriminate itself just to get through the courthouse door.

Moreover, the Attorney General's argument that Plaintiff's unrebutted evidence that it partnered with a Miami-based chef in the past cannot demonstrate injury-in-fact pursuant to *City of Los Angeles v. Lyons*, 461 U.S. 95, 110-11 (1983) misapplies the law of that case. In *Lyons*, the Supreme Court held that an "equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again[.]" *Id*. at 111. Because Lyons had only shown that he was illegally strangled by police in the past but did not face a real or immediate

10

threat of being illegally strangled going forward, the Supreme Court held that he lacked standing "to seek an injunction as a remedy for the claim arising out of" the past violation. *Id*. But this analysis concerning the threat of a future violation based on a past violation says nothing about whether Plaintiff's evidence of past sales or distribution contributes to its showing as to a concrete injury-in-fact. Instead, Plaintiff's evidence demonstrates that it has engaged in sales and distribution in the past and that it intends to continue doing so but for the challenged law. In other words, Plaintiff's evidence demonstrates that it faces a real and immediate threat of criminal enforcement against it if it continues to attempt to sell or distribute its cultivated chicken in Florida.

As to the challenged law's civil enforcement provisions, in the event Plaintiff moves forward with distributing its cultivated chicken at Art Basel, working with the Miami-based chef who has already distributed Plaintiff's cultivated chicken, or any other future event, its product would be subject to a stop-sale order and detention or destruction by the Department of Agriculture and Consumer Services. This is not a hypothetical or speculative harm. By definition, Plaintiff's cultivated chicken product is not allowed to be sold or distributed in Florida, and the Commissioner, as head of the Department, is authorized to enforce this prohibition against Plaintiff or

any other business that sells Plaintiff's product.[5] Moreover, Plaintiff's evidence demonstrates that it is substantially likely that, but for the challenged law's prohibitions and resulting civil penalties, at least one Miami-based chef plans to work with Plaintiff to sell its cultivated chicken meat.

In short, Plaintiff's evidence establishes that it has suffered and continues to suffer a concrete, particularized injury that is neither speculative nor hypothetical. But for the ban and the imminent threat of prosecution and civil enforcement for violating the ban, Plaintiff has halted all efforts to distribute or offer its cultivated chicken meat for sale in Florida. This injury is traceable both to the State Attorneys with authority to prosecute crimes in the regions where Plaintiff has demonstrated it was working to distribute its product and to the Commissioner, whose agency has state-wide authority to impose civil penalties, including stop-sale orders and embargos on the offending products. Accordingly, this Court finds that Plaintiff has demonstrated standing to seek preliminary injunctive relief against the State Attorneys for the Second and Eleventh Circuits and the Commissioner.

Next, this Court addresses the merits of Plaintiff's motion.

---

[5] To the extent the Commissioner asserts Plaintiff lacks standing to sue him because Plaintiff has not satisfied federal requirements to sell its product in the United States, the Commissioner is mistaken. Plaintiff has established that it has received a USDA-issued mark of inspection, directly rebutting the Commissioner's assertion that Plaintiff has not satisfied federal requirements to sell its product in the United States. *See* ECF No. 38 at 6; ECF No. 38-1.

B

To start, both sides have spilled much ink over preliminary issues, such as whether Plaintiff has even alleged a legally cognizable cause of action to assert its express preemption claims. Both sides agree that the Poultry Products Inspection Act does not create a private cause of action. Nor has Plaintiff argued that the Supremacy Clause creates a cause of action. As Defendants persuasively argued on the record at the hearing, the Declaratory Judgment Act does not create a cause of action, but instead creates a remedy. Nor is it clear that Plaintiff has even alleged its claims pursuant to a cause of action in equity.[6] Instead, the parties' dispute largely centers on whether 42 U.S.C. § 1983 provides the proper vehicle for Plaintiff to assert its express preemption claims. But this Court need not resolve this dispute at this juncture because, assuming *arguendo* that Plaintiff's express preemption claims are properly before this Court under section 1983[7], Plaintiff has failed to meet its burden to demonstrate that it is substantially likely to succeed on the merits.

---

[6] To the extent Plaintiff is seeking to pursue its express preemption claims via an action in equity, it would be wise to amend its complaint to make this plain.

[7] This Court recognizes that whether Plaintiff can pursue a cause of action for express preemption under section 1983 is a nuanced question involving two parts—first, does the PPIA's express preemption provision create an individual right that is enforceable under section 1983, and second, has Congress foreclosed Plaintiff's cause of action for express preemption under section 1983? But this Court need not answer these questions now to rule on Plaintiff's motion.

13

1

Plaintiff argues that its cultivated chicken meat is "poultry" or a "poultry product" within the meaning of the PPIA, and therefore, Florida's cultivated meat ban is expressly preempted by two provisions of the PPIA. In response, Defendants argue that (1) Plaintiff's cultivated chicken meat does not fall within the statutory definition of "poultry" or a "poultry product," and thus, is not even covered by the federal preemption provisions, and (2) even if Plaintiff's cultivated chicken meat is covered by the PPIA, Florida's law does not impose any requirement inconsistent with the PPIA.

