**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

UPSIDE FOODS, INC.,

     Plaintiff,

v.                   Civil Action No. 4:24-cv-316-MW-MAF

WILTON SIMPSON, in his official capacity as
Commissioner of the Florida Department of
Agriculture and Consumer Services; et al.,

     Defendants.

_____/

## COMMISSIONER WILTON SIMPSON'S MOTION TO DISMISS UPSIDE'S AMENDED COMPLAINT

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................... 1

II.   LEGAL STANDARD ............................................................. 2

III.  ARGUMENT .......................................................................... 4

    A.    Plaintiff's Counts I through IV fail to state a claim for relief because there is no cause of action to enforce the PPIA or the Supremacy Clause, either statutorily or in equity .................................................. 4

        1.    The PPIA explicitly reserves enforcement for the United States .................................................... 4

        2.    The Supremacy Clause also does not provide a private right of action ............................................ 6

        3.    The Declaratory Judgments Act is not a substitute for a private right of action .................. 9

    B.    SB 1084 is not preempted by federal law..................... 10

        1.    The PPIA does not apply to UPSIDE's product ..... 10

        2.    Preemption claims are disfavored........................ 11

        3.    The PPIA does not expressly preempt state laws ................................................................. 12

            i.    SB 1084 does not regulate "ingredients." .... 13

            ii.   SB 1084 does not regulate "facilities."......... 15

            iii.  Federal courts have rejected preemption claims based on allegations that state meat-product bans offend federal regulation .................................................. 16

        4.    There is no federal law regulating cultivated meat ................................................................. 20

    C.    SB 1084 does not violate the dormant Commerce Clause........................................................................ 24

        1.    Courts employ a general presumption against finding dormant Commerce Clause violations ..... 24

  2. SB 1084 is even-handed, treating in-state and out-of-state interests the same............................ 26

  3. Plaintiff has not sufficiently alleged harms to the interstate market stemming from Florida's neutral law........................................................ 28

  4. SB 1084's practical effects reflect a legitimate local public interest, not discrimination .............. 30

IV. CONCLUSION .................................................... 33

CERTIFICATE OF COMPLIANCE ................................. 35

CERTIFICATE OF SERVICE....................................... 35

## I.    Introduction

Earlier this year, the elected representatives of the people of Florida amended the Florida Food Safety Act to prohibit the manufacture, sale, or distribution of "cultivated meat" in this state. § 500.542, Fla. Stat. The statutory amendments in SB 1084 ensure that a new and unproven category of food product is not distributed for consumption among Floridians. Such health-and-safety matters are areas of historical state concern, and the Florida Legislature is competent to regulate them.

UPSIDE does not state a claim for relief. Its first four causes of action in the amended complaint are based on the Poultry Products Inspection Act (PPIA)—but the PPIA expressly prohibits private enforcement, and neither the Supremacy Clause nor section 1983 nor general principles of equity generate an independent cause of action. And although UPSIDE's "cultivated meat" may be grown from chicken cells, it isn't "poultry" or a "poultry product" as those terms are defined in federal law. *See* 21 U.S.C. § 453(e)–(f); 9 C.F.R. § 381.1(b). Moreover, Florida's categorical ban on the product doesn't regulate UPSIDE's "ingredients" or "facilities"—the only two

provisions of the PPIA that UPSIDE's claims depend on. So, neither the PPIA nor any other federal law preempts SB 1084.

UPSIDE's dormant Commerce Clause Claim fares no better. Florida prohibits *all* lab-created meat, regardless of where it is produced. Such state-level product bans are unremarkable. Because the law makes no reference to the location of the entity peddling the lab-grown meat product, it is non-discriminatory on its face and does not offend the Commerce Clause through any incidental interstate effects.

In short, there is no actionable claim stated here; and given the plain text of the laws at issue, no further amendment could overcome the defects in UPSIDE's amended complaint. The Court should dismiss the amended complaint with prejudice.

## II.    Legal Standard

Pursuant to Rule 12(b)(1), a party may move to dismiss a complaint for lack of subject-matter jurisdiction. To survive a facial attack under Rule 12(b)(1), a complaint must allege facts sufficient to establish the court's subject-matter jurisdiction. *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007).

A party may also move to dismiss a complaint under Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This requires "factual content" that will support a "reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint need not make "detailed factual allegations," *Twombly*, 550 U.S. at 555, but requires more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678. If a complaint makes "allegations [that] are indeed more conclusory than factual, then the court does not have to assume their truth." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012).

## III.  Argument

### A.  Plaintiff's Counts I through IV fail to state a claim for relief because there is no cause of action to enforce the PPIA or the Supremacy Clause, either statutorily or in equity.

