# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

|  |  |
|---|---|
| UPSIDE FOODS INC.,<br><br>    Plaintiff,<br><br>        v.<br><br>WILTON SIMPSON, in his official capacity as Commissioner of the Florida Department of Agriculture and Consumer Services, et al.,<br><br>    Defendants. | Case No. 4:24-cv-316 |

## STATE ATTORNEY DEFENDANTS' MOTION TO DISMISS

States may ban "particular structure[s] or methods of operation in a retail market," *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978), particularly when those bans are "designed [to] protect[] the public health." *Austin v. Tennessee*, 179 U.S. 343, 349 (1900). That authority enables states to outlaw scores of harmful products and practices—from menthol cigarettes[1] and microplastics,[2] to puppy mills[3] and horsemeat.[4]

---

[1] *See R.J. Reynolds Tobacco Co. v. Bonta*, 661 F. Supp. 3d 1009, 1012 (S.D. Cal. 2023), *aff'd*, No. 23-55349, 2023 WL 4546550 (9th Cir. June 28, 2023).

[2] *E.g.*, 415 Ill. Comp. Stat. 5/52.5; N.J. Stat. § 58:10A-71.

[3] *See Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 503 (7th Cir. 2017); *Just Puppies, Inc. v. Frosh*, 565 F. Supp. 3d 665, 723 (D. Md. 2021).

[4] *See Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 555 (7th Cir. 2007); *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 335 (5th Cir. 2007).

Florida did nothing more when it banned cell-cultivated meat—an untested food product made from lab-grown animal cells. Even so, UPSIDE Foods, Inc. contends that the Dormant Commerce Clause and a federal poultry law each command Florida to permit cell-cultivated meat within its borders. That is all wrong. SB 1084 does not offend the Dormant Commerce Clause because it "treats all comers equally without regard to citizenship or location." *Locke v. Shore*, 682 F. Supp. 2d 1283, 1293 (N.D. Fla. 2010) (Hinkle, J.). And it does not violate federal poultry law for the reasons given in this Court's preliminary-injunction order and the State Attorneys' corresponding brief. *See* DE35, 40. The Court should dismiss the complaint.

## BACKGROUND

### A.    UPSIDE's cell-cultivated-meat product

In the early 2000s, researchers began developing cell-cultivated meat.[5] Cell-cultivated meat "consists of animal cells or tissues that are grown directly, rather than being grown inside an animal." DE44 ¶ 15.[6] The product is in its infancy: The first cell-cultivated-meat item "developed for human consumption [was created] in 2013," and just two companies sell the meat in

---

[5] Neil Stephens et al., *Making Sense of Making Meat: Key Moments in the First 20 Years of Tissue Engineering Muscle to Make Food*, 3 Frontiers in Sustainable Food Sys. 1 (2019), https://tinyurl.com/y63weznm.

[6] Unless otherwise noted, this brief omits from its authorities all quotations, citations, emphases, and alterations original to the authority. Any alterations or emphases within this brief are added.

the United States today. Lisa S. Benson et al., *Cell-Cultivated Meat: An Overview (CRS Report)* at 1, Cong. Rsch. Serv. (2023), https://tinyurl.com/mtmksfef.

One of those companies is Plaintiff UPSIDE Foods, Inc. (UPSIDE). DE44 ¶ 14. UPSIDE is a California-based company that has developed what it terms a "cultivated chicken product." *Id.* ¶¶ 1, 42. To make that product, UPSIDE extracted cells from a "fertilized chicken egg,"[7] manipulated them to multiply indefinitely (a process call "immortalization"[8]), and "generate[d] a large master cell bank." *Supra* note 7 (in the "Cultivation Glossary" tab). To grow that cell bank into meat, UPSIDE places cells from the bank into a "cultivator"—effectively, a steel vat. *Id.*; CRS Report at 3. And once the meat cells mature, UPSIDE empties the vat, sifts through the mix to find the cells, and "mold[s]" the byproduct "into the shape of a chicken filet." *Supra* note 7 (in the "04 Prepare" tab).[9]

The United States Department of Agriculture (USDA) and the Food and Drug Administration (FDA) have asserted joint jurisdiction over

---

[7] *See Innovation*, Upside Foods, https://tinyurl.com/y5wyfvfh (visited Nov. 15, 2024) (in the "Where do you obtain your cells?" tab).

[8] Fasano, *Memorandum on Cell Culture Consultation 000002* (CCC Memo) at 6, FDA (2022), https://tinyurl.com/acbs7uk8.

[9] *See What the FDA Evaluated During the First Completed Pre-Market Consultation*, FDA, https://tinyurl.com/2v9ee368 (sketching out the process) (visited Nov. 15, 2024); CCC Memo (detailing UPSIDE's process).

UPSIDE's product.[10] Per their agreement, FDA supervises the process of "cell collection" and the "proliferation and differentiation of cells through the time of harvest." *Id.* at 2. USDA, in turn, oversees the "harvest[ing]" of the cell-cultured meat and the development of that meat into a product. *Id.* at 3. USDA, however, may not "inspect activities solely regulated by" the FDA, like the process for culturing cells. *Id.*

Following that framework, USDA has approved one of UPSIDE's manufacturing plants for operation and authorized UPSIDE to label its product as "cell-cultivated chicken." DE44 ¶ 45; CRS Report at 11. But USDA has not directed states to allow UPSIDE to sell its product in their poultry markets, or even suggested that it would have the statutory authority to do so. *See* CRS Report at 8-11.

