## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

UPSIDE FOODS, INC.
      Plaintiff,

v.

WILTON SIMPSON, in his official
capacity as Commissioner of the
Florida Department of Agriculture
and Consumer Services, et al.
      Defendants.

Civil Action No.
4:24-cv-00316-MW-MAF

---

## PLAINTIFF'S COMBINED RESPONSE TO
## DEFENDANTS' MOTIONS TO DISMISS

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................iii

INTRODUCTION ................................................................................ 1

ARGUMENT ...................................................................................... 4

    I.    UPSIDE has alleged a valid claim under the Dormant
        Commerce Clause .......................................................... 4

        A.   Facially neutral laws that impede the interstate flow of
           commercial goods, with the purpose or effect of favoring an
           in-state commercial interest, are subject to heightened
           scrutiny ................................................................. 6

        B.   UPSIDE has sufficiently alleged that SB 1084 impedes the
           interstate flow of commercial goods, with the purpose or
           effect of favoring an in-state commercial interest ............... 14

        C.   UPSIDE has sufficiently alleged that SB 1084 cannot
           survive heightened scrutiny .................................................. 24

    II.   UPSIDE has alleged valid federal preemption claims ............... 26

        A.   UPSIDE has properly pleaded a cause of action in equity
           and under Section 1983 ........................................................ 27

           1. UPSIDE has properly pleaded a claim in equity ............. 28

           2. UPSIDE has properly pleaded a claim under
              Section 1983 ...................................................................... 29

           3. Congress has not foreclosed equitable claims or claims
              under Section 1983 ............................................................ 33

i

B.  UPSIDE has validly alleged that Florida's Prohibition on cultivated poultry products is preempted by federal law..... 38

1. The PPIA expressly preempts state requirements regarding the permissible ingredients in poultry products or the premises, facilities, or operations of official establishments in which poultry products are produced, regardless of whether those requirements conflict with any requirement in federal law ........................................ 39

2. UPSIDE has validly alleged that SB 1084 imposes ingredient and facilities requirements that are different from or in addition to those imposed under federal law.. 47

3. The primary cases that the government relies on did not involve state laws that imposed ingredient requirements or other requirements that directly reach into federally regulated facilities ............................................................ 52

4. The government's remaining objections are meritless..... 57

CONCLUSION .................................................................... 59

LOCAL RULE 7.1(F) CERTIFICATE ................................. 60

CERTIFICATE OF SERVICE ............................................. 61

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Armour & Co v. Ball*,
    468 F.2d 76 (6th Cir. 1972) ............................................ 44, 45, 46, 47

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015) ...................................................... 28, 32, 34, 37

*Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra*,
    870 F.3d 1140 (9th Cir. 2017) ................................. 37, 49, 52, 53, 54

*Ass'n des Éleveurs de Canards et d'Oies du Québec v. Harris*,
    729 F.3d 937 (9th Cir. 2013) ..................................................... 12, 21
    No. 12-56822, 2012 WL 5915406 (9th Cir. Nov. 16, 2012) ........... 21

*Baldwin v. G.A.F. Seelig, Inc.*,
    294 U.S. 511 (1935) ........................................................ 7, 8, 10, 23

*Barron v. United States*,
    111 F.4th 667 (5th Cir. 2024) ........................................................ 29

*Baude v. Heath*,
    538 F.3d 608 (7th Cir. 2008) ................................................... 18, 19

*Blessing v. Freestone*,
    520 U.S. 329 (1997) ................................................................ 30, 31

*Bowles v. DeSantis*,
    934 F.3d 1230 (11th Cir. 2019) ........................................... 30, 31, 32

*C&A Carbone, Inc. v. Town of Clarkstown*,
    511 U.S. 383 (1994) .............................................................. 4, 5, 24

*Cavel Int'l, Inc. v. Madigan*,
    500 F.3d 551 (7th Cir. 2007) ................................................... 12, 20

*Chinatown Neighborhood Ass'n v. Harris,*
  794 F.3d 1136 (9th Cir. 2015) ........................................................ 12

*Collier v. Dickinson,*
  477 F.3d 1306 (11th Cir. 2007) ................................................ 33, 34

*Del Real, LLC v. Harris,*
  966 F.Supp. 2d 1047 (E.D. Cal. 2013),
  *aff'd,* 636 F. App'x 956 (9th Cir. 2016) .......................................... 37

*Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry,*
  476 F.3d 326 (5th Cir. 2007) .......................................................... 13

*Ex parte Young,*
  209 U.S. 123 (1908) ........................................................................ 28

*Exxon Corp. v. Governor of Md.,*
  437 U.S. 117 (1978) ............................................... 10, 11, 12, 17, 18

*Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.,*
  703 F.3d 1230 (11th Cir. 2012) ............................ 4, 6, 10, 14, 22, 23

*Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.,*
  504 U.S. 353 (1992) .......................................................................... 6

*Fresenius Med. Care Holdings, Inc. v. Tucker,*
  704 F.3d 935 (11th Cir. 2013) ........................................................ 18

*Funtana Vill., Inc. v. City of Panama City Beach,*
  No. 5:15-cv-282, 2016 WL 375102 (N.D. Fla. Jan. 28, 2016)......... 13

*Graham v. R.J. Reynolds Tobacco Co.,*
  857 F.3d 1169 (11th Cir. 2017) ...................................................... 58

*House of Raeford Farms, Inc. v. SOMMA Food Grp., LLC,*
  No. 05-22-01231-CV, 2024 WL 396609 (Tex. App. Feb. 2, 2024) .. 36

*Hunt v. Wash. State Apple Advert. Comm'n,*
    432 U.S. 333 (1977) ..................................... 4, 6, 7, 9, 10, 12, 16, 23

*Island Silver & Spice, Inc. v. Islamorada,*
    542 F.3d 844 (11th Cir. 2008) ................................... 8, 9, 10, 23, 24

*Just Puppies, Inc. v. Frosh,*
    565 F. Supp. 3d 665 (D. Md. 2021) ................................................ 20

*Locke v. Shore,*
    634 F.3d 1185 (11th Cir. 2011) ................................................ 12, 13

*Maine v.* Taylor,
    477 U.S. 131 (1985) ......................................................... 24

*Marrache v. Bacardi U.S.A., Inc.,*
    17 F.4th 1084 (11th Cir. 2021) ........................................... 59

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) ......................................................... 58

*Monster Beverage Corp. v. Herrera,*
    No. 13-cv-786, 2013 WL 4573959 (C.D. Cal. Aug. 22, 2013) ......... 37

*Nat'l Broiler Council v. Voss,*
    44 F.3d 740 (9th Cir. 1994) ................................................ 37

*Nat'l Meat Ass'n v. Harris,*
    565 U.S. 452 (2012) ........................................... 46, 50, 51, 52, 55, 56

*Nat'l Pork Producers Council v. Ross,*
    598 U.S. 356 (2023) ......................................................... 19

*N.J. Thoroughbred Horsemen's Ass'n v. Nat'l Collegiate Athletic Ass'n,*
    584 U.S. 453 (2018) ......................................................... 30, 33, 35, 40

*N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health,*
    509 F. Supp. 2d 351 (S.D.N.Y. 2007) ...................................... 37

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health,*
     50 F.4th 1126 (11th Cir. 2022) .................................................. 12, 16

*Park Pet Shop, Inc. v. City of Chicago,*
     872 F.3d 495 (7th Cir. 2017) ........................................................ 12

*Pike v. Bruce Church, Inc.,*
     397 U.S. 137 (1970) ........................................................................ 5

*POM Wonderful LLC v. Coca-Cola Co.,*
     573 U.S. 102 (2014) ...................................................................... 36

*Sanderson Farms, Inc. v. Tyson Foods, Inc.,*
     549 F. Supp. 2d 708 (D. Md. 2008) .............................................. 36

*Trs. of Ind. Univ. v. Curry,*
     918 F.3d 537 (7th Cir. 2019) ..................................................... 9, 12

*Turtle Island Foods, SPC v. Thompson,*
     725 F. Supp. 3d 963 (W.D. Mo. 2024) .......................................... 13

*W. Lynn Creamery, Inc. v. Healy,*
     512 U.S. 186 (1994) ...................................................................... 17

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n,*
     945 F.3d 206 (5th Cir. 2019) .................................................. 19, 20

*Webb v. Trader Joe's Co.,*
     418 F. Supp. 3d 524 (S.D. Cal. 2019),
     *aff'd* 999 F.3d 1196 (9th Cir. 2021) .............................................. 36

*Wyeth v. Levine,*
     555 U.S. 555 (2009) ...................................................................... 58

## Constitutional Provisions

Dormant Commerce Clause
Artl. S8. C3............................................................................ *passim*


## Statutes and Codes

Food, Drug, and Cosmetic Act
21 U.S.C. § 301 et seq. ..................................................... 36, 37

Poultry Product Inspection Act................................... *passim*
21 U.S.C. § 451 ........................................................................31
21 U.S.C. § 452 ........................................................................31
21 U.S.C. § 453(f) .......................................................................2
21 U.S.C. § 453(p) ........................................................ 2, 42, 50
21 U.S.C. § 467c .................................................................35, 36
21 U.S.C. § 467e..................... 31, 32, 33, 35, 39, 40, 49, 50, 51
21 U.S.C. § 641 .................................................................56, 57

9 C.F.R. § 381.65 ........................................... 41, 42, 50, 51

9 C.F.R. § 381.145(a) ................................... 41, 42, 50, 51

9 C.F.R. § 381.145(b) ................................... 41, 42, 50, 51

9 C.F.R. § 424.1 ..................................................................41

9 C.F.R. § 424.21(c) ..........................................................41

Cal. Health & Safety Code § 25984 .......................................21

Fla. Stat. § 500.03(k) .............................................................49

Fla. Stat. § 500.452..................................................................49

Fla. Stat. § 500.452(1) ...........................................................18

**Other Authorities**

The Federalist No. 22 (A. Hamilton) (Clinton Rossiter ed., 1961) ....... 4, 5

FSIS NOTICE 31-23,
  *Updated Cell-Cultured Meat & Poultry Food Products Sampling
  Program* (Jun 29, 2023),
  https://www.fsis.usda.gov/sites/default/files/media_file/
  documents/31-23.pdf ...................................................................... 42

James Madison,
  *Vices of the Political System of the United States, in*
  2 Writings of James Madison (Gaillard Hunt ed., 1901) ................ 5

*Precatory*, Merriam-Webster,
  https://www.merriam-webster.com/dictionary/precatory
  (last visited Dec. 2, 2024) ............................................................... 33

U.S. Dept. of Agriculture, FSIS Directive 7800.1,
  *FSIS Responsibilities in Establishments Producing Cell-Cultured
  Meat & Poultry Food Products* (June 21, 2023),
  https://www.fsis.usda.gov/policy/fsis-directives/7800.1 ......... 2, 3, 41

  https://www.fsis.usda.gov/sites/default/files/media_file/
  documents/7800.1.pdf ......................................................... 41, 47, 48

U.S. Dept. of Agriculture,
  *Human Food Made with Cultured Animal Cells*,
  https://www.fsis.usda.gov/inspection/compliance-
  guidance/labeling/labeling-policies/human-food-made-cultured-
  animal-cells (Aug. 17, 2023) ......................................................... 42

## INTRODUCTION

This Court should deny the government's motions to dismiss the amended complaint filed by Plaintiff UPSIDE Foods, Inc.

First, UPSIDE has alleged a valid claim under the Dormant Commerce Clause. UPSIDE has alleged facts that, taken for their truth, show that the overriding purpose for the enactment of SB 1084 was not to protect public health and safety but to protect Florida's domestic agriculture industry from a new form of innovative, out-of-state competition. Thus, even though SB 1084 was written in facially neutral terms, it is subject to heightened scrutiny because it has the purpose or effect of impeding interstate commerce for discriminatory purposes. Under that scrutiny, it is the government's rigorous burden to show not only that SB 1084 furthers a legitimate non-protectionist interest, but also that Florida has no other alternative in pursuing that interest. The government cannot carry that heavy burden at the motion-to-dismiss stage.

Second, UPSIDE has alleged valid claims that Florida's ban on cultivated meat is expressly preempted under the Poultry Product Inspection Act. That law's express preemption provisions do not require

a direct conflict between federal and state law. Instead, they prohibit states from imposing *any* requirements for the ingredients used in poultry products or the "premises, facilities and operations" of USDA-inspected "official establishments" that produce poultry products if such requirements are "*in addition to*, or different than" those made under the Poultry Products Inspection Act (PPIA).

Here, UPSIDE's cultivated poultry product meets the PPIA's definition of "poultry product" because it is produced from cells harvested from a slaughtered chicken and is thus a "product which is made . . . in part from . . . part [of a poultry carcass]."[1] Moreover, the facility at which UPSIDE produces its cultivated poultry product has obtained a USDA Grant of Inspection, and is thus an "official establishment" under the PPIA.[2] USDA has made clear that cultivated poultry products, including UPSIDE's products, are "subject to the same statutory requirements, regulations, and [USDA Food Safety and Inspection Service (FSIS)] oversight authority" as conventional poultry

---

[1] *See* 21 U.S.C. § 453(f); PI Ruling (Dkt. 40) at 14.
[2] 21 U.S.C. § 453(p) ("The term 'official establishment' means any establishment as determined by the Secretary at which inspection of the slaughter of poultry, or the processing of poultry products, is maintained under the authority of this chapter.")

2

products.[3] These include binding requirements governing which ingredients can be used in poultry products (including UPSIDE's cultivated poultry products) and the operations of the official establishments at which such products are produced (including UPSIDE's official establishment).

Florida SB 1084, however, directly prohibits UPSIDE from using certain ingredients in its poultry products that it would otherwise be allowed to use under the USDA's federal ingredient requirements—specifically, cultivated chicken cells—thus imposing ingredient requirements that are "in addition to, or different than" applicable ingredient requirements issued under the PPIA. SB 1084 also reaches into UPSIDE's USDA-inspected official establishment by dictating which manufacturing processes it may and may not use to produce its products—specifically, cell cultivation and harvest processes—again imposing requirements that are "in addition to, or different than"

---

[3] *See* U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat & Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/policy/fsis-directives/7800.1.

applicable Federal requirements. The PPIA denies the state that authority.

## ARGUMENT

In Section I, UPSIDE explains why its amended complaint raises a valid claim under the Dormant Commerce Clause. In Section II, UPSIDE explains why it has also raised valid federal preemption claims.

## I.    UPSIDE has alleged a valid claim under the Dormant Commerce Clause.

Recognizing the need to foster a "national 'common market'" in the aftermath of the failed Articles of Confederation, the Constitution's framers granted Congress the authority to regulate interstate commerce under the Commerce Clause. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 350 (1977). That "affirmative grant of authority to Congress also encompasses an implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce." *Fla. Transp. Servs., Inc. v. Miami-Dade County*, 703 F.3d 1230, 1243 (11th Cir. 2012) (citation omitted). This doctrine— known as the "Dormant" Commerce Clause—prevents States from impeding the flow of interstate commerce through "laws whose object is

local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994) (citing The Federalist No. 22, at 143–45 (Alexander Hamilton) (Clinton Rossiter ed. 1961); James Madison, Vices of the Political System of the United States, in 2 Writings of James Madison 362–63 (Gaillard Hunt ed. 1901)).[4]

As alleged in UPSIDE's amended complaint, Florida's ban on cultivated meat products, SB 1084, is such a law. In Section A, UPSIDE explains that laws that impede the interstate flow of commercial goods, with the purpose or effect of favoring an in-state commercial interest, are subject to heightened scrutiny under the Dormant Commerce Clause even if written in facially neutral terms. In Section B, UPSIDE shows that it has sufficiently alleged that SB 1084 is such a law, and

---

[4] Under the Supreme Court's ruling in *Pike v. Bruce Church, Inc.*, a law may also be challenged under the Dormant Commerce Clause even if it does not have the purpose or effect of discriminating against interstate commerce if that law nevertheless imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits." 397 U.S. 137, 142 (1970). UPSIDE does not rely on the *Pike* balancing test, however, because SB 1084's purpose and effect is to discriminate against interstate commerce.

therefore it must satisfy heightened scrutiny. Finally, in Section C,

UPSIDE explains why the government cannot satisfy heightened

scrutiny at this early stage.

## A. Facially neutral laws that impede the interstate flow of commercial goods, with the purpose or effect of favoring an in-state commercial interest, are subject to heightened scrutiny.

Under the Dormant Commerce Clause, a law impeding the flow of

interstate commerce is subject to heightened scrutiny if it "directly

regulates or discriminates against interstate commerce, *or* has the

effect of favoring in-state economic interests." *Fla. Transp.*, 703 F.3d at

1243–44 (emphasis added, citation omitted). The challenged law does

not escape such scrutiny merely "because it applies 'alike to the people

of all the States, including the people of the State enacting such

statute.'" *Id.* at 1244 (quoting *Fort Gratiot Sanitary Landfill, Inc. v.

Mich. Dep't of Nat. Res.*, 504 U.S. 353, 361 (1992)). Instead, courts must

ask whether the law operates, either by design or effect, to shield an in-

state commercial interest from competition posed by interstate

commerce. *Hunt*, 432 U.S. at 350–51.

The Supreme Court's ruling in *Hunt* provides an example. In

*Hunt*, North Carolina had passed a statute requiring that "all closed

6

containers of apples sold, offered for sale, or shipped into the State to
bear 'no grade other than the applicable U.S. grade or standard.'" *Id.* at
335. Although the statute applied to everyone in North Carolina, it had
the effect of nullifying a competitive advantage of the Washington apple
industry, whose marketing had relied on advertising Washington's
grades (which were more stringent than the U.S. grade). *Id.* at 351.
Moreover, statements by the North Carolina Agriculture Commissioner
suggested that the statute was passed in service to the state's apple
industry. *Id.* at 352. Notwithstanding the statute's "declared purpose of
protecting consumers from deception and fraud in the marketplace," the
Supreme Court found that the law was subject to heightened scrutiny,
as its effect was to provide "the North Carolina apple industry the very
sort of protection against competing out-of-state products that the
Commerce Clause was designed to prohibit." *Id.* at 352–53.

    *Hunt* did not break new ground. The Supreme Court had applied
the principle decades earlier in *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S.
511 (1935). There, New York had passed a law that banned milk sales
unless the milk had been obtained from the producer at a minimum
price. *Id.* at 519. The law, like the challenged law in *Hunt*, applied to all

7

sales equally—that is, regardless of whether the milk was obtained from an in-state or an out-of-state producer. *Id*. But the effect of its application to in-state sales of milk obtained from producers located outside of New York was to negate those products' competitive advantage, which would "suppress or mitigate the consequences of competition between the states." *Id*. at 522. Thus, the law was subject to heightened scrutiny—which it could not satisfy. *Id*. at 522–26.

Modern cases from this Circuit confirm the continued vitality of the rule that facial neutrality will not save a law from heightened scrutiny under the Dormant Commerce Clause if it has the purpose and effect of discriminating against interstate commerce. In *Island Silver & Spice, Inc. v. Islamorada*, 542 F.3d 844, 845 (11th Cir. 2008), Islamorada passed an ordinance that heavily restricted "formula restaurants" and "formula retail" establishments—i.e., establishments that are "required by contractual or other arrangement to maintain any of the following: standardized array of services or merchandise, trademark, logo, service mark, symbol, decor, architecture, layout, uniform, or similar standardized feature." The court noted that the law was "facially neutral," i.e., it applied both to Florida residents and non-

8

Florida residents. *Id.* at 846. But the ordinance's effect was to prohibit interstate retail chains, with the "effect of favoring in-state economic interests." *Id.* at 846–47 (cleaned up). Therefore, the court reviewed the ordinance with heightened scrutiny, which it failed. *Id.* at 847–48.

Defendants, for their part, acknowledge that a "facially neutral" law nevertheless may trigger heightened scrutiny under the Dormant Commerce Clause. State Att'y MTD (Dkt. 54), at 10. Yet at the same time they suggest that such scrutiny does not apply when the law "applies equally" to both in-state and out-of-state residents. *Id.* at 11 (quoting *Trs. of Ind. Univ. v. Curry*, 918 F.3d 537, 543 (7th Cir. 2019) (upholding ban on possessing fetal tissue)). That, however, is merely another way of describing a law that is facially neutral—i.e., a law whose "text does not distinguish between local and non-local residents." Dkt. 54, at 10.

As the cases discussed above show, however, facial neutrality alone will not save a law from heightened scrutiny if it was enacted with a discriminatory purpose and has a discriminatory effect. North Carolina's statute "applie[d] to all apples sold in closed containers in the State without regard to their point of origin"; that did not prevent the

Court from subjecting the law to heightened scrutiny. *Hunt*, 432 U.S. at 349. New York's minimum-price law applied equally to sales of milk produced both in-state and out-of-state; again, that did not prevent the Court from subjecting the law to heightened scrutiny. *Baldwin*, 294 U.S. at 519, 521–26. Thus, this Circuit has explained that an allegedly protectionist law does not escape heightened scrutiny under the Dormant Commerce Clause merely "because it applies alike to the people of all the States, including the people of the State enacting such statute." *Fla. Transp.*, 703 F.3d at 1243 (cleaned up). *Accord Island Silver*, 542 F.3d at 846–47.

Defendants' contention—that it is dispositive that SB 1084 "applies equally to both local and non-local meat producers," Dkt. 54, at 14—is wrong. And a closer look at Defendants' proffered cases reveals that, in each case, the reason heightened scrutiny under the Dormant Commerce Clause was not implicated was because either (1) the law did not in fact impede the flow of interstate commerce or (2) the law did not operate to the advantage of an in-state commercial interest.

In the first category is *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978). *Exxon* was a challenge to an anti-tying provision that

10

outlawed gasoline producers from operating gasoline retail stations. *Id.* at 121. The provision was passed in response to "the 1973 shortage of petroleum"; specifically, a state study had concluded that, during the shortage, inequities resulted from producers granting preferential treatment to their own retail stations. *Id.* Exxon challenged the provision under a Dormant Commerce Clause theory, citing the fact that the law's burden fell primarily on out-of-state businesses because "no petroleum products are produced or refined in Maryland." *Id.* at 123.

The *Exxon* Court declined to subject the anti-tying provision to heightened scrutiny—not because it applied equally to in-state and out-of-state actors, but because it did not in fact burden the flow of interstate commerce. Although Maryland had set corporate structuring requirements that comparatively burdened out-of-state entities, those requirements left "no impact on the relative proportions of local and out-of-state goods sold in Maryland and, indeed, no demonstrable effect whatsoever on the interstate flow of goods." *Id.* at 126 n.16. Both before and after the law took effect, all the gasoline consumed in Maryland originated outside the state; there was no reason to suspect that would

11

change because of the challenged law, nor did the law in effect favor any in-state producer of gasoline or a competing product. *Id.* at 125. At bottom, the Court held, the mere "fact that the burden of a state regulation falls on some interstate companies does not, *by itself*, establish a claim of discrimination against interstate commerce." *Id.* at 126 (emphasis added). But nothing in *Exxon* purported to overturn *Hunt*'s rule that facially neutral laws that have the purpose and effect of favoring in-state interests can escape heightened scrutiny under the Dormant Commerce Clause.

The second category of cases invoked by Defendants all involved laws that did not benefit an in-state commercial interest.[5] As this Court

---

[5] *See, e.g., Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 555 (7th Cir. 2007) (upholding ban on slaughter of horsemeat, because "[n]o local merchant or producer benefits from [it]"). *See also Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1142 (11th Cir. 2022) (upholding ban on businesses' requiring customers to show proof of COVID-19 vaccination); *Curry*, 918 F.3d at 543 (upholding ban on possessing fetal tissue); *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 502 (7th Cir. 2017) (upholding restriction on puppy mills that "does not have a disparate impact on out-of-state breeders"); *Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1146 (9th Cir. 2015) (upholding ban on shark fin trade); *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Harris* ("*Canards I*"), 729 F.3d 937, 948 (9th Cir. 2013) (upholding ban on sales of meat from force-fed animals); *Locke v. Shore*, 634 F.3d 1185, 1193 (11th Cir. 2011)

has explained, if an in-state commercial interest is not gaining an advantage from the regulation, then the regulation does not "implicate the kind of protectionism that the Dormant Commerce Clause is meant to address." *Funtana Vill., Inc. v. City of Panama City Beach*, No. 5:15-cv-282, 2016 WL 375102, at *7 (N.D. Fla. Jan. 28, 2016).

To be clear, UPSIDE does not assert that it necessarily implicates the Dormant Commerce Clause every time a state bans the sale of a product, or every time the burden of a state regulation happens to fall disproportionately on out-of-state residents. Instead, UPSIDE asserts the more limited proposition that heightened scrutiny applies when a state discriminates against interstate commerce by enacting a law that has the purpose or effect of impeding the interstate flow of a commercial good, to the advantage of an in-state commercial interest. Any suggestion that a law escapes this rule just because its letter applies

_____

(upholding licensing requirement for interior designers); *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 335 (5th Cir. 2007) (upholding ban on horsemeat for human consumption); *Funtana Vill., Inc. v. City of Panama City Beach*, No. 5:15-cv-282, 2016 WL 375102, at *7–8 (N.D. Fla. Jan. 28, 2016) (upholding restrictions on nightlife during spring break season); *Turtle Island Foods, SPC v. Thompson*, 725 F. Supp. 3d 963, 975–76 (W.D. Mo. 2024) (upholding regulation on cultivated-meat advertisement, which would not have the effect of "shift[ing] market share" to an in-state commercial interest).

13

equally to both in-state and out-of-state producers would, effectively, shield facially neutral laws from review for illegitimate state protectionism. That is not the law. *Fla. Transp.*, 703 F.3d at 1243.

**B. UPSIDE has sufficiently alleged that SB 1084 impedes the interstate flow of commercial goods, with the purpose or effect of favoring an in-state commercial interest.**

The next question, then, is whether UPSIDE has sufficiently alleged that SB 1084 impedes the interstate flow of commercial goods with a purpose and effect of shielding an in-state commercial interest from competition. As explained below, UPSIDE has done so, and thus SB 1084 is subject to heightened scrutiny.

First, UPSIDE has extensively alleged that the overriding purpose behind SB 1084 was to prevent cultivated meat—all of which is produced outside of Florida—from competing with Florida's domestic agriculture industry. Indeed, Florida officials could hardly have been more brazen in announcing that the point here is to shield their in-state commercial interests from California-based commercial producers like UPSIDE. Among other statements alleged in the complaint:

- Defendant Commissioner Simpson stated at the signing ceremony for SB 1084 that it "protect[s] *our* incredible farmers" and that it is "Californians [who] are participating

14

in this crap." Amend. Compl. (Dkt. 44) ¶¶ 79, 100 (emphasis added).

- Governor Ron DeSantis, while standing behind a podium reading "SAVE OUR BEEF" and surrounded by Florida cattle farmers declared that the purpose of the law was to "put down the mark very clearly" that "we stand with *our* farmers." *Id.* ¶¶ 68, 74 (emphasis added).

- Governor DeSantis also stated that competition from cultivated meat would "wipe the people sitting here today"— Florida cattle farmers—"out of business," that cultivated meat is "designed to be a threat to agriculture as we know it," and thus the purpose of the law was to "snuff[] this [competition] out at the beginning." *Id.* ¶¶ 74–75, 86.

- In a news release that accompanied SB 1084's signing, Governor DeSantis stated that SB 1084 represents "investing in *our local farmers and ranchers*, and we will save *our* beef." *Id.* ¶ 99 (emphases added).

- Senator Jay Collins, who sponsored SB 1084, explained that the bill was needed because "[w]e cannot let agriculture fail in the state of Florida." *Id.* ¶ 83.

- Representative Danny Alvarez, the House sponsor of the bill, stated, "If you believe that we are doing this because we know that *Florida's agriculture* can hold us down and provides plenty of safe, quality beef and agricultural products—you are absolutely correct." *Id.* ¶ 90 (emphasis added).

- Representative Dean Black, who is himself a cattle rancher, said that if Florida consumers want to try cultivated meat they should "go to California," but that they "sure as heck" should not be able to get it "here in Florida." *Id.* ¶ 91.

These extensive, repeated statements are far more "glaring"

evidence of a protectionist motive than the single statement attributed

15

to the North Carolina Agriculture Commissioner in *Hunt*. *See* 432 U.S. at 352 (noting statement from the North Carolina Agriculture Commissioner that in-state apple producers were "mainly responsible for this legislation being passed"). And, as Defendants themselves acknowledge, such evidence of protectionist "motive can help establish that a law discriminates 'in effect.'" Dkt. 54, at 15. *See also Norwegian Cruise Line*, 50 F.4th, at 1146 ("[W]e must look to legislative history because the Supreme Court has done so in this [Dormant Commerce Clause] context. Here, we are not using legislative history to determine what the statute means but to ensure that it serves a constitutional purpose." (citation omitted)).

Second, UPSIDE's complaint alleges that SB 1084 has the direct effect of impeding interstate commerce, to the competitive advantage of an in-state commercial interest. Cultivated meat has been newly developed and is produced entirely outside of Florida. Amend. Compl. ¶¶ 87–88. The interstate sale of cultivated meat presents new competition to Florida's robust conventional meat industry, as cultivated meat promises to "replicate the sensory and taste profile of conventional meat" without posing environmental, ethical, or certain

16

health concerns associated with conventional meat. *Id*. ¶¶ 18, 20–27.
That is a significant competitive advantage; indeed, the governor
believes that, if cultivated meat producers are allowed to sell their
products in Florida, it could risk "wip[ing] the people sitting here [i.e.,
Florida's commercial agriculture business] today out of business." *Id*.
¶ 75. *Cf. W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 196 n.12 (1994)
(Dormant Commerce Clause applies regardless of whether the state is
seeking to "increase[] the market share of local producers" or to
"mitigate[] a projected decline"). As alleged in the amended complaint,
by impeding the interstate trade of these products, Florida is
deliberately and effectively suppressing these competitive advantages
for the benefit of its existing in-state commercial interests.

These detailed allegations distinguish this case from all the cases
that the government relies on. First, unlike *Exxon*, Florida is impeding
the interstate flow of commercial goods. The challenged anti-tying law
in *Exxon* did not in fact impede the flow of any product in interstate
commerce. *Supra*, Argument pt. I(A). By contrast, SB 1084 impedes the
interstate flow of a commercial product (cultivated meat). It does so
directly—by categorically prohibiting cultivated meat producers like

UPSIDE from carrying their products across state lines into Florida,

selling their products within Florida, or even *offering* to sell their

products within Florida. Fla. Stat. § 500.452(1). It also does so

indirectly—by making it difficult or impossible for producers like

UPSIDE to work with national distribution chains (and thereby

impeding the flow of cultivated meat products across the country).

Amend. Compl., ¶ 113.[6] These distinctions place this case squarely

outside of *Exxon*. Compare *Fresenius Med. Care Holdings, Inc. v.*

*Tucker*, 704 F.3d 935, 943–44 (11th Cir. 2013) (citing *Exxon* to uphold a

law that "prohibits vertical integration of dialysis clinics," because

although the law fell disproportionately on out-of-state businesses, it

did not burden the flow of interstate commerce), *with Baude v. Heath*,

538 F.3d 608, 612 (7th Cir. 2008) (distinguishing *Exxon* from a law

burdening the interstate shipment of wine, because "the Court

concluded in *Exxon* that Maryland's separation of the retail and

---

[6] Defendant Commissioner Simpson states that UPSIDE "doesn't allege harms to the interstate lab-meat industry as a whole." Simpson MTD (Dkt. 53) at 29. That is incorrect. UPSIDE has alleged that SB 1084 is "contributing to the fragmentation of the interstate market in meat and poultry" by encouraging a "growing patchwork" of state laws that, like Florida's, protect existing in-state commercial agriculture interests from competition posed by cultivated meat sales. Amend. Compl. ¶¶ 112–13.

wholesale functions did not affect interstate commerce in petroleum, all of which came from out of state no matter how the distribution system was organized").

Second, unlike Defendants' other cases, this case involves the ban of a commercial good with a purpose and effect of advantaging an in-state commercial interest. In *National Pork Producers Council v. Ross*, for example, the plaintiffs "[did] not allege that California's law [sought] to advantage in-state firms or disadvantage out-of-state rivals." 598 U.S. 356, 370 (2023).[7] Similarly, Illinois's ban on the slaughter of horses

---

[7] The State Attorney Defendants cite a variety of cases—many involving claims of racial and sex discrimination—for the proposition that UPSIDE "must allege facts *dispelling* any 'obvious alternative explanation[s]' for SB 1084" in order to allege a valid claim that SB 1084 was adopted for improper discriminatory purposes. State Attorneys MTD at 19 (emphasis added). But the primary dormant commerce case on which the government relies—*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206, 217 (5th Cir. 2019)— holds no such thing. Instead, that case holds that "[t]he challenger must show that the discriminatory effect was 'a substantial or motivating factor' leading to the enactment of the statute, 945 F.3d at 215, not that it was the exclusive one.

As already explained, UPSIDE's allegations are more than sufficient to show that economic protectionism was the predominant motive behind the enactment of SB 1084. And the government cannot rebut those allegations at the motion-to-dismiss stage merely by pointing to a "presumption of good faith." *Wal-Mart* confirms that this presumption

escaped heightened scrutiny under the dormant commerce clause

because "[n]o local merchant or producer benefit[ed] from [it]." *Cavel*,

500 F.3d at 555. Here, by contrast, UPSIDE has sufficiently alleged

that both the purpose and effect of SB 1084 is to favor an in-state

commercial interest.[8]

---

may be rebutted by evidence, which may include "the legislative or administrative history of the state action, including contemporary statements by decisionmakers." Id. at 214. No surprise then that *Wal-Mart* was not decided on a motion to dismiss. *See id.* (appeal from a bench trial). Indeed, with but one exception, it appears that all of the Dormant Commerce Clauses cases the government cites that reached a final judgment did so on full evidentiary records following summary judgment or trial. That single exception appears to be the Maryland District Court's ruling in *Just Puppies, Inc. v. Frosh*, which granted a motion to dismiss after concluding that a single out-of-context statement by a state legislator was insufficient to raise a claim of discriminatory purpose where the court had already concluded that the law had no discriminatory effect. 565 F. Supp. 3d 665, 723 (D. Md. 2021). That decision remains on appeal at the Fourth Circuit (No. 21-2170) and, in any event, UPSIDE has alleged far more extensive evidence of protectionist purpose.

[8] Defendant Commissioner Simpson, without explanation, suggests that cultivated meat is not "similarly situated" to conventional meat, for purposes of a Dormant Commerce Clause analysis. Simpson MTD at 32. But out-of-state products against which a state discriminates need not be identical to in-state products to trigger heightened scrutiny under the Dormant Commerce Clause; what matters is that they compete in the marketplace. It is beyond dispute that these are competing products, which is why—as the commissioner himself has publicly admitted—the Ban operates to insulate Florida's in-state agriculture industry from competition posed by cultivated meat. *See* Amend. Compl.

The same observation distinguishes this case from *Canards I*.
Invoking *Canards I*, Defendants suggest it is immaterial that "only out-
of-state businesses are burdened" by SB 1084. Dkt. 54, at 15 (quoting
*Canards I*, 729 F.3d at 948). However, *Canards I* is inapt—because
California's ban on sales of foie gras produced by force feeding was not
intended to favor, and did not have the effect of favoring, any in-state
commercial interest. California passed its ban in 2004, but the law, on
its own terms, would not go into effect until 2012. Cal. Health & Safety
Code § 25984. In the interim, virtually all California-based foie gras
producers shut down operations entirely, in anticipation of the
upcoming ban. *See* Appellants' Opening Br., *Canards I*, No. 12-56822,
2012 WL 5915406, at *9–10 (9th Cir. Nov. 16, 2012). As a result, when
the foie gras ban came into effect, it only *appeared* to burden specifically
out-of-state businesses—because it had *already* forced in-state
businesses to shut down. In fact, however, the challenged law in
*Canards I* had already worked to the disadvantage of existing in-state
commercial interests, just as much as out-of-state interests.

---

¶ 100. *See also* Dkt. 54, at 14 (accepting that "SB 1084 effectively
pushes poultry consumers away from cell-cultivated poultry and toward
conventional poultry").

It is a different matter where, as here, the law shields an existing in-state commercial interest from competition posed by interstate sales of a product that has been newly developed outside the state. This Circuit has explained that, in evaluating whether a law triggers Dormant Commerce Clause concerns, courts must "evaluate the practical effect of the statute by considering what effect would arise if not one, but many or every, State adopted similar legislation." *Fla. Transp. Servs.*, 703 F.3d at 1245 (cleaned up). The practical effect of upholding SB 1084 would be to invite a patchwork of retaliatory measures across the country, all aimed at insulating politically connected in-state commercial interests from products newly innovated in other states. The next time a Floridian develops a new citrus cultivar that might compete with existing commercial interests in California, nothing would prevent California from preemptively banning it before its citizens develop a taste for the new product. Indeed, as UPSIDE has alleged, other states are following Florida's lead and shielding their existing in-state commercial agriculture interests from having to compete with interstate sales of cultivated meat—contributing to the fragmentation of the interstate market. Amend. Compl. ¶¶ 112–13. The

22

Dormant Commerce Clause exists precisely to prevent such occurrences. *See Baldwin*, 294 U.S. at 522. These crucial distinctions trigger heightened scrutiny in this case. The government cannot escape that scrutiny simply because SB 1084's protectionist purpose and effect is not recorded in the statute's text, or because some legislators suggested that SB 1084 promoted public health and safety. Dkt. 54, at 19–24. As this Circuit has held, the "incantation of a legitimate purpose does not insulate a state law from Commerce Clause attack." *Fla. Transp. Servs.*, 703 F.3d at 1261 (cleaned up). After all, the challenged law in *Hunt* expressed "the declared purpose of protecting consumers from deception and fraud in the marketplace." *Hunt*, 432 U.S. at 353. That did not prevent the Court from employing heightened scrutiny to strike it down. Nor can the government escape heightened scrutiny merely by characterizing SB 1084 as a preference for one "method of operation in a State's market" over another. Dkt. 54, at 14 (cleaned up). Again, North Carolina could not avoid heightened scrutiny by framing its statute as a preference for a particular method of marketing apples. *See Hunt*, 432 U.S. at 349. Islamorada could not avoid heightened scrutiny by framing its ordinance as a preference for a particular

corporate retail structure. *Island Silver*, 542 F.3d at 846–47 (distinguishing *Exxon*). There is no reason why those laws would trigger heightened scrutiny under the Dormant Commerce Clause, but SB 1084 would not.

### C.    UPSIDE has sufficiently alleged that SB 1084 cannot survive heightened scrutiny.

"Discrimination against interstate commerce in favor of local business or investment is *per se* invalid, save in a narrow class of cases in which the [government] can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest. *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994). "Once a state law is shown to discriminate against interstate commerce either on its face or in practical effect, the burden falls on the State to demonstrate both that the statute serves a legitimate local purpose, and that this purpose could not be served as well by available nondiscriminatory means. *Maine v. Taylor*, 477 U.S. 131, 138 (1985). This is a determination to be made on the basis of empirical evidence. *See id.* at 144. It is a heavy burden, and not one the government can carry at the motion to dismiss stage.

And it is not a burden the government can carry faced with the allegations in UPSIDE's amended complaint. Among other things, UPSIDE has alleged that cultivated meat poses no risk to public health not also found in conventional meat and, in fact, poses *less* risk (in part because it is produced under strict controls that eliminate environmental contamination). Amend. Compl. ¶¶ 23–26. UPSIDE has also sufficiently alleged that there are alternative ways of advancing legitimate government interest in promoting public health and safety that would not impede interstate commerce to protectionist effect. For example, as UPSIDE has alleged, Florida could issue disclosure requirements for food establishments to inform consumers that a given product contains cultivated meat. *Id.* ¶ 211. At the motion-to-dismiss stage, those allegations, which must be accepted as true, are enough to defeat the motions to dismiss.

Florida cannot escape this result merely by noting that cultivated meat is a new product. New products are not invariably harmful, nor does the Commerce Clause include a "precautionary principle" exception to the heightened scrutiny that applies to laws that have the purpose and effect of discriminating against interstate commerce. Once

again, if botanists in Florida develop a juicier orange, California could not justify a ban on the importation of that orange simply on the grounds that it was new.

Florida will, of course, have the opportunity argue that the USDA's extensive pre-market review of UPSIDE's product was insufficient and that cultivated meat is so potentially dangerous that the only means of protecting Floridians is by shutting Florida off from interstate commerce (to the benefit of Florida's in-state agricultural interests). But it will have to do so on the basis of evidence developed in discovery. It cannot do so at the motion-to-dismiss stage.

## II.    UPSIDE has alleged valid federal preemption claims

This Court should also deny the motion to dismiss as to UPSIDE's federal preemption claims.

As explained in Section A, UPSIDE's amended complaint cures any ambiguity about whether UPSIDE's preemption claims are properly before this Court.

As explained in Section B, UPSIDE's preemption claims also state a valid claim for relief. The PPIA's express preemption provisions do not require that there be conflict between state and federal law; they apply

whenever a state imposes *any* requirements "in addition to, or different than" those made under the PPIA regarding the ingredients used in poultry products or the premises, facilities, and operations of USDA-inspected official establishments that produce such products. USDA has unambiguously stated that cultivated poultry products like UPSIDE's are subject to the same binding statutory and regulatory requirements as conventional poultry products. These include requirements governing the ingredients used in poultry products and the premises, facilities, and operations of official establishments that produce poultry products. Florida's law imposes both ingredient requirements and operational requirements that are in addition to and different from these binding federal requirements. That distinguishes this case from the cases that the government primarily relies on—involving horsemeat and foie gras—which involve animal husbandry and welfare regulations that fall outside the USDA's regulatory ambit. Thus, UPSIDE has stated a valid claim that SB 1084 is preempted under the PPIA.

## A.   UPSIDE has properly pleaded a cause of action in equity and under Section 1983.

As explained below, UPSIDE has properly pleaded causes of action both in equity and under Section 1983, and the government has

27

not met its heavy burden of showing that Congress intended to foreclose those traditional causes of action here.

### 1. UPSIDE has properly pleaded a claim in equity.

"[A]s [the Supreme Court has] long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015). In this Court's ruling on UPSIDE's motion for preliminary injunction, this Court also invited Plaintiff to amend its complaint to clarify that it was "seeking to pursue its express preemption claims via an action in equity." PI Ruling (Dkt. 40) at 13 n.6. UPSIDE has done so. Its amended complaint explicitly seeks "Equitable Relief" under this Court's "inherent equitable power to grant injunctive relief against state officers who are violating, or planning to violate, federal law." Amend. Compl. ¶¶ 140, 176 (citing *Ex parte Young*, 209 U.S. 123 (1908)).

Defendants' motions to dismiss largely ignore these amendments. Commissioner Simpson's motion to dismiss repeats arguments from his response to UPSIDE's motion for preliminary injunction, arguing that

neither the Supremacy Clause nor the Declaratory Judgment Act confer a private right of action. But Claims 2 and 4 of UPSIDE's Amended Complaint do not claim otherwise. To be sure, both claims mention the Supremacy Clause, which is the provision of the Constitution at issue in all federal preemption cases. Amend. Compl. ¶¶ 141, 152, 177, 191. And both claims seek declaratory relief. *Id.* ¶¶ 155, 194. But both claims are explicit that they seek this relief "pursuant to this Court's inherent equitable power." *Id.*

It is unclear what else Defendants think UPSIDE should have said. What is clear, however, is that "[f]ederal pleading standards do not demand any magic words, but instead only require plaintiffs to give fair notice of all claims brought against the defendant." *Barron v. United States*, 111 F.4th 667, 674 (5th Cir. 2024) (cleaned up). UPSIDE's amended complaint is more than sufficient to meet this minimal pleading standard.

## 2. UPSIDE has properly pleaded a claim under Section 1983.

As this Court noted in its ruling on UPSIDE's motion for preliminary injunction, whether UPSIDE has properly pleaded a cause of action under Section 1983 involves answering two questions. First,

29

"does the PPIA's express preemption provision create an individual

right that is enforceable under section 1983, and second, has Congress

foreclosed Plaintiff's cause of action for express preemption under

section 1983?" PI Ruling at 13 n.7. UPSIDE's claims satisfy both

requirements.[9]

First, the PPIA's express preemption provisions create

individually enforceable rights. As the Supreme Court explained in *New

Jersey Thoroughbred Horsemen's Ass'n v. National Collegiate Athletic

Ass'n*, express preemption provisions like the PPIA's "confer[] on private

entities . . . a federal right to engage in certain conduct subject only to

certain (federal) constraints." 584 U.S. 453, 478–79 (2018).

This federal right satisfies the three-factor test set forth in

*Blessing v. Freestone*, 520 U.S. 329 (1997), for determining whether a

federal law unambiguously provides this right. *See Bowles v. DeSantis*,

_____

[9] Arguably, there is little to be gained by resolving at this early stage
the question of whether UPSIDE may raise its federal preemption
claims under Section 1983. Because the preemption claims are also
properly raised under the Court's inherent equitable power, *see supra* at
28, the only practical significance to whether those claims are *also*
proper under Section 1983 is the potential availability of attorneys' fees
under Section 1988. Thus, this Court in its discretion could withhold
ruling on this question until the issue of attorneys' fees becomes
relevant.

934 F.3d 1230, 1239–40 (11th Cir. 2019) (discussing the *Blessing*

factors). Those three factors are: (1) whether Congress "intended that

the provision in question benefit the plaintiff," (2) whether "the right

assertedly protected by the statute is . . . so vague and amorphous that

its enforcement would strain judicial competence," and (3) whether the

statute "unambiguously impose[s] a binding obligation on the states."

*Id.* at 1239–40.

First, poultry producers are one of the intended beneficiaries of

the PPIA in general and the PPIA's express preemption provisions

specifically. The PPIA itself declares in its statement of findings that,

"[u]nwholesome, adulterated, or misbranded poultry products . . .

destroy markets for wholesome, not adulterated, and properly labeled

and packaged poultry products, and result in sundry losses to *poultry*

*producers and processors of poultry and poultry products*." 21 U.S.C.

§ 451 (emphasis added). Congress sought to prevent "the burdening of

such commerce." 21 U.S.C. § 452. And one of the ways it sought to

achieve this end was by creating a uniform set of requirements "with

respect to premises, facilities and operations of . . . official

establishment[s]" like UPSIDE's in which poultry products are

manufactured and the "[m]arking, labeling, packaging, [and] ingredient requirements" to which those products are subject. 21 U.S.C. § 467e.

Second, the right created by the PPIA's preemption provision is not "so vague and amorphous that its enforcement would strain judicial competence." *Bowles*, 934 F.3d at 1239–40. Rather, the preemption requirements prohibit any state requirements "in addition to, or different than," those imposed under the PPIA. 21 U.S.C. § 467e. This total prohibition on additional or different requirements thus bears no resemblance to the sort of value-laden statutory language that courts have found to be judicially unadministrable. *See, e.g.*, *Armstrong*, 575 U.S. at 328 (holding that requirements in the Medicaid Act that states provide Medicaid reimbursement plans "consistent with efficiency, economy, and quality of care," while "safeguard[ing] against unnecessary utilization of . . . care and services" was not judicially administrable).

Third and finally, the PPIA's express preemption provision is "couched in mandatory, rather than precatory, terms." *Bowles*, 934 F.3d at 1245. Under both the "premises, facilities and operations" clause and the "ingredients" clause, requirements that differ from or add to federal

32

law "may not be imposed by any State." 21 U.S.C. § 467e. This is not

Congress "expressing a wish." *See Precatory*, Merriam-Webster,

https://www.merriam-webster.com/dictionary/precatory (last visited

Dec. 2, 2024). It is Congress establishing "a federal right to engage in

certain conduct subject only to certain (federal) constraints." *N.J.*

*Thoroughbred Horsemen's Ass'n*, 584 U.S. at 478–79. And where

Congress has established such a right, that right is presumptively

enforceable under Section 1983. *See Collier v. Dickinson*, 477 F.3d 1306,

1310 (11th Cir. 2007) ("If all three conditions are satisfied, there exists

a rebuttable presumption that the statute is enforceable under Section

1983.").

### 3. Congress has not foreclosed equitable claims or claims under Section 1983.

Because UPSIDE's federal preemption claims are grounded both

in this Court's inherent equitable power and in Section 1983, the

government may only escape those claims if it shows that Congress

intended to foreclose both equitable relief and relief under Section 1983.

But the government cannot do so here.

Courts do not lightly conclude that Congress has displaced either

traditional equitable remedies or resort to Section 1983. The mere

33

possibility of pursuing relief through other means is not enough.

Instead, Courts will find that Congress has foreclosed equitable relief or

relief under Section 1983 only where Congress has created an

alternative avenue of relief that it intends to be both comprehensive

and exclusive. *See Armstrong*, 575 U.S. at 328; *Collier*, 477 F.3d at

1311. For UPSIDE's equitable claims, the existence of alternative

enforcement mechanisms is most likely to foreclose equitable relief

when the statute is "judicially unadministrable," *Armstrong*, 575 U.S.

at 328, which, as discussed, the PPIA is not. For UPSIDE's Section 1983

claims the standard is even higher: "[T]o support the conclusion that

Section 1983 relief is precluded, the scheme set forth by Congress must

be so detailed, complex, or comprehensive, such that it is nonsensical to

hold that Congress intended Section 1983 relief to be available." *Collier*,

477 F.3d at 1311.

    The government has not met these high bars. Indeed, the

government points to no comprehensive enforcement scheme at all,

besides the possibility of UPSIDE complaining to the USDA and hoping

that it pursues action against the state, which it is under no obligation

to do. But that is no remedy at all, let alone the sort of comprehensive scheme required to foreclose UPSIDE's claims.

The government's reliance on 21 U.S.C. § 467c—which provides that "[a]ll proceedings for the enforcement or to restrain violations of this chapter shall be by and in the name of the United States"—does not change this conclusion. That is because a state's enactment of a law that is preempted under § 467e of the PPIA is not a "violation" of the PPIA in the relevant sense of that term.

Once again, *New Jersey Thoroughbred Horsemen's Ass'n* is instructive. As the Court explained, Defendants' error stems from "the language used by Congress in framing preemption provisions." 584 U.S. at 478–79. Though the language of an express preemption like § 467e "might appear to operate directly on the States," "it is a mistake to be confused by the way in which a preemption provision is phrased." *Id.* As noted above, the PPIA's preemption provision "confers on private entities . . . a federal right to engage in certain conduct subject only to certain (federal) constraints." *Id.* A state that enacts a law that is expressly preempted by the PPIA violates regulated parties' rights, and that law is void under the Supremacy Clause. But that enactment is not

a statutory "violation" of the type described in 21 U.S.C. § 467c because

states are not regulated entities under the PPIA. And none of the cases

that the government cites suggests otherwise. Instead, all of them

involve lawsuits by private parties against other private parties that

involved—or were alleged to involve—duties as a regulated entity under

the PPIA.[10] The same is true for the case law the government cites

interpreting similar statutory language under the Food, Drug, and

Cosmetic Act.[11]

    None of the cases the government cites involves let alone

forecloses a claim like the one here, that a state has enacted a law that

---

[10] *See Webb v. Trader Joe's Co.*, 418 F. Supp. 3d 524, 530 (S.D. Cal. 2019), *aff'd*, 999 F.3d 1196 (9th Cir. 2021) (dismissing consumer class action against Trader Joe's that alleged the grocery store sold chicken that retained more water than claimed on its USDA approved label); *Sanderson Farms, Inc. v. Tyson Foods, Inc.*, 549 F. Supp. 2d 708, 719 (D. Md. 2008) (stating in dicta, in a lawsuit against Tyson Foods, that plaintiffs "may not use the Lanham Act as a disguised attempt to enforce the PPIA"); *House of Raeford Farms, Inc. v. SOMMA Food Grp., LLC*, No. 05-22-01231-CV, 2024 WL 396609, at *4 (Tex. App. Feb. 2, 2024) (holding that chicken supplies duties under the PPIA could not serve as the basis for a state tort lawsuit).

[11] Indeed, the one case the government cites for this proposition specifically held that the FDCA did *not* preempt federal claims brought under the Lanham Act. *See POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014).

is expressly preempted by the PPIA or the FDCA. UPSIDE is not suing a competitor, alleging that it has failed to abide by the requirements of the PPIA; it is suing a state, alleging that it is threatening to enforce an unconstitutional law against it. And federal courts have repeatedly heard such cases under both the PPIA and the similarly worded FDCA.[12] The existence of these lawsuits—which are inexplicable under Defendant's theory—is no mystery. They are straightforward applications of the general rule that "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong*, 575 U.S. at 326. That is what UPSIDE has done, and its preemption claims are properly before this Court.

---

[12] *See Association des Éleveurs de Canards et d'Oies du Québec v. Becerra*, 870 F.3d 1140, 1150 (9th Cir. 2017); *Nat'l Broiler Council v. Voss*, 44 F.3d 740, 743 (9th Cir. 1994); *Del Real, LLC v. Harris*, 966 F. Supp. 2d 1047 (E.D. Cal. 2013), *aff'd*, 636 F. App'x 956, 957 (9th Cir. 2016); *see also, e.g., Monster Beverage Corp v. Herrera*, No. 13-cv-786, 2013 WL 4573959 (C.D. Cal. Aug. 22, 2013) (denying motion to dismiss federal preemption claim under the FDCA brought by private litigant); *N.Y. State Rest. Ass'n v. N.Y.C. Bd. of Health*, 509 F. Supp. 2d 351 (S.D.N.Y. 2007) (holding that New York City regulation requiring restaurants to disclose calorie information on menu boards was preempted by the FDCA in suit brought by private litigants).

**B. UPSIDE has validly alleged that Florida's prohibition on cultivated poultry products is preempted by federal law**

Besides having a valid cause of action, UPSIDE has also alleged facts sufficient to show that SB 1084 imposes requirements on the ingredients in UPSIDE's poultry products and on the facilities, premises, and operations and the ingredients in its poultry product at the official establishment at which UPSIDE produces those products that are in addition to or different than those imposed under federal law and thus are preempted by the PPIA. UPSIDE acknowledges, of course, that this Court reached the contrary result in ruling on UPSIDE's motion for preliminary injunction. Respectfully, and as explained in more detail below, that ruling was error.

In Section 1, UPSIDE will explain the broad scope of the PPIA's preemption provisions and why they apply even when there is no direct conflict between state and federal requirements. In Section 2, UPSIDE will explain why the allegations in the amended complaint state valid preemption claims under the PPIA. In Section 3, UPSIDE will explain why the government's reliance on cases regulating which animals may be slaughtered and how animals must be treated while alive are

distinguishable from this case, which involves a law that directly

regulates the preparation of poultry products within official

establishments. Finally, in Section 4, UPSIDE will explain why the

government's other arguments for avoiding federal preemption are

meritless.

> **1.    The PPIA expressly preempts state requirements regarding the permissible ingredients in poultry products or the premises, facilities, or operations of official establishments in which poultry products are produced, regardless of whether those requirements conflict with any requirement in federal law.**

This case involves two federal preemption clauses in the PPIA.

The first pertains to state efforts to regulate the "premises, facilities

and operations of any official establishment" regulated under the PPIA:

> Requirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter may not be imposed by any State or Territory or the District of Columbia, except that any such jurisdiction may impose recordkeeping and other requirements within the scope of paragraph (b) of section 460 of this title, if consistent therewith, with respect to any such establishment.

21 U.S.C. § 467e.

The second pertains to state efforts to regulate the marking, labeling, packaging, or ingredient requirements for articles prepared in any official establishment regulated under the PPIA:

> Marking, labeling, packaging, or ingredient requirements (or storage or handling requirements found by the Secretary to unduly interfere with the free flow of poultry products in commerce) in addition to, or different than, those made under this chapter may not be imposed by any State or Territory or the District of Columbia with respect to articles prepared at any official establishment in accordance with the requirements under this chapter . . . .

*Id.*

By their terms, neither of these express preemption provisions requires that there be a conflict between state and federal law before a state requirement will be held preempted. Instead, these express preemption provisions establish that official establishments—and the articles prepared in them—will be subject to a single set of standards: the federal standard. *See N.J. Thoroughbred Horsemen's Ass'n*, 584 U.S. at 478–79 (holding that express preemption provisions like the PPIA's "confer[] on private entities . . . a federal right to engage in certain conduct subject only to certain (federal) constraints").

In this case, although the USDA has not yet enacted separate regulations specific to cultivated poultry products, it has taken the

40

unequivocal position that cultivated meat and poultry products are

"subject to the same statutory requirements, regulations, and [USDA

Food Safety and Inspection Service (FSIS)] oversight authority as meat

and poultry food products derived from slaughter."[13] Under its existing

statutory authority, the USDA has promulgated ingredient

requirements that govern the use of ingredients in meat and poultry

products. These include regulations that specifically govern which

ingredients can and cannot be used in the production of conventional

and cultivated poultry products.[14] The USDA has also established

regulations for the safe production, labeling, and distribution of poultry

products, including cultivated chicken products. These include

regulations that specifically govern the processing of cultivated poultry

products at "official establishments" that are subject to a USDA Grant

---

[13] *See* U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat & Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/policy/fsis-directives/7800.1.

[14] *See, e.g.*, U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat & Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/sites/default/files/media_file/documents/7800.1.pdf; 9 C.F.R. § 424.1; 9 C.F.R. § 424.21(c).

of Inspection.[15] The USDA has stated that its existing inspectional

regime for official establishments that produce meat or poultry products

is "immediately applicable" to facilities that produce cultivated meat

and poultry products.[16] Pursuant to this authority, USDA issued a

Grant of Inspection for UPSIDE's manufacturing facility, indicating

UPSIDE's compliance with regulations promulgated under the

authority of the Poultry Products Inspection Act,"[17] and the facility is

subject to inspection by USDA-FSIS during each production shift. Thus,

contrary to Plaintiff Simpson's assertion that "UPSIDE is not an

'official establishment' under the PPIA," UPSIDE's facility is an "official

establishment" as that term is defined in section 453(p) of the PPIA,

since UPSIDE's facility is an establishment "at which inspection of . . .

---

[15] *See, e.g.*, 9 C.F.R. § 381.65, .145(a), .145(b).

[16] U.S. Dep't of Agric., *Human Food Made with Cultured Animal Cells*, https://www.fsis.usda.gov/inspection/compliance-guidance/labeling/labeling-policies/human-food-made-cultured-animal-cells (Aug. 17, 2023); *see also* FSIS NOTICE 31-23, *Updated Cell-Cultured Meat & Poultry Food Products Sampling Program* (Jun 29, 2023), https://www.fsis.usda.gov/sites/default/files/media_file/documents/31-23.pdf (providing instructions to inspection program personnel on sampling and inspections at facilities that produce cultivated meat and poultry).

[17] Amended Compl. ¶ 46.

the processing of poultry products, is maintained under the authority of [the PPIA]."

Notably, while many of the requirements outlined above are discussed in FSIS directives and the formal agreement between USDA and FDA regarding the regulation of cultivated meat and poultry products, UPSIDE has not, as Commissioner Simpson's motion suggests, argued that these materials, themselves, are binding law. Rather, UPSIDE cites these sources because they clearly convey USDA's determination that its existing binding legal authorities— including the PPIA and various USDA implementing regulations— apply to cultivated meat and poultry products just as they apply to other meat and poultry products. Florida's law establishes ingredient requirements and operational requirements that are in addition to and different than these binding federal requirements, and which are thus void under the PPIA's broad preemption provision.

To be clear, UPSIDE's argument is not "if it's a poultry product, states can't ban it." PI Ruling at 16. Rather, UPSIDE's argument is that, if it is a poultry product, a state may not ban it just because it contains or is made from a specific ingredient (i.e., cultivated chicken

cells) permitted under the PPIA or based on the use of a specific production method used within a USDA-inspected official establishment (i.e., cell cultivation) permitted under the PPIA. Whether such a ban is better characterized as an ingredient requirement (in the sense that the state is banning products containing specific ingredients) or a facilities requirement (in the sense that the state is banning the sale of products manufactured in a way it disapproves of, but that are permitted under applicable USDA requirements), the result is the same: States may not impose requirements that are in addition to or different than requirements imposed under federal law.

That is true even if there is no direct conflict between the state law and the PPIA. What matters is that "Congress has unmistakably ordained that the Federal Act fixes the sole standards." *Armour & Co v. Ball*, 468 F.2d 76, 84 (6th Cir. 1972) (cleaned up) (discussing the identical preemption provisions of the FMIA). And because Congress intended the PPIA to set the sole standards for the ingredients used in poultry products and the premises, facilities, and operations of official establishments that produce such products, it is irrelevant that neither Congress nor the USDA has mandated that cultivated poultry cells

44

*must* be used in poultry products. What they *have* established is that poultry products prepared under the USDA's standards for safe manufacture are suitable for sale in interstate commerce, and the state cannot exclude those products simply because it disagrees with that judgment.

The Sixth Circuit's ruling in *Armour* is instructive. In that case a manufacturer of sausage regulated under the FMIA challenged Michigan's Comminuted Meat Law, which governed the sale of "meat that has been subjected to a process whereby it has been reduced to minute meat particles." That definition encompassed sausage, and Michigan's law prohibited the sale within the state of any sausage that did not meet the state's definition of "grade 1" sausage. The Sixth Circuit considered various provisions of Michigan's law, ultimately holding that they were preempted under the FMIA.

Significantly, not all these provisions were in direct conflict with any federal statute or regulation governing the manufacture of sausage. For example, although federal law allowed sausage to be prepared "from any part of cattle, sheep, swine, or goats capable of use as human food," Grade 1 sausage could be prepared only from "striated muscle,

including head and cheek meat (basically, skeletal meats) derived only
from the carcass of any cattle, swine, or sheep, or a mixture of such
meats." It was possible to comply with both the state and federal
definitions of sausage; one simply had to abide by the more restrictive
ingredient requirements established under state law. Yet the court held
that Congress's manifest intent to establish "uniform national
standards" for meat products preempted Michigan's sales ban. The
same was true even where neither Congress nor the USDA had
specifically spoken to an issue regulated under Michigan's law. Thus,
although federal law imposed "no federal regulation governing overall
moisture or protein content," Michigan's requirements for those
components were held to be preempted. *Armour*, 468 F.2d at 81.
Consistent with this, the Supreme Court, in examining the materially
identical "premises, facilities and operations" preemption provision of
the FMIA, held that the provision "prevents a State from imposing any
additional or different—*even if non-conflicting*—requirements that fall
within the scope of the [FMIA] and concern an [official establishment's]
facilities or operations." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459–
60 (2012) (emphasis added).

46

## 2. UPSIDE has validly alleged that SB 1084 imposes ingredient and facilities requirements that are different from or in addition to those imposed under federal law.

The reasoning of *Armour* applies with equal force here. It is possible to create poultry products that comply with both the PPIA and SB 1084: One must simply ensure that those products do not contain cultivated poultry cells. But just as that reasoning could not save Michigan's Comminuted Meat Law, it cannot save SB 1084.

First, UPSIDE has properly alleged that SB 1084 imposes a preempted ingredient requirement. UPSIDE has alleged that it is an "official establishment" under the PPIA and that its cultivated chicken product is an "article[] prepared at [an] official establishment in accordance with the requirements of the PPIA." UPSIDE has also alleged that the USDA, acting under the authority of the PPIA, has established ingredient requirements that govern cultivated poultry products. For example, the USDA has issued a directive clarifying that cultivated poultry food products are "subject to the same statutory requirements, regulations, and FSIS oversight authority as meat and poultry food products derived from slaughter" and that "establishments that produce cells for cell-cultured meat or poultry food products may

47

distribute the raw harvested cells in commerce or process the harvested cells into finished products that contain ingredients, such as spices, flavorings, binders, or other ingredients." U.S. Dep't of Agric., FSIS Directive 7800.1, *FSIS Responsibilities in Establishments Producing Cell-Cultured Meat & Poultry Food Products* (June 21, 2023), https://www.fsis.usda.gov/sites/default/files/media_file/documents/7800. 1.pdf. This same directive provides that ingredients used in cultivated meat and poultry products "must be considered safe and suitable by FSIS" and "[i]ngredients listed as approved for meat in [certain current USDA regulations and directives] may be used in cell-cultured meat food products, and ingredients listed as approved for poultry may be used in cell-cultured poultry food products . . . ." In other words, the USDA has established that cultivated poultry cells may be used as an ingredient in finished poultry products, that products containing those cells may be sold in interstate commerce, and that its broader regulatory framework governing the lawful use of ingredients in poultry products applies to cultivated poultry products.

The only remaining question, then, is whether UPSIDE has alleged that Florida has enacted an "ingredient requirement" that is "in

addition to, or different than" the federal requirement. Plainly it has. "Ingredient requirements" refer to "the physical components that comprise a poultry product." *Association des Éleveurs de Canards et d'Oies du Québec v. Becerra*, 870 F.3d 1140, 1147–48 (9th Cir. 2017). Here, USDA has authorized the use of cultivated cells as ingredients (i.e., "physical components") in poultry products. Indeed, UPSIDE's USDA-FSIS-approved product label describes the product as being made "from chicken cells" and states that the product's primary ingredient is "cell-cultivated chicken." Despite this, Florida forbids UPSIDE from using this same ingredient in its poultry products. *See* Fla. Stat. § 500.03(k) (defining "cultivated meat" as "any meat or food product produced from cultured animal cells"); § 500.452 (making it "unlawful for any person to manufacture for sale, sell, hold or offer for sale or distribute cultivated meat in [Florida]"). Thus, SB 1084 is expressly preempted under the "ingredients" clause of 21 U.S.C. § 467e.

For similar reasons, UPSIDE has properly alleged that SB 1084 is also preempted under the PPIA's "Premises, Facilities and Operations" Clause, which prohibits states from imposing "[r]equirements within the scope of this chapter with respect to premises, facilities and

49

operations of any official establishment, which are in addition to, or different than those made under this chapter." 21 U.S.C. § 467e. The Supreme Court has expressly examined the Federal Meat Inspection Act's identical clause, holding that it "sweeps widely." *Nat'l Meat Ass'n*, 565 U.S. at 459. The Court has also held that a state cannot avoid this clause "just by framing [its law] as a ban on the sale of meat produced in whatever way the State disapprove[s]." *Id.* at 464. "That would make a mockery of the FMIA's preemption provision." *Id.* And, here, the PPIA's analogous provision straightforwardly applies to UPSIDE and its chicken product.

First, as established previously, UPSIDE has alleged that its production facility is an official establishment subject to USDA inspection: UPSIDE has been issued a Grant of Inspection and is subject to routine inspection by USDA-FSIS. UPSIDE's establishment is therefore an establishment "at which inspection of . . . the processing of poultry products, is maintained under the authority of [the PPIA]." 21 U.S.C. § 453(p). Second, UPSIDE has alleged that the USDA, acting under the authority of the PPIA, has adopted a variety of requirements for premises, facilities, and operations of establishments at which

50

cultivated chicken products are manufactured. *See supra* at 41–42 n.15.

Third, and finally, UPSIDE has alleged that Florida has enacted

requirements for premises, facilities, and operations that are "different

than" the federal requirements. By preventing UPSIDE from

manufacturing, distributing, and selling cultivated chicken that is

produced in accordance with federal requirements for poultry facilities,

Florida "reaches into" UPSIDE's federally regulated facility and

"substitutes a new regulatory scheme for the one the FSIS uses." *Nat'l*

*Meat Ass'n*, 565 U.S. at 460, 467. Simply put, under the PPIA, an

official establishment is permitted to slaughter a chicken, extract its

cells, and cultivated those cells for use in human food. Under Florida

law, an official establishment may process those cells in any other

manner permitted under federal law *except* cultivation. Thus, SB 1084

imposes "[r]equirements . . . with respect to premises, facilities and

operations of any establishment at which inspection is provided under

[the PPIA], which are in addition to, or different than those made under

[the PPIA]." *Id.* at 460, 467; 21 U.S.C. § 467e. And just as in *National*

*Meat Ass'n*, Florida cannot avoid preemption simply by "framing [its

law] as a ban on the sale of meat produced in [a] way the State

disapproves." 565 U.S. at 464.

> ### 3. The primary cases that the government relies on did not involve state laws that imposed ingredient requirements or other requirements that directly reach into federally regulated facilities.

The government's primary response to these arguments is to point

to cases that upheld state laws that prohibited the sale of certain meat

products based on factors that are distinguishable from those at issue

here. For example, the government relies heavily on the Ninth Circuit's

ruling in *Association des Éleveurs de Canards et d'Oies du Québec v.

Becerra* (*Canards II*), 870 F.3d 1140 (9th Cir. 2017), which upheld a

California law that forbade the force-feeding of ducks or geese as well as

the in-state sale of products made elsewhere from birds that had been

force fed. The Ninth Circuit held that this law was not preempted under

the PPIA's ingredients clause because it regulated only an animal-

husbandry practice—i.e., the treatment of animals before slaughter—

and not the physical components of poultry products. The plaintiffs

could not circumvent this by arguing that California's law prohibited

the use of "force-fed livers" as an "ingredient" in poultry products

because, after all, "it is not the livers that are force-fed, it is the birds." *Id.* at 1149. "[T]he difference," the court observed, "is in the treatment of the birds *while alive*." *Id.*

Florida's law is distinguishable from the law at issue in *Canards II*. Unlike the law at issue in *Canards II*, Florida's law does not regulate how animals are treated when alive. Instead, Florida's law regulates whether certain poultry parts *harvested from a slaughtered bird* can be used as an ingredient in poultry products and, as explained further below, how those parts may be processed for inclusion in poultry products within official establishments. This difference matters. Indeed, as the Ninth Circuit noted in *Canards*, the USDA had repeatedly represented in legal filings that the agency "has no authority to regulate the care or feeding of birds *prior to* their arrival at the slaughter facility." *Id.* at 1148 (emphasis added). But once cells have been extracted from a poultry carcass for use in making poultry products in an official establishment, they become potential ingredient in poultry products, and a state law that disqualifies them from inclusion as an ingredient becomes an ingredient requirement.

The government then argues that even if "cultivated poultry cells" are the relevant ingredient in UPSIDE's product, Florida's ban on the inclusion of those cells in poultry products does not violate the PPIA because nothing in the PPIA prevents a state from banning an ingredient from existing within the state. Once again, the government relies on *Canards II*, apparently for the proposition that the PPIA imposes no limits whatsoever on the state's ability to ban any or all poultry products from existing within its borders.

*Canards II* should not be read so broadly. Rather, it should be understood in terms of that court's focus on the USDA's lack of jurisdiction over animal husbandry practices. *Id.* at 1150 ("The fact that Congress established 'ingredient requirements' for poultry products that *are* produced does not preclude a state from banning products— here, for example, on the basis of animal cruelty—*well before the birds are slaughtered*." (second emphasis added)).

The state's reliance on Fifth and Seventh Circuit decisions upholding, against preemption challenges, state prohibitions on the slaughter or sale of horsemeat is similarly misplaced. Whether those cases, which concerned the analogous "premises, facilities and

54

operations" prong of the FMIA's preemption provision, were correctly
decided—a question the U.S. Supreme Court explicitly declined to
express any view on in *National Meat Ass'n*—they are distinguishable
from SB 1084 because they concerned laws that operate "at a remove
from the sites and activities that the [PPIA] most directly governs." 565
U.S. at 467. The laws at issue in the horsemeat cases categorically
restricted facilities from slaughtering a specific animal species (i.e.,
horses) for human consumption or from receiving or processing meat
sourced from that specific animal species with the intent to sell for
human consumption, thus preventing those animals or meat products
from arriving at official establishments in the first instance. *See id.*
("When such a ban is in effect, no horses will be delivered to, inspected
at, or handled by a slaughterhouse, because no horses will be ordered
for purchase in the first instance."). This is distinguishable from the law
at issue in *National Meat Ass'n*, which dictated how official
establishments could handle certain animals (i.e., non-ambulatory
animals) after those animals had arrived at the slaughter
establishment.

SB 1084 is closer to the law at issue in *National Meat Ass'n*: It does not prohibit official establishments from slaughtering chickens or other birds for human consumption or from receiving or processing poultry meat with the intent to sell for human consumption. It instead dictates how one must treat chicken parts *within* an official establishment. Under Florida law, chicken cells may enter an official establishment and be blended, mechanically separated, emulsified, steamed, fried, boiled or subject to any number of other processes while being made into finished food products. But, under SB 1084, they may not be cultivated. Thus, like the law at issue in *National Meat Ass'n*— and unlike the laws at issue in the horsemeat cases—SB 1084 does not "work at a remove" from the operations of USDA-inspected official establishment.[18] Rather, it strikes at the very core of what the PPIA

---

[18] This Court's previously suggested that UPSIDE is incorrect to argue that the horsemeat cases are distinguishable because they deal with the treatment of animals while alive. PI Ruling at 20–21. But Texas's prohibition on the possession of horsemeat with an intent to sell it for human consumption necessarily prohibited the slaughter of those animals for human consumption, thus preventing their meat from coming within the ambit of the USDA's authority and the FMIA's preemption provisions. To the extent Texas's law permitted the continued slaughter of horse for use as animal food, that slaughter occurred at facilities that were not subject to USDA jurisdiction. *See* 21

56

regulates and precisely the type of interest that the PPIA facilities preemption provision forbids.

### 4.   The government's remaining objections are meritless.

Besides the core dispute over whether Florida's law, as alleged, violates the PPIA's preemption provisions, the government raises two general objections to UPSIDE's preemption claims, neither of which has merit.

First, the government argues that UPSIDE's product is not a "poultry product" within the meaning of the PPIA because UPSIDE has not "allege[d] that its product comes from a 'carcass' or that the cells it uses come from a 'slaughtered' bird." Simpson MTD at 11. But at the motion to dismiss stage, this Court must draw all reasonable factual inferences in UPSIDE's favor. UPSIDE's complaint is replete with references to its "cultivated chicken product" and the USDA premarket review process that UPSIDE completed, none of which would have applied had UPSIDE's product not met the federal definition of "poultry product." *See, e.g.*, Amend. Compl. ¶¶ 41–47. Further, this Court has

_____

U.S.C. § 641. Thus, unlike SB 1084, no aspect of Texas's ban on the slaughter of horse for human consumption reached into and affected the operation of "official establishments" regulated under the FMIA.

already held, in resolving UPSIDE's motion for preliminary injunction, that UPSIDE's product is a "poultry product" within the meaning of the PPIA since it is a "product which is made . . . in part from . . . part [of a poultry carcass]." And it did so on the basis of evidence that the government sought in discovery disclosing that the cells used to produce UPSIDE's product do indeed come from a slaughtered bird. Having seen actual proof of the matter, it is more than reasonable for this Court to infer that UPSIDE's product does, indeed, meet the federal definition of poultry product.

Second, the government argues that preemption claims are disfavored in areas traditionally subject to state regulation. Simpson MTD at 11–12. But, as the Supreme Court has held, "the purpose of Congress is the ultimate touchstone in every pre-emption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). This purpose, in turn, "primarily is discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it." *Graham v. R.J. Reynolds Tobacco Co.*, 857 F.3d 1169, 1186 (11th Cir. 2017) (en banc) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996)). And where, as here, the law contains an *express* preemption provision, that provision

"manifests [Congress's] intent to displace a state law." *Marrache v.*

*Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1094 (11th Cir. 2021).

## CONCLUSION

This Court should deny the motions to dismiss.

Dated: December 6, 2024

Respectfully submitted,

INSTITUTE FOR JUSTICE

/s/ Paul M. Sherman
Paul M. Sherman (VA Bar No. 73410)
Suranjan Sen (TN 038830)*
Samuel B. Gedge (VA Bar No. 80387)*
901 North Glebe Road, Suite 900
Arlington, VA 22203-1854
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: psherman@ij.org; ssen@ij.org;
        sgedge@ij.org

*Admitted *pro hac vice*

*Counsel for Plaintiff*

Ari Bargil (FL Bar No. 71454)
INSTITUTE FOR JUSTICE
2 South Biscayne Boulevard, Suite 3180
Miami, FL 33131
Tel: (305) 721-1600
Fax: (305) 721-1601
Email: abargil@ij.org

*Local Counsel for Plaintiff*

59

## LOCAL RULE 7.1(F) CERTIFICATE

Plaintiff's counsel were granted leave to file a combined response with an unopposed extended word limit of 12,000 words on November 21, 2024 [ECF 58].

## FONT AND WORD-COUNT CERTIFICATION

This document is typed in 14-point Century Schoolbook font and contains <u>11,962</u> words, excluding the parts of the brief exempted by this rule.

/s/ Paul M. Sherman
Paul M. Sherman (VA Bar No. 73410)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 6, 2024, the above captioned Plaintiff's Combined Response to Defendants' Motions to Dismiss was filed with the clerk of the court via the ECF filing system, providing service on all attorneys of record.

/s/ Paul M. Sherman
Paul M. Sherman (VA Bar No. 73410)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
*Counsel for Plaintiff*