**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

UPSIDE FOODS INC.,

    Plaintiff,

       v.

WILTON SIMPSON, in his official capacity as Commissioner of the Florida Department of Agriculture and Consumer Services, et al.,

    Defendants.

Case No. 4:24-cv-316

## DEFENDANTS' COMBINED REPLY IN SUPPORT OF THEIR MOTIONS TO DISMISS

Blocking a "democratically adopted state law in the name of the dormant Commerce Clause is a matter of extreme delicacy, something courts should do only where the infraction is clear." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 390 (2023).[1] To survive a motion to dismiss, UPSIDE must plausibly allege that SB 1084 "discriminate[s] purposefully against out-of-state economic interests." *Id.* at 364. As UPSIDE sometimes acknowledges, that requires plausible allegations that Florida's law has "the purpose and effect of discriminating against interstate commerce." DE60 at 25; *see Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206,

---

[1] This brief omits from its authorities all quotations, citations, emphases, and original alterations. Any alterations or emphases within this brief are added.

214 (5th Cir. 2019) ("The challenger must show that the discriminatory effect was a substantial or motivating factor leading to the enactment of the statute.").

UPSIDE's assertion that SB 1084 interferes with one out-of-state company's business plans does not plausibly allege a sufficient discriminatory effect. And the isolated statements from government officials that UPSIDE cobbles together fall far short of plausibly alleging discriminatory purpose. Either deficiency alone is fatal to its case. Because UPSIDE cannot plausibly allege purposeful discrimination—and because federal law does not preempt SB 1084—the case should be dismissed.

## ARGUMENT

## I.    UPSIDE's dormant-commerce claim fails.

UPSIDE disclaims reliance on the *Pike* balancing test and concedes SB 1084's facial neutrality. DE60 at 1, 5 n.4. It must therefore plausibly allege that SB 1084 "discriminate[s] purposefully" against out-of-state residents. *Pork Producers*, 598 U.S. at 364; *see id.* at 379 (if not alleging facial discrimination or pursuing *Pike* balancing, petitioner must allege that "an examination of [the law's] practical effects in operation would disclose purposeful discrimination against out-of-state businesses"). To that end, it offers allegations about SB 1084's "effect" and the Legislature's "purpose" in passing it.

2

DE60 at 8. But UPSIDE's allegations fail to plead "purposeful discrimination." *Pork Producers*, 598 U.S. at 371.

### A.    Discriminatory effect

When the "practical effects" of a law strip out-of-state businesses of their "competitive advantages" and award such advantages to in-state businesses, those effects may "disclose purposeful discrimination" against interstate commerce. *Id.* at 374, 379; *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 351 (1977). At the same time, the Dormant Commerce Clause leaves room for states to ban "particular structure[s] or methods of operation in a retail market." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978). When such bans allow "[o]ut-of-state businesses [to] freely enter the market [so long as] they comply with [the state's] prohibition," they seldom have the practical effects necessary to reveal purposeful discrimination. *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 943-44 (11th Cir. 2013). For that reason, "outright bans" on commercial practices—like SB 1084's ban on distributing cell-cultivated meat—rarely violate the Dormant Commerce Clause. *Trs. of Ind. Univ. v. Curry*, 918 F.3d 537, 543 (7th Cir. 2019) (Easterbrook, J.); *see Funtana Vill., Inc. v. City of Panama City Beach*, No. 5:15-cv-282, 2016 WL 375102, at *8 (N.D. Fla. Jan. 28, 2016) (Walker,

J.); *Locke v. Shore*, 682 F. Supp. 2d 1283, 1293 (N.D. Fla. 2010) (Hinkle, J.); DE54 at 11-12 (collecting cases).

Rather than argue that this case is an exception, UPSIDE disputes the principle that equally applicable market restrictions generally comport with the Dormant Commerce Clause. DE60 at 9-14. It first claims that *Exxon* does not support that premise. *Id.* at 10-12. In its view, *Exxon* "declined to subject [Maryland's] anti-tying provision to heightened scrutiny [] not because it applied equally to in-state and out-of-state actors," but only because the provision had "no impact on the relative proportions of local and out-of-state [gasoline] sold in Maryland." *Id.* at 11.

UPSIDE is mistaken. No doubt, that was one factor in *Exxon*'s analysis. *See Exxon*, 437 U.S. at 126 n.16. But the primary factors—the factors most courts have drawn from *Exxon*, *see Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 42 (1980); *Maharg, Inc. v. Van Wert Solid Waste Mgmt. Dist.*, 249 F.3d 544, 554 (6th Cir. 2001)—were that Maryland's law "create[d] no barriers" or "added costs" for "interstate [gas] dealers," and did not "distinguish between in-state and out-of-state companies in the retail market." *Exxon*, 437 U.S. at 125-26. The "absence of [those] factors," or any other indicia that the law "favored [local] dealer[s]," led the Court to hold that Maryland's law did not discriminate against interstate commerce. *Id.* at 126.

4

The Sixth Circuit rebuffed a similar attempt to reframe *Exxon* in *Maharg*. Describing *Exxon*, the Sixth Circuit explained that "although local Maryland retailers were being protected against competition from the major [interstate] integrated oil companies, the local retailers were not being protected against competition from a small number of interstate companies that chose to engage solely in gasoline retailing." *Maharg*, 249 F.3d at 554. That "circumstance"—that the market remained open to all interstate retailers who complied with Maryland's law—"fully distinguish[ed] *Exxon* from cases such as *Hunt*." *Id. Exxon*, wrote the court, "manifest[ed] an obvious reluctance to push cases such as *Hunt*[] to their logical extremes." *Id.* It thus affirmed the dismissal of the plaintiff's dormant-commerce claim under *Exxon*. *Id.* at 557. This Court should do the same.

UPSIDE next incorrectly asserts that the cases cited by Defendants are distinguishable because they dealt only with laws that did not "advantage" in-state commercial interests. DE60 at 19-24. *Of course* the laws in those cases "advantaged" in-state commercial interests to some degree. *See, e.g.*, *Locke v. Shore*, 634 F.3d 1185, 1193 (11th Cir. 2011) (licensing restriction "somewhat restrict[ed] entry into Florida's commercial interior design market"). But the advantages did not reveal purposeful discrimination because they were not conferred on the basis of citizenship or location. Instead, those

5

laws merely imposed universal market restrictions that applied to "all comers equally." *Locke*, 682 F. Supp. 2d at 1293; *see, e.g.*, *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 555 (7th Cir. 2007) (Posner, J.). That reasoning applies equally to SB 1084. *See* Fla. Stat. § 500.452(1) (making it "unlawful for *any person*"—Floridian or not—"to manufacture for sale, sell, hold or offer for sale, or distribute cultivated meat in this state"); *see also Just Puppies, Inc. v. Brown*, No. 21-2170, 2024 WL 5063822, at *8 (4th Cir. Dec. 11, 2024) (upholding law that "eliminate[d] plaintiffs' preferred mode of doing business").

Unable to avoid *Exxon* and cases applying it, UPSIDE reaches back further to *Hunt*. But *Hunt* involved an extreme case of economic protectionism worlds apart from these facts. *See* 432 U.S. at 352 ("North Carolina singled out . . . the very means by which apples are transported in commerce[.]"); *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 36 (1st Cir. 2007). There, Washington had developed a "stringent" apple-grading system that had "gained nationwide acceptance in the apple trade" and "earned" its apple industry significant "competitive and economic advantages" in the apple market. *Hunt*, 432 U.S. at 336, 351. North Carolina then passed a law prohibiting virtually all imported apples from bearing non-USDA grading marks (like those from Washington). *See id.* at 337. That move "rais[ed] the costs of

6

doing business in North Carolina for Washington apple growers" and "stripp[ed] away from the Washington apple industry" its hard-earned competitive advantages. *Id.* at 351. Worse yet, the law imposed no new burdens on "local apple producers," for North Carolina did not have any state grading system. *See id.* The sweeping effect of that law on Washington, combined with the lack of added burdens for local producers, led the Court to infer purposeful discrimination. *See id.* at 351-52; *Garber v. Menendez*, 888 F.3d 839, 843 (6th Cir. 2018).

UPSIDE alleges nothing like that. Unlike North Carolina's law, SB 1084 equally imposes burdens on in-staters and out-of-staters. Before the law, both those groups could sell cell-cultivated meat in Florida; now, neither can. And nowhere in its complaint does UPSIDE explain how out-of-state cultivated-meat producers hold "competitive advantages" over in-state conventional-meat producers—let alone advantages on par with those that Washington had over North Carolina. *See* DE44 ¶¶ 196-214.

Instead, UPSIDE suggests that SB 1084 strips the company of a competitive advantage merely by banning an out-of-state product that could "present[] new competition to Florida's robust conventional meat industry." DE60 at 16. But on that capacious view of the law, *any* ban on an emergent product would trigger heightened scrutiny. A statute banning medicinal

marijuana, for example, would unconstitutionally strip out-of-state mariju-ana distributors of their "competitive advantage" in a state's existing pain-management industry. *Cf. HW Premium CBD, LLC v. Reynolds*, No. 4:24-cv-210, 2024 WL 3548320, at *12 (S.D. Iowa July 25, 2024). The Court should reject that all-consuming take on the Dormant Commerce Clause. *See Curry*, 918 F.3d at 543.

### B. Discriminatory purpose

At the outset, UPSIDE has no response to Defendants' argument that direct evidence of discriminatory motive cannot establish purposeful dis-crimination without corresponding evidence of a sufficient discriminatory effect on interstate commerce. DE54 at 15-18. Because UPSIDE has not es-tablished such a discriminatory effect here, *supra* 3-8, its direct evidence about the Legislature's motives is irrelevant. *See* DE54 at 15-18.

In any case, UPSIDE's response cannot cover the flaws in its discrimi-natory-purpose theory. When a challenger asserts that a discriminatory pur-pose motivated a law's passage, the Court must apply a "presumption of leg-islative good faith." *League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 923 (11th Cir. 2023). And the "focal point for determin-ing a legislature's purpose" is the statute's plain language. *Gerling Glob. Reins. Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1239-40 (11th Cir. 2001);

*see also Truesdell v. Friedlander*, 80 F.4th 762, 773 (6th Cir. 2023). SB 1084's express "[p]urpose" is to "[s]afeguard the public health." Fla. Stat. §§ 500.02(1), 500.452. As an explicit "safety regulation," this law thus carries a "strong presumption of validity." *Locke*, 634 F.3d at 1195.

UPSIDE's heavy reliance on out-of-context quotations from state officials cannot surmount that presumption. *See* DE60 at 14-15. The Dormant Commerce Clause does "not require courts to inquire into . . . legislators' reasons for enacting a law." *Comptroller of Treasury v. Wynne*, 575 U.S. 542, 561 n.4 (2015). Although that comment, alongside *Pork Producers*, might "leave[] unclear how th[e] purpose inquiry fits into the mix," *Truesdell*, 80 F.4th at 772, it is clear that stray comments from lawmakers quoted out of context constitute lackluster proof of an entire legislature's intent. *See, e.g.*, *Garcia v. United States*, 469 U.S. 70, 78 (1984) ("Isolated statements [from legislators] are not impressive legislative history.").

To the extent they reveal intent at all, the comments UPSIDE cites align with SB 1084's stated purpose (to protect Florida consumers from an untested food product) and with a desire to preserve a conventional meat industry (which does not activate the Dormant Commerce Clause). UPSIDE emphasizes seven comments in its response, only three of which come from legislators who voted for the bill. DE60 at 14-15. One explained that "[w]e

cannot let *agriculture* fail in the state of Florida." *Id.* at 15. Another emphasized that "Florida's *agriculture* can hold us down and provides plenty of safe, quality beef and agricultural products." *Id.* The third added that cultivated meat "sure as heck" should not be available in Florida. *Id.* Each of these comments evinces a legislative intent that is entirely lawful under the Dormant Commerce Clause. *See* DE54 at 20-24. And when "obvious alternative explanations, which suggest lawful conduct" may be inferred from a complaint, the claim must be dismissed. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010); *accord Just Puppies, Inc.*, 2024 WL 5063822, at *10.[2]

## II.   UPSIDE has not plausibly alleged a PPIA violation.

### A.   UPSIDE lacks a private cause of action.

**1.** UPSIDE contends that Congress did not foreclose a private right of action because the PPIA does not provide a comprehensive scheme for relief. *See* DE60 at 34. But here, the point is that the statutory scheme forecloses relief not implicitly in its magisterial comprehensiveness, but rather by a straightforward, indeed rather explicit, congressional command that "*[a]ll* proceedings for the enforcement or to restrain violations of this chapter shall

---

[2] UPSIDE is also wrong that, aside from *Just Puppies*, "all of the Dormant Commerce Clause cases the government cites . . . reached a final judgment . . . following summary judgment or trial." DE60 at 20. *Pork Producers* itself affirmed dismissal of a case. *See* 598 U.S. at 367-68, 391.

be by and in the name of the United States." 21 U.S.C. § 467c. The Court thus need not search for a comprehensive enforcement scheme to discern Congress's intent. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 n.4 (2002); *In re Wild*, 994 F.3d 1244, 1259 (11th Cir. 2021) (en banc). That is why courts construing the FDCA's identically worded enforcement provision have not asked whether a comprehensive enforcement scheme exists before determining that the FDCA forecloses private enforcement. *See Standley ex rel. B.M.S. v. Nelms*, No. 22-35833, 2024 WL 1793667, at *3 (9th Cir. Apr. 25, 2024); *Bird v. Martinez-Ellis*, No. 22-8012, 2022 WL 17973581, at *5 (10th Cir. Dec. 28, 2022); *Lloyd v. Sch. Bd. of Palm Beach Cnty.*, 570 F. Supp. 3d 1165, 1175-76 (S.D. Fla. 2021).

UPSIDE errs in waving away those authorities on the ground that they "involve lawsuits by private parties against other private parties." DE60 at 36. *Standley*, *Bird*, and *Lloyd*, which Defendants cited in their preliminary-injunction response, DE35 at 14, all involved a private party suing a government actor. And those courts all held that the FDCA's identical exclusive enforcement provision foreclosed private lawsuits. *See also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001) (Under the FDCA, "the Federal Government" alone may "file suit for noncompliance" under its exclusive enforcement provision.).

11

UPSIDE next argues that Section 467c does not prohibit private enforcement because "a state's enactment of a law that is preempted under § 467e of the PPIA is not a 'violation' of the PPIA." DE60 at 35. That is beside the point, as Section 467c makes it the exclusive remedy for proceedings to "enforce[]" the PPIA, in addition to proceedings brought to remedy "violations" of it. 21 U.S.C. § 467c. The argument is also wrong: When a state enacts a law that contradicts a federal statute's preemption provision, it is "void under the Supremacy Clause," DE60 at 35, only *because* it violates the preemption provision. *See Hayfield N. R.R. Co. v. Chi. & N. W. Transp. Co.*, 467 U.S. 622, 627 (1984); *Taylor v. Polhill*, 964 F.3d 975, 981 (11th Cir. 2020).

**2.** Responding to Defendants' argument that UPSIDE lacks the "personal rights" necessary to attain a private right of action, *see Gonzaga*, 536 U.S. at 284-85; *Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 899-904 (10th Cir. 2017); DE35 at 16, UPSIDE contends that the PPIA's preemption provision endows it with enforceable rights because "poultry producers are one of the intended beneficiaries of the PPIA in general and the PPIA's express preemption provisions specifically." DE60 at 31-33. But UPSIDE misunderstands the analysis that governs whether a preemption provision grants privately enforceable rights. *See id.* To do so, the provision must "den[y] [the] sovereign the authority to abridge a personal liberty." *Golden State Transit*

*Corp. v. City of Los Angeles*, 493 U.S. 103, 112 (1989); *see Bollack v. City of Mitchell*, 935 F. Supp. 1042, 1045-46 (D.S.D. 1996). Yet when the preemption provision is better read as an effort to "maintain[] uniformity in the administration of the federal regulatory [scheme]," the provision grants no privately enforceable rights. *Golden State*, 493 U.S. at 110-12 (explaining the distinction); *Bollack*, 935 F. Supp. at 1046.

That is the case here. Context from both Section 467e and the rest of the PPIA makes clear that the preemption provision isn't designed to protect personal liberties, but to administer a complex federal food-safety framework. *See* DE35 at 15-17; DE50 at 41-44. The only contrary evidence that UPSIDE cites is Congress's finding that spoiled poultry products "result in sundry losses to poultry processers." DE60 at 31 (quoting 21 U.S.C. § 451). But that statement merely recognizes that an unregulated poultry industry could harm *consumers* by "destroy[ing] markets for wholesome" poultry. 21 U.S.C. § 451. That construction best tracks the statutory scheme, which imposes a host of restrictions on producers so that they will maintain safe poultry for public consumption. *See* DE35 at 17 (surveying the restrictions). Section 451 therefore far from supplies the "clear and unambiguous" statement that UPSIDE needs to establish a private right to enforce the statute that regulates it. *Gonzaga*, 536 U.S. at 290.

13

## B.     SB 1084 is not preempted.

UPSIDE claims this Court's "ruling" that SB 1084 does not violate the ingredients clause "was error" because that clause entitles poultry producers to "be subject to . . . the federal standard" for poultry ingredients. DE60 at 38, 40. But this Court held nothing different; it correctly acknowledged—just as the Ninth Circuit did in *Canards II*[3]—that the ingredients clause "does not mandate that particular types of poultry be produced for people to eat." DE40 at 17. Though UPSIDE tries to sidestep that holding by claiming that the ingredients clause merely prevents states from banning poultry products that "contain[] or [are] made from a specific ingredient," DE60 at 43-44, that is a distinction without a difference. On that view, states may not ban from their borders any ingredient that USDA permits in poultry products. That is not the law. *See* DE40 at 15-18; DE35 at 33-34.

According to UPSIDE, *Armour & Co. v. Ball* says otherwise because "[w]hat matters is that 'Congress has unmistakably ordained that the Federal Act fixes the sole standards.'" DE60 at 44-46 (citing 468 F.2d 76, 84 (6th Cir. 1972)). But this Court already correctly distinguished *Armour*. DE40 at 17. The preempted Michigan law there conditioned the sale of meats, like

---

[3] *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra* (*Canards II*), 870 F.3d 1140, 1150 (9th Cir. 2017).

sausage, on whether the meat met certain standards. 468 F.2d at 79, 84. *Armour* says nothing about whether Michigan could have banned sausage entirely. *See Canards II*, 870 F.3d at 1150 (9th Cir. 2017).[4]

Finally, UPSIDE argues that SB 1084 violates the facilities clause because it reaches into its federally inspected facility. DE60 at 51. That argument fails because SB 1084 works "at a remove from the sites and activities that the [PPIA] most directly governs." DE35 at 33 (quoting *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 467 (2012)). And regardless, UPSIDE has no facilities in Florida, so its facilities are not subject to SB 1084. DE40 at 19.

## CONCLUSION

The case should be dismissed.

---

[4] UPSIDE repeats that *Canards II* is limited to laws regulating live animals. DE60 at 52-53. As explained at the hearing, DE50 at 68:13-70:5, *Canards II* turned on the state's ability to ban a poultry product, which it may do without running afoul of the ingredients clause. *Canards II*, 870 F.3d at 1150; DE35 at 30-31.

Dated: December 20, 2024

Respectfully submitted,

SEAN T. GARNER (FBN 26096)
DARBY G. SHAW (FBN 58728)

ASHLEY MOODY
 *Attorney General*

Florida Department of Agriculture
& Consumer Services
407 S. Calhoun St., Suite 520
Tallahassee, FL 32399-7032
(850) 245-1000

*/s/ Bridget K. O'Hickey*
HENRY C. WHITAKER (FBN 1031175)
 *Solicitor General*
DANIEL W. BELL (FBN 1008587)
 *Chief Deputy Solicitor General*
DAVID M. COSTELLO (FBN 1004952)
 *Senior Deputy Solicitor General*
BRIDGET K. O'HICKEY (FBN 1048521)
 *Deputy Solicitor General*
FOSTER H. SWARTZ (FBN 1059583)
 *Deputy Solicitor General*
WILLIAM H. STAFFORD III (FBN 70394)
 *Special Counsel*

*/s/ Daniel E. Nordby*
DANIEL E. NORDBY (FBN 14588)
RICKY L. POLSTON (FBN 648906)
DENISE M. HARLE (FBN 81977)
KASSANDRA S. REARDON (FBN 103320)

Shutts & Bowen LLP
215 South Monroe Street,
Suite 804
Tallahassee, FL 32301
(850) 241-1717
dnordby@shutts.com

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399
(850) 414-3300
bridget.ohickey@myfloridale-
 gal.com

*Counsel for Wilton Simpson*

*Counsel for the State Attorney De-
fendants*

## CERTIFICATE OF COMPLIANCE

This motion complies with this Court's order granting leave because it contains 3,188 words.

*/s/ Bridget O'Hickey*
Deputy Solicitor General

## CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2024, a true and correct copy of the foregoing was served on all parties.

*/s/ Bridget O'Hickey*
Deputy Solicitor General