## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**UPSIDE FOODS, INC,**

 *Plaintiff*,

**v.**          **Case No.: 4:24cv316-MW/MAF**

**WILTON SIMPSON**, *et al.,*

 *Defendants*.

_____/

## <u>ORDER ON MOTION TO DISMISS</u>

This Court has reviewed, without hearing, Defendant Simpson's motion to dismiss Plaintiff's amended complaint, ECF No. 53, Defendants Cambell, Barlett, Bain, and Rundle's (collectively, the "State Attorney Defendants") motion to dismiss Plaintiff's amended complaint, ECF No. 54, Plaintiff's combined response in opposition to Defendants' motions, ECF No. 60, and Defendants' combined reply, ECF No. 66. For the following reasons, Defendant Simpson's motion, ECF No. 53, is **GRANTED in part and DENIED in part** and the State Attorney Defendants' motion, ECF No. 54, is **GRANTED in part and DENIED in part.**

# I.    Background

Plaintiff Upside Foods, Inc. is a company that produces cultivated chicken meat and aims to sell its cultivated chicken product in Florida. ECF No. 44 ¶¶ 1–3, 102–106, 116–119. But in 2024, the Florida Legislature enacted SB 1084, which prohibits selling, offering for sale, distributing, and manufacturing for sale "cultivated meat," defined as "any meat or food produced from cultured animal cells." SB 1084 now prevents Plaintiff from selling, offering to sell, or distributing its product in Florida. §§ 500.03(1)(k), 500.452(1)–(6), Fla. Stat.; ECF No. 44  ¶¶ 60–64. Seeking to challenge the validity of the law, Plaintiff sued Defendant Simpson, the Commissioner of the Florida Department of Agriculture and Consumer Services, and the State Attorney Defendants, in their official capacities, for declaratory and injunctive relief. *Id.* ¶¶ 10–11. Plaintiff contends that Florida's cultivated meat ban is unconstitutional because it is expressly preempted by the Poultry Product Inspection Act ("PPIA"), 21 U.S.C. §§ 451–73, and because it violates the dormant Commerce Clause. *Id.* ¶¶ 134–38, 150–55, 161–74, 181–94, 200–14.

Plaintiff previously filed a motion for preliminary injunction based on its federal preemption claims, ECF No. 11, which this Court denied after a hearing, ECF No. 40. Before assessing the merits of Plaintiff's preemption claims, this Court concluded that Plaintiff failed to demonstrate a substantial likelihood of establishing

standing for preliminary injunctive relief against (1) the Attorney General, (2) Defendant Barlett, who has enforcement authority for the Sixth Judicial Circuit of Florida, and (3) Defendant Bain, who has enforcement authority for the Ninth Judicial Circuit of Florida. ECF No. 40 at 4–6. This Court went on to evaluate Plaintiff's federal preemption claims and concluded that, even assuming that they were properly before this Court, Plaintiff failed to demonstrate that it was substantially likely to succeed on the merits of those claims. *Id.* at 21.

Plaintiff then amended its complaint, where among other things, it dropped the Attorney General as a defendant and indicated that it was seeking equitable relief under *Ex parte Young*, 209 U.S. 123 (1908), and 42 U.S.C. § 1983. ECF No. 1 at ¶ 11; ECF No. 44 ¶¶ 10–11, 138, 155, 174, 194, 214. Defendants filed their present motions to dismiss Plaintiff's amended complaint shortly after. ECF No. 53; ECF No. 54. Defendants contend that all of Plaintiff's claims must be dismissed because Plaintiff lacks a private cause of action to enforce the PPIA, fails to allege that Florida's ban is preempted by the PPIA, and fails to allege that Florida's ban violates the dormant Commerce Clause. ECF No. 53 at 7–9, 13–36; ECF No. 54 at 8–28.

In ruling on Defendants' motions to dismiss, this Court accepts Plaintiff's factual allegations as true and construes them in the light most favorable to Plaintiff. *Hunt v. Aimco Props.*, *L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). To withstand a motion to dismiss under Rule 12(b)(6), a complaint must include "enough facts to

state a claim to relief that is plausible on its face." *Id.* at 1221 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Plaintiff's allegations must amount to 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).

## II.    Standing

While Defendants do not raise the issue of standing in their motions to dismiss, this Court has an "independent responsibility to ensure that Plaintiff[] has standing" to obtain equitable relief, and accordingly begins by examining whether Plaintiff has plausibly alleged facts to establish standing against all Defendants. *League of Women Voters of Fla., Inc. v. Lee*, 566 F. Supp. 3d 1238, 1248 (N.D. Fla. 2021). To establish standing at the motion to dismiss stage, a plaintiff must allege (1) that it has suffered an injury-in-fact that is (2) traceable to the defendants and that (3) can likely be redressed by a favorable ruling. *Id.*; *Taylor v. Polhill*, 964 F.3d 975, 981 (11th Cir. 2020). This Court previously concluded in its order denying Plaintiff's motion for preliminary injunction that Plaintiff demonstrated a substantial likelihood of success in establishing standing for preliminary injunctive relief against Defendant Simpson, Defendant Campbell—the State Attorney for the

4

Second Judicial Circuit, and Defendant Rundle—the State Attorney for the Eleventh Judicial Circuit. ECF No. 40 at 6–12. Because Plaintiff's factual allegations are substantially the same in its amended complaint and because the burden for establishing standing for preliminary injunctive relief is greater than what is required to establish standing on a motion to dismiss, this Court concludes Plaintiff has plausibly alleged standing as to Defendants Campbell, Rundle, and Simpson for the reasons stated in this Court's order denying Plaintiff's motion for preliminary injunction. ECF No. 40 at 6–12; *see Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 975–76 (11th Cir. 2005) ("[W]hen a question about standing is raised at the motion to dismiss stage, it may be sufficient to provide general factual allegations of injury resulting from the defendant's conduct. . . . In contrast, when, as here, standing is raised at the summary judgment stage, the plaintiff can no longer rest on mere allegations.") (internal citations and quotations omitted); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 (6th Cir. 2018) ("[W]here a plaintiff moves for preliminary injunction, the district court . . . should normally evaluate standing 'under the heightened standard for evaluating a motion for summary judgment.'") (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)).

However, this Court also previously found that Plaintiff failed to demonstrate a substantial likelihood of establishing standing for preliminary injunctive relief

against Defendants Barlett and Bain since it "submitted *no* evidence demonstrating a concrete and particularized injury that [was] traceable" to either of those defendants. ECF No. 40 at 4–6 (emphasis in original). However, on a motion to dismiss, a plaintiff need only "provide 'general factual allegations of injury resulting from the defendant[s'] conduct.'" *Bochese*, 405 F.3d at 975–76 (citations omitted). Plaintiff has done so here with respect to Defendants Barlett and Bain.

As this Court previously noted, the State Attorney Defendants have the specific statutory authority to enforce Florida's cultivated meat ban in their respective jurisdictions. ECF No. 40 at 6. Furthermore, Florida law recognizes an "attempt" to offer cultivated meat for sale or distribution as a crime. ECF No. 40 at 9–11; § 777.04(1), Fla. Stat. Since Plaintiff claims that it plans to speak with chefs throughout Florida with the goal of selling its cultivated chicken product, it has plausibly alleged that it would be subject to a "real and immediate threat of criminal enforcement" for arguably engaging in "solicitation" to violate Florida's cultivated meat ban. ECF No. 40 at 9–11; ECF No. 44 ¶¶ 49–60; § 777.04(2), Fla. Stat. The locations where Plaintiff claims it would attempt to sell or market its product fall under the jurisdiction of Defendants Barlett and Bain. *See* ECF No. 44 ¶¶ 118. In sum, Plaintiff has plausibly alleged that it suffers a concrete injury traceable to Defendants Barlett and Bain because it would face prosecution from these state

6

attorneys if it continued marketing its cultivated chicken meat in Florida, and this Court's enjoining of Florida's ban would redress its injury. *See* ECF No. 40 at 12.

Having concluded that Plaintiff has plausibly alleged standing as to all Defendants, this Court now turns to Plaintiff's first set of claims regarding express preemption under the PPIA.

### III.    PPIA Express Preemption Claims

In Counts I through IV of its amended complaint, Plaintiff alleges that Florida's cultivated meat ban is expressly preempted by the PPIA's "ingredient requirement" provision and its "premises, facilities, and operations requirement" provision. ECF No. 44 ¶¶ 130–35, 145–152, 166–71, 186–91. The "ingredient requirement" provision of the PPIA provides that "[m]arking, labeling, packaging, or ingredient requirements . . . in addition to, or different than, those made under this chapter may not be imposed by any State . . . with respect to articles prepared at any official establishment in accordance with the requirements under this chapter." 21 U.S.C. § 467e. Similarly, the PPIA's "premises, facilities and operations requirement" provision provides that "[r]equirements within the scope of this chapter with respect to premises, facilities and operations of any official establishment which are in addition to, or different than those made under this chapter may not be imposed by any State." *Id.*

As a threshold issue, parties seeking to challenge a state law as preempted by federal law must employ a proper cause of action to proceed in federal court. *United Fac. of Fla. v. Lamb,* Case No. 1:24cv136-MW/MAF (N.D. Fla., April 11, 2025) (citing *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015)).[1] Defendants argue that Plaintiff's express preemption claims must be dismissed because the PPIA does not give Plaintiff privately enforceable rights and forecloses all actions by private parties. ECF No. 53 at 7–13; ECF No. 54 at 28. However, Plaintiff contends that the PPIA provides it with a federal right to sell its product subject to only federal constraints and that it may bring its express preemption claims through 42 U.S.C. § 1983 and in equity. ECF No. 44 ¶¶ 122, 128, 138, 140, 155, 162, 171, 174, 176, 182, 191, 194. Accordingly, this Court begins by analyzing whether Plaintiff may pursue its PPIA preemption claims under either section 1983 or in equity.

### A.    Whether Plaintiff May Bring its Preemption Claims Under Section 1983

As this Court previously explained in its order denying Plaintiff's motion for preliminary injunction, whether Plaintiff may pursue a cause of action for express preemption under section 1983 is a "nuanced question involving two parts." ECF

---

[1] Defendant Simpson argues that neither the Supremacy Clause nor the Declaratory Judgment Act provide Plaintiff with a private right of action. ECF No. 53 at 9–13. This Court previously concluded that the Declaratory Judgment Act does not create a private cause of action, and the Supreme Court has held that the Supremacy clause does not create a private cause of action either. ECF No. 40 at 13; *Armstrong*, 575 U.S. at 326–27.

No. 40 at 13 n. 7. The first part of the inquiry is whether the PPIA's express preemption provision creates an individual right that is enforceable under section 1983. *Id.*; *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106 (1989).[2] The second part of the inquiry focuses on whether Congress has foreclosed Plaintiff's cause of action under section 1983. ECF No. 40 at 13 n. 7; *Blessing*, 520 U.S. at 341. Even if a statute does grant a plaintiff a privately enforceable right, a plaintiff may not pursue a private cause of action to enforce that right if Congress has "specifically foreclosed a remedy under [section] 1983." *Id.* Congressional foreclosure of relief under section 1983 may be present where Congress has acted "expressly, by forbidding recourse to [section] 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under [section] 1983." *Id.* (internal citations omitted).

Defendants argue that the PPIA does not unambiguously grant Plaintiff private rights because the PPIA does not advance any rights or interests of poultry producers and instead has the purpose of maintaining a federal regulatory scheme to promote poultry safe for public consumption. ECF No. 66 at 12–13. Moreover, Defendants contend that Congress has foreclosed private rights of action under the

---

[2] For a statute to create a privately enforceable right, the statute must clearly and unambiguously confer the private right, the right asserted must not be so "vague and amorphous" that its enforcement would strain judicial competence, and the provision establishing the right must be couched in mandatory, rather than precatory, terms. *Blessing v. Freestone*, 520 U.S. 329, 340–341 (1997); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–286, 290 (2002).

PPIA by including an express enforcement provision that reserves the power to enforce violations of the PPIA exclusively to the Secretary of the U.S. Department of Agriculture. *Id.* at 10–12; ECF No. 53 at 7; 21 U.S.C. § 467c ("All proceedings for the enforcement or to restrain violations of this chapter shall be by and in the name of the United States."). Plaintiff asserts that the PPIA unambiguously grants it private rights since it fulfills the factors set forth by the Supreme Court in *Blessing v. Firestone* by designating poultry producers like Plaintiff its intended beneficiaries, providing a preemption provision that can be enforced without straining judicial competence, and unambiguously restricting states from imposing additional ingredients or facilities requirements beyond its directives. ECF No. 60 at 39–42; *Blessing*, 520 U.S. at 340–41. And Plaintiff argues that Congress has not foreclosed section 1983 actions under the PPIA because "a state's enactment of a law that is preempted under § 467e of the PPIA is not a 'violation' of the PPIA in the relevant sense of that term." *Id.* at 44–46.

Defendants have the stronger of the arguments. Even assuming that the PPIA grants Plaintiff a privately enforceable right, this Court finds that congressional foreclosure precludes Plaintiff from bringing a section 1983 action to enforce the PPIA. The PPIA's enforcement provision declaring that "[a]ll proceedings for the enforcement or to restrain violations of [21 U.S.C. Ch. 10] shall be by and in the name of the United States" expressly evidences congressional foreclosure of private

10

actions to enforce the PPIA under section 1983. 21 U.S.C. § 467c. In construing another act, the Supreme Court stated that this language "leaves no doubt that it is the Federal Government rather than private litigants" that has the authority to file suit for noncompliance with the relevant federal law. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001) (interpreting the Federal Drug and Cosmetic Act's ("FDCA") identical mandate that "[a]ll such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States."). The PPIA's foreclosure of private actions brought by private litigants includes section 1983 actions premised on the PPIA's express preemption provision, because such claims attempt to enforce a requirement under the PPIA— namely, the "ingredient requirement" provision and the "premises, facilities, and operations requirement"—against another party. *See Lloyd v. Sch. Bd. of Palm Beach Cnty.*, 570 F. Supp. 3d 1165, 1175 (S.D. Fla. 2021) ("Plaintiffs may not assert their rights under the FDCA in a [section] 1983 premised upon a violation of the Supremacy Clause because the FDCA clearly states 'that its requirements may only be enforced by the United States government.'") (internal citations omitted); *see also Standley ex. rel. B.M.S. v. Nelms*, 2024 WL 1793667, at *3 (9th Cir. Apr. 25, 2024) ("Because Standley's [section] 1983 claim [that the challenged Rule violates section 564 of the FDCA] on this score is an attempt to use [section] 1983 to create a federal

cause of action to enforce the requirements of FDCA § 564, it is foreclosed by express provision of the FDCA.") (internal citations and quotations omitted).

Accordingly, Plaintiff may not bring its PPIA express preemption claim under section 1983 since Congress has "specifically foreclosed a remedy under [section] 1983" by reserving enforcement power of the PPIA to the United States. *See Blessing*, 520 U.S. at 341; 21 U.S.C. § 467c.

## B.  Whether Plaintiff May Bring its Preemption Claims in Equity

Plaintiff's other vehicle for bringing its preemption claims is through a cause of action in equity. ECF No. 44 ¶¶ 140, 155, 176, 194; ECF No. 60 at 37. But Defendant Simpson argues that the PPIA's enforcement provision forecloses private plaintiffs from bringing any causes of action under the PPIA, including through equity. ECF No. 53 at 8. This Court recently held that though a plaintiff pursuing an action in equity does not need to premise their claim on a privately enforceable right as is required to allege a cause of action under section 1983, an equitable cause of action will fail if Congress intended to foreclose equitable relief under the relevant statute. *United Fac. of Fla.*, Case No. 1:24cv136-MW/MAF, at *23–26 (citing *Armstrong*, 575 U.S. at 328–29).[3]

---

[3] Factors implicitly indicating congressional foreclosure of equitable relief include whether a court can discern congressional intent to foreclose equitable relief from the statute and whether the relevant statutory provision has an administratively complex nature that would make providing a remedy under the statute "judicially unadministrable." *Armstrong,* 575 U.S. at 328–29 (determining that Congress intended to foreclose equitable relief under section 30 (A) of the Medicaid Act where no express provision foreclosing equitable relief was present in the statute

Here, Congress's express foreclosure of private actions by private litigants under the PPIA governs. Congress has stated that "[a]ll proceedings for the enforcement or to restrain violations of [the PPIA] shall be by and in the name of the United States," which indicates "that Congress sought to override the federal courts' equitable authority to entertain [Plaintiff's] suit for injunctive relief on preemption grounds." 21 U.S.C. § 467c; *see Buckman Co.*, 531 U.S. at 349 (concluding that private litigants could not bring private actions under the FDCA because the FDCA's enforcement provision granted the Federal Government the exclusive right to file suit for noncompliance with the FDCA); *but see United States v. Sup. Ct. of N.M.*, 839 F.3d 888 n.9 (10th Cir. 2016) (concluding that, unlike the situation the Supreme Court encountered in *Armstrong*, nothing in the structure or terms of the McDade Act suggested Congress's intent to override the courts' authority to provide equitable relief).[4] Plaintiff cannot circumvent the congressional foreclosure of private

---

through employing factors such as the judicial administrability of the statute and the statute's method of enforcing a substantive rule); *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 145 (2d Cir. 2016) (noting that the defendant would need to rely on the Supreme Court's factor-based analysis in *Armstrong* to establish that Congress implicitly intended to foreclose equitable relief under the Airport Noise and Capacity of Act of 1990 because there was no express provision foreclosing equitable relief in the statute's requirements); *United Fac. of Fla.*, Case No. 1:24cv136-MW/MAF, at *26 (analyzing the Federal Arbitration Act for evidence of implicit Congressional intent and judicial administrability in absence of an express enforcement provision).

[4] This Court also finds persuasive that the title of the section delegating the PPIA's enforcement to the United States includes the phrase "United States as plaintiff." 21 U.S.C. § 467c; *see In re Wild,* 994 F.3d 1244, 1259 (11th Cir. 2021) (noting that a subsection of the examined statute, titled "[n]o cause of action," bolstered the conclusion that a crime victim did not have a freestanding civil cause of action to assert her rights).

enforcement of the PPIA by attempting to invoke this Court's equitable powers. *Armstrong*, 575 U.S. at 328.

However, even assuming *arguendo* that Plaintiff could pursue its express preemption claims under section 1983 or in equity, those claims would still fail because Plaintiff does not plausibly allege that Florida's ban adds to the PPIA's "ingredient requirement" provision or its "premises, facilities, and operation requirement" provision. This Court explains why below.[5]

### C. Florida's Ban Does Not Add to the PPIA's Requirements

Plaintiff asserts that Florida's ban is preempted by the PPIA's "ingredient requirement" provision because the ban imposes the additional requirement of prohibiting poultry products containing cultivated cells as an ingredient. ECF No. 44 ¶¶ 133, 134, 150, 151. Plaintiff also asserts that Florida's ban is preempted by the PPIA's "premises, facilities and operations requirement" provision because Florida's ban imposes an additional requirement of prohibiting the use of cultivated chicken cells in the manufacturing of poultry products. *Id.* ¶¶ 170, 190. In both arguments, Plaintiff places great emphasis on the United States Department of

---

[5] Defendants also argue that Plaintiff's actions based on the PPIA must be dismissed because Plaintiff's product is not a poultry product. ECF No. 53 at 13–14; ECF No. 54 at 28. However, this Court already concluded at the preliminary injunction stage that Plaintiff's cultivated chicken product arguably qualifies as a poultry product and declines to revisit that conclusion. ECF No. 40 at 14.

Agriculture's ("USDA") approval of its facility as an official establishment in compliance with the PPIA, that the USDA has allowed Plaintiff to generally sell its cultivated chicken, and that the USDA maintains regulatory authority over Plaintiff's product. *Id.* ¶¶ 43–48, 131, 148, 165–68, 185–88; ECF No. 60 at 52–54. Plaintiff's argument appears to be that because the USDA has generally authorized Plaintiff's cultivated chicken products for sale nationally, a state cannot enact any further regulation on its manufacturing or product composition without running afoul of the PPIA's preemption provisions. ECF No. 60 at 52–54. But this Court analyzed an identical argument when denying Plaintiff's motion for preliminary injunction. *See* ECF No. 40 at 17–20. Though Plaintiff's rephrasing of its arguments is creative, Plaintiff still fails to allege how the sales ban imposes any additional "ingredient requirement" or "premises, facilities and operations requirement" to the PPIA.

Start with Plaintiff's "ingredient requirement" argument. While clever, Plaintiff's characterization of Florida's ban as an additional "ingredient requirement" attempts to stretch the PPIA's express preemption provision to function as a sort of field preemption that would prohibit states from enacting any additional regulations regarding ingredients that might go into a finished poultry product. *See* ECF No. 60 at 53–54. But the "ingredient requirements" provision in the PPIA concerns "definitions and standards of identity or composition" of finished

products; it does not dictate what a state *must* allow for sale in its borders. ECF No. 40 at 16–18; *see Armour & Co. v. Ball,* 468 F.2d 76, 81 (6th Cir. 1972) (examining the analogous Federal Meat Inspection Act ("FMIA") and concluding that the "ingredient requirements" was the functional equivalent of the term "definitions and standards of identity or composition," where "prescribing the ingredients" was essential to determine the "identity" of the finished product and to protect the consumer from "economic adulteration."); *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1150 (9th Cir. 2017) (concluding that the PPIA targets the processing and distribution of poultry products rather than mandating the types of poultry that must be produced for consumption); *Empacadora de Carnes de Fresnillo, S.A. de C.V., v. Curry*, 476 F.3d 326, 333 (5th Cir. 2007) (interpreting the FMIA's identical preemption provisions and concluding that it "expressly limits states in their ability to govern meat inspection and labeling requirements. It in no way limits states in their ability to regulate what types of meat may be sold for human consumption in the first place."); *see, e.g.,* 9 C.F.R. § 381.170 (specifying standards for kinds and classes and for cuts of raw poultry, including the requirements for each class). While the PPIA's "ingredient requirement" provision addresses the components that a poultry product must include to be fit for sale, receive a specific designation, and additives that may be included in the finished

16

poultry product, it does not speak to what poultry components states must allow for sale.[6]

To be sure, a law may run afoul of the PPIA's "ingredient requirement" provision where it attempts to recategorize or add to classifications of poultry products already proscribed by federal law. *See Armour*, 468 F.2d at 83–85 (concluding that a Michigan law violated the FMIA's synonymous "ingredient requirement" provision where it attempted to change the content and composition of what qualified as grade 1 sausage in contrast to standards for grade 1 sausage already prescribed by federal law). But the PPIA and its corresponding regulations do not mention cultivated chicken cells or cultivated chicken meat in its standards or identities for poultry products, so there is nothing that Florida's ban could arguably add on to. And Plaintiff does not point to any provision in the PPIA suggesting that cultivated chicken cells are considered an "ingredient requirement" as meant by the PPIA, much less an ingredient that must be permitted in a derivative or finished poultry product. ECF No. 40 at 17; *Empacadora de Carnes de Fresnillo, S.A. de C.V.,* 476 F.3d at 333.

---

[6] *See* 9 C.F.R. § 424.21(c) (providing a chart for "food ingredients," such as trisodium phosphate, that are "acceptable for use in poultry products, provided they are used for the purpose indicated, within the limits of the amounts stated and other conditions specified in this part."); 9 C.F.R. § 381.170 (specifying standards for the various classes of the specified kinds of poultry and the requirements for each class and standards for specified cuts of poultry); 21 U.S.C. §§ 453 (g) (providing when a poultry product is considered "adulterated"), (h) (providing when a poultry product is considered "misbranded" ).

That Plaintiff's product is approved for sale by the USDA does not transform it or its subcomponents into ingredients that the USDA has tacitly recognized as an "ingredient requirement" in the required make-up of a finished poultry product. ECF No. 40 at 16. And as this Court previously concluded in its order denying Plaintiff's motion for preliminary injunction, the fact that Plaintiff's product falls within the scope of the PPIA does not mean that a state is expressly preempted from banning its sale. *See* ECF No. 40 at 16. Again, the ban on the sale of a sub-category of poultry is not an "ingredient requirement" within the meaning of the PPIA. ECF No. 40 at 17. Regardless of whether Plaintiff choses to characterize its product as cultivated chicken meat or as cultivated chicken cells, Plaintiff still does not plausibly allege that Florida's ban imposes an additional "ingredient requirement" that is expressly preempted by the PPIA. ECF No. 40 at 17–18.

Plaintiff's attempt to repackage its argument regarding the PPIA's "premises, facilities and operations requirement" provision fares no better. Plaintiff recasts Florida's sales ban as a law that imposes an additional operational requirement that poultry products cannot be manufactured with cultivated chicken cells. ECF No. 60 at 52–53. But in the order denying Plaintiff's motion for preliminary injunction, this Court already concluded that Plaintiff failed to identify a "premises, facilities or operations requirement" that Florida's ban adds to. ECF No. 40 at 18. This is because the PPIA's "premises, facilities, and operation requirement" provision only "limit[s]

18

states in their ability to govern meat inspection and labeling requirements." *Empacadora de Carnes de Fresnillo, S.A. de C.V.*, 476 F.3d at 333 (interpreting the analogous express preemption clause in the FMIA). It "is concerned with inspecting premises at which [poultry] is produced for human consumption . . . rather than with preserving the production of particular types of [poultry] for people to eat," and "is more naturally read as being concerned with the methods, standards of quality, and packaging that [facilities] use." *Id.*; *See Cavel Intern., Inc. v. Madigan*, 500 F.3d 551, 554 (7th Cir. 2007) (construing the FMIA's analogous language regarding premises, facilities, and operations, and concluding that the FMIA "is concerned with inspecting premises at which meat is produced for human consumption . . . rather than with preserving the production of particular types of meat for people to eat[.]") (internal citations omitted).[7] Contrary to Plaintiff's contentions, the PPIA's "premises, facilities, and operations" requirement does not dictate what production processes states must allow producers to use in making products for human consumption. *Empacadora de Carnes de Fresnillo, S.A. de C.V.*, 476 F.3d at 333.

---

[7] *See also* 21 U.S.C. § 456 (a) (requiring that official establishments that process poultry shall comply with "regulations promulgated by the Secretary for the purpose of preventing the entry into or flow or movement in commerce or burdensome effect upon commerce, of poultry products which are adulterated[.]"); 9 C.F.R. § 381.65 (providing general operations and procedures that official establishments handling poultry products must abide by, primarily to "result in sanitary processing, proper inspection, and the production of poultry and poultry products that are not adulterated[.]").

Just as the federal government's decision to tax income from gambling that violates state law does not mean that a state must permit gambling in its borders, the USDA's approval of Plaintiff's facilities as compliant with federal law does not mean that a state must permit Plaintiff's manufacturing of cultivated meat within its borders. *See Cavel,* 500 F.3d at 554. Florida's ban operates to prohibit the sale, distribution and manufacture for sale of cultivated meat in Florida, not to direct Plaintiff as to how it should handle its cultivated chicken cells in a way that the PPIA or its regulations are concerned with. Ultimately, Plaintiff's creative attempts at reframing its argument do not change the fact that Plaintiff fails to plausibly allege that Florida's ban is expressly preempted by the PPIA's "premises, facilities, and manufacturing requirement" provision. *See* ECF No. 40 at 18–20.

Having determined that Plaintiff fails to plausibly allege that Florida's ban is preempted by the PPIA, this Court now turns to Plaintiff's remaining claim that Florida's ban violates the dormant Commerce Clause.

## IV. Dormant Commerce Clause Claim

The dormant Commerce Clause prevents states from unjustifiably discriminating against or burdening the interstate flow of articles of commerce. *Or. Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 98 (1994). While not every exercise of state authority imposing some burden on commerce will violate the dormant Commerce Clause, a law that discriminates against interstate

20

commerce in favor of local businesses, either facially or in practical effect, is *per se* invalid unless the government can demonstrate, "under rigorous scrutiny, that it has no other means to advance [its] legitimate local interest." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390, 392 (1994); *Maine v. Taylor*, 477 U.S. 131, 138 (1986).[8]

Defendants argue that Plaintiff fails to plausibly allege that Florida's ban violates the dormant Commerce Clause because Florida's ban is facially neutral and lacks discriminatory effect. ECF No. 53 at 29–31; ECF No. 54 at 8–24. But Plaintiff contends that Florida's ban discriminates in effect against the out-of-state cultivated meat industry to the benefit Florida's conventional meat industry. ECF No. 44 ¶¶ 199–205; ECF No. 60 at 15, 18–19, 22, 23–26, 31–32. Plaintiff also argues that because it has alleged Florida's ban discriminates in effect, its dormant Commerce Clause claim cannot be resolved on a motion to dismiss because the government would have the burden to prove the ban's local benefit and the unavailability of nondiscriminatory alternatives. ECF No. 60 at 33–35.

---

[8] Similarly, under the so-called *Pike* balancing test, a law that regulates even-handedly and only incidentally effects interstate commerce violates the dormant Commerce Clause when it imposes a substantial burden on interstate commerce that is "clearly excessive in relation to the [law's] putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Defendants contend that Florida's ban does not violate the *Pike* balancing test because it does not impose a substantial burden on interstate commerce. ECF No. 53 at 31–33; ECF No. 54 at 24–27. However, Plaintiff notes that it is not relying on the *Pike* balancing test in alleging that Florida's ban violates the dormant Commerce clause. ECF No. 60 at 14 n. 4.

To start, Florida's cultivated meat ban does not appear to facially discriminate against out-of-state cultivated meat businesses. The text of Florida's meat ban applies to cultivated meat manufacturers, sellers, and distributors without regard to where they are located. *See* § 500.452 (1), Fla. Stat. ("It is unlawful for any person to manufacture for sale, sell, hold or offer for sale, or distribute cultivated meat in this state."). But whether Florida's ban appears facially neutral is not the end of the inquiry. *Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1244 (11th Cir. 2012) ("[A] discriminatory law is no less discriminatory because it applies 'alike to the people of all the States, including the people of the State enacting such statute.'") (internal citation omitted). As Plaintiff notes, a facially neutral law can violate the dormant Commerce Clause if it discriminates in effect against interstate commerce. *Id.*; *Locke v. Shore*, 634 F.3d 1185, 1193–94 (11th Cir. 2011). A law may have a discriminatory effect where it raises out-of-state companies' cost of doing business while leaving in-state companies unaffected, excludes a class of predominately out-of-state businesses from a particular market, strips away a competitive or economic advantage from out-of-state businesses, imposes costs on out-of-state businesses that in-state businesses do not have to bear, or creates a leveling effect operating to the advantage of a local industry. *Locke*, 634 F.3d at 1193; *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 351–52 (1977). A discriminatory purpose can also aid in establishing the existence of a discriminatory

effect. *Locke*, 634 F.3d at 1193 (noting that the Supreme Court "has considered whether the state legislature was motivated by protectionist purposes in passing the law at issue" when evaluating whether "a neutrally-worded state law has a discriminatory impact.").[9]

Here, Plaintiff asserts that Florida's ban discriminates against out-of-state firms and products because it prohibits out-of-state cultivated meat from entering Florida to compete against in-state conventional meat. ECF No. 44 ¶¶ 200–204. Florida's ban on cultivated meat, Plaintiff says, is a proxy for discriminating against out-of-state products since cultivated meat is entirely produced outside of Florida. *Id.*; ECF No. 60 at 25–26. Plaintiff alleges that the ban also confers a benefit to in-state conventional meat and agricultural businesses by shielding them from the potential decline in market share that they would face from competing with out-of-state cultivated meat. ECF No. 44 ¶¶ 74–76, 99–100, 202–204; ECF No. 60 at 25–26. And according to Plaintiff, the ban's protectionist effects were intentional. Plaintiff alleges that several Florida public officials, including Governor DeSantis and Defendant Simpson, publicly announced that the out-of-state cultivated meat industry threatened Florida's in-state conventional meat and agricultural industries,

---

[9] *See Hunt*, 432 U.S. at 352–53 (noting that "despite the statute's facial neutrality," the record indicated that the discriminatory impact on interstate commerce was "not an unintended byproduct" of the statute); *but see Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 561 n.4 (2015) (suggesting that a discriminatory purpose alone is insufficient to violate the dormant Commerce Clause because "[t]he Commerce Clause regulates effects, not motives.").

and that Florida's ban would prevent cultivated meat, like the product Plaintiff sells, from ever competing with Florida's conventional meat and agricultural industries. ECF No. 44 ¶¶ 66–91.

In response, Defendants argue that Plaintiff's complaint falls short of plausibly alleging a discriminatory effect under the dormant Commerce Clause because Florida's ban would apply to firms located in Florida as it would to out-of-state firms since the ban does not concern itself with the location of cultivated meat businesses. ECF No. 53 at 29–31; ECF No. 54 at 11–15. Defendants also contend that the law does not discriminate against interstate commerce since it still allows out-of-state firms to participate in Florida's market and merely expresses a preference for a certain subset of firms within the national market. ECF No. 54 at 11. Defendants assert that Florida's ban was motivated by the State's health and safety concerns regarding cultivated cells and ask this Court to disregard Plaintiff's allegations regarding Florida officials' statements about the ban's purpose. ECF No. 54 at 19–24; ECF No. 66 at 8–10.

Both parties cite extensive case law in support of their arguments. Ultimately, this Court concludes that Plaintiff has plausibly alleged that Florida's ban violates the dormant Commerce Clause by discriminating in effect against interstate commerce through excluding out-of-state businesses and products from Florida's market to protect in-state businesses against a projected decline in market share. *See*

*W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 196 n.12 (1994) (concluding that a Massachusetts law violated the dormant Commerce Clause because it protected in-state dairy farmers from a projected decline of market share caused by competition with out-of-state goods). Plaintiff's allegations of discriminatory effect are also bolstered by its allegations regarding Florida officials' statements about the ban's protectionist purpose.[10] The question remains as to whether conventional meat and cultivated meat are actually in the same market or in competition with one another. But on a motion to dismiss, it is sufficient that Plaintiff has alleged that the two are competing products and that barring cultivated meat from coming into Florida benefits Florida's in-state conventional meat industry. ECF No. 44 ¶¶ 203–204.

Defendants rely heavily on *Exxon Corporation v. Governor of Maryland*, 437 U.S. 117 (1978), but *Exxon* is distinguishable. In *Exxon*, the state of Maryland passed a law prohibiting companies that produced and refined gasoline from operating retail

---

[10] Despite what Defendants contend, Plaintiff need not dispel all other possible justifications for Florida's ban to survive a motion to dismiss. A plaintiff does not fail to plausibly allege that a law was enacted for a discriminatory purpose simply because the government has claimed that the law serves a non-discriminatory purpose. *See Hunt*, 432 U.S. at 352 (noting that evidence in the record, such as the North Carolina Agriculture Commissioner's comments that that local apple producers wanted a statute affecting Washington apples passed, tended to demonstrate that North Carolina's facially neutral statute has a purposeful discriminatory impact, even though North Carolina claimed that the purpose of its law was to eliminate consumer deception and confusion); *Fla. Transp. Servs., Inc.*, 703 F.3d at 1261 (11th Cir. 2012) (concluding that the district court did not need to defer to the government's statement of the law's putative purposes and benefits because "the incantation of a [legitimate] purpose . . . does not insulate a state law from Commerce Clause attack. Regulations designed for that salutary purpose nevertheless may further the purpose so marginally, and interfere with commerce so substantially, as to be invalid under the Commerce Clause.") (citing *Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 670 (1981) (pl. op.)).

gasoline establishments within Maryland, which effectively barred a subset of interstate businesses from operating retail gas stations in the state. *Id.* at 119, 125–26. While Defendants attempt to liken Florida's ban to Maryland's law in *Exxon* because out-of-state companies producing conventional meat may still compete in Florida's market, Defendants ignore that the law in *Exxon* did not operate to the benefit of an in-state industry by preventing competing articles of commerce from entering the state. *See Exxon Corp.*, 437 U.S. at 125–26 (concluding that Maryland's law prohibiting interstate companies that produced and refined gasoline from operating retail gasoline establishments in Maryland did not violate the dormant Commerce Clause because it did not favor or confer a competitive advantage to in-state dealers and because the law did not prohibit the flow of interstate goods in the market). Rather, the law in *Exxon* had no impact on the flow of commerce because articles of commerce entered the state at the same rate they had both before and after the law. *Id.* And in contrast to the law in *Exxon* which prohibited a type of business format from operating within the state's borders, Florida's ban targets an end-product allegedly produced only by out-of-state businesses. *Compare id.* at 119 ("A Maryland statute provides that a producer or refiner of petroleum products (1) may not operate any retail service station within the State…") *with* § 500.452, Fla. Stat.

(prohibiting individuals and businesses alike from manufacturing for sale, distributing, or selling cultivated meat).[11]

Defendants' reliance on cases where courts have upheld facially neutral meat product bans is also misplaced. Those cases did not deal with a product ban that allegedly conferred benefits to a comparable state industry. In *Canards I* for example, the Ninth Circuit upheld a California ban on all force-fed foie gras, but there was no suggestion that in-state businesses specialized in some alternative method of feeding geese that the law would advantage. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 948–50 (9th Cir. 2013). Similarly, in *Cavel*, the Seventh Circuit upheld Illinois's ban on slaughtering horses for human consumption because "no local merchant or producer benefit[ed] from the ban on slaughter" such as by maintaining alternative or competing products, like imitation horse meat. *Cavel Intern., Inc.*, 500 F.3d at 555. In contrast to these cases, Plaintiff has alleged that Florida's ban confers a distinct benefit favoring local businesses and producers by banning products produced out-of-state.[12]

---

[11] Additionally, *Exxon* was decided after the facts were developed on a full record at trial; here, Defendants' arguments regarding Florida's ban come on a motion to dismiss. *See Exxon Corp.*, 473 U.S. at 123–24.

[12] Because this Court concludes that Plaintiff has plausibly alleged that Florida's ban discriminates in effect against interstate commerce, it does not review whether the law imposes a substantial burden on interstate commerce in relation to its putative benefits under the *Pike* balancing test.

It may ultimately be the case that Florida's cultivated meat ban does not actually provide a benefit to Florida's in-state conventional meat or agricultural industries, or that cultivated meat does not compete with businesses in those industries. But taking Plaintiff's allegations in the light most favorable to Plaintiff as this Court is required to do on a motion to dismiss, this Court concludes that Plaintiff has plausibly alleged that Florida's ban violates the dormant Commerce Clause because it discriminates in effect against interstate commerce. *See Hunt*, 814 F.3d at 1221. Under the dormant Commerce Clause framework, the burden to prove the ban's validity would now fall on Defendants and require them to demonstrate under "rigorous scrutiny" that Florida's ban both "serves a legitimate local purpose," and that this purpose could not be served by available nondiscriminatory means. *C & A Carbone, Inc.*, 511 U.S. at 392; *Taylor*, 477 U.S. at 138 (1986). But that analysis saves itself for a later date since it would require this Court to analyze "empirical evidence" and make a factual determination regarding Florida's ban, which it cannot do on a motion to dismiss. *See Taylor*, 477 U.S. at 144–45.

## V.    Conclusion

Accordingly,

**IT IS ORDERED**:

1.    Defendant Simpson's Motion to Dismiss, ECF No. 53, is **GRANTED** with respect to Counts I, II, III and IV of Plaintiff's Amended

Complaint, and **DENIED** with respect to Count V of Plaintiff's Amended Complaint.

2.  Defendants State Attorneys' Motion to Dismiss, ECF No. 54, is **GRANTED** with respect to Counts I, II, III and IV of Plaintiff's Amended Complaint, and **DENIED** with respect to Count V of Plaintiff's Amended Complaint.

3.  This case shall proceed on Count V only.

**SO ORDERED on April 25, 2025.**

<u>**s/Mark E. Walker**</u>
**Chief United States District Judge**

29