# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

March 23, 2026

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  24-13640-CC
Case Style:  Upside Foods Inc v. Commissioner, Florida Department of Agriculture an, et al
District Court Docket No:  4:24-cv-00316-MW-MAF

Opinion Issued
Enclosed is a copy of the Court's decision issued today in this case. Judgment has been entered today pursuant to FRAP 36. The Court's mandate will issue at a later date pursuant to FRAP 41(b).

Petitions for Rehearing
The time for filing a petition for panel rehearing or rehearing en banc is governed by 11th Cir. R. 40-2. Please see FRAP 40 and the accompanying circuit rules for information concerning petitions for rehearing.

Costs
Costs are taxed against Appellant(s) / Petitioner(s).

Bill of Costs
If costs are taxed, please use the most recent version of the Bill of Costs form available on the Court's website at www.ca11.uscourts.gov. For more information regarding costs, see FRAP 39 and 11th Cir. R. 39-1.

Attorney's Fees
The time to file and required documentation for an application for attorney's fees and any objection to the application are governed by 11th Cir. R. 39-2 and 39-3.

Appointed Counsel
Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation via the eVoucher system no later than 45 days after issuance of the mandate or the filing of a petition for writ of certiorari. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

<u>Clerk's Office Phone Numbers</u>

General Information:    404-335-6100        Attorney Admissions:            404-335-6122

Case Administration:    404-335-6135        Capital Cases:                  404-335-6200

CM/ECF Help Desk:    404-335-6125        Cases Set for Oral Argument:  404-335-6141

OPIN-1 Ntc of Issuance of Opinion

**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-13640
_____

UPSIDE FOODS INC,

*Plaintiff-Appellant,*

*versus*

COMMISSIONER, FLORIDA DEPARTMENT OF
AGRICULTURE AND CONSUMER SERVICES,
ATTORNEY GENERAL, STATE OF FLORIDA,
STATE ATTORNEY, THE SECOND JUDICIAL
CIRCUIT OF FLORIDA,
STATE ATTORNEY, THE SIXTH JUDICIAL
CIRCUIT OF FLORIDA,
STATE ATTORNEY, 9TH JUDICIAL CIRCUIT, et al.,

*Defendants-Appellees.*

2                          Opinion of the Court                    24-13640

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:24-cv-00316-MW-MAF

_____

Before NEWSOM and BRASHER, Circuit Judges, and HUCK,* District Judge.

BRASHER, Circuit Judge:

The question in this appeal is whether the Poultry Products Inspection Act preempts a Florida law that bans the sale of lab-grown chicken. Florida's SB 1084 outlaws the manufacture, distribution, and sale of all lab-grown meat in the state. Fla. Stat. § 500.452(1)–(6). Upside Foods, Inc. is a startup based in California that makes lab-grown meat, including chicken, and would like to distribute and sell its chicken product in Florida. Upside has challenged SB 1084 as preempted under the federal Poultry Products Inspection Act and has moved to preliminarily enjoin its enforcement. The district court denied Upside's motion, ruling that Upside was unlikely to succeed on its preemption claims because a ban on lab-grown chicken is not equivalent to a regulation of Upside's ingredients, premises, facilities, or operations. We must wade through a morass of justiciability and other preliminary issues before we can reach the merits. But the bottom line is that we agree with the district court. Because Florida's ban on lab-grown meat

_____

* Honorable Paul C. Huck, United States District Judge for the Southern District of Florida, sitting by designation.

does not regulate Upside's ingredients, premises, facilities, or operations, federal law does not preempt SB 1084. Accordingly, we affirm.

## I.

We begin by summarizing the relevant provisions of the Poultry Products Inspection Act before examining the origins of this lawsuit and tracing its procedural history.

### A.

Congress enacted the Poultry Products Inspection Act in 1957 to require the Secretary of Agriculture to establish uniform federal standards for poultry products, 21 U.S.C. §§ 451, 455–57, and to inspect poultry products to prevent them from being "adulterated or misbranded." *Id.* § 452. To help the Secretary implement these uniform standards, the PPIA contains two express preemption provisions: the Ingredients Provision and the Facilities Provision. The Ingredients Provision preempts state laws that require additional or different "ingredient requirements . . . with respect to articles prepared at any official establishment . . . ." *Id.* § 467e. The Facilities Provision preempts state laws with additional or different requirements "with respect to premises, facilities and operations of any official establishment . . . ." *Id.* The language of the PPIA resembles that of a companion statute, the Federal Meat Inspection Act, which governs meat products much like the PPIA governs poultry products, *see id.* § 603(a), and contains near-identical Facilities and Ingredients Provisions. *See id.* § 678.

4                      Opinion of the Court                  24-13640

To be governed by the PPIA, a facility must be an "official establishment." *Id.* § 453(p). Because Upside has received a U.S. Department of Agriculture Grant of Inspection, it is considered an "official establishment" and is thus subject to the PPIA. *See* Upside Foods, Inc., U.S. Dep't of Agric. (last visited Jan. 22, 2026) [https://perma.cc/X4V3-LPF5].

The PPIA defines "poultry" as "any domesticated bird, whether live or dead," and defines "poultry product" as "any poultry carcass, or part thereof; or any product which is made wholly or in part from any poultry carcass or part thereof." *Id.* §§ 453(e)–(f). The USDA has repeatedly characterized lab-grown chicken as "poultry food products" and determined that existing regulatory requirements apply to lab-grown poultry. *See* FSIS Responsibilities in Establishments Producing Cell-Cultured Meat and Poultry Food Products, U.S. Dep't of Agric., at 1–2 (June 21, 2023), [https://perma.cc/7VUP-2KRN]; *see also* Human Food Made with Cultured Animal Cells, U.S. Dep't of Agric. (last visited Oct. 7, 2025), [https://perma.cc/7JVC-27E8].

Finally, the PPIA requires that "[a]ll proceedings for the enforcement or to restrain violations of [the PPIA] shall be by and in the name of the United States." 21 U.S.C. § 467c.

*B.*

We draw the following facts from Upside's evidentiary submission in support of its motion for a preliminary injunction. Upside produces lab-grown chicken by banking embryonic chicken cells, placing them in a "cultivator," supplying them with the same

nutrients they would receive in an animal's body, and forming the resulting product into a shape that looks like conventional meat—for example, a chicken breast. Upside's founder and CEO, Uma Valeti, testified that lab-grown meat can replicate the sensory, taste, and nutritional profile of conventional meat. According to Valeti, Upside's chicken product "looks, cooks, and tastes, like a conventional boneless, skinless chicken cutlet." Doc. 11-3 ¶ 24. Valeti explained that Upside's goal is to produce a meat product that avoids ethical, environmental, and health concerns related to slaughtered or conventional meat.

Upside has completed a pre-market consultation with the Food and Drug Administration, and the FDA issued Upside a letter stating that the FDA had "no questions" as well as a scientific memorandum regarding the safety of Upside's lab-grown chicken. The USDA's Food Safety and Inspection Service has also issued product labeling approval and a Grant of Inspection to Upside, allowing it to sell its lab-grown chicken in interstate commerce. Upside undergoes the same kind of routine federal inspection of its facility as do producers of conventional meat.

After Upside received these federal approvals, the company began distributing its product in California and has showcased its product in at least four other states (including Florida). In Florida, before SB 1084 went into effect, Upside held a tasting event in Miami and talked with a Florida chef who was interested in serving lab-grown chicken. Upside also alleges that it was planning to hold at least two other tasting events in Miami—one at the Art Basel

6                      Opinion of the Court                      24-13640

event in December 2024, and another at the South Beach Wine and Food Festival in February 2025. Upside wishes to continue developing business relationships with Florida chefs because Florida contains the headquarters of the world's largest full-service restaurant company and one of the largest quick service restaurants in the world, and it is the third-most populous state in the country. But Upside's ambitions in Florida are limited to selling and distributing—not manufacturing. No companies produce lab-grown meat in Florida, and Upside is not planning to be the first to do so.

Although Upside claims that its product tastes, feels, and has a nutrition profile like that of conventional meat, Florida policymakers who promoted SB 1084 highlighted the experimental nature of the product. They also referenced the threat that lab-grown meat poses to Florida's commercial agriculture industry.

Reflecting this concern, Florida policymakers passed SB 1084 to ban the manufacture, sale, holding, or distribution of lab-grown meat in the state. *See* Fla. Stat. § 500.452(1). SB 1084 imposes criminal and civil penalties on violators. *Id.* § 500.452(2)–(5). For example, it is a second-degree misdemeanor "for any person to manufacture for sale, sell, hold or offer for sale, or distribute cultivated meat in this state." *Id.* § 500.452. If restaurants violate this ban, Florida officials can revoke their permits and administratively fine them up to $5,000 per violation. *Id.* §§ 500.121(1)(b), 570.971(1)(b).

### C.

Shortly after SB 1084 went into effect, Upside sued Florida's Commissioner of Agriculture, State Attorneys for four judicial districts in Florida, and the Florida Attorney General, seeking declaratory and injunctive relief. Upside's complaint argued that because the USDA has approved it to sell lab-grown chicken, Florida could not ban Upside's product because such a ban amounted to an additional or different ingredient or facilities requirement and was thus expressly preempted under the PPIA. And although not at issue in this appeal, Upside also brought a dormant Commerce Clause claim. Upside alleged that SB 1084 had injured the company "in the form of lost revenue, missed business and promotional opportunities, reputational damage, and loss of consumer goodwill." Doc. 1 at 20.

Upside moved for a preliminary injunction. The district court held a hearing and denied Upside's motion. The district court first held that Upside did not have standing to enjoin the Attorney General or the State Attorneys for the Sixth and Ninth Circuits of Florida because the Attorney General did not have power to enforce SB 1084 and Upside's complaint did not specify any injury traceable to the State Attorneys for the Sixth and Ninth Circuits. The district court then held that Upside had standing to enjoin the remaining defendants—the Commissioner and the State Attorneys for the Second and Eleventh Circuits—because those defendants had statutory authority to enforce SB 1084 and Upside alleged that

it had talked with chefs or distributed its product in Florida's Second and Eleventh Circuits.

But the district court concluded that the PPIA did not preempt SB 1084 and denied the preliminary injunction. The district court first addressed whether Upside had a cause of action to enforce the PPIA. The court assumed that there was a cause of action to enforce the PPIA under 42 U.S.C. § 1983 but noted that there was some confusion on this point, as both sides agreed the PPIA does not create a private cause of action. The court suggested that Upside file an amended complaint to clarify whether it was bringing preemption claims in equity. The district court held that lab-grown chicken qualified as a "poultry product" because Upside produced its product by growing cells taken from a slaughtered chicken. The district court then held that the Ingredients Provision did not preempt SB 1084 because Upside had not identified any federal requirement mandating that states permit the sale of lab-grown meat. The district court also held that the Facilities Provision did not preempt SB 1084 because banning the sale of a product does not "reach into [Upside]'s facilities to tell them how they should handle their cultivated chicken cells." Doc. 40 at 20.

Taking the district court's advice, Upside filed an amended complaint to clarify that it was bringing its preemption claims in equity and under section 1983. The main changes to the amended complaint were to: omit the Florida Attorney General from the list of defendants, split each of the two preemption claims (premised on SB 1084's Facilities Provision and Ingredients Provision,

respectively) into a section 1983 claim and an *Ex parte Young* equitable claim, and add allegations related to Upside's business activities in other areas of Florida.

Upside filed its notice of appeal four days after it filed the amended complaint. The Commissioner and State Attorneys moved to dismiss the amended complaint. Before oral argument on this appeal, the district court dismissed Upside's preemption claims, maintaining only its dormant Commerce Clause claim. The district court concluded that Upside did not have a cause of action under section 1983 or in equity to bring its preemption action because 21 U.S.C. § 467c foreclosed private enforcement of the PPIA. The district court then concluded that even if there were a cause of action, neither the Ingredients Provision nor the Facilities Provision preempted SB 1084.

We ordered additional briefing on the question: "Did UPSIDE's appeal of the order denying its request for a preliminary injunction become moot after the district court entered an order dismissing all of UPSIDE's preemption claims?" The parties timely filed supplemental briefs, with Upside arguing that the appeal was not moot and with the Commissioner and State Attorneys arguing that it was.

## II.

We review jurisdictional questions *de novo*, *United States v. Amodeo*, 916 F.3d 967, 970 (11th Cir. 2019), and we also review *de novo* whether a cause of action exists, *Fulton v. Fulton Cnty. Bd. of Comm'rs*, 148 F.4th 1224, 1235 (11th Cir. 2025) (first quoting *Davis*

*v. Passman*, 442 U.S. 228, 239 n.18 (1979); then citing *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 70 (1978)). We review a denial of a motion for a preliminary injunction for abuse of discretion, *Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1288 (11th Cir. 2022) (citing *Jysk Bed'N Linen v. Dutta-Roy*, 810 F.3d 767, 773 (11th Cir. 2015)), but we review *de novo* the "legal conclusions on which the denial is based," *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011) (citing *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009)).

### III.

Upside argues that the district court should have granted its motion for a preliminary injunction. To be entitled to a preliminary injunction, a plaintiff must establish: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018) (quoting *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002)). If a plaintiff does not demonstrate a substantial likelihood of success on the merits, we need not address the remaining preliminary injunction requirements. *See Bloedorn*, 631 F.3d at 1229.

This appeal turns on three issues: mootness, the existence of a private cause of action to enjoin the enforcement of a preempted state law, and the likelihood of success on the merits of Upside's preemption claims. As to mootness, we must decide whether this appeal has been mooted by the filing of an amended complaint or

the dismissal of Upside's preemption claims in that amended complaint. As to the cause of action, we must assess whether Upside may bring a preemption claim as a matter of equity. And as to likelihood of success on the merits, we must determine whether Florida's law is likely preempted by federal law.

We address each issue in turn. We conclude that this appeal is not moot. We conclude that Upside has a cause of action to challenge Florida's law as preempted. But we conclude that Upside's action is unlikely to succeed. For that reason, we affirm the district court's denial of the preliminary injunction.

*A.*

We turn first to mootness. Article III of the Constitution requires that parties in litigation have a "legally cognizable interest in the outcome" of a dispute throughout the proceeding. *Keohane v. Fla. Dep't of Corrs. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). So even if a controversy is live in the district court, we cannot rule on an appeal if an intervening event or change in status eliminates our ability to give "meaningful relief" to the appellant. *Id.* (quoting *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001)). Appeals like this one, from orders denying or granting preliminary injunctions, often run into mootness problems. Such an appeal may be mooted if the requested injunction is about an event that happens while the appeal is pending, *see Graham v. Att'y Gen.*, 110 F.4th 1239, 1244 (11th Cir. 2024), if the district court enters final judgment granting or denying injunctive relief while the appeal is pending, *see Harper ex rel. Harper*

*v. Poway Unified Sch. Dist.*, 549 U.S. 1262, 1262 (2007), or if a key event cannot be unwound after the fact (for example, an election), *see Ga. Muslim Voter Project v. Kemp*, 918 F.3d 1262, 1279 (11th Cir. 2019) (Newsom, J., concurring).

When assessing whether we can grant "meaningful relief," we shouldn't elevate form over substance. We ask whether a judicial decision would have "any practical effect." *Ohio v. U.S. Env't Prot. Agency*, 969 F.3d 306, 308 (6th Cir. 2020) (citing *DeFunis v. Odegaard*, 416 U.S. 312, 317 (1974)); *see also ABN Amro Verzekeringen BV v. Geologistics Ams., Inc.*, 485 F.3d 85, 94 (2d Cir. 2007) (considering whether there is an "issue of practical importance for the court to adjudicate"). The mootness question is whether a lawsuit would be "a waste of effort on questions now more pedantic than practical." *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1209 (10th Cir. 2012) (Gorsuch, J.).

The defendants argue that two procedural developments in the district court make it so that we cannot give Upside "meaningful relief." First, the defendants say that we cannot reverse the denial of Upside's motion for a preliminary injunction because Upside filed an amended complaint before filing its notice of appeal. Second, the defendants say that we cannot reverse the denial of Upside's motion for preliminary injunction because the district court dismissed Upside's preemption claims after Upside filed its notice of appeal. We disagree. Neither procedural development in the district court prevents us from potentially giving Upside meaningful relief.

24-13640                    Opinion of the Court                    13

1.

Let's start with the amended complaint. The defendants be-lieve that the filing of Upside's amended complaint necessarily eliminates our ability to review the earlier denial of its motion for a preliminary injunction. The defendants reason that, because a party can request an injunction based only on the relief that is re-quested in a complaint, *any* change to the complaint between the denial of a preliminary injunction and an appeal moots the appeal.

The defendants' argument betrays a misunderstanding of in-terlocutory appellate review and is squarely foreclosed by our prec-edent. We have—at least twice—resolved appeals from prelimi-nary injunction rulings even though the plaintiff filed an amended complaint between the district court's order and the notice of ap-peal. *See Barber v. Governor of Ala.*, 73 F.4th 1306, 1316 n.16 (11th Cir. 2023) (amended complaint filed between denial of preliminary injunction and appeal); *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1524 n.5 (11th Cir. 1994) (amended complaint filed between grant of pre-liminary injunction and appeal). We simply look to the record at the time of the district court's ruling, which is what an appellate court always does when reviewing an interlocutory order. *See id.*; *see also League of Women Voters of Mich. v. Johnson*, 902 F.3d 572, 578–79 (6th Cir. 2018) (on interlocutory appeal, an appellate court is "not called to decide whether" the district court erred "as the case currently stands" but whether the district court erred "as the case stood").

The mere fact of an amended complaint doesn't stop us from resolving whether the district court's preliminary injunction decision was correct. Instead, under our caselaw, so long as the plaintiff is still seeking relief in the district court on substantively the same claims that the plaintiff is pursuing in this Court, the filing of an amended complaint doesn't moot an interlocutory appeal. Our decision in *Johnson v. 3M Co.*, 55 F.4th 1304 (11th Cir. 2022), is instructive. There, we concluded that an amended complaint did not moot a plaintiff's interlocutory appeal about a nuisance abatement claim because the plaintiff's amended complaint did not meaningfully change the nuisance abatement claim. *Id.* at 1309. "The key point," we said, "is that [the] fourth amended complaint does not change the nuisance abatement allegations on which" the appeal was based. *Id.*

Applying *Johnson*'s reasoning here, nothing about Upside's amended complaint—which dropped some defendants and reorganized its claims—changes the fundamental nature of its case against the remaining defendants. Upside's amended complaint did not moot its appeal.

2.

Moving to the defendants' second mootness argument, they say that the district court's separate interlocutory order dismissing Upside's preemption claims prevents us from granting meaningful relief. They say that, because the district court has rejected the claims that Upside seeks to vindicate on appeal, we cannot review

24-13640               Opinion of the Court                    15

the district court's earlier denial of Upside's motion for a preliminary injunction on those claims. Again, we disagree.

It is axiomatic that a district court cannot defeat our appellate jurisdiction by entering additional orders. After a party files an interlocutory appeal, the district court has the authority to move forward only with aspects of the case that are *not* on appeal. *Green Leaf Nursery v. E.I. DuPont de Nemours & Co.*, 341 F.3d 1292, 1309 (11th Cir. 2003) (quoting *May v. Sheahan*, 226 F.3d 876, 880 n.2 (7th Cir. 2000)). A district court lacks the jurisdiction to take any action that would "alter the status of the case on interlocutory appeal." *Johnson*, 55 F.4th at 1309 (citation modified) (quoting *Green Leaf Nursery*, 341 F.3d at 1309). A district court cannot take such action because a notice of appeal shifts jurisdiction over the appealed aspects of the case from the district court to the appellate court. *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982).

For similar reasons, we believe the district court's partial dismissal order can't defeat our ability to grant the relief that Upside seeks. Despite the district court's order, Upside is still pressing its preemption claims. And if we were to order the district court to enter a preliminary injunction on those claims, it would have to "enter an order in strict compliance with the mandate," notwithstanding its partial dismissal order. *Piambino v. Bailey*, 757 F.2d 1112, 1119 (11th Cir. 1985) (citing *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895)). It may be true that, if we were to order the district court to grant the preliminary injunction, the district court would *also* want to (or, perhaps, need to) revise its dismissal order. But

that doesn't matter. A district court can revise an interlocutory order like the partial dismissal order at any time before a final judgment. *See Hornady v. Outokumpu Stainless USA, LLC*, 118 F.4th 1367, 1380 (11th Cir. 2024); Fed. R. Civ. P. 54(b). And although there are several narrow exceptions to the mandate rule, *see Piambino*, 757 F.2d at 1120, there isn't one that would allow a district court to ignore our mandate just because following it would require the court to revise a related ruling too.

There is one, final mootness issue: the defendants say that the district court's partial dismissal order moots this appeal just like the entry of final judgment moots an appeal from a preliminary injunction. But the defendants are wrong yet again. It is true that the entry of a final judgment moots an interlocutory appeal about a preliminary injunction. *See Harper ex rel. Harper*, 549 U.S. at 1262. But the reason a final judgment moots such an appeal is that a preliminary injunction lasts only *until final judgment*. After a final judgment is issued, any dispute related to a preliminary injunction is no longer live because the time period for a preliminary injunction has run. By contrast, the district court's partial dismissal order isn't final, and the time period for a preliminary injunction has not expired.

## B.

Because this appeal is not moot, we now turn to whether Upside can bring this action at all. Upside is asking the federal courts to enjoin the defendants from prosecuting it under a Florida law because, Upside says, the law facially and as applied to it is

24-13640                 Opinion of the Court                 17

preempted by the PPIA. The defendants argue that Upside has no cause of action under the PPIA, under 42 U.S.C. § 1983, or as a matter of equity. Because Upside's "likelihood of success turns on whether it can raise a PPIA preemption claim in the first place," the defendants argue that we must "resolve that procedural question first." State Att'ys Br. at 32 n.17. We agree that we should address whether Upside has a cause of action. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 196 (1976) (resolving "the existence of a private cause of action" before examining its substantive elements). We conclude that it does.

It is well established that a regulated entity like Upside has a cause of action in equity[1] to restrain the enforcement of a preempted state law if that entity could raise such a preemption defense to an enforcement action. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015). That is, if a regulated entity would have a federal defense to a state prosecution, then the regulated entity can seek declaratory and equitable relief in federal court without waiting for the state prosecution. This equitable remedy "reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.* at 327 (citing Jaffe & Henderson, *Judicial Review and the Rule of Law: Historical Origins*, 72 L.Q. Rev. 345 (1956)). And the availability of pre-enforcement

---

[1] We believe that Upside's original complaint, which requested declaratory, injunctive, and other equitable relief, was sufficient to put the defendants on notice that it was raising a claim in equity. *See* Fed. R. Civ. P. 8(a)(2). We take no position on whether section 1983 also provides a cause of action.

18                      Opinion of the Court                    24-13640

declarary relief has been codified in the Declaratory Judgment Act. *See* 28 U.S.C. §§ 2201–02.

The logic of this cause of action stems from the idea that, if a state enforces a law against a private entity, that entity can invoke the defense that federal law preempts the state law being enforced. *See Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1261 n.7 (11th Cir. 2012) (quoting *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 620 (2012) (Roberts, C.J., dissenting) (in turn citing *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring))). As the Supreme Court explained in *Ex parte Young*, requiring a private party to "suffer imprisonment and pay fines" before "obtaining a judicial decision" would "close up all approaches to the courts." 209 U.S. 123, 148 (1908). For this reason, federal courts have the power to recognize "the pre-emptive assertion in equity of a defense that would otherwise have been available in the State's enforcement proceedings at law." *Va. Off. for Prot. & Advocacy*, 563 U.S. at 262; *see also Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983).

A regulated entity's ability to sue to enjoin a state law as preempted is so ingrained in our jurisprudence that it "has gone largely unquestioned." *Ga. Latino All. for Hum. Rts.*, 691 F.3d at 1261. The Supreme Court has regularly entertained such equitable preemption claims by private parties.[2] We regularly entertain

---

[2] *See, e.g., Shaw*, 463 U.S. at 92, 96 n.14 (arguing that ERISA preempted state laws); *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 459 (2012) (challenging California slaughterhouse law as preempted by the FMIA); *Jones v. Rath Packing Co.*, 430

24-13640                Opinion of the Court                19

equitable preemption claims by private parties.[3] And other circuits do as well.[4]

---

U.S. 519, 523–24 (1977) (challenging California food labeling statute as preempted by FMIA and other federal laws); *Whiting*, 563 U.S. at 594 (challenging state alien employment law as preempted by federal immigration law); *Hines*, 312 U.S. at 74 (challenging state alien registration act they were enforcing was preempted by federal Alien Registration Act); *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642 (2002) (challenging a state entity's order as preempted by federal law).

[3] *See, e.g.*, *Ga. Latino All. for Hum. Rts.*, 691 F.3d at 1260–62 (challenging Georgia immigration law as preempted by the Immigration and Nationality Act); *Sims v. Fla. Dep't of Highway Safety & Motor Vehicles*, 862 F.2d 1449, 1454–55 (11th Cir. 1989) (en banc) (challenging Florida motor vehicle safety standards as preempted by the Clean Air Act and the Safety Act); *Scurlock v. City of Lynn Haven*, 858 F.2d 1521, 1524–25 (11th Cir. 1988) (challenging municipal ordinance as preempted by federal and state law); *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1155 (11th Cir. 2008) (challenging Florida voter registration statute as preempted by federal law); *America's Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1326 (11th Cir. 2014) (challenging state insurance law was preempted by ERISA); *Galactic Towing, Inc. v. City of Mia. Beach*, 341 F.3d 1249, 1250 (11th Cir. 2003) (challenging local ordinance regulating towing on the grounds that it was preempted by the Interstate Commerce Commission Termination Act).

[4] *See, e.g.*, *Local Union No. 12004, United Steelworkers of Am. v. Massachusetts*, 377 F.3d 64, 75 (1st Cir. 2004) (explaining that Supreme Court precedent makes clear that a private plaintiff may challenge state action as preempted by federal law); *Nw. Selecta, Inc. v. Ramón González-Beiró*, 145 F.4th 9, 13–15 (1st Cir. 2025) (entertaining PPIA preemption suit by private plaintiff); *Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136, 149 (2d Cir. 2006) (holding that a private plaintiff had an "undisputed" right to challenge a municipal regulation as preempted by federal law); *Lozano v. City of Hazleton*, 724 F.3d 297, 301 (3d Cir. 2013); *Planned Parenthood of Hou. & Se. Tex. v. Sanchez*, 403 F.3d 324, 334 (5th Cir. 2005); *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007); *Bio Gen LLC*

20                    Opinion of the Court                    24-13640

Notwithstanding this well-established caselaw, the defendants say that Upside lacks a cause of action to bring preemption claims in equity for two reasons. We reject both arguments.

First, the defendants say that all this precedent has been overruled, *sub silentio*, by *Armstrong*. They are wrong. In *Armstrong*, medical providers sued state officials, claiming that they were being reimbursed at rates lower than what Section 30(A) of the Medicaid Act required. 575 U.S. at 323–24. They wanted the federal courts to order state officials to reimburse them at higher rates. The Supreme Court rejected that kind of lawsuit. It held that the Supremacy Clause did not confer a private right of action to enforce all federal law and that the Medicaid Act itself did not contemplate lawsuits to compel higher payments. *Id.* at 324–25.

*Armstrong* has no bearing on this case, except to emphasize that Upside can, in fact, bring its preemption claims. No one in *Armstrong* was attempting to prevent the enforcement of a state law. Rather, *Armstrong* was about whether a medical provider could compel a state official to follow the medical provider's view of federal law in the way the officer administered a joint state-federal program. *See id.* at 323–24. For good measure, the Court expressly distinguished its well-established preemption jurisprudence from

---

*v. Sanders*, 142 F.4th 591, 599–600 (8th Cir. 2025); *Bud Antle, Inc. v. Barbosa*, 45 F.3d 1261, 1269 (9th Cir. 1994) (citing *Shaw*, 463 U.S. at 96 n.14) (holding that a private plaintiff may seek declaratory and injunctive relief against a state law on the ground that federal law preempts it); *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Bonta*, 33 F.4th 1107, 1112 (9th Cir. 2022); *Chamber of Com. of United States v. Edmondson*, 594 F.3d 742, 755 (10th Cir. 2010).

what the plaintiffs were asking for in that case. The Court recognized the longstanding rule that "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Id.* at 326 (citing *Ex parte Young*, 209 U.S. at 155–56). But the Court said that what the medical providers wanted in *Armstrong* was different in kind. Here, Upside is asking for the standard, well-established remedy of an injunction against a preempted state law, not the "follow-federal-law-and-pay-me-more-money" injunction the medical providers wanted in *Armstrong*.

Second, the defendants point to language in section 467c of the PPIA that reserves the exclusive right to enforce the PPIA's provisions to the United States. The statute says that "[a]ll proceedings for the enforcement or to restrain violations of this chapter shall be by and in the name of the United States." 21 U.S.C. § 467c. Broadly construing this language, the defendants say that this reservation of rights to the United States precludes Upside's lawsuit. But we cannot construe section 467c "in a vacuum"; instead, we must read it in "context and with a view to [its] place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). And, in context, nothing about section 467c precludes a plaintiff in equity from seeking to enjoin the enforcement of a preempted state law.

Section 467c says that only the United States may enforce or restrain violations *of the PPIA*. The PPIA regulates poultry

processors, not state actors. *See, e.g.*, 21 U.S.C. §§ 456 (authorizing regulations of premises, facilities, and equipment); 457 (outlining labeling and container standards); 458 (outlining prohibited acts in poultry processing, transport, and sale). The ordinary meanings of the terms "enforce" ("to put in force"), "restrain" (to "prevent from doing something"), and "violation" ("an infringement or transgression") are not broad enough to cover a lawsuit like this one that seeks to stop state officers, not from breaking the PPIA, but from enforcing a state law. *Webster's Third New International Dictionary* 751, 1936, 2554 (1961). Moreover, the language in section 467c is common, and courts routinely allow private plaintiffs to bring equitable preemption actions in relation to federal statutes that contain similar language. *See Council for Responsible Nutrition v. James*, 159 F.4th 155, 170 (2d Cir. 2025) (entertaining a preemption challenge under the Food, Drug, and Cosmetic Act, despite exclusive enforcement provision in 21 U.S.C. § 337(a)); *United Egg Producers v. Dep't of Agric. of P.R.*, 77 F.3d 567, 569 (1st Cir. 1996) (entertaining a dormant Commerce Clause challenge related to the Egg Products Inspection Act, despite exclusive enforcement provision in 21 U.S.C. § 1050).

Although the defendants insist that Upside's lawsuit is about "enforcing" the PPIA's express preemption provision, this is a misunderstanding of the nature of preemption. Upside is advancing a constitutional defense to a putative prosecution under Florida law. "Preemption is the power of federal law to displace state law substantively" and provides "a substantive defense to a state law action on the basis of federal law." *Geddes v. Am. Airlines, Inc.*, 321 F.3d

1349, 1352 (11th Cir. 2003). Although an express preemption provision like the PPIA's may define the scope of a preemption defense in any given case, the force of preemption is constitutional in nature. *See Haywood v. Drown*, 556 U.S. 729, 736 (2009) (holding that a state law contrary to federal law "violates the Supremacy Clause"); *Branch v. Smith*, 538 U.S. 254, 281 (2003) (describing a state law that "violates the Supremacy Clause" as "a legal nullity"); *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981) ("It is basic to this constitutional command that all conflicting state provisions be without effect."). That is, under the Supremacy Clause, preemption "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). Because Upside could raise a preemption defense to the enforcement of Florida's statute in a state proceeding, it can bring this claim for declaratory and injunctive relief.

C.

Finally, we arrive at the merits of Upside's claim. Because we have decided that Upside has a cause of action to restrain the enforcement of state laws that are contrary to the PPIA, we must decide whether its action is likely to succeed on the facts of this case. Two main parts of the statute are implicated by Upside's claim. First, there is the Facilities Provision, which preempts state laws that impose different or additional requirements "with respect to premises, facilities and operations of any official establishment." 21 U.S.C. § 467e. Second, there is the Ingredients Provision, which

24                    Opinion of the Court                    24-13640

preempts state laws that impose different or additional "ingredient requirements . . . with respect to articles prepared at any official establishment." *Id.* Upside argues that Florida's law is preempted by both provisions. The defendants argue that Florida's ban on lab-grown chicken doesn't regulate Upside's facilities or the ingredients in Upside's products.[5] On this issue, we agree with the defendants. We will address the Facilities Provision and Ingredients Provision in turn.

1.

The PPIA's Facilities Provision does not preempt SB 1084 because a pure product ban like this one does not regulate the premises, facilities, or operations of any official establishment. The Facilities Provision prohibits additional or different requirements "with respect to premises, facilities and operations of any official establishment." 21 U.S.C. § 467e. Florida's SB 1084 provides that

---

[5] The defendants also argue that lab-grown meat isn't covered by the PPIA at all because it was not part of a living chicken. The PPIA covers "poultry products"—which it defines as "any poultry carcass, or part thereof; or any product which is made wholly or in part from any poultry carcass or part thereof." 21 U.S.C. § 453(f). Upside says that, at some point in its process, it uses chicken cells to create its chicken breasts. And the USDA has characterized lab-grown chicken products as "poultry food products" and regulates them as such. *See* FSIS Responsibilities in Establishments Producing Cell-Cultured Meat and Poultry Food Products, U.S. Dep't of Agric., at 1 (June 21, 2023), [https://perma.cc/7VUP-2KRN]. We are unconvinced that the preliminary injunction record in this case is sufficiently developed for us to opine on this question. So, we will assume without deciding that lab-grown chicken is a "poultry product" regulated by the PPIA.

"[i]t is unlawful for any person to manufacture for sale, sell, hold or offer for sale, or distribute cultivated meat in this state." Fla. Stat. § 500.452(1). Upside asserts that this ban on lab-grown meat is essentially a ban on "the use of a specific production method" and could affect Upside's facilities by causing them to close. Blue Br. at 35. The defendants respond that nothing in SB 1084 tells Upside how to operate its manufacturing facilities.

We agree with the defendants. We conclude that the PPIA preempts state laws with a direct relationship to the onsite operations of a poultry processor. And the product ban in SB 1084 does not regulate Upside's (or any other) out-of-state operations facilities. We think this is the best reading of the PPIA for four reasons.

First, the PPIA's preemptive scope is limited to premises, facilities, and operations. The PPIA does not define "premises, facilities, and operations," so we give these terms their "ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). Both "premises" and "facilities" refer to the site of poultry slaughtering or processing. When the PPIA was enacted in 1957, a contemporaneous dictionary defined "premises" as "a specified piece or tract of land with the structures on it" or "the place of business of an enterprise or institution." *Webster's Third New International Dictionary* 1789 (1961). The same dictionary defined "facilities" as "something (as a hospital, machinery, plumbing) that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end." *Id.* at 812–13. These definitions all refer to a physical site. The PPIA lends

further context by limiting preemption to "premises, facilities and operations *of any official establishment*," confirming that "premises" and "facilities" refer to the land and structures of an establishment that slaughters poultry or processes poultry products.

Although "operations" has a broader definition, in the context of the PPIA we believe it also refers to onsite operations. A contemporaneous dictionary defines "operations" as "the whole process of planning for and operating a business or other organized unit." *Webster's Third New International Dictionary* 1581 (1961). Considered alone, this definition could encompass *off*site as well as *on*-site operations and thus presents some ambiguity. But under the contextual canon *noscitur a sociis*, when several nouns are associated in a way suggesting they have something in common, we should assign them a permissible meaning that makes them similar. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 195 (2012). The series qualifier "of any official establishment," reinforces this conclusion, as the PPIA defines an "official establishment" as an establishment "at which inspection of the slaughter of poultry, or the processing of poultry products" occurs. 21 U.S.C. § 453(p).

Second, the phrase "with respect to" narrows the application of the Facilities Provision to only those state laws with a direct effect on premises, facilities, or operations. We have recognized that one meaning of the phrase "with respect to" is a "direct relation to, or impact on." *In re Appling*, 848 F.3d 953, 958 (11th Cir. 2017) (quoting *Presley v. Etowah Cnty. Comm'n*, 502 U.S. 491, 506 (1992))), *aff'd,*

*Lamar, Archer & Cofrin, LP v. Appling,* 584 U.S. 709, 719 (2018)). Phrases like this can "ha[ve] different relevant meanings in different contexts," *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 7 (2011), so we must examine the ordinary meaning of this phrase in the context of the Facilities Provision.

Here, the phrase requires a direct relationship to the premises, facilities, and onsite operations of a poultry processor. The phrase "with respect to" has an operative effect only if it requires a direct connection between state law and premises, facilities, and operations. The Facilities Provision preempts state laws that regulate premises, facilities, or operations. If we read "with respect to" expansively, to cover regulations with even incidental downstream effects on premises, facilities, or operations, then the list items would become largely redundant. Most regulations with an incidental effect on premises (such as a regulation that reduces product sales) would also have incidental effects on facilities and operations. Reading "with respect to" expansively would thus violate the surplusage canon, which counsels that we should attempt to give effect to every word in a statute. Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012). Thus, the phrase "with respect to" narrows the application of the Facilities Provision to only those state laws with a direct effect on premises, facilities, or operations.

Third, this reading also preserves the operation of the savings clause that follows the PPIA's preemption provisions. That clause provides that "[t]his chapter shall not preclude any

State . . . from making requirement or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter." 21 U.S.C. § 467e. Any state law respecting other matters that the PPIA regulates could have an incidental or indirect effect on premises, facilities, or operations. Interpreting the facilities preemption provision broadly would leave nothing for the savings clause to do.

Applying this understanding of the PPIA to SB 1084, we conclude that the Facilities Provision does not preempt Florida's lab-grown meat ban. SB 1084 makes it "unlawful for any person to manufacture for sale, sell, hold or offer for sale, or distribute cultivated meat in this state." Fla. Stat. § 500.452(1). This ban covers lab-grown chicken, not how lab-grown chicken is created or processed. Even though the ban could have a plausible downstream effect on Upside's premises, facilities, or onsite operations, the PPIA's clause "with respect to" limits the clause to the preemption of laws with a *direct* relationship to a poultry processing premises, facilities, or operations. Because SB 1084 lacks such a direct relationship, it is not preempted by the PPIA's Facilities Provision.

Fourth, our sister circuits have read comparable language similarly. The Fifth Circuit and Seventh Circuit have both held that an analogous Facilities Provision in the FMIA did not preempt state bans on processing or selling horsemeat for human consumption because the bans didn't regulate onsite slaughterhouse operations. *See Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 333 (5th Cir. 2007); *Cavel Int'l Inc. v. Madigan*, 500 F.3d 551,

553–54 (7th Cir. 2007). Both circuits explained that the Facilities Provision did not require a state to permit the sale of certain meat just because the federal government regulated the production of that meat. *See Empacadora*, 476 F.3d at 333; *Cavel*, 500 F.3d at 553–54. In the same way, we believe the PPIA's regulation of lab-grown chicken does not obligate states to permit the manufacture or sale of lab-grown chicken—it obligates states not to impose additional or different regulations on such manufacture or sale if it is permitted.

Upside relies on the Supreme Court's decision in *National Meat Association v. Harris*, 565 U.S. 452, 464 (2012), which held that the FMIA's Facilities Provision preempted a California law about swine processing. But the California law in that case was meaningfully different than the Florida law in this one. California's law prohibited slaughterhouses from buying or selling nonambulatory animals, from processing or selling their products for human consumption, and from holding nonambulatory animals without immediately euthanizing them. *Id.* at 458–59 (quoting Cal. Penal Code Ann. § 599f). The Supreme Court held that the FMIA preempted California's law because: (1) it required slaughterhouses to handle nonambulatory pigs onsite in a different way than the USDA did, *id.* at 460, (2) the state purchase ban regulated onsite operations because that is where purchases happened, *id.* at 462–63, and (3) although the sales ban could operate offsite (after operations had ended), its combination with the onsite regulations made it "a command to slaughterhouses to structure their operations in the exact way the remainder of § 599f mandates." *Id.* at 464.

Unlike California's swine processing law, SB 1084 does not instruct Upside how to make its product. It bans its manufacture or sale. Fla. Stat. § 500.452(1). The key difference here is that the California swine-processing law permitted an end product—pork—but told facilities how to handle or process that product if the pigs were nonambulatory. By contrast, SB 1084 bans an end product—lab-grown chicken—and doesn't tell facilities how to handle or process that product. SB 1084 might look more like the California swine processing law if it told Upside what cell harvesting methods to use, what material the "cultivator" should be made of, or how to dispose of waste products from the manufacturing process. But SB 1084 does none of those things. It just bans the end product by prohibiting the manufacture or sale of that end product.

In short, SB 1084 does not tell Upside how to make its lab-grown chicken. Although it bans a category of meat, SB 1084 does not reach into Upside's premises, facilities, or onsite operations. Therefore, the Facilities Provision does not preempt SB 1084.

2.

Upside is also unlikely to succeed on its claim that the PPIA's Ingredients Provision preempts SB 1084. The Ingredients Provision preempts state laws that require additional or different "ingredient requirements . . . with respect to articles prepared at any official establishment." 21 U.S.C. § 467e. Upside asserts that SB 1084 is an ingredient requirement because it bans all poultry products that contain the ingredient of lab-grown cells. The defendants respond that a ban on lab-grown chicken bans a product, not its ingredients,

and that a state is free to ban meat products even if the federal government regulates them.

We reject Upside's reading of the Ingredients Provision for the same reason we reject its reading of the Facilities Provision: SB 1084 is not an ingredient requirement because it bans the poultry product of "cultivated meat." Fla. Stat. § 500.452(1). The PPIA does not define "ingredient requirement," so we give this term its "ordinary, contemporary, common meaning." *Perrin*, 444 U.S. at 42. When the PPIA was enacted in 1957, a contemporaneous dictionary defined "ingredient" as "something that enters into a compound or is a component part of any combination or mixture." *Webster's Third New International Dictionary* 1162 (1961). The same dictionary defined "requirement" as "a requisite or essential condition." *Id.* at 1929. Together, an "ingredient requirement" means a rule establishing an essential component of a mixture or combination. SB 1084 does not establish an essential component of a mixture; it bans an end product (lab-grown meat).

Upside's argument that SB 1084 bans the "ingredient" of lab-grown chicken cells ignores the ordinary meaning of "ingredient" in a food production context. A recipe book, for example, would never list "chicken cells" as an ingredient for fried chicken. Rather, it would list items like chicken, milk, flour, seasoning, and oil. The PPIA also describes ingredients at a non-cellular level, prohibiting foreign poultry product imports if the products contain certain "dye[s], chemical[s], preservative[s], or ingredient[s]" that would make them harmful to humans, 21 U.S.C. § 466(a), and stating that

a product would be misbranded if its label does not state the "common names of optional ingredients (other than spices, flavoring, and coloring)." 21 U.S.C. § 453(h)(7). Regulations implementing the PPIA use the term "ingredient" similarly, approving poultry product ingredients such as citric acid, gelatin, or coloring agents, and never once referring to components on a cellular level. C.F.R. § 424.21(c); *see also Armour & Co. v. Ball*, 468 F.2d 76, 81–82 (6th Cir. 1972) (holding that the FMIA's analogous Ingredients Provision preempted a state sausage regulation because it regulated ingredients like cereal, soya binders, milk, and fatty tissue).

Our reasoning is consistent with that of our sister circuits that have concluded that product bans are not preempted by the Ingredients Provision. The Ninth Circuit upheld as non-preempted a state ban on foie gras produced by force-feeding birds. *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra*, 870 F.3d 1140 (9th Cir. 2017). It interpreted the PPIA's Ingredients Provision to "address the physical components of poultry products, not the way the animals are raised." *Id.* at 1147. Likewise, the Fifth Circuit upheld as non-preempted a state ban on horsemeat. *Empacadora*, 476 F.3d at 333. It reasoned that, that notwithstanding the FMIA's analogous Ingredients Provision, states may "regulate what types of meat may be sold for human consumption in the first place." *Id.* Just like state bans on foie gras and horsemeat, Florida's categorical ban on lab-grown chicken is not an ingredient regulation that is preempted by the PPIA.

## IV.

For the foregoing reasons, the district court's order denying the motion for a preliminary injunction is **AFFIRMED**.