As to the first issue, whether Plaintiff's cultivated chicken meat falls within the statutory definition of "poultry" or "poultry product," this Court concludes Plaintiff has the better of the arguments. The PPIA defines "poultry" as "any domesticated bird, whether live or dead." 21 U.S.C. § 453(e). A "poultry product" is further defined as "any poultry carcass, or part thereof; or any product which is made wholly or in part from any poultry carcass or part thereof, [excepting products that are not at issue here]." *Id*. § 453(f). Without dispute, a chicken is "poultry" under the plain reading of the PPIA. And, without dispute, Plaintiff produces its cultivated chicken meat by taking chicken cells harvested from a slaughtered chicken—i.e., parts of a "poultry carcass"—and growing those cells to create more chicken cells. The result is a "product which is made . . . in part from . . . part [of a poultry carcass]."

14

2

But whether Plaintiff's cultivated chicken meat is considered a "poultry product" under the PPIA is not the end of the inquiry. Plaintiff has not claimed that the USDA has occupied the field when it comes to "poultry products." Nor would Plaintiff have legs to stand on if it did. *See, e.g.*, *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra,* 870 F.3d 1140, 1152 (9th Cir. 2017) ("Because the PPIA itself contemplates extensive state involvement, Congress clearly did not intend to occupy the field of poultry products."); *Empacadora des Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 334 (5th Cir. 2007) ("Congress did not intend to preempt the entire field of meat commerce under the [analogous Federal Meat Inspection Act].").

Instead, Plaintiff argues the Florida ban imposes inconsistent requirements on Plaintiff that are expressly preempted by two provisions of the PPIA, the so-called "ingredient requirement" provision and the "premises, facilities, and operations" provision. Accordingly, given that the inquiry is limited only to whether Florida law is expressly preempted by either of these statutory provisions, this Court turns to the text of the statute at issue.

a

As to the "ingredient requirement" provision, the PPIA provides that "[m]arking, labeling, packaging, or ingredient requirements . . . in addition to, or

different than, those made under this chapter may not be imposed by any State . . .

with respect to articles prepared at any official establishment in accordance with the

requirements under this chapter . . . ." 21 U.S.C. § 467e. Plaintiff asserts that because

its cultivated chicken product is a "poultry product" under the PPIA's statutory

definition, Florida's ban imposes an inconsistent "ingredient requirement" by

prohibiting the sale or distribution of food products that contain cultivated chicken

meat as an ingredient. When pressed at the hearing, Plaintiff could identify no statute

or regulation that creates a federal "ingredient requirement" with respect to

"cultivated meat." And Plaintiff has disclaimed any reliance upon federal agency

agreements to regulate cultivated meat as a basis for its express preemption claims.[8]

*See* ECF No. 38 at 30 n.15. Instead, Plaintiff's argument boils down to "if it's a

poultry product, states can't ban it."

But just because Plaintiff's product arguably falls within the scope of the

PPIA, and thus, is under the USDA's regulatory authority, this does not mean that a

state is expressly preempted from banning the sale of that particular kind of poultry

product. *See, e.g.*, *Empacadora de Carnes de Fresnillo*, 476 F.3d at 333 (construing

---

[8] To the extent Plaintiff, in its initial brief, attempted to bolster its express preemption claims with agency documents and agreements that lack the force of law, Plaintiff abandoned such reliance in its reply brief and at oral argument. Accordingly, insofar as any agency action was even tangentially before this Court so as to cause the Attorney General to raise the specter of the "major questions doctrine" in her briefing, this Court need not take the bait. At the hearing, the Attorney General disclaimed any need to resort to the "major questions doctrine" to resolve Plaintiff's motion at the hearing, and this Court accepts the invitation to base its ruling on Plaintiff's motion on other grounds.

analogous express preemption provision in Federal Meat Inspection Act and noting that "[t]his preemption clause expressly limits states in their ability to govern meat inspection and labeling requirements. It in no way limits states in their ability to regulate what types of meat may be sold for human consumption in the first place."). Indeed, "[t]he PPIA targets the slaughtering, processing, and distribution of poultry products, . . . but *it does not mandate that particular types of poultry be produced for people to eat*." *Canards*, 870 F.3d at 1150 (emphasis added). Nor does a ban on the sale of a sub-category of poultry—i.e., cultivated chicken—impose any "ingredient requirement" that is inconsistent with what federal law expressly requires. *Cf. Armour & Co. v. Ball*, 468 F.2d 76 (6th Cir. 1972) (holding that Michigan law that imposed unique requirements for "grade 1" sausage that substantially differed from federal standards of identity or composition for sausage was expressly preempted as an ingredient requirement inconsistent with federal law).

To be clear, Plaintiff has identified no federal authority that *requires* the sale or use of cultivated meat in any derivative poultry product. Nor has Plaintiff pointed to anything other than the statutory definition of "poultry product" to suggest that cultivated chicken must be permitted as an ingredient in any derivative poultry product. Moreover, although Plaintiff's cultivated chicken arguably falls within the plain meaning of the PPIA's "poultry product" definition, federal regulations

identifying the standards for kinds and classes, and for cuts of raw poultry available in the market do not appear to include cultivated chicken as a "kind" or "class" of poultry. *See* 9 C.F.R. § 381.170. All this is to say that Plaintiff has failed to demonstrate how Florida's sales ban imposes any ingredient requirement that is inconsistent with federal law.

b

Next, Plaintiff asserts that Florida's ban imposes an inconsistent requirement with respect to its premises, facilities, and operations, and is therefore expressly preempted. Under the PPIA, the "premises, facilities, and operations" provision provides that "[r]equirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter may not be imposed by any State . . . ." 21 U.S.C. § 467e. But, again, Plaintiff has failed to identify any federal requirement that Florida's ban adds to or differs from, such that Florida's law is expressly preempted by the PPIA. This is not a case like *National Meat Ass'n v. Harris*, 565 U.S. 452 (2012), where the state imposed a whole host of inconsistent requirements upon meat producers' operations and used a sales ban to enforce the regulatory requirements. Instead, the question boils down to whether a pure sales ban imposes inconsistent requirements on Plaintiff's premises, facilities, or operations.

18

Plaintiff concedes it does not manufacture cultivated chicken in Florida. Accordingly, the ban on the manufacture for sale in Florida does not impact Plaintiff's facilities or operations in the same way the horse-slaughtering bans affected slaughterhouses in Texas and Illinois as discussed in the "horsemeat cases." *See Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007) *and Empacadora de Carnes de Fresnillo*, 476 F.3d 326. Regardless, even such a direct impact—the closing of slaughterhouses that processed horsemeat—was not found to impose additional or different facilities requirements as compared to federal law. *Cavel*, 500 F.3d at 554 ("Of course in a literal sense a state law that shuts down any 'premises, facilities and operations of any establishment at which inspection is provided' is 'different' from the federal requirements for such premises, but so literal a reading is untenable."). This is because the analogous Federal Meat Inspection Act (FMIA) "is concerned with inspecting premises at which meat is produced for human consumption . . . rather than with preserving the production of particular types of meat for people to eat." *Id*.

Moreover, it is no answer to point to a cherry-picked quotation from *National Meat Ass'n* to assert that Florida's cultivated meat ban is expressly preempted by the PPIA. *See* ECF No. 38 at 37. Considering the statutory scheme in context, the Supreme Court rejected the argument that California's ban on sales of nonambulatory pig meat for human consumption avoided preemption under the

19

FMIA's analogous provision. Instead, the Court held that "this argument mistakes how the prohibition on sales operates within [the challenged statute] as a whole." 565 U.S. at 463. "The sales ban is a criminal proscription calculated to help implement and enforce each of the section's other regulations—its prohibition of receipt and purchase, its bar on butchering and processing, and its mandate of immediate euthanasia." *Id*. at 463–64.

Here, on the other hand, Florida has only banned the sale, distribution, or manufacture for sale in Florida of cultivated meat. Unlike the California law at issue in *National Meat Ass'n*, Florida has not sought to reach into Plaintiff's facilities to tell them how they should handle their cultivated chicken cells throughout the production process and then reframed such regulations as a sales ban. To the extent Plaintiff asserts *National Meat Ass'n* requires a different conclusion, it is mistaken.

c

Finally, this Court is not persuaded by Plaintiff's assertion, with respect to both of their express preemption arguments, that the horsemeat cases and *Canards* are distinguishable from this case because they dealt with the treatment of live animals *prior* to slaughter. With respect to the horsemeat cases, this is simply incorrect. *See, e.g.*, *Empacadora de Carnes de Fresnillo*, 476 F.3d at 330, 333 (citing challenged provision which made it a crime to sell, offer for sale, exhibit for sale, or possess with intent to sell horsemeat for human consumption and holding that "[t]he

FMIA does not expressly dispose states of the ability to define what meats may be available for slaughter *and human consumption*" (emphasis added)). As for *Canards*, this distinction is beside the point. As noted above, the Ninth Circuit held that even if California's law constituted a ban on foie gras, it was not expressly preempted by the PPIA.

For all these reasons, this Court concludes that Plaintiff has failed to meet its burden to establish that it is substantially likely to succeed on the merits of its express preemption claims under either the "ingredient requirement" or the "premises, facilities, and operations requirement" provisions of 21 U.S.C. § 467e. Inasmuch as Plaintiff has failed to demonstrate a substantial likelihood of success on the merits, this Court need not address the remaining Rule 65 factors. Accordingly, Plaintiff is not entitled to preliminary injunctive relief. *See Pittman v. Cole*, 267 F.3d 1269, 1291 (11th Cir. 2001) ("[O]ur cases have uniformly required a finding of substantial likelihood of success on the merits before injunctive relief may be provided . . . .").

## II

Even assuming Plaintiff's express preemption claims are properly before this Court, Plaintiff has failed to demonstrate that it is substantially likely to succeed on its express preemption claims. Plaintiff's motion, ECF No. 11, is **DENIED**.

**SO ORDERED on October 11, 2024.**

s/Mark E. Walker                     
**Chief United States District Judge**