#### 1.  The PPIA explicitly reserves enforcement for the United States.

The PPIA contains an express enforcement provision: only the Secretary of the U.S. Department of Agriculture may enforce violations. 21 U.S.C. § 467c ("All proceedings for the enforcement or to restrain violations of this chapter shall be by and in the name of the United States."). No private party has an express or implied right of action under the PPIA, as courts have noted. *See Sanderson Farms, Inc. v. Tyson Foods, Inc.*, 549 F. Supp. 2d 708, 719 (D. Md. 2008) (citing 21 U.S.C. § 467c); *see also Webb v. Trader Joe's Co.*, 418 F. Supp. 3d 524, 530 (S.D. Cal. 2019) ("[O]nly the federal government is vested with the authority to enforce the PPIA"), aff'd, 999 F.3d 1196 (9th Cir. 2021). The Supreme Court has held that similar statutory language precludes a private right of action. *E.g.*, *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 109 (2014) (citing 21 U.S.C. § 337(a) (FDCA)). This makes sense: the "duty to comply with federal safety regulations is a duty owed to the United

States for the benefit of consumers, and commercial

parties . . . cannot assert private causes of action for violations of

those regulations." *House of Raeford Farms, Inc. v. SOMMA Food*

*Grp., LLC*, No. 05-22-01231-CV, 2024 WL 396609, at *4 (Tex. App.

Feb. 2, 2024) (citing 21 U.S.C. § 467c (PPIA)).

Congress's "intent to foreclose" private enforcement of the PPIA

bars UPSIDE's claims brought in equity (Counts II and IV) and

under section 1983 (Counts I and III). *Armstrong*, 575 U.S. at 326–

29 (equitable claim); *see also Gonzaga Univ. v. Doe*, 536 U.S. 273,

284–85 (2002) (section 1983 claim). Because Congress's "express

provision of one method of enforcing" the PPIA indicates an "inten[t]

to preclude others," *Alexander v. Sandoval*, 532 U.S. 275, 290

(2001), all other enforcement is foreclosed, regardless of the vehicle.

UPSIDE "cannot, by invoking [this Court's] equitable powers,

circumvent Congress's exclusion of private enforcement."

*Armstrong*, 575 U.S. at 328.

Even setting aside its express foreclosure provision, the PPIA

does not create "personal rights" that UPSIDE can enforce.

*Gonzaga*, 536 U.S. at 284–85. Nothing in the statute's text indicates

a congressional intent to benefit or to bestow rights upon poultry-

product producers; instead, it imposes "duties" on them. *Raeford Farms*, 2024 WL 396609, at *4. From top to bottom, the PPIA imposes requirements and obligations on producers, in service of its purpose to protect consumers from "[u]nwholesome, adulterated, misbranded poultry products." 21 U.S.C. § 451. Producers of "poultry products" are required to adhere to storage, handling, labeling, production, and sanitation standards, 21 U.S.C. §§ 455-458—or else be subject to prosecution and the condemnation of their products, *id.* §§ 461, 467b. Because the PPIA lacks "clear and unambiguous terms" conferring "personal rights" upon producers, UPSIDE has no substantive right that it can enforce through a cause of action based on the PPIA, whether by invoking section 1983 or equity. *Gonzaga*, 536 U.S. at 290.

## 2. The Supremacy Clause also does not provide a private right of action.

UPSIDE cites the Supremacy Clause as a basis for Counts I through IV. Am. Comp. ¶¶ 135, 152, 171, 191. But UPSIDE cannot circumvent the PPIA's lack of private right of action by invoking the Supremacy Clause, which also does not provide a right of action. Because "the Supremacy Clause is not the 'source of any federal

rights,' and certainly does not create a cause of action." *Armstrong*, 575 U.S. at 324–25 (cleaned up), federal circuit courts have rejected claims by private plaintiffs that rest on an implied right of action in the Supremacy Clause, *see Davis v. Shah*, 821 F.3d 231 (2d Cir. 2016); *Safe Streets All. v. Hickenlooper*, 859 F.3d 865 (10th Cir. 2017). As the Supreme Court explained in *Armstrong*, 575 U.S. at 327–28, "the power of the federal courts of equity to enjoin unlawful executive action that may conflict with the Supremacy Clause is subject to express and implied limitations," and courts cannot "disregard statutory and constitutional requirements and provisions." (cleaned up). Where, as here, Congress explicitly provides for enforcement by federal officials, it implicitly precludes private enforcement, no matter the asserted grounds.

The Supremacy Clause provides a rule of decision. *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (quoting *Armstrong*, 575 U.S. at 324). "It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Armstrong*, 575 U.S. at 325. Courts must look to the relevant federal law to make that determination. And because Article I vests broad discretion in

Congress to "implement" its enumerated powers, casting the

Supremacy Clause as a hook for private actors to widely enforce

federal law would gut Congress's constitutional role:

> It is unlikely that the Constitution gave Congress such broad discretion with regard to the enactment of laws, while simultaneously limiting Congress's power over the manner of their implementation, making it impossible to leave the enforcement of federal law to federal actors... It would be strange indeed to give a clause that makes federal law supreme a reading that limits Congress's power to enforce that law, by imposing mandatory private enforcement.

*Armstrong*, 575 U.S. at 325–26.

UPSIDE's contrary reading invites "inconsistent

interpretations and misincentives that can arise out of an

occasional inappropriate application of the statute in a private

action." 575 U.S. at 329. *See also N.J. Thoroughbred Horsemen's

Ass'n v. Nat'l Collegiate Athletic Ass'n,* 584 U.S. 453, 477 (2018) (the

Supremacy Clause "is not an independent grant of legislative power

to Congress"; a state law is preempted only if it "represent[s] the

exercise of a power conferred on Congress by the Constitution;

pointing to the Supremacy Clause will not do").

UPSIDE therefore cannot invoke a general equity power in the

Supremacy Clause when a federal statute bars its claims.

*Armstrong*, 575 U.S. at 328 ("respondents cannot, by invoking our equitable powers, circumvent Congress's exclusion of private enforcement"). Simply put, the Supreme Court's Supremacy Clause precedents "establish that a private right of action under federal law is not created by mere implication, but must be unambiguously conferred." 575 U.S. at 332 (cleaned up). No such conferral has occurred here—in fact, PPIA provides the opposite—and UPSIDE therefore cannot assert its preemption claims based on the PPIA.

### 3. The Declaratory Judgments Act is not a substitute for a private right of action.

Plaintiff's reference to the Declaratory Judgment Act, Am. Compl. ¶ 6, does not create a right of action. "[T]he Declaratory Judgments Act is not an independent source of federal jurisdiction." *Schilling v. Rogers*, 363 U.S. 666, 677 (1960) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). Declaratory relief under the Act "presupposes the availability of a judicially remediable right." *Schilling*, 363 U.S. at 677. And because UPSIDE states no valid cause of action, the Declaratory Judgment Act cannot save its claims from dismissal. *See, e.g.*, *Newton v. Duke Energy Fla., LLC*, No. 16-CV-60341-WPD, 2016 WL 10564996, at *3

(S.D. Fla. Sept. 21, 2016) (dismissing preemption and dormant Commerce Clause claims, and noting that the Declaratory Judgment Act does not "provide[] a ground . . . to hear th[ose] claim[s]" in "the absence of a private right of action").

## B.    SB 1084 is not preempted by federal law.

Congress has not specifically addressed animal-cell-culture technology and the appropriateness of sale to the public by statute. The PPIA says nothing about it. Federal agencies have not engaged in rulemaking specifically addressing the practice. So the mere fact that the FDA and USDA have jointly asserted jurisdiction to oversee production of cell-cultured poultry food products does not strip states of their ability to have health-and-safety laws regarding food. UPSIDE's First, Second, Third, and Fourth Claims for Relief based on preemption accordingly fail.

### 1.    The PPIA does not apply to UPSIDE's product.

Counts I through IV, relying on the PPIA, fail to state a claim for relief. The plain text of the PPIA excludes UPSIDE's product because the lab-created product does not meet the statute's definition of "poultry product." The PPIA defines "poultry product," in relevant part, as "any poultry carcass, or part thereof; or any

-10-

product which is made wholly or in part from any poultry carcass or part thereof." 21 U.S.C. § 453(f). Separately, "poultry food product" is defined as "any product capable of use as human food which is made in part from any poultry carcass or part thereof." 9 C.F.R. § 381.1(b)(ii). "Carcass," under the regulation, "means all parts, including viscera, of any slaughtered poultry"; and "slaughter," in turn, "means the act of killing poultry for human food." *Id.*

UPSIDE's Amended Complaint does not minimally allege that its product comes from a "carcass" or that the cells it uses come from a "slaughtered" bird.

### 2. Preemption claims are disfavored.

Even if UPSIDE had adequately alleged that its products are made from a poultry "carcass," the PPIA does not preempt SB 1084. Preemption analysis begins "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). "That assumption applies with particular force when Congress has legislated in a field traditionally occupied by the States." *Altria Grp.*

*Inc. v. Good*, 555 U.S. 70, 77 (2008) (cleaned up); *see also Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

Here, UPSIDE is claiming preemption in an area that has long been the purview of the States. "[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985) (rejecting argument that local ordinance governing blood plasma was preempted by the FDA's National Blood Policy for plasma collection); *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1095 (11th Cir. 2021) ("[f]ederal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained") (cleaned up).

### 3. The PPIA does not expressly preempt state laws.

Congress's "clear and manifest purpose" in enacting the PPIA was not to preempt state laws. Rather, the PPIA was designed to come alongside states; it expressly contemplates state laws that complement and supplement its regulatory scope. Specifically, the PPIA's purpose was to prevent "[u]nwholesome, adulterated,

misbranded poultry products" from entering the market and harming consumers. 21 U.S.C. § 451; *see also* 21 U.S.C. § 452 ("Congressional declaration of policy" to "prevent the movement or sale in interstate or foreign commerce of . . . poultry products which are adulterated or misbranded"). Recognizing the historic role of States in such regulation, Congress made the non-preemptive nature of the PPIA explicit: "It is the policy of the Congress to protect the consuming public from poultry products that are adulterated or misbranded and *to assist in efforts by State* and other government agencies to accomplish this objective." 21 U.S.C. § 454(a) (emphasis added).

### i.    SB 1084 does not regulate "ingredients."

Counts I and II fail because SB 1084 does not run afoul of the PPIA's Ingredients Clause. UPSIDE alleges that "[u]nder the PPIA, cultivated chicken cells and poultry meat made from such cells are allowable ingredients in poultry food products." Am. Compl. ¶ 131, 148. This claim is dubious for two reasons: one, the PPIA doesn't address cultivated chicken cells; and two, calling cultivated chicken cells the "ingredient" in a mass of cultivated chicken cells is tautological and a distortion of language. But even taking the

-13-

allegation as true, the PPIA's so-called Ingredients Clause does not mandate consumer access to products with certain ingredients. Rather, that clause merely specifies the "ingredient requirements" for "articles prepared at any official establishment in accordance with the requirements under this chapter." 21 U.S.C. § 467e. That section of the Act also contains a saving clause, expressly permitting state laws on the subject: "This chapter shall not preclude any State . . . from making requirement or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter." 21 U.S.C. § 467e.

SB 1084 makes only a broad, general reference to "meat or food product produced from cultured animal cells" and no reference at all to what ingredients any manufacturer may put in its product. The Amended Complaint does not allege that SB 1084 sets requirements for the particular ingredients in UPSIDE's quasi-chicken products (which it does not). The Amended Complaint does not allege that SB 1084 conflicts in any way with codified federal ingredient regulations (which it also does not). *See* 9 C.F.R. 381.2; *see also* Am. Comp. ¶ 35. And UPSIDE has not identified any federal law setting an ingredient requirement for cultivated meat.

-14-

*See also* Order Denying MPI at 16 (noting Plaintiff's counsel's failure to identify such a law). Counts I and II thus fail on the face of the Amended Complaint and the challenged law.

### ii.   SB 1084 does not regulate "facilities."

Similarly, Counts III and IV fail to state a claim because the so-called Facilities Clause is inapplicable, when nothing in SB 1084 regulates UPSIDE's "premises, facilities[, or] operations." 21 U.S.C. § 467e. As alleged, UPSIDE has no manufacturing facilities in Florida; nor does it allege an intent to acquire premises in Florida. The Amended Complaint does not allege that SB 1084 requires UPSIDE to alter its plants, laboratories, production methods, or other operations. And the Amended Complaint "fail[s] to identify any federal requirement that Florida's ban adds to or differs from, such that Florida's law is expressly preempted by the PPIA." Order DE 40 at 18. Further, section 467e's saving clause applies here, too, confirming that Florida is free to "tak[e] other action, consistent with this chapter, with respect to any other matters regulated under [the PPIA]."

In addition, UPSIDE is not an "official establishment" under the PPIA, because UPSIDE does not allege that it conducts "the

slaughter of poultry" or "the processing of poultry products" as defined by the Act, when it creates its cultivated-meat product by proliferating cells. *See* 9 C.F.R. § 381.1(b). So, neither the Ingredients Clause nor the Facilities Clause—nor any part of PPIA— applies or can provide UPSIDE a basis for a cause of action.

### iii.    Federal courts have rejected preemption claims based on allegations that state meat-product bans offend federal regulation.

State-law bans of federally-approved products have often withstood preemption claims. While no courts have yet considered UPSIDE's novel argument involving lab-grown meat and the PPIA, at least two federal circuit courts have already rejected the argument that the Federal Meat Inspection Act preempts state laws banning a certain product. In *Empacadora de Carnes de Fresnillo v. Curry*, the Fifth Circuit held that a Texas law prohibiting the processing, sale, or transfer of horse meat for human consumption was not expressly preempted by FMIA because FMIA's prohibition on states imposing different "[m]arking, labeling, packaging, or ingredient requirements" does not limit a state's ability to regulate what *types* of meats may be sold for human consumption. 476 F.3d 326, 333 (5th Cir. 2007) (vacating injunction and remanding with

-16-

instructions to grant summary judgment for the state). And in

*Cavel International v. Madigan*, the Seventh Circuit held that the

Illinois Horse Meat Act prohibiting slaughter, import, or expert of

horsemeat for human consumption was not expressly preempted by

FMIA because FMIA's regulation of horse meat does not mandate

that states allow horses to be slaughtered for human consumption.

500 F.3d 551, 553–54 (7th Cir. 2007) (affirming dismissal of claims

with prejudice).

UPSIDE's full-throated reliance on *National Meat Association v.*

*Harris*, 565 U.S. 452 (2012), is misplaced. That case involved a

California law regulating the treatment of nonambulatory pigs in a

swine slaughterhouse. There, California's law imposed additional

and different requirements on slaughterhouses than what the FMIA

provided: "Where under federal law a slaughterhouse may take one

course of action in handling a nonambulatory pig, under state law

the slaughterhouse must take another." *Id.* at 460. But the analogy

to the PPIA and SB 1084 misses because the latter does not

mandate what UPSIDE must do. SB 1084 does not "substitute a

new regulatory scheme," as was the case in *National Meat*

*Association*, 565 U.S. at 460; and no further amendment to the

Amended Complaint could ever state facts establishing otherwise.
*National Meat Association* itself noted the difference, with the
unanimous Supreme Court emphasizing that it was not calling
*Empacadora de Carnes* and *Cavel* into question: "The Circuit
decisions upholding state bans on slaughtering horses [for
consumption] . . . do not demand any different conclusion." *Id.* at
467.

In *Graham v. R.J. Reynolds Tobacco, Co.*, the Eleventh Circuit
determined that the federal law regulating tobacco did not preclude
a ban on the sale of cigarettes, recognizing that states are sovereign
and retain historic police powers to protect public health. 857 F.3d
1169, 1188–90 (11th Cir. 2017) (en banc), *cert. denied*, 583 U.S.
1053 (2018) ("Over a hundred years ago, Tennessee, like some
states, passed a law making it a crime to sell cigarettes . . .
Although that experiment in prohibition, like so many others, failed,
Tennessee did not violate the federal Constitution."). Similarly, in
*Marrache*, the Eleventh Circuit held that the district court erred in
concluding that a Florida statute prohibiting the adulteration of
liquor was preempted by the federal Food Additives Amendment
that allowed an additive. 17 F.4th at 1092–97. There was no conflict

-18-

preemption because "the fact that grains of paradise [the added ingredient] can be included in alcohol under federal law does not mean that federal law mandates individual states to allow the sale of alcohol containing grains of paradise." *Id.* at 1095. And because the manufacturer could still sell its adulterated liquor in other states, the Eleventh Circuit "f[ound] no physical impossibility preventing Defendants' compliance with both federal law permitting grains of paradise to be included in alcohol and section 562.455 banning the inclusion of grains of paradise in alcohol sold in Florida." *Id.* So too here.

Florida's ban on cultivated meat is consistent with the purpose of the Florida Food Safety Act and the purpose of Chapter 500, as described in section 500.02: to safeguard the public health and promote the public welfare. "The supervision of the readying of foodstuffs for market has always been deemed a matter of peculiarly local concern." *Marrache*, 17 F.4th at 1095 (quoting *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 144 (1963)). And, like a ban on the sale of cigarettes or adulterated liquor, nothing in the federal law or U.S. Constitution prohibits it.

-19-

### 4.    There is no federal law regulating cultivated meat.

UPSIDE alleges that "[f]or cultivated meat, regulatory oversight is divided between the USDA's Food Safety and Inspection Services (FSIS) and the FDA," Am. Compl. ¶ 29, noting that those two agencies "issued a Formal Agreement outlining how the federal government would apply these laws and regulations to the manufacture, distribution, and sale of cultivated meat and poultry," Am. Compl. ¶ 30. But a "formal agreement" between USDA and FDA regarding cultivated meat is not binding, preemptive federal law. UPSIDE has "disclaimed any reliance upon federal agency agreements to regulate cultivated meat as a basis for its express preemption claims," and all references in the Amended Complaint should be ignored accordingly. DE 40 at 16; *but see* Am. Compl. ¶¶ 30-34 (extensively quoting the disclaimed USDA-FDA formal agreement); ¶¶ 35, 39, 130, 134, 147, 151, 166, 186 (relying on FSIS directive based on the disclaimed formal agreement); ¶¶ 40, 47 (citing USDA guidance document based on disclaimed formal agreement).

Elsewhere in the Complaint, UPSIDE alleges that "[p]ursuant to the PPIA, *as well as other federal legislation*, USDA, in conjunction with FDA, regulates the production, labeling, and distribution of cultivated poultry products," Am. Compl. ¶¶ 129, 146, 165 (emphasis added); and that "[p]ursuant to the PPIA, *as well as other federal legislation*, USDA has established regulations for the safe production, labeling, and distribution of poultry products, which apply to . . . cultivated poultry products," Am. Compl. ¶¶ 130, 147 (emphasis added). What is the "other federal legislation"? The amended complaint never says. Failure to identify federal law governing lab-grown meat is fatal to UPSIDE's preemption claims, which should be dismissed.

If UPSIDE is now resorting to various agency documents to support its claims under the PPIA, those documents cannot bear the weight. When determining whether an agency action constitutes a regulation or a mere policy statement, courts consider effects of the agency action, as well as the agency's expressed intentions. *See CropLife Am. v. EPA*, 329 F.3d 876, 883 (D.C. Cir. 2003). As to effects, courts ask whether the action "(1) impose[s] any rights and obligations, or (2) genuinely leaves the agency and its

-21-

decisionmakers free to exercise discretion." *Id.* (cleaned up). As to expressed intentions, courts look to "(1) the Agency's own characterization of the action; (2) whether the action was published in the Federal Register or the Code of Federal Regulations; and (3) whether the action has binding effects on private parties or on the agency." *Id.* (citing *Molycorp., Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999)).

Here, the USDA–FDA "formal agreement" is simply a policy statement resulting in no codified regulation and leaving each agency discretion to determine how it will fulfill its roles and oversight. The document describes the two agencies' "inten[tions]" and "commitment[s]" regarding food made from cultured animal cells, such as the agencies' "ongoing cooperation to refine the details regarding the[ir] respective roles" and "a joint process by which the Parties [agencies] will identify any changes needed to statutory or regulatory authorities to effect the intended regulatory oversight." And it expressly states an intent to sketch policy contours without binding either agency: "This agreement represents the broad outline of the Parties' present intent to collaborate in areas of mutual interest to HHS-FDA and USDA-FSIS. It does not

create binding, enforceable obligations against either Agency." Such open-ended aspirations are not law.

Likewise, the USDA–FSIS "directive," Am. Compl. ¶ 35, and "compliance guidance," Am. Compl. ¶ 40, UPSIDE cites are not federal law. Both documents merely point back to the USDA–FDA "formal agreement" (which itself was not based on any particular congressional authority) and offer various definitions and updates. None of these agency actions complied with the Administrative Procedure Act for notice and comment in rulemaking. They "do[] not carry the force of law and cannot preempt state[]law." *Carson v. Monsanto Co.*, 92 F.4th 980, 993 (11th Cir. 2024) (en banc) (federal agency actions that did not carry force of law could not impliedly preempt state-law claim); *see also Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2247 (2024) (even when a statute is ambiguous, courts must "independently interpret the statutes," not delegate to agencies for statutory interpretation). In short, none of the FDA or USDA guidance documents Plaintiff cites carries the force of federal law with preemptive effect.

**C.   SB 1084 does not violate the dormant Commerce Clause.**

**1.   Courts employ a general presumption against finding dormant Commerce Clause violations.**

Plaintiff's dormant Commerce Clause claim comes to this Court as a disfavored cause of action. The Supreme Court recently reiterated that " 'extreme caution' is warranted before a court deploys [its] implied authority" under the dormant Commerce Clause. *Nat'l Pork Producers*, 598 U.S. at 390 (cleaned up). Underscoring the point, the Court emphasized that "[p]reventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear.' " *Id.*

No infraction exists here, as the Commerce Clause does not prohibit a state from banning an article of commerce within its borders. *Austin v. State of Tennessee*, 179 U.S. 343, 362 (1900) (rejecting dormant Commerce Clause challenge to Tennessee law prohibiting the sale of cigarettes); *Plumley v. Massachusetts*, 155 U. S. 461 (1894) (state statute banning the sale of artificially colored margarine did not intrude on Congress's power of interstate

regulation under the Commerce Clause); *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1147 (9th Cir. 2015) (rejecting Commerce Clause challenge to a California law making it unlawful to possess, sell, offer for sale, trade, or distribute a shark fin in California); *R.J. Reynolds Tobacco Co. v. Bonta*, 661 F. Supp. 3d 1009, 1017 (S.D. Cal. 2023) (rejecting Commerce Clause challenge to a California law prohibiting sale of flavored tobacco products), aff'd, No. 23-55349, 2023 WL 4546550 (9th Cir. June 28, 2023), cert. denied, 144 S. Ct. 551 (2024); *Bryant Radio Supply, Inc. v. Slane*, 507 F. Supp. 1325, 1329 (W.D. Va. 1981), aff'd, 669 F.2d 921 (4th Cir. 1982) (holding that a Virginia law prohibiting the sale of radar detection devices did not violate the Commerce Clause). And the Supreme Court has rejected a reading of the Commerce Clause that could "require any consumer good available for sale in one State to be made available in every State." *Nat'l Pork Producers*, 598 U.S. at 388 (plurality) (citing state laws banning consumer goods "ranging from fireworks . . . to single-use plastic grocery bags").

### 2. SB 1084 is even-handed, treating in-state and out-of-state interests the same.

As the amended complaint concedes, Am. Compl. ¶ 199, SB 1084 is facially neutral between in-state and out-of-state interests. Florida's law treats all traditional meat vendors the same, on one hand, and all lab-grown meat vendors alike, on the other—making no reference to the location of the entity peddling the product. Facially neutral laws like SB 1084 are presumed inoffensive to the Commerce Clause. *See United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) ("discrimination" under the dormant Commerce Clause "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter" (citation omitted)).

Courts have repeatedly rejected challenges like Plaintiff's to facially neutral laws—including to bans involving meat products. In *Empacadora de Carnes*, 476 F.3d at 336–37, the plaintiff brought a dormant Commerce Clause claim as part of its challenge to Texas's ban on the processing, sale, or transfer of horse meat for human consumption. The Fifth Circuit instructed the district court to enter

summary judgment for Texas on the claim because the law did "not favor local industry [or] place excessive burdens on out-of-state industry." *Id.* at 336–37. Likewise, in *Cavel*, the Seventh Circuit rejected a dormant Commerce Clause claim asserted against Illinois's law banning the slaughter, import, or export of horse meat for human consumption, reasoning that the law applied equally to local merchants and producers, and that any impact on interstate commerce was slight. *Cavel Intern., Inc. v. Madigan*, 500 F.3d 551, 555 (7th Cir. 2007) ("No local merchant or producer benefits from the ban on slaughter."). And the Ninth Circuit in *Association des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F. 3d 937 (9th Cir. 2013), affirmed the district court's denial of a preliminary injunction in a dormant Commerce Clause challenge to California's Health and Safety Code provision banning the sale of products that are the result of force-feeding birds to enlarge their livers beyond normal size. The panel explained that there was no Commerce Clause violation because the statute did not discriminate against out-of-state businesses, when the complete ban did not make distinctions based on the origin of the product and did not directly regulate interstate commerce.

Here, too, Florida's law is a *categorical* ban that does not

create distinctions between in-state versus out-of-state vendors.

Where UPSIDE has chosen to locate its operations is happenstance,

with no effect on the legal analysis of a facially non-discriminatory

law.

### 3.    Plaintiff has not sufficiently alleged harms to the interstate market stemming from Florida's neutral law.

To challenge a facially neutral law based on excessive out-of-

state burden under the dormant Commerce Clause, a plaintiff must

"plead facts 'plausibly' suggesting a substantial harm to interstate

commerce." *Nat'l Pork Producers*, 598 U.S. at 385. The asserted

harms must be broad, "market-wide consequences." *Id.* at 389

(Roberts, C.J., concurring). This requirement stems from the test

that the Supreme Court set forth in *Pike v. Bruce Church, Inc.*, 397

U.S. 137, 142 (1970): "Where [a] statute regulates even-handedly to

effectuate a legitimate local public interest, and its effects on

interstate commerce are only incidental, it will be upheld unless the

burden imposed on such commerce is clearly excessive in relation

to the putative local benefits . . . ." In other words, the test is two-

step: (1) Does the facially neutral law with a legitimate purpose pose

a substantial burden on interstate commerce?; and if so, (2) do the

law's costs to interstate commerce clearly outweigh its local

benefits?

UPSIDE merely alleges harm to its own sales and to Florida

consumers who might wish to try its lab-grown chicken product. As

to sales, the amended complaint doesn't allege harms to the

interstate lab-meat industry as a whole (which is virtually

nonexistent) or even to UPSIDE's own business model—just

reduced potential sales in Florida that are purely speculative and

remote in the first place.[1] And as to consumer harm, "no one thinks

that costs ultimately borne by in-state consumers thanks to a law

they adopted counts as a cognizable harm under [the Court's]

dormant Commerce Clause precedents." *Nat'l Pork Producers*

*Council,* 598 U.S. at 386.

When the Supreme Court recently considered whether to

retain the *Pike* balancing test and how to apply it, "[t]he plurality

held that courts should not even attempt to quantify a state law's

---

[1] UPSIDE's only allegation relating to market harm is the conclusory
allegation that Florida's law impairs UPSIDE's *own* "opportunities to
help grow the nascent market for cultivated meat." Am. Compl.
¶ 110.

local 'benefits' or compare those benefits to the law's costs unless a challenger has first shown that the law inflicts 'substantial burdens on interstate commerce[.]' " *Truesdell v. Friedlander*, 80 F.4th 762, 774 (6th Cir. 2023) (quoting *Nat'l Pork Producers*, 356 U.S. at 383–86). As explained, UPSIDE's allegations do not sufficiently plead a *substantial* burden on the interstate market. But even if it had alleged sufficient facts of substantial interstate burden, UPSIDE's claim would fail under the remainder of the *Pike* test because "the 'costs' side of the *Pike* balance does not consider *all* burdens that a state law might impose; it considers only *interstate-commerce* burdens," which the amended complaint does not plead. *Truesdell*, 80 F.4th at 774 (quoting *Nat'l Pork Producers*, 356 U.S. at 383–86) (emphasis in original).

### 4. SB 1084's practical effects reflect a legitimate local public interest, not discrimination.

UPSIDE's references to statements by state officials do not overcome its failure to allege an interstate burden. And while a state law's "practical effects may also disclose the presence of a discriminatory purpose," *Nat'l Pork Producers*, 598 U.S. at 377, SB 1084's practical effects reveal nothing of the sort and are in line

with other laws that have been upheld in the face of dormant Commerce Clause challenges. As in *Minnesota Creamery*, here "there is no reason to suspect that the gainers" would be in-state firms or that "the losers [would be] out-of-state firms." 449 U. S. 456, 473 (1981). Rather, the losers are lab-grown meat producers, wherever they may be—consistent with Florida "effectuat[ing] a legitimate local public interest." *Pike*, 397 U.S. at 142.

In Supreme Court dormant Commerce Clause precedent evaluating facially neutral laws, "the presence or absence of discrimination *in practice* [has] proved decisive." *Nat'l Pork Producers*, 598 U.S. at 378 (emphasis added). But UPSIDE does not allege that the "practical effects [of SB 1084] in operation would disclose purposeful discrimination against *out-of-state* businesses"—just against lab-grown-meat businesses. *Id.* at 379. SB 1084's ban on lab-grown meat in Florida is blind to the corporate citizenship of its producers.

UPSIDE's allegations that SB 1084 practically "discriminates," Am. Compl. ¶¶ 197, 199, involves a sleight of hand: equating traditional meat with lab-grown meat. Cultivated-meat producers are not a protected class, nor is cultivated-meat production a

fundamental right, nor are cultivated-meat producers similarly situated with conventional-meat producers; and the State of Florida is liberally empowered to make such distinctions. Because SB 1084 functions "without any differential treatment favoring local entities over *substantially similar* out-of-state interests," it "does not discriminate against interstate commerce for purposes of the dormant Commerce Clause." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 343 (2008) (cleaned up).

SB 1084's plain and permissible practical local effect independently shows that Plaintiff fails to state a dormant Commerce Clause claim. Because the Commerce Clause was not crafted to hamstring states in their essential functions as guardians of public welfare, "health and safety considerations [may] be weighed in the process of deciding the threshold question whether the conditions entailing application of the dormant Commerce Clause are present." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 307 (1997). In protecting against the sale of uncertain products, Florida has done exactly what states may do: "adopt laws addressing even 'imperfectly understood' health risks associated with goods sold within their borders." *Nat'l Pork Producers*, 598 U.S. at 382. In

particular, states may consider "health interests of some (disputable) magnitude for in-state residents," and "weigh the relevant political and economic costs and benefits for themselves" through the democratic process. *Id.*

Promoting public health and safety through a ban on untested lab-grown meat does far more than "further the purpose . . . marginally while interfering with commerce . . . substantially"—and the amended complaint does not include allegations stating otherwise. *Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1144 (11th Cir. 2022). This Court need look no further than UPSIDE's allegations on their face to conclude that the amended complaint fails to state a dormant Commerce Clause claim.

## IV.    Conclusion

On Counts I through IV, the plain language of the PPIA precludes UPSIDE's cause of action, and the plain text of SB 1084 imposes no conflicting ingredient or facilities requirements on UPSIDE. On Count V, Florida's law does not distinguish between in-state and out-of-state interests, nor does it otherwise unduly burden the interstate market for lab-grown meat. The Court should

dismiss the amended complaint with prejudice because the asserted

claims fail as a matter of law, and no set of facts would entitle

UPSIDE to relief.

Respectfully submitted,

/s/ Daniel Nordby

SEAN T. GARNER (FBN 26096)
DARBY G. SHAW (FBN 58728)
**FLORIDA DEPARTMENT OF**
**AGRICULTURE & CONSUMER**
**SERVICES**
4040 Esplanade Way,
Suite 135
Tallahassee, FL 32399-7032
(850) 245-5515
Sean.Garner@fdacs.gov
Darby.Shaw@fdacs.gov

RICKY L. POLSTON (FBN 648906)
DANIEL E. NORDBY (FBN 14588)
DENISE M. HARLE (FBN 81977)
ASHLYN R. BANKS (FBN 1002580)
KASSANDRA S. REARDON (FBN 103320)
**SHUTTS & BOWEN LLP**
215 South Monroe Street,
Suite 804
Tallahassee, Florida 32301
(850) 241-1717
DNordby@shutts.com
RPolston@shutts.com
DHarle@shutts.com
KReardon@shutts.com
ABanks@shutts.com

*Counsel for Commissioner Wilton Simpson*

## CERTIFICATE OF COMPLIANCE

This motion complies with Local Rule 7.1(F) because it contains 6,314 words.

*/s/ Daniel Nordby*
Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2024, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

*/s/ Daniel Nordby*
Attorney