### B.   SB 1084

Like other emerging and experimental technologies, cell-cultivated meat has sparked national and international debate. Though some herald it as a panacea for climate change and food poverty, *see* DE44 ¶¶ 20-26, others worry both about the unknown health consequences of ingesting

---

[10] *See Formal Agreement Between the FDA and USDA*, FSIS (March 7, 2019), https://tinyurl.com/3cftffap.

immortalized cells and about the erosion of traditional agricultural methods.[11] Citing those concerns, Italy and Alabama have banned cell-cultivated meat,[12] and other states have considered similar action. *See* H.B. 597, 24 Reg. Sess. (Ky. 2024); H.B. 5879, 2024 Reg. Sess. (Mich. 2024); S.B. 2870, 113th Gen. Assemb. (Tenn. 2024); H.B. 2121, 56th Leg., 2d Reg. Sess. (Ariz. 2024).

Those concerns were at the forefront during Florida's 2024 legislative session. Legislators stressed that "we don't know [what] using an immortalized cell in a human body will do in the next 25 years,"[13] and "[t]here is no guarantee of safety for the consumer."[14] Cell-cultivated meat, they said, also lacks many "bio-active compounds" that humans derive from conventional meat.[15] By contrast, legislators noted, conventional "agriculture can hold us down and provides plenty of safe, quality beef and agricultural products." DE44 ¶ 90. And since conventional meat obviates any "absolute need for [cell-cultivated meat]," legislators thought it wise to first "make sure [that

---

[11] Joel L. Greene et al., *Regulation of Cell-Cultured Meat*, Cong. Rsch. Serv. (2018), https://tinyurl.com/484e57e4; *infra* notes 13, 15-16 (citing the legislative debates over SB 1084).

[12] Angelo Amante, *Italy's Parliament Approves Ban on Lab-grown Food Amid Tensions*, Reuters (Nov. 16, 2023), https://tinyurl.com/m3c2j424; Ala. Stat. § 20-1-8.

[13] *Florida Crossroads—It's a Law 2024: Part 3* at 12:44, The Fla. Channel (June 21, 2024), https://tinyurl.com/bdf5zanf (Rep. Daniel Antonio Alvarez Sr.).

[14] *Id*. at 13:04 (Sen. Jay Collins).

[15] *House Session* at 1:11:22, The Fla. Channel (Mar. 6, 2024), https://tinyurl.com/4x78trfh (Rep. Dean Black).

the meat is] safe for the normal person" before permitting its sale.[16] Florida "has a responsibility to keep [its] consumer[s] safe,"[17] and it would not "allow [its] citizens to be used as a petri dish."[18]

Against that backdrop, Florida enacted SB 1084. *See* Ch. 2024-137, § 25, Laws of Fla. (codified at Fla. Stat. §§ 500.452, 500.03). That law makes it "unlawful for *any person* to manufacture for sale, sell, hold or offer for sale, or distribute cultivated meat in this state"—no matter the person's state of origin. Fla. Stat. § 500.452(1). It defines "[c]ultivated meat" as "any meat or food product produced from cultured animal cells." *Id*. § 500.03(k). Those who violate the law can face civil and criminal penalties. *Id*. § 500.452(2)-(5).

SB 1084 took effect on May 1, 2024. *See* Ch. 2024-137, §§ 25, 50. Nearly three months later, UPSIDE sued. DE1 (filed Aug. 12, 2024). It alleged that SB 1084 is preempted by the Poultry Products Inspection Act (PPIA) and violates the Dormant Commerce Clause. *Id*. ¶¶ 119-70. It later moved for a preliminary injunction based only on its preemption counts, DE11, which this Court denied on the merits. DE40 at 15-21. UPSIDE then amended its complaint to add putative equitable causes of action for its PPIA claims, but it did

---

[16] *House Session* at 2:13:00, The Fla. Channel (Mar. 5, 2024), https://tinyurl.com/4pexdcc9 (Rep. Daniel Antonio Alvarez Sr.).

[17] *Supra* note 13 at 13:08 (Sen. Jay Collins).

[18] *Id*. at 12:54 (Rep. Daniel Antonio Alvarez Sr.).

not substantively alter its PPIA and Dormant Commerce Clause theories. *Compare* DE1 *with* DE44.

## LEGAL STANDARD

A complaint must "state a claim to relief that is plausible," not "mere[ly] possib[le]." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). To "nudge[] [its] claims across the line from conceivable to plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), UPSIDE must "plead[] factual content"—not "mere conclusory statements"—"allow[ing] the court to draw the reasonable inference" of liability. *Iqbal*, 556 U.S. at 678; *see Doe v. Emory Univ.*, 110 F.4th 1254, 1261 (11th Cir. 2024). If UPSIDE's allegations "are merely consistent with [the State's] liability," they suggest only the "possibility of misconduct" and "fall short of being facially plausible." *Doe v. Samford Univ.*, 29 F.4th 675, 685 (11th Cir. 2022); *Iqbal*, 556 U.S. at 679. Courts may use their "judicial experience and common sense" in that analysis, *Iqbal*, 556 U.S. at 679, and "may infer from [the complaint] obvious alternative explanations, which suggest lawful conduct" rather than "unlawful conduct." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010). When such obvious alternative explanations exist, the claim is implausible and should be dismissed. *See id.* (applying *Iqbal*).

## ARGUMENT

UPSIDE has not stated a claim. Its Dormant Commerce Clause claim fails because its complaint does not allege facts showing that SB 1084 either "purposely discriminate[s]" against out-of-state residents or imposes a "substantial" and "clearly excessive" burden on interstate commerce. *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 371, 377 (2023) (affirming dismissal of a dormant-commerce claim). And its PPIA claims fail for the reasons given in this Court's order denying the preliminary injunction, DE40, and in the State Attorneys' opposition, DE35.

## I.   UPSIDE has not plausibly alleged a Dormant Commerce Clause violation.

The Commerce Clause empowers Congress to "regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. That power implies a "dormant" restriction on state-driven "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Pork Producers*, 598 U.S. at 369.

To prove a Dormant Commerce Clause violation, UPSIDE must travel one of two paths. *See Locke v. Shore*, 634 F.3d 1185, 1192 (11th Cir. 2011). First, UPSIDE may show that SB 1084 "discriminates" against out-of-state residents to benefit Florida residents. *Id.* That "antidiscrimination rule" represents "the core" of the Dormant Commerce Clause. *Pork Producers*, 598

8

U.S. at 377. Second, UPSIDE may establish that SB 1084 fails the *Pike* balancing test. *Id.* (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970)). To do so, UPSIDE must show that SB 1084 inflicts a "substantial burden on interstate commerce," *id.* at 383 (plurality op.),[19] that is "clearly excessive in relation to [SB 1084's] local benefits." *Locke*, 634 F.3d at 1192; *see Norwegian Cruise Line Holdings Ltd v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1142 (11th Cir. 2022).

UPSIDE has stated neither claim. Its complaint does not suggest that SB 1084 discriminates against out-of-state residents. Nor does it show that SB 1084 imposes a substantial and clearly excessive burden on interstate commerce.

### A.    UPSIDE has not plausibly alleged that SB 1084 discriminates against out-of-state residents.

A law offends the Dormant Commerce Clause when it "purposely discriminate[s] against out-of-state economic interests." *Pork Producers*, 598 U.S. at 371 (majority op.). Purposeful economic discrimination can arise "on [the law's] face or in [its] effect." *Locke*, 634 F.3d at 1192; *see Norwegian*, 50 F.4th at 1141.

---

[19] Though the Justices in *Pork Producers* split on many issues, all nine agreed that a plaintiff must plausibly allege a "substantial burden against interstate commerce" to state a claim under *Pike*. *See* 598 U.S. at 383-87 (Gorsuch, J., joined by Thomas, Kagan, and Sotomayor, JJ.); *id.* at 395 (Roberts, C.J., joined by Alito, Kavanaugh, and Jackson, JJ., concurring in part and dissenting in part); *id.* at 394 (Barrett, J., concurring in part).

At the threshold, UPSIDE does not (and cannot) contend that SB 1084 discriminates on its face. *See* DE44 ¶¶ 199-200. The law prohibits "any person" from dealing cell-cultivated meat "in this state." Fla. Stat. § 500.452. That text does not distinguish between local and non-local residents; "both Florida and out-of-state [residents]" alike must follow its prohibitions. *Locke*, 634 F.3d at 1192 (law requiring all designers to be licensed was facially neutral); *see Norwegian*, 50 F.4th at 1142 (same for law banning all businesses from requiring vaccine passports).

Because SB 1084 is facially neutral, UPSIDE must show that the law discriminates against out-of-state residents "in effect." *Locke*, 634 F.3d at 1193. To meet that task, UPSIDE says that SB 1084 discriminates against out-of-staters by shuttling market share to the conventional-meat industry, *see* DE44 ¶¶ 201-204, and that legislators enacted SB 1084 with "discriminatory purpose." *See id.* ¶¶ 200, 204; *see Locke*, 634 F.3d at 1192 (motive is relevant to the discriminatory-effects inquiry). Neither assertion states a claim.

### 1. Discriminatory effect

UPSIDE first contends that SB 1084 "operates with discriminatory effect" because it "ban[s] distribution of a product that is produced solely outside the state and that otherwise would compete with in-state conventional meat producers." DE44 ¶ 204. Its theory is that SB 1084 bans a poultry

product made only by out-of-state companies (at least for now), which will effectively funnel poultry consumers toward a conventional-poultry industry comprised of in-state producers.

That contention fails because SB 1084 does not favor in-staters over out-of-staters; it favors *conventional* methods of producing poultry over non-conventional methods (like cell cultivation). Florida's favoritism for a "particular structure or method[] of operation in a retail market," *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978), is not discriminatory so long as the State "treats all comers equally without regard to citizenship or location." *Locke v. Shore*, 682 F. Supp. 2d 1283, 1293 (N.D. Fla. 2010) (Hinkle, J.). And here, SB 1084's "outright ban[]" on peddling cell-cultivated meat "applies equally" to both in-state and out-of-state producers, so the law does not discriminate against interstate commerce. *Trs. of Ind. Univ. v. Curry*, 918 F.3d 537, 543 (7th Cir. 2019) (Easterbrook, J.) (equally applicable ban on possessing fetal tissue did not discriminate against interstate commerce); *see Norwegian*, 50 F.4th at 1142 (same for law barring all businesses from requiring vaccine passports); *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 555 (7th Cir. 2007) (same for ban on the sale of horsemeat); *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris (Canards I)*, 729 F.3d 937, 948 (9th Cir. 2013) (same for ban on the sale of meat grown by force-feeding);

*Turtle Island Foods, SPC v. Thompson*, No. 2:18-cv-4173, 2024 WL 1342597, at \*7 (W.D. Mo. Mar. 26, 2024) (same for advertising restriction on cell-cultivated meat).

Cases applying that principle are legion. In *Exxon*, for instance, the Supreme Court considered a Maryland law that banned gasoline manufacturers from operating retail gas stations within the state. Although the law disproportionately burdened out-of-state residents (for Maryland had no in-state gas manufacturers), the Court held that the ban did not discriminate against interstate commerce because the law neither "distinguish[ed] between in-state and out-of-state companies in the retail market," nor "place[d] added costs" or burdens on gas retailers because of their out-of-state status. *Exxon*, 437 U.S. at 126. Rather, both in-state and out-of-state gas dealers were equally regulated by the law, so the law did not grant in-state dealers a "competitive advantage over out-of-state dealers." *Id.*

The Eleventh Circuit applied the same logic in *Locke v. Shore*. There, out-of-state designers challenged a Florida law requiring all designers to "obtain a license to practice interior design in commercial settings." 634 F.3d at 1193. Judge Hinkle held that the law did not discriminate against out-of-staters because it treated all designers "equally without regard to their citizenship or location." *Locke*, 682 F. Supp. 2d at 1293. Applying *Exxon*, the

Eleventh Circuit affirmed: Because the law required "both in and out-of-state" designers to obtain a license, it was not discriminatory. *Locke*, 634 F.3d at 1193.

Finally, this Court followed that reasoning to uphold Panama City Beach's "Spring Break Ordinances." *Funtana Vill., Inc. v. City of Panama City Beach*, No. 5:15-cv-282, 2016 WL 375102, at *7 (N.D. Fla. Jan. 28, 2016). Those ordinances imposed various restrictions on nightlife during the month of March (when most universities pause for Spring Break). *Id.* at *1-2. Though many out-of-staters visited the City during Spring Break (and thus were disproportionately affected by the ordinances), this Court held that the ordinances were "not discriminatory within the meaning of the Dormant Commerce Clause," because they "appl[ied] equally to locals and non-locals during [March]." *Id.* at *8. Nor did the ordinances even grant locals the relative advantage of unencumbered "libating during the rest of the year," as non-locals who visited the City during that time were *also* free of the ordinances, and thus were "treated exactly the same as th[e] locals" were. *Id.*

UPSIDE's claim cannot withstand those precedents. Just as Maryland barred any gas manufacturer from owning a gas station, as Florida banned any unlicensed designer from designing, and as Panama City Beach blocked any person from late-night libating during Spring Break, SB 1084 prohibits

"*any person*" from dealing cell-cultivated meat "in this state." Fla. Stat. § 500.452. That "blanket prohibition" applies equally to both local and non-local meat producers, *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 335 (5th Cir. 2007), so it "is not discriminatory within the meaning of the Dormant Commerce Clause." *Funtana*, 2016 WL 375102, at *8.

It does not matter if SB 1084 effectively pushes poultry consumers away from cell-cultivated poultry and toward conventional poultry. Restrictions on one "method[] of operation in [a State's] market" do not offend the Dormant Commerce Clause so long as "[o]ut-of-state businesses" who "comply with the [restriction]" may still "freely enter the market." *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 943-45 (11th Cir. 2013). In that event, the law's "practical effect" is not "to protect in-state producers," but "to shift market share from one set of out-of-state firms ([those who don't comply with the restriction]) to another ([those who do])." *Pork Producers*, 598 U.S. at 384-85 (plurality op.); *see id.* at 378 (majority op.). And here, Florida permits out-of-state firms to compete in the State's poultry trade so long as they "comply with [Florida's restriction on cell-cultivating meat]." *Fresenius*, 704 F.3d at 945; *see Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 503 (7th Cir. 2017) (upholding similar restriction on puppy mills).

14

Also irrelevant are UPSIDE's complaints that because "[t]here are no producers of cultivated meat in Florida," DE44 ¶ 201, "the burden[s]" imposed by SB 1084 "fall[] solely on [out-of-state entities]." *Fresenius*, 704 F.3d at 943-44. "[T]he fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Funtana*, 2016 WL 375102, at *8 n.10 (quoting *Exxon*, 437 U.S. at 126). That "is so even when only out-of-state businesses are burdened because there are no comparable in-state businesses." *Canards I*, 729 F.3d at 948; *see Fresenius*, 704 F.3d at 943-44 (upholding Florida law that burdened only out-of-state companies). That no Florida business has yet dared to compete with UPSIDE's nascent mystery-meat experiment more plausibly demonstrates good sense, not protectionism.

### 2.    Discriminatory purpose

Because SB 1084 treats in-state and out-of-state residents alike, UPSIDE's complaint mainly focuses on SB 1084's alleged "purpose of shielding in-state agricultural interests from . . . interstate competition." DE44 ¶ 204; *see Locke*, 634 F.3d at 1192-93 (motive can help establish that a law discriminates "in effect"). But those purpose-based allegations do not state a claim. To begin with, discriminatory motive alone does not offend the Dormant Commerce Clause without an actual discriminatory effect. And even if

15

motive alone could suffice, UPSIDE's complaint does not plausibly assert that Florida enacted SB 1084 to discriminate against out-of-state residents.

### a) Purpose alone cannot establish a Dormant Commerce Clause violation.

The Supreme Court has never "struck down a statute [under the Dormant Commerce Clause] solely on the ground that it was motivated by a discriminatory purpose." *Just Puppies, Inc. v. Frosh*, 565 F. Supp. 3d 665, 723 (D. Md. 2021).[20] And in recent years, the Court has clarified that bare discriminatory purpose does not violate the Dormant Commerce Clause—the plaintiff must always show that the challenged law causes discriminatory effects. *See Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 561 n.4 (2015); *see also Pork Producers*, 598 U.S. at 371.[21]

---

[20] Though the Court has at times suggested that a dormant-commerce violation "may be [premised] on the basis of either discriminatory purpose or discriminatory effect," *Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 270 (1984), the Court has always found discriminatory purpose in part *because* the law had a discriminatory effect. *See id.* at 271; *see, e.g.*, *Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 654 (1994); *Am. Trucking Ass'ns v. Scheiner*, 483 U.S. 266, 286 (1987); *City of Philadelphia v. New Jersey*, 437 U.S. 617, 626-27 (1978); *Gregg Dyeing Co. v. Query*, 286 U.S. 472, 481 (1932).

[21] *See also Foresight Coal Sales, LLC. v. Chandler*, 60 F.4th 288, 296 & n.1 (6th Cir. 2023) (collecting authorities recognizing that purpose alone should not suffice); *Truesdell v. Friedlander*, 80 F.4th 762, 772-73 (6th Cir. 2023); *Am. Trucking Ass'ns v. Alviti*, 14 F.4th 76, 89 (1st Cir. 2021); *All. of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 36 n.3 (1st Cir. 2005); *Puppies 'N Love v. City of Phoenix*, 116 F. Supp. 3d 971, 993 (D. Ariz. 2015), *vacated for mootness*, 283 F. Supp. 3d 815 (D. Ariz. 2017); *Wal-Mart Stores v. City of Turlock*, 483 F.Supp.2d 987, 1012-13 (E.D. Cal. 2006); *Just Puppies*, 565 F. Supp. 3d at 723.

That rule flows straight from *Wynne*. There, Maryland argued that it was "free to adopt any tax scheme that is not *actually intended* to discriminate against interstate commerce." 575 U.S. at 561 n.4. In other words, Maryland claimed that discriminatory motive was all that mattered in dormant-commerce cases. But the Court rejected that view. The Dormant Commerce Clause, it held, "regulates *effects*, not motives, [so] it does not require courts to inquire into voters' or legislators' reasons for enacting a law that has a discriminatory effect." *Id.* And since the Dormant Commerce Clause "regulates effects," bare discriminatory motive cannot establish a dormant-commerce violation. *See Foresight Coal*, 60 F.4th at 296 n.1.

The Court confirmed that rule in *Pork Producers*. Throughout its majority opinion, the Court reiterated that the Dormant Commerce Clause bars "*purposeful discrimination* against out-of-state economic interests." 598 U.S. at 371; *see id.* at 379. To have purposeful discrimination, though, a law must in fact *discriminate* against a particular class. And a law does not discriminate under the Dormant Commerce Clause unless it treats "in-state and out-of-state economic interests" differently by "benefit[ting] the former and burden[ing] the latter." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007).

17

The Court requires discriminatory effects for good reason. The Dormant Commerce Clause safeguards "private trade in the national marketplace," *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997), but "equality [in] the flow of commerce is measured in dollars and cents, not legal abstractions." *Lohman*, 511 U.S. at 654. Purposeful yet ineffectual discrimination is simply not "problematic" for interstate trade, so it does not offend the dormant-commerce principle. *See Foresight Coal*, 60 F.4th at 296 n.1. And by requiring discriminatory effects, the Dormant Commerce Clause tracks other areas of discrimination jurisprudence, all of which require that the challenged law have a discriminatory effect. *E.g.*, *Red Door Asian Bistro v. City of Fort Lauderdale*, No. 22-11489, 2023 WL 5606088, at *7 (11th Cir. Aug. 30, 2023) (racial discrimination under the Equal Protection Clause); *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018) (retaliation under Title VII); *Karantsalis v. City of Miami Springs*, 17 F.4th 1316, 1322 (11th Cir. 2021) (discrimination under the ADA).

To sum up, any showing of discriminatory economic purpose must be paired with discriminatory economic effects. *See Wynne*, 575 U.S. at 561 n.4; *Pork Producers*, 598 U.S. at 371. And because SB 1084 does not have discriminatory effects, *supra* 10-15, UPSIDE's allegations about the law's purpose fall short.

      **b)**      **In any event, UPSIDE has not plausibly al-
leged that Florida enacted SB 1084 to dis-
criminate against out-of-state residents.**

Even if purpose alone could establish unlawful discrimination, UP-

SIDE has not plausibly asserted that Florida enacted SB 1084 to discriminate

against non-locals. To meet that mark, UPSIDE must overcome the strong

"presumption of good faith" accorded to state legislators. *Wal-Mart Stores,*

*Inc. v. Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206, 217 (5th Cir. 2019);

*see League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 923

(11th Cir. 2023). And it must allege facts dispelling any "obvious alternative

explanation[s]" for SB 1084. *Emory Univ.*, 110 F.4th at 1263; *see Denton v.*

*Bd. of Governors for State Univ. Sys. of Fla.*, 713 F. Supp. 3d 1207, 1218

(N.D. Fla. 2024) (Hinkle, J.). Its complaint does not come close.

For starters, the Legislature has expressly stated its "purpose" in en-

acting SB 1084. *Locke*, 634 F.3d at 1194. It placed SB 1084 in Chapter 500 of

the Florida Statutes,  Ch. 2024-137, § 24, Laws of Fla., and provided that the

"[p]urpose of chapter [500]" is to "[s]afeguard the public health . . . by pro-

tecting the consuming public from injury by product use." Fla. Stat. § 500.02.

That "clear statutory statement of purpose" is the best evidence of the Legis-

lature's true motive for enacting SB 1084, particularly given the lack of con-

trary textual evidence. *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*,

267 F.3d 1228, 1240 (11th Cir. 2001) (divining legislative purpose from a purpose statement because "the focal point for determining a legislature's purpose . . . must be the plain language of the statute itself"); *see Locke*, 634 F.3d at 1194 (holding that Florida's licensing statute was not protectionist when the statute stated that its "primary legislative purpose" was to ensure "safe practice"); *Truesdell v. Friedlander*, 80 F.4th 762, 773 (6th Cir. 2023) (similar for an ambulance-licensing law).

To overcome that clear text, UPSIDE collects statements from political actors about SB 1084. DE44 ¶¶ 66-79, 82-87, 90-91, 99-100. But the "subjective mindsets" of individual lawmakers reveal little about the Legislature's "single intent" for enacting SB 1084. *Truesdell*, 80 F.4th at 773; *see Wynne*, 575 U.S. at 561 n.4. And regardless, those statements do not plausibly suggest that Florida enacted SB 1084 to discriminate against out-of-state companies. Rather, the "equally or more plausible alternative explanation" is that Florida passed SB 1084 to favor a particular market structure (a conventional poultry market) and to safeguard citizens from an untested food product. *Denton*, 713 F. Supp. 3d at 1218.

Take UPSIDE's allegations about officials expressing their preference for conventional agriculture. *E.g.*, DE44 ¶¶ 67-69, 70-76, 80-83, 90-91, 96-100. UPSIDE asserts that SB 1084 was signed "in a rural Florida county that

is known for cattle ranching," *id.* ¶ 67; that the podium at the signing said "SAVE OUR BEEF," *id.* ¶ 68; that cattle ranchers spoke in support of the law, *id.* ¶¶ 69, 80-81, 91, 96; that public officials called cell-cultivated meat "a threat to agriculture as we know it," *id.* ¶ 86; *see id.* ¶ 70; and that officials announced their support for SB 1084 because they "stand with agriculture," *id.* ¶ 74, and would not "let agriculture fail in the state of Florida." *Id.* ¶ 83; *see id.* ¶¶ 70, 75-76, 86, 99-100.

Those allegations are "as consistent with an innocent explanation as with an actionable one," *Denton*, 713 F. Supp. 3d at 1218: that Florida enacted SB 1084 because it prefers conventional "structure[s] and methods of operation" in its agricultural industry. *Exxon*, 437 U.S. at 126-27. As explained, *supra* 10-15, "[f]avoritism for [a particular type of agricultural market] does not pose a constitutional problem," *Baude v. Heath*, 538 F.3d 608, 615 (7th Cir. 2008), so long as that market remains open to "all comers." *Locke*, 682 F. Supp. 2d at 1293; *see Fresenius*, 704 F.3d at 943. And under SB 1084, "[o]ut-of-state businesses may [still] freely enter the market to [sell poultry] in Florida so long as they comply with the [Act's] prohibition [on cell-cultivated meat]." *Fresenius*, 704 F.3d at 944. The statements UPSIDE cites are thus equally "consistent" with an obvious, "non-actionable explanation" for the law, so its complaint "stop[s] short of the line between possib[le]

21

and plausib[le]." *Emory Univ.*, 110 F.4th at 1260; *see also Turtle Island Foods*, 2024 WL 1342597, at *7 (rejecting dormant-commerce challenge to advertising restriction on cell-cultivated meat, even when legislators said that the law was enacted to "protect our meat industry," because the statements merely reflected a desire to protect the integrity of the conventional-meat industry).

UPSIDE's complaint is also "consistent with [the] innocent explanation" that Florida enacted SB 1084 to protect the public from an untested food product. *Denton*, 713 F. Supp. 3d at 1218. Consider the legislative debates, which UPSIDE has incorporated into the complaint by reference. *See Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1189 (11th Cir. 2018). Legislators supporting SB 1084 underscored, on the one hand, that "we don't know [what] using an immortalized cell in a human body will do in the next 25 years,"[22] that "[t]here is no guarantee of safety for the consumer,"[23] and that cell-grown meat lacks many "bio-active compounds" that humans derive from conventional meat.[24] On the other hand, they explained, "Florida's [conventional] agriculture" industry "can hold us down and provides plenty of safe, quality beef." DE44 ¶ 90. The debates, in short, confirm

---

[22] *Supra* note 13 at 12:44 (Rep. Daniel Antonio Alvarez Sr.).

[23] *Id.* at 13:04 (Sen. Jay Collins).

[24] *Supra* note 15 at 1:11:22 (Rep. Dean Black).

that the Legislature enacted SB 1084 "to keep [Florida's] consumer[s] safe"[25]—exactly as the Legislature provided in SB 1084's purpose statement. *See* Fla. Stat. § 500.02(1); *see also Locke*, 634 F.3d at 1194 (similar).

UPSIDE's other allegations do not move the needle. It first notes that "Florida has a robust conventional meat industry," yet has "no Florida-based producers" in the cell-cultivated-meat industry. DE44 ¶¶ 87-88. But as explained, *supra* 15, a law does not discriminate against interstate commerce merely because the "burden" of the law "falls solely on [out-of-state companies]." *Fresenius*, 704 F.3d at 943-44; *see Funtana*, 2016 WL 375102, at *8 n.10 (quoting *Exxon*, 437 U.S. at 126).

Next, UPSIDE quotes statements from officials citing cell-cultivated meat's popularity in California. DE44 ¶¶ 79, 91. But those statements, taken in "context," *Just Puppies*, 565 F. Supp. 3d at 723, show only that officials disagree with another polity's ideological preference for the newfangled science of cultivating meat. Those passing references do not plausibly suggest that Florida enacted SB 1084 to discriminate against California companies, especially when SB 1084 "applies equally" to Florida companies. *Curry*, 918 F.3d at 543.

---

[25] *Supra* note 13 at 13:08 (Sen. Jay Collins).

Finally, UPSIDE notes that officials at the signing event also cited Florida's restrictions on land ownership by foreign governments of concern. DE44 ¶¶ 71, 78; *see* Fla. Stat. §§ 692.201-04. Yet UPSIDE does not explain how referencing those security measures reveals some "sinister protectionist purpose." *Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 153 (4th Cir. 2016). And indeed, context again shows that officials discussed those laws only to underscore Florida's commitment to securing a conventional agriculture industry,[26] which remains open to out-of-state participants. *Supra* 10-15.

### B.   UPSIDE has not plausibly alleged that SB 1084 inflicts substantial and clearly excessive harm to interstate commerce.

Since SB 1084 does not discriminate against interstate commerce, UPSIDE must travel under the *Pike* balancing test. *See Norwegian*, 50 F.4th at 1141-42. Yet UPSIDE's complaint does not assert a *Pike* claim; it asserts only a discrimination claim. Nowhere does the complaint mention the standards for satisfying *Pike*. *Compare* DE44 ¶¶ 195-211, *with infra* 25-26. Rather, the complaint tracks the standards for proving a dormant-commerce

---

[26] *See Signing of SB 1084* at 5:13-6:51, The Fla. Channel (May 1, 2024), https://tinyurl.com/4ftvwwp4 (Governor DeSantis listing the foreign-ownership restriction as one way in which Florida has expressed its "commitment to having a vibrant agriculture industry"); *id.* at 12:45 (Commissioner Simpson listing the foreign-ownership restrictions as one of "the tools" that Florida has given "farmers" to help ensure "food security").

discrimination claim, alleging for example that SB 1084 has a discriminatory purpose or effect, *see* DE44 ¶ 200, and that Florida cannot meet the tailoring test used for discrimination claims. *See id.* ¶ 211; *see also Norwegian*, 50 F.4th at 1141 (explaining the elements of a dormant-commerce discrimination claim). The complaint therefore does not assert a *Pike* challenge, and that omission is unsurprising: "State laws frequently survive *Pike* scrutiny," *Funtana*, 2016 WL 375102, at *9, and "the Supreme Court has not invalidated a law under *Pike* in more than 30 years." *Truesdell*, 80 F.4th at 773.

In any event, SB 1084 does not flunk *Pike*. To start with, "*Pike*'s heartland" covers cases involving "purposeful discrimination against out-of-state businesses," *Pork Producers*, 598 U.S. at 379-80, and UPSIDE's complaint does not plausibly allege discrimination. *Supra* 10-15. "That is not an auspicious start." *Pork Producers*, 598 U.S. at 380; *see Truesdell*, 80 F.4th at 774-75.

The complaint fares no better under the *Pike* factors. To succeed under *Pike*, UPSIDE must show that SB 1084 imposes a "substantial burden on interstate commerce." *Pork Producers*, 598 U.S. at 383 (plurality op.). But a law does not "impermissibly burde[n] interstate commerce" when it merely "shift[s] market share from one set of out-of-state firms . . . to another." *Id.* at 384 (citing *Exxon*, 437 U.S. at 125, 127). And UPSIDE's "pleading[]

25

allow[s] for [that] possibility—that [poultry] market share previously enjoyed by one group of profit-seeking, out-of-state businesses ([cell-cultivated-meat producers]) will be replaced by another ([conventional-meat producers]).” *Id.* at 385; *see supra* 10-15.[27] Though SB 1084 may harm UPSIDE’s “particular . . . firm[]” by outlawing its preferred “method[] of operation,” that is not a substantial burden on the “interstate market.” *Pork Producers*, 598 U.S. at 384 (plurality op.); *see Blocktree Props., LLC v. Pub. Util. Dist. No. 2 of Grant Cnty.*, 447 F. Supp. 3d 1030, 1042 (E.D. Wash. 2020) (“The Dormant Commerce Clause does not protect an industry’s profit margin, structure, or even its existence.”).

Nor has UPSIDE pleaded that any of SB 1084’s burdens are “clearly excessive in relation to [its] putative local benefits.” *Locke*, 634 F.3d at 1192. Among other benefits, SB 1084 advances public “health and safety” by protecting citizens from an untested food product. *Supra* 22-23 (discussing the State’s public-safety rationale); *see Norwegian*, 50 F.4th at 1142 (States have “great latitude” to protect the public welfare). Because the law protects the public health, it receives “great deference” and “a strong presumption of validity” in the balancing analysis, which the Court generally may “not second-

---

[27] *See Norwegian*, 50 F.4th at 1152 (similar for ban on vaccine passports); *Truesdell*, 80 F.4th at 775 (similar for ambulance-licensing law); *Turtle Island Foods*, 2024 WL 1342597, at *9 (similar for advertising restriction on cell-cultivated meat).

26

guess." *Norwegian*, 50 F.4th at 1144, 1150; *see Locke*, 634 F.3d at 1194-95. And UPSIDE's complaint fails to undermine "the legislature's judgment as to the relative importance [of its safety justifications] versus any burdens imposed on interstate commerce." *Norwegian*, 50 F.4th at 1144.

Rather than rebut the "strong presumption" accorded to public-health rationales, UPSIDE instead suggests that Florida's public-health concern is "illusory." *Id.* at 1150; *see* DE44 ¶ 208 (claiming that there is no "adequate health or safety justification"). Yet in determining whether a public-health rationale is illusory, courts may not "substitute their evaluation of [the purported health risk] for that of the legislature." *Norwegian*, 50 F.4th at 1145; *see Pork Producers*, 598 U.S. at 381 (plurality op.) ("States may often adopt laws addressing even imperfectly understood health risks associated with goods sold within their borders."). Instead, a court may find a justification illusory—and thus, dispense with the "strong presumption of validity"—only if "applying [the law] as written would [not] rationally contribute to the State's purported local benefits." *Norwegian*, 50 F.4th at 1145, 1150.

SB 1084 clears that test with ease. The law's ban on cell-cultivated meat plainly contributes to Florida's interest in protecting the public from experimental foods by "outlawing" the experimental food product. *Id.* at 1146. Its "putative local benefits" are not illusory. *Id.* at 1151.

## II.    UPSIDE has not plausibly alleged a PPIA violation.

In denying UPSIDE's motion for a preliminary injunction, this Court correctly held that SB 1084 does not violate the PPIA's ingredients and facilities clauses. DE40 at 15-21. That analysis controls here. *See also* DE35 at 28-35 (making a similar argument). In the alternative, UPSIDE's PPIA claims should be dismissed because UPSIDE lacks a private cause of action to enforce the PPIA, *see id.* at 11-17, and because UPSIDE's product is not a poultry product, *see id.* at 21-27.

### CONCLUSION

"Just as the Constitution does not enact Mr. Herbert Spencer's Social Statics, so it does not enact" UPSIDE's vision for Florida's poultry trade. *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1132 (7th Cir. 1995). Because SB 1084 leaves Florida's poultry industry open to "all comers," *Locke*, 682 F. Supp. 2d at 1293, the State's preference for conventional "methods of operation" in that market do not offend the Dormant Commerce Clause. *Exxon*, 437 U.S. at 127. And as this Court has already intimated, UPSIDE's PPIA claims fail on the merits. The case should be dismissed.

28

Dated: November 15, 2024

Respectfully submitted,

ASHLEY MOODY
 *Attorney General*

HENRY C. WHITAKER (FBN 1031175)
 *Solicitor General*

DANIEL W. BELL (FBN 1008587)
 *Chief Deputy Solicitor General*

*/s/ David M. Costello*
DAVID M. COSTELLO (FBN 1004952)
 *Senior Deputy Solicitor General*

BRIDGET K. O'HICKEY (FBN 1048521)
 *Deputy Solicitor General*

FOSTER H. SWARTZ (FBN 1059583)
 *Solicitor General Fellow*

WILLIAM H. STAFFORD III (FBN 70394)
 *Special Counsel*

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
david.costello@myfloridalegal.com

*Counsel for the State Attorney Defendants*

29

## CERTIFICATE OF COMPLIANCE

This motion complies with Local Rule 7.1(F) because it contains 6,250 words.

*/s/ David M. Costello*
Senior Deputy Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2024, a true and correct copy of the foregoing was served on all parties.

*/s/ David M. Costello*
Senior Deputy Solicitor General

31