**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
Tallahassee Division**

THE UPSIDE GROUP INC.
     Plaintiff,

v.

WILTON SIMPSON, in his official
capacity as Commissioner of the
Florida Department of
Agriculture and Consumer
Services, et al.
     Defendants.

Civil Action No.
4:24-cv-00316-MW-MAF

---

**PLAINTIFF'S RESPONSE TO DEFENDANT SIMPSON'S
MOTION FOR SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................iii

INTRODUCTION ...................................................................... 1

ARGUMENT ........................................................................ 3

I.  SB 1084 Is Subject to Rigorous Scrutiny Because It Discriminates Against Interstate Commerce in Purpose and Effect ................................................................................ 3

    A. Rigorous scrutiny applies to laws that discriminate against interstate commerce in purpose or effect .............................. 4

    B. The undisputed facts show SB 1084 has the practical effect of banning an entirely out-of-state product from competing with in-state agriculture ....................................................... 7

        1.  SB does not regulate business structure; it bars an interstate good from the Florida market .......................... 8

        2.  Cultivated meat and conventional meat compete in the same market ................................................................. 10

        3.  The size and newness of the cultivated-meat market do not eliminate the discriminatory effect ........................... 14

        4.  SB 1084 protects in-state agriculture even if some out-of-state conventional-meat businesses also benefit .. 17

    C. The undisputed facts show that economic protectionism was a motivating factor for the enactment of SB 1084 ........ 20

II. The Government Has Not Carried Its Burden Under Rigorous Scrutiny ............................................................................. 27

A. The government has not shown any sufficient government interest ............................................................. 29

B. The government has not shown narrow tailoring ................ 34

CONCLUSION ..................................................................... 37

LOCAL RULE 56.1(C) and (E) CERTIFICATE ..................................... 39

CERTIFICATE OF SERVICE............................................................. 40

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*American Trucking Ass'ns v. Rhode Island Tpk. & Bridge Auth.*,
123 F.4th 27 (1st Cir. 2024) .......................................................... 16

*Bacchus Imports, Ltd. v. Dias*,
468 U.S. 263 (1984) ...........................5, 10, 11, 13, 15, 19, 20, 25-27

*Blanchette v. Connecticut General Insurance Corp.*,
419 U.S. 102 (1974) ....................................................................... 24

*C & A Carbone Inc. v. Town of Clarkstown*,
511 U.S. 383 (1994) ...................................................................... 4, 5

*Cachia v. Islamorada*,
542 F.3d 839 (11th Cir. 2008) .......................................................... 9

*City of Philadelphia v. New Jersey*,
437 U.S. 617 (1978) ........................................................................ 27

*Comptroller of the Treasury of Maryland v. Wynne*,
575 U.S. 542 (2015) ........................................................................ 26

*Dean Milk Co. v. City of Madison*,
340 U.S. 349 (1951) ........................................................................ 34

*Diamond Alternative Energy, LLC v. EPA*,
606 U.S. 100 (2025) ....................................................................... 17

*Exxon Corp. v. Governor of Maryland*,
437 U.S. 117 (1978) ...................................................................... 8-10

*Greater Birmingham Ministries v. Secretary of State*,
992 F.3d 1299 (11th Cir. 2021) ............................................... 21, 22

*Hallmark Developers, Inc. v. Fulton Cnty.*,
    466 F.3d 1276 (11th Cir. 2006) ...................................................... 24

*Hughes v. Oklahoma*,
    441 U.S. 322 (1979) ...................................................................... 28

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977) .................................................. 5, 6, 20, 23, 24

*Kassel v. Consolidated Freightways Corp. of Delaware*,
    450 U.S. 662 (1981) ...................................................................... 23

*League of Women Voters of Florida, Inc. v. Florida Secretary of State*,
    66 F.4th 905 (11th Cir. 2023) ................................................. 21, 22

*Locke v. Shore*,
    634 F.3d 1185 (11th Cir. 2011) ..................................................... 27

*Maine v. Taylor*,
    477 U.S. 131 (1986) ....................................... 4, 5, 28-30, 32, 34, 37

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. 122 (2023) ...................................................................... 26

*National Pork Producers Council v. Ross*
    598 U.S. 356 (2023) ................................................................... 3, 6

*Or. Waste Sys., Inc. v. Dep't of Env't Quality*,
    511 U.S. 93 (1994) ........................................................................ 34

*Pacific Northwest Venison Producers v. Smitch*,
    20 F.3d 1008 (9th Cir. 1994) ........................................................ 28

*South Dakota Farm Bureau, Inc. v. Hazeltine*,
    340 F.3d 583 (8th Cir. 2003) ................................... 5, 25, 28, 29, 37

iv

## Constitutional Provisions

Dormant Commerce Clause Art I § 8, cl. 3 ..................................... *passim*

Fla. Const. art. III, § 8(a) ........................................................22

## Statutes, Codes, Rules, and Bill

7 U.S.C. § 1639b ................................................................35

Fla. Admin. Code r. 61C-1.001(12) .........................................35

S.B. 1084, 2024 Leg., Reg. Sess. (Fla. 2024) .................................. *passim*

## Other Authorities

National Bioengineered Food Disclosure Standard
    Pub. L. No. 114-216, 130 Stat. 834 (2016) ....................................35

**INTRODUCTION**

UPSIDE's cross-motion showed that the undisputed record entitles UPSIDE to judgment on its Dormant Commerce Clause claim. SB 1084 has the practical effect—and was enacted with the admitted purpose—of shutting Florida's borders to an innovative product that competes with the State's conventional meat industry. Every producer of cultivated meat is located outside Florida, and Commissioner Simpson admits there has never been an in-state producer. Def. Simpson's Answer ¶ 201, ECF No. 128-4. Cultivated meat is designed, marketed, regulated, served, and understood as meat; it competes with conventional meat for the same consumers and food dollars. Gerber Decl. ¶¶ 17–20, 71–78, ECF No. 128-3. Florida officials understood that competitive relationship and said so publicly. Def. Simpson's Answer ¶¶ 75, 79, 100, ECF No. 128-4. Most importantly, the State Attorney Defendants—*i.e.*, the Attorney General's Office, Florida's chief legal advocate, charged with criminal enforcement of the Ban—admitted that a purpose of SB 1084 is to preserve the conventional-meat industry by banning unconventional meat: "[T]he conventional-meat industry," the State Attorney Defendants freely

1

admit, "is preserved by banning unconventional meat." State Attorney Defs.' Resp. to Pl.'s First Interrogs. No. 1, ECF No. 128-7.

Commissioner Simpson does not meaningfully dispute those facts.[1] That failure is fatal. A state law that discriminates against interstate commerce in purpose or effect is subject to a virtually per se rule of invalidity, and the State cannot overcome that rule on this record. Florida has produced no evidence that cultivated meat is especially likely to harm anyone, no evidence that federal and ordinary state food-safety regulations are inadequate, and no evidence that any legitimate concern could not be addressed through nondiscriminatory regulation rather than a categorical ban.

This brief proceeds in two parts. Part I explains why SB 1084 is subject to rigorous scrutiny: it removes an entirely out-of-state product from Florida's market while protecting the in-state agriculture industry

---

[1] Simpson's statement of facts includes numerous assertions that are not cited or relied on in his legal argument and have no apparent bearing on the Dormant Commerce Clause issues before the Court. Those assertions appear designed to portray cultivated meat as unfamiliar or unsettling, not to establish facts material to the parties' cross-motions. UPSIDE does not concede those assertions or Simpson's characterizations of them. But because they are immaterial to the legal issues presented, and because Simpson does not rely on them to carry his burden, UPSIDE addresses only the facts necessary to resolve the parties' cross-motions.

that competes with it, and the State Attorney Defendants admit that protecting that industry was one purpose of the law. Simpson's attempts to avoid that scrutiny fail. Part II explains why Simpson cannot satisfy the burden that rigorous scrutiny imposes. He has not shown that SB 1084 serves a legitimate, non-protectionist interest that could justify discrimination against interstate commerce, and he has not shown that a categorical ban is necessary because no nondiscriminatory alternative would serve that interest. The Court should deny Simpson's motion and grant UPSIDE's cross-motion.

## ARGUMENT

### I.    SB 1084 Is Subject to Rigorous Scrutiny Because It Discriminates Against Interstate Commerce in Purpose and Effect.

Commissioner Simpson's motion opens with a quotation from *National Pork Producers Council v. Ross*: "[a]bsent discrimination," a State may prohibit the sale of products it considers harmful to its citizens. 598 U.S. 356, 369 (2023). But the words "[a]bsent discrimination" do all the work. *National Pork Producers* was a *Pike*-balancing case because the plaintiffs there disclaimed any theory of discrimination. This case is different. As this Court recognized at the motion-to-dismiss stage, the deferential review applied in *National Pork*

3

*Producers* has no application where, as here, the challenged law discriminates against interstate commerce in purpose or effect. Order Granting in Part & Denying in Part MTD, ECF No. 85 at 27 n.12.

The summary-judgment record confirms that SB 1084 is subject to rigorous scrutiny. Section A explains the governing rule: a law that discriminates against interstate commerce in purpose or effect—even if written in facially neutral terms—is subject to a virtually per se rule of invalidity. Sections B and C then explain why that rule applies here. SB 1084 removes an entirely out-of-state product from Florida's market while protecting the in-state industry with which that product competes. And the undisputed record shows that this effect was not accidental: protecting the conventional-meat industry from cultivated-meat competition was a motivating purpose of the law.

## A. Rigorous scrutiny applies to laws that discriminate against interstate commerce in purpose or effect.

Under the Supreme Court's Dormant Commerce Clause jurisprudence, a law that discriminates against interstate commerce in favor of local economic interests is invalid unless the State can show, under rigorous scrutiny, that the law serves a legitimate local purpose that cannot be served by available nondiscriminatory means. *C & A*

4

*Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994); *Maine v. Taylor*, 477 U.S. 131, 138 (1986). That rule is not limited to laws that discriminate on their face. It applies equally to laws that are facially neutral but have the practical effect of discriminating against interstate commerce or were enacted for a discriminatory purpose. *See Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 350–53 (1977); *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583 (8th Cir. 2003) (applying rigorous scrutiny based on a finding of discriminatory purpose alone).

Those precedents defeat Simpson's central argument that the Ban cannot discriminate because it applies to all cultivated-meat producers alike, regardless of location. Def.'s Br. 20. The same was true in *Hunt*. There, North Carolina required all closed containers of apples sold, offered for sale, or shipped into the State to bear "no grade other than the applicable U.S. grade or standard." 432 U.S. at 335. The law did not classify by state of origin, and it applied to everyone selling apples in North Carolina. But its practical effect was to strip Washington apple producers of the competitive advantage they had earned through Washington's superior grading system while leaving local producers with

5

no comparable burden. *Id*. at 351. The Supreme Court held that this facially neutral law discriminated against interstate commerce and subjected it to rigorous scrutiny. *Id*. at 352–53.

*National Pork Producers* did not change that rule. To the contrary, the Court reaffirmed that the "antidiscrimination principle lies at the very core of our dormant Commerce Clause jurisprudence," and that the Commerce Clause forbids "economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." 598 U.S. at 369. The Court applied *Pike* balancing only because the plaintiffs there "disavow[ed]" any discrimination claim and did not allege that California's law "purposeful[ly] discriminat[es] against out-of-state economic interests." *Id*. at 371–72. This case presents the theory *National Pork Producers* did not: SB 1084 discriminates in both practical effect and purpose by eliminating an entirely out-of-state product from Florida's market to protect the in-state industry that competes with it.

Those are the principles that govern here. Because SB 1084 discriminates against interstate commerce in effect and was enacted with a protectionist purpose, it is subject to rigorous scrutiny.

6

### B. The undisputed facts show SB 1084 has the practical effect of banning an entirely out-of-state product from competing with in-state agriculture.

Although SB 1084 is written in facially neutral terms, its burdens fall exclusively on out-of-state companies. When the Ban took effect, there were no Florida-based manufacturers of cultivated meat, and there never had been. Def. Simpson's Answer ¶ 201, ECF No. 128-4. Every producer of cultivated meat—including UPSIDE—is located outside Florida. SB 1084 categorically bans the sale and distribution of that out-of-state product while allowing conventional meat, including meat produced by Florida agriculture, to remain on the market. As UPSIDE's cross-motion explained, that total prohibition imposes a far greater burden on interstate commerce than lesser burdens the Supreme Court has already held sufficient to trigger rigorous scrutiny. ECF No. 129 at 25–27.

Simpson's contrary arguments all fail. First, SB 1084 does not merely regulate different "ways of doing business"; it bars an interstate good from the Florida market altogether. Second, cultivated meat and conventional meat are similarly situated because they compete for the same consumers and food dollars. Third, the size and newness of the

7

cultivated-meat market do not eliminate the Ban's discriminatory effect. And fourth, the Ban protects Florida agriculture even if some out-of-state conventional-meat businesses also benefit. None of those arguments changes the undisputed practical effect of the law: Florida has removed an entirely out-of-state meat product from its market to protect the Florida agriculture industry from that product's competition.

### 1. SB 1084 does not regulate business structure; it bars an interstate good from the Florida market.

Simpson's lead argument is that SB 1084 regulates evenhandedly because it draws no express geographic line and distinguishes only between different kinds of business structures Def.'s Br. 19–20. That argument depends principally on *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978), but *Exxon* shows why SB 1084 is discriminatory.

*Exxon* involved a Maryland law prohibiting petroleum producers and refiners from operating retail service stations in the State. *Id.* at 119–20. The law did not prevent gasoline from entering Maryland, did not stop out-of-state refiners from selling gasoline in Maryland, and did not favor any in-state class of gasoline producers. The Supreme Court upheld the law because it created "no barrier" to the interstate flow of gasoline, did not prohibit the sale of any interstate product, and did not

8

give local producers a competitive advantage over out-of-state producers. *Id.* at 125–26. *Exxon* thus stands for the limited proposition that a law does not discriminate merely because some out-of-state firms bear a business-structure burden, so long as interstate goods continue to flow and no in-state producer class is favored.

The Eleventh Circuit has drawn the same distinction. In *Cachia v. Islamorada*, the court considered an ordinance barring formula restaurants and rejected the argument that *Exxon* controlled. 542 F.3d 839, 842–43 (11th Cir. 2008). Although *Exxon* held that the Commerce Clause does not protect any particular "structure or methods of operation" in a retail market, the Eleventh Circuit explained that a complete prohibition on a class of businesses "amounts to more than the regulation of methods of operation" when it "serves to exclude" interstate competitors from the local market. *Id.* at 843. The court therefore treated the ordinance as discriminatory because it functioned as an "explicit barrier" to national chains competing with local restaurants. *Id.* at 842.

SB 1084 is even further from *Exxon*. It does not merely require UPSIDE to change its corporate structure, distribution model, or method of doing business. It leaves UPSIDE with no lawful way to sell or

distribute cultivated meat in Florida at all. UPSIDE's cultivated chicken may not enter Florida for distribution or sale. And unlike in *Exxon*, the Ban protects a favored in-state industry: Florida agriculture, whose conventional meat products remain on the market while cultivated meat is excluded. That is not evenhanded regulation of business structure. It is total market foreclosure of an interstate good.

### 2. Cultivated meat and conventional meat compete in the same market.

Simpson next argues that SB 1084 cannot discriminate because cultivated meat and conventional meat are not "similarly situated." Def.'s Br. 21. But the Dormant Commerce Clause does not require favored and disfavored products to be identical. What matters is whether they compete in the same market. *See Bacchus Imports,* , 468 U.S. at 269–71; *Hunt*, 432 U.S. at 350–53.

*Bacchus* illustrates the point. Among the products Hawaii singled out for favored treatment in that case was okolehao, a brandy distilled from an indigenous Hawaiian shrub. 468 U.S. at 265. As a uniquely Hawaiian product, okolehao was obviously not identical to liquors manufactured outside the state. And because okolehao represented only a tiny fraction of the liquor market, the extent of competition between

10

okolehao and other liquors was small. But even that small amount of marketplace competition was enough to implicate the full protection of the Dormant Commerce Clause. *See id.* at 269 ("On the stipulated facts in this case, we are unwilling to conclude that *no competition* exists between the exempted and the nonexempted liquors." (emphasis added)).

The same principle applies here. The undisputed record shows that cultivated chicken and conventional chicken compete for the same consumers and food dollars. Dr. Suzannah Gerber was retained to analyze the market overlap between cultivated meat and traditional meat, and she explains that products occupy the same market when they are reasonably interchangeable or substitutable from the buyer's perspective, considering product characteristics, biological composition, intended culinary and dietary use, regulatory treatment, consumer perception, and observed substitution behavior. Gerber Decl. ¶¶ 17–20, 71–78, ECF No. 128-3. Applying those factors, she concludes that cultivated meat is functionally and competitively positioned alongside conventional meat. *Id.* ¶ 78.

That conclusion is exemplified by UPSIDE specifically. UPSIDE's cultivated chicken is made from chicken cells and is designed to look,

11

cook, and taste like conventional chicken. Valeti Decl. ¶¶ 25–26, ECF No. 128-1; Gerber Decl. ¶¶ 24–35, ECF No. 128-3. It has been served explicitly as a chicken substitute in restaurants and at public tastings, including a Miami tasting where a Florida chef prepared UPSIDE's product using ordinary chicken-cooking techniques and Florida consumers evaluated its taste by comparing it to chicken. Valeti Decl. ¶¶ 36–37, ECF No. 128-1; Gerber Decl. ¶¶ 10–11, 35, 56, ECF No. 128-3. Consumers evaluate cultivated chicken as a meat product and as a substitute for conventional chicken. Gerber Decl. ¶¶ 25–35, 75, ECF No. 128-3. The federal government regulates cultivated poultry under the same federal meat-and-poultry framework that governs conventional poultry. *Id.* ¶ 47. And conventional agriculture has treated cultivated meat as a competitive threat—which is precisely why the industry and its allies have opposed it. *Id.* ¶¶ 40–42. Indeed, the State Attorney Defendants have admitted as much: "[T]he conventional-meat industry is preserved by banning unconventional meat," they assert. State Attorney Defs.' Resp. to Pl.'s First Interrogs. No. 1, ECF No. 128-7. And SB 1084 "advances" that interest by stifling cultivated meat and thereby "preserving a conventional-meat industry." *Id.*

12

Simpson's attempts to avoid this evidence fail. He points to differences in production method, but products need not be produced the same way to compete. Organic and conventional produce compete. Cage-free and conventional eggs compete. Butter and margarine compete. Product differentiation is not the absence of competition. *See Bacchus*, 468 U.S. at 269.

Nor does Simpson's "manufactured commerce" argument undermine the evidence of competition. The June 27, 2024 tasting is not the basis for UPSIDE's injury; it is corroborating evidence of substitutability. UPSIDE's cultivated chicken was prepared as chicken, served as chicken, and evaluated by Florida consumers as chicken. That is evidence of competition in the ordinary sense.[2]

---

[2] Simpson's "manufactured commerce" argument also rests on a mistaken chronology. SB 1084 provides that, "[e]xcept as otherwise expressly provided in this act and except for this section, which shall take effect upon this act becoming a law, this act shall take effect July 1, 2024." Ch. 2024-137, Laws of Fla. The "this section" carve-out refers to the effective-date section itself, not to the substantive cultivated-meat prohibition. The Ban therefore took effect July 1, 2024, and UPSIDE's June 27 tasting occurred before that date.

13

### 3. The size and newness of the cultivated-meat market do not eliminate the discriminatory effect.

Simpson also argues that UPSIDE's competition theory is speculative because cultivated meat is an emerging product and UPSIDE does not currently have product for sale to the public. That argument fails on the record and the law alike.

As a matter of fact, Simpson's "Theoretical Cultivated Chicken" term—referring to UPSIDE's product currently undergoing FDA pre-market review—is rhetoric, not evidence. SB 1084 bars UPSIDE from selling, offering, distributing, or holding for distribution cultivated meat in Florida, including the cultivated chicken that completed FDA pre-market review and received a USDA Grant of Inspection. *See* Valeti Decl. ¶ 33, ECF No. 128-1. That product is real, federally cleared, and barred from the Florida market by a law that makes its sale a crime. The constitutional question is not whether UPSIDE has already achieved commercial scale. It is whether Florida may exclude an out-of-state product from its market to protect an in-state commercial interest from competition. It may not.

To be sure, UPSIDE is currently capable of producing its existing product in only relatively small quantities, and its distribution of that

14

product has been limited as a result. But as a matter of law, the Dormant Commerce Clause protects emerging interstate competition no less than established interstate competition. If market size were dispositive, States could immunize the most effective protectionism by acting early: identify an emerging out-of-state substitute, ban it before consumers have access, and then point to the lack of pre-ban sales as proof that no market was burdened—precisely the gambit Florida has tried to execute here. That rule would reward States for closing markets before competition can take hold.

*Bacchus* rejects that approach. There, the Supreme Court invalidated a discriminatory tax exemption even though the protected local products had a tiny market share. The Court explained that the volume of commerce affected goes to the extent of discrimination, not whether discrimination exists, and that there is "no relevant distinction between thriving and struggling enterprises" under the Commerce Clause. 468 U.S. at 269–71. The same principle applies here. SB 1084 does not impose a small compliance cost on UPSIDE. It forecloses the Florida market altogether. Cultivated meat may not be manufactured, sold, offered for sale, held for sale, or distributed in Florida. *See* Pl.'s

15

Opening Br. 17, ECF No. 129. That is discrimination whether the excluded market is large, small, mature, or emerging. Whether a State is trying to dismantle well-established out-of-state competitors or smother a new one in its cradle, the Dormant Commerce Clause applies with equal force.

Defendant Simpson's reliance on *American Trucking Ass'ns v. Rhode Island Turnpike & Bridge Authority*, 123 F.4th 27 (1st Cir. 2024), does not help. The challengers there failed on one claim because the district court found, as a matter of fact, that the favored and disfavored vehicles did not compete in the same market, and the plaintiffs offered only "conjecture" to the contrary. *Id.* at 39. That threshold problem is absent here. Dr. Gerber's unrebutted expert testimony is concrete evidence that cultivated chicken competes with conventional chicken for the same consumers; Simpson offers no contrary market evidence. And *American Trucking* confirms UPSIDE's point in any event: as the First Circuit made clear, "[o]nce a court finds that a statute is discriminatory, it need not inquire into the extent of that discrimination to conclude that the statute is unconstitutional." *Id.* at 20 n.5. Market size therefore goes to the magnitude of the burden, not to whether discrimination exists.

16

Common sense points the same way. When a State removes a meat substitute from the market, the predictable effect is to protect incumbent meat products from that competition. The Supreme Court's recent decision in *Diamond Alternative Energy, LLC v. EPA* is instructive. There, the Court held that fuel producers had standing to challenge regulations designed to increase electric-vehicle production because the predictable effect was reduced demand for liquid fuel. The Court did not demand proof of the precise extent of that effect, instead relying on "commonsense economic principles and record evidence." 606 U.S. 100, 116 (2025). The same common sense applies here. Florida would not have enacted and defended SB 1084—and celebrated that exclusion as a win for in-state agriculture—if excluding cultivated meat had no competitive effect on the market.

### 4. SB 1084 protects in-state agriculture even if some out-of-state conventional-meat businesses also benefit.

Simpson's final effects argument is that SB 1084 protects no in-state interest because much of the conventional meat consumed in Florida is processed outside the State. His only support is Dr. Curran's declaration, which states that the Department knows of no large-scale conventional beef manufacturers in Florida, few large-scale chicken

17

manufacturers, and that much conventional meat consumed in Florida is processed elsewhere. Curran Decl. ¶¶ 7–9, ECF No. 127-2. Even accepting all of that, the argument misses the point.

SB 1084 was not defended or enacted as a law protecting only in-state meat processors. It was defended and enacted as a law protecting Florida agriculture—the ranchers, farmers, and poultry producers whose livelihoods depend on raising animals for the conventional meat market. Curran's own declaration acknowledges that Florida has cattle farms and ranches and poultry operations. *Id*. ¶¶ 7–8. Those producers benefit when Florida excludes a competing meat product, regardless of where some downstream processing occurs.

Indeed, the supply-chain structure Simpson invokes confirms the competitive threat to Florida agriculture. Conventional meat begins with farmers and ranchers raising animals. Cultivated meat reduces the need for that ongoing animal husbandry: no livestock to raise, no animals to sell to processors, no continuing demand for Florida cattle ranchers and poultry farmers. That is why Governor DeSantis told the Florida Cattlemen's Association at the signing ceremony that cultivated meat would "wipe the people sitting here today out of business." *See* Pl.'s

18

Opening Br. 10, ECF No. 129. The people sitting there that day were not out-of-state processors. They were Florida ranchers.

Nor does it matter that some out-of-state conventional-meat businesses may also benefit from the Ban. The Dormant Commerce Clause does not require proof that a protectionist law benefits *only* in-state interests. It is enough that the law protects favored in-state economic interests by burdening out-of-state competition. *See Bacchus*, 468 U.S. at 271–73. Otherwise, a State could shelter any local industry from a competing out-of-state product so long as some out-of-state incumbents might benefit too.

The State's own sworn admission confirms the point. The State Attorney Defendants identify the protected interest as the "conventional-meat industry," not out-of-state processors. State Attorney Defs.' Resp. to Pl.'s First Interrogs. No. 1, ECF No. 128-7. Simpson cannot argue that SB 1084 protects no cognizable in-state interest when the State Attorney Defendants themselves admit that preserving the conventional-meat industry by banning unconventional meat was a purpose of the law.

19

### C. The undisputed facts show that economic protectionism was a motivating factor for the enactment of SB 1084.

Because SB 1084 has a discriminatory effect on interstate commerce, it is subject to rigorous scrutiny on that ground alone. But a finding of economic protectionism "may be made on the basis of either discriminatory purpose . . . or discriminatory effect." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984) (citing in part *Hunt*, 432 U.S. at 352–53). Here, SB 1084's discriminatory purpose supplies a second, independent basis for applying rigorous scrutiny.

As UPSIDE's cross-motion explained, the purpose evidence is extensive and, at its center, undisputed. The State Attorney Defendants—Florida's chief legal advocate, representing the State Attorneys charged with criminally enforcing the Ban—admitted in sworn discovery responses that a purpose of SB 1084 is to "preserv[e] a conventional-meat industry" by "banning unconventional meat." State Attorney Defs.' Resp. to Pl.'s First Interrogs. No. 1, ECF No. 128-7. That admission is corroborated by a consistent public record: the Governor signed the bill before the Florida Cattlemen's Association, behind a "SAVE OUR BEEF" podium; the Commissioner described cultivated

20

meat as a "liberal agenda to shut down farms"; and the bill's sponsors told the public that those who want cultivated meat should "go to California." *See* Pl.'s Opening Br. 9–11, ECF No. 129.

Trying to minimize the law's discriminatory purpose, the Commissioner makes three arguments, each of which fails.

First, the Commissioner contends that statements by individual legislators cannot be attributed to the Legislature as a whole, citing the Eleventh Circuit's decisions in *Greater Birmingham Ministries v. Secretary of State*, 992 F.3d 1299 (11th Cir. 2021), and *League of Women Voters of Florida Inc. v. Florida Secretary of State*, 66 F.4th 905 (11th Cir. 2023). But the evidence in this case is not remotely like the evidence in either of those cases. In *Greater Birmingham Ministries v. Secretary of State*, for example, the Eleventh Circuit refused to find discriminatory purpose because plaintiffs challenging Alabama's voter ID law produced zero statements by legislators suggesting that the challenged law had a discriminatory purpose. Instead, they relied on statements by legislators—some years old—pertaining to different legislation or even no legislation to argue that some who voted for the bill were racially prejudiced. 992 F.3d at 1325 ("[I]t is undisputed that *none* of the

21

comments in question were made about [the challenged] legislation."). Similarly, in *League of Women Voters*, the Eleventh Circuit refused to find discriminatory purpose based on "a single statement by the sponsor that, in context, offers no evidence of discriminatory intent." 66 F.4th at 932. That is nothing like the record here, where multiple legislators explicitly stated that the purpose of SB 1084 was to protect Florida's in-state agriculture industry from new out-of-state competition.

The Commissioner's arguments for ignoring statements by himself and Governor DeSantis fare no better. The Commissioner dismisses those statements as "post-enactment statements" made at a "press conference." Def.'s Br. 26. But the signing ceremony for SB 1084 was not some after-the-fact commentary about an already-enacted law. Under the Florida Constitution, "[e]very bill passed by the legislature shall be presented to the governor for approval and shall become a law if the governor approves and signs it." Fla. Const. art. III, § 8(a). Thus, statements made by the official constitutionally charged with deciding whether SB 1084 would become law, at the very moment he approved and signed it, are probative of the law's purpose. And the same is true of

22

statements by Commissioner Simpson, the state official charged with civil enforcement of the Ban.

The Supreme Court has considered comparable statements by executive-branch officials when determining whether state laws violated the Dormant Commerce Clause. In *Kassel v. Consolidated Freightways Corp. of Delaware*, the Court struck down an Iowa law restricting the use of 65-foot double-trailer trucks. 450 U.S. 662 (1981) (plurality op.). In doing so, the plurality relied on the Iowa Governor's veto message opposing repeal because repeal would "benefit only a few Iowa-based companies while providing a great advantage for out-of-state trucking firms and competitors at the expense of our Iowa citizens." *Id.* at 677. Justice Brennan's concurrence likewise relied on statements by the Director of the Iowa Department of Transportation explaining that the challenged regime had the predicted effect of benefiting Iowa residents at the expense of neighboring states. *Id.* at 685–86 (Brennan, J., concurring). And in *Hunt*, the Court considered comments by North Carolina's Agriculture Commissioner as probative evidence that the challenged law's discriminatory effect was "not simply an unintended byproduct" of the State's asserted consumer-protection rationale. 432

23

U.S. at 352. Those cases foreclose the government's suggestion that courts must blind themselves to statements by governors and agriculture officials revealing a law's protectionist purpose.

Neither case the government cites counsels otherwise. The government invokes *Blanchette v. Connecticut General Insurance Corps.*, 419 U.S. 102 (1974), for the proposition that statements by Governor DeSantis and Commissioner Simpson cannot supply evidence of legislative intent. Def.'s Br. 26. But *Blanchette* was not a discriminatory-purpose case (or, for that matter, a Dormant Commerce Clause case). It addressed whether post-enactment legislative history could be used to determine the meaning of a federal statute. That statutory-interpretation principle has nothing to do with whether courts may consider contemporaneous statements by the Governor who signed a bill into law, or by the state official charged with enforcing it, as evidence that the law was enacted for an impermissible protectionist purpose. Nor does *Hallmark Developers, Inc. v. Fulton Count* (likewise not a Dormant Commerce Clause case) help the government. *Hallmark* involved statements by private citizens, not statements by government decisionmakers or enforcement officials. 466 F.3d at 1281–82. This case

24

involves official statements by the Governor who made SB 1084 law, the Commissioner who enforces it, and multiple legislators who sponsored and supported it.

Finally, there is no merit to the Commissioner's suggestion that this Court may disregard discriminatory purpose because "discriminatory purpose alone is insufficient to show discrimination." Def.'s Br. 28. That argument misreads both this Court's prior order and controlling precedent. The Supreme Court has expressly held that "[a] finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose or discriminatory effect." *Bacchus Imports, Ltd.*, 468 U.S. at 270 (cleaned up). Indeed, *Bacchus* held that "[e]xamination of the State's purpose" was sufficient to show that the challenged exemption was not entitled to deferential review. *Id*; *see also S.D. Farm Bureau*, 340 F.3d at 593 ("[W]e rest our conclusion on the evidence in the record of a discriminatory purpose . . . . As a result, we do not consider the other two tests [i.e., facial discrimination or discriminatory effect].").

The Commissioner's reliance on this Court's motion-to-dismiss order fares no better. Commissioner Simpson says this Court

25

"recognized" that discriminatory purpose alone cannot violate the Dormant Commerce Clause because "[t]he Commerce Clause regulates effects, not motives." Def.'s Br. 28 (quoting Order Granting in Part & Denying in Part MTD, ECF No. 85 at 23 n.9). But the cited footnote did not decide that question. It merely noted that *Comptroller of the Treasury of Maryland v. Wynne*, 575 U.S. 542 (2015), "suggest[ed]" that proposition. ECF 85 at 23 n.9. And for its part, *Wynne* addressed a different issue: whether the *lack* of a discriminatory purpose could save a tax scheme that had discriminatory effects. It did not hold the converse: that the *presence* of a discriminatory purpose was irrelevant to the Dormant Commerce Clause analysis.

On that question, Supreme Court precedent is clear: "A finding that state legislation constitutes 'economic protectionism' may be made on the basis of *either* discriminatory purpose *or* discriminatory effect." *Bacchus*, 468 U.S. at 270 (citations omitted; emphasis added). That should be the end of the matter. *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) ("'If a precedent of this Court has direct application in a case,' . . . a lower court 'should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.'").

26

In any event, the Court need not decide whether discriminatory purpose standing alone would trigger rigorous scrutiny: SB 1084 has *both* discriminatory effect *and* discriminatory purpose. And even if discriminatory purpose alone were insufficient (*but see Bacchus*, 468 U.S. at 270 ("Examination of the State's purpose in this case is sufficient to demonstrate the State's lack of entitlement to a more flexible approach . . . .")), both the Supreme Court and the Eleventh Circuit recognize that purpose is relevant to whether a law has discriminatory effect. *See Locke v. Shore*, 634 F.3d 1185, 1193 (11th Cir. 2011) (collecting cases). That makes sense: when a law is enacted to protect in-state industry from out-of-state competition, courts should not assume that the law failed to achieve what its proponents openly set out to accomplish. Here, the undisputed record shows that economic protectionism was at least a motivating factor for SB 1084's enactment, confirming that rigorous scrutiny applies.

## II.    The Government Has Not Carried Its Burden Under Rigorous Scrutiny.

Because SB 1084 discriminates against interstate commerce, it is subject to a "virtually *per se* rule of invalidity." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978). To survive that rule, the

27

Commissioner must prove both that SB 1084 serves a legitimate local purpose and that the purpose cannot be served by available nondiscriminatory means. *Maine v. Taylor*, 477 U.S. 131, 138 (1986); *Hughes v. Oklahoma*, 441 U.S. 322, 336–37 (1979). He has not carried either burden.

Simpson therefore cannot avoid rigorous scrutiny by invoking deferential language from cases whose premises are absent here. *Pacific Northwest Venison Producers v. Smitch*, for example, upheld a wildlife regulation only after concluding that neither its purpose nor its effect was economic protectionism. 20 F.3d 1008, 1012–13 (9th Cir. 1994). The Washington law in that case applied to in-state game farms as well as out-of-state interests; indeed, an in-state game farm was one of the plaintiffs. Here, by contrast, there are no in-state cultivated-meat producers to bear SB 1084's burden, the protected conventional-meat industry remains free to sell, and the State's own lawyers admitted that preserving that industry by banning unconventional meat was a purpose of the law. State Attorney Defs.' Resp. to Pl.'s First Interrogs. No. 1, ECF No. 128-7. *South Dakota Farm Bureau, Inc. v. Hazeltine* helps UPSIDE, not Simpson: there, the Eighth Circuit found a discriminatory purpose,

28

applied the nondiscriminatory-alternatives test, and held that South Dakota failed to show that discrimination against interstate commerce was necessary. 340 F.3d 583, 593–99 (8th Cir. 2003).

Once discrimination is shown, the burden is the State's. Section A explains why Simpson has not shown a legitimate, non-protectionist interest sufficient to justify discrimination against interstate commerce. Section B explains why, even if such an interest existed, Simpson has not shown that a categorical ban is necessary because nondiscriminatory alternatives would fail.

## A. The government has not shown any sufficient government interest.

Simpson identifies only one interest that could even potentially justify SB 1084's discrimination: protecting Floridians from the supposedly "unknown" risks of eating cultivated meat. That interest fails on this record for two independent reasons. First, *Maine* requires evidence that the banned article is "particularly likely" to threaten health or safety, not generalized uncertainty about a new product. 477 U.S. at 148 n.19. Simpson has no such evidence. Second, the asserted safety interest is a post-hoc rationalization: the legislative record identified no safety hazard, while the State Attorney Defendants' discovery response

29

admitted that a purpose of the Ban was to preserve the conventional-meat industry by banning unconventional meat. State Attorney Defs.' Resp. to Pl.'s First Interrogs. No. 1, ECF No. 128-7.

*Maine* does not permit a State to justify a discriminatory ban by invoking uncertainty in the abstract. It permits discrimination only when the State proves a concrete risk that cannot be addressed through nondiscriminatory means. There, Maine introduced expert testimony that out-of-state baitfish were known to carry three identified parasites, could harbor non-native species, and could cause ecological harms that could not be undone once introduced into Maine waters. 477 U.S. at 141–44. The State also proved that no available test could screen for the relevant parasites. *Id*. at 145–47. The Supreme Court upheld Maine's ban because the record showed a concrete pathway of harm and the inadequacy of nondiscriminatory alternatives.

Florida has no comparable record. Simpson's safety case is a list of scientific-sounding concerns—immortalized cells, genetic drift, growth media, microplastics, heavy metals, and gene transfer—not evidence that cultivated meat is particularly likely to harm consumers. The unrebutted expert testimony is the opposite. Dr. Kaplan explains that the human

30

digestive system breaks cultivated meat down as it breaks down other animal products; that immortalized cells lose their proliferative capacity upon harvest and are denatured by cooking and digestion; that those cells are categorically distinct from cancerous cells; and that the immortalized-cell concern at the center of Florida's argument is therefore "frankly nonsensical." Kaplan Decl. ¶¶ 26–28, ECF No. 128-2 On gene transfer, Dr. Kaplan explains that there is no known or hypothesized biological mechanism by which the human body incorporates genetic material from digested cells—otherwise humans would incorporate the genetic material of every food they eat. *Id.* ¶¶ 28–31. And the pathogens, residues, media, and metals Simpson lists are ordinary food-safety considerations—applicable to conventional meat and cultivated meat alike—which are managed through hygiene, sterilization, raw-material controls, cooking, inspection, and federal oversight. *Id.* ¶¶ 32–36.

Simpson offers no expert who disputes that account. His own expert, Dr. Curran, was unable to articulate or even hypothesize any mechanism by which consuming cultivated animal cells could be more dangerous than consuming conventional animal cells. Curran Dep. 40:10–16, ECF No. 127-6. Dr. Curran did not disagree with Dr. Kaplan's

31

specific opinions; he believes only that more testing would be prudent. *Id*. at 36:24–37:15 And he conceded that there is no evidence cultivated meat has harmed, or would harm, any consumer. *Id*. at 39:12–19. On the dispositive question—whether cultivated meat is particularly likely to threaten health—the record contains only UPSIDE's expert evidence.

Nor can Simpson satisfy *Maine*'s evidentiary standard by pointing to things that "cannot [be] rule[d] out." Def.'s Br. 4. A remote possibility that cannot be disproved is not affirmative evidence of a particularized risk. If it were, no producer could ever prevail, because a State could ban any product newly developed in another state and demand that the producer disprove every conceivable unknown. *Maine* places the burden on the State, and it requires evidence that the banned article is "particularly likely" to threaten health or safety. 477 U.S. at 148–49 n.19. Simpson has not supplied that evidence.

Simpson's reliance on tasting waivers and old internal laboratory emails does not fill the gap. The waivers described pre-commercial tastings of a product still completing federal review as "experimental"; that is ordinary liability caution, not evidence that the product *post-review* would be particularly likely to harm consumers. Valeti Dep.

32

54:19–24, ECF No. 127-7. The internal messages concern laboratory techniques for establishing a cell line years before any product was offered as food; they say nothing about whether eating a since-federally-reviewed, inspected, and approved chicken product is dangerous. These materials may make cultivated meat sound unfamiliar. But they do not carry the State's burden of demonstrating any actual risk to the public.

That the State cannot satisfy this burden is unsurprising, because there is ample reason to believe that the government's asserted safety interest is a post hoc rationalization for a protectionist law. The legislative record contains no finding that cultivated meat poses a health risk. To the contrary, the Senate staff analysis identified no safety hazard and acknowledged that the existing federal framework ensures that cultivated meat is safe, unadulterated, and truthfully labeled. Pl.'s Opening Br. 15, ECF No. 129. Against that record stands the State Attorney Defendants' admission that a purpose of SB 1084 was to "preserv[e] a conventional-meat industry" by "banning unconventional meat." State Attorney Defs.' Resp. to Pl.'s First Interrogs. No. 1, ECF No. 128-7. An asserted safety interest that the legislature did not find, advanced to defend a statute the State's own lawyers admit was meant

33

to suppress competition, is not the legitimate local purpose rigorous scrutiny requires.

## B. The government has not shown narrow tailoring.

Even if the government had identified a sufficient local interest, it would still bear the burden of proving that the interest could not be served by available nondiscriminatory means. *Maine*, 477 U.S. at 138; *see also Or. Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 101 (1994) ("Our cases require that justifications for discriminatory restrictions on commerce pass the 'strictest scrutiny.'"). It has not carried that burden.

Simpson's tailoring argument reduces to a single proposition: a ban prevents consumption more completely than any regulation short of a ban. That is true, but irrelevant. A ban is always more absolute than a disclosure, inspection, testing, registration, or labeling requirement. If that were enough, every discriminatory ban would survive. The question is not whether prohibition is the most restrictive option available. The question is whether reasonable nondiscriminatory alternatives would adequately serve the State's legitimate interest. *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354–56 (1951).

34

Several alternatives would address the Commissioner's stated concerns without excluding an out-of-state product from the Florida market. If the concern is that consumers might unknowingly eat cultivated meat, labeling and disclosure address that concern. Indeed, Florida already requires written consumer advisories for other food risks, including the risk of foodborne illness from undercooked meat. Pl.'s Opening Br. 34–35, ECF No. 129; Fla. Admin. Code r. 61C-1.001(12). Florida legislators proposed a disclosure requirement in place of a ban, and the Legislature rejected it. Pl.'s Opening Br. 34–35, ECF No. 129.

And disclosure is not a speculative alternative. It is the mechanism Congress chose for the far broader category of bioengineered food. Through the National Bioengineered Food Disclosure Standard, Congress addressed bioengineered foods through mandatory consumer disclosure rather than prohibition. Pub. L. No. 114-216, 130 Stat. 834 (2016); 7 U.S.C. § 1639b. That real-world regime matters here. The category of bioengineered foods is broader than cultivated meat, and it implicates the same kinds of consumer-awareness concerns Simpson invokes. If mandatory disclosure is an administrable way to inform consumers across the bioengineered-food supply, Simpson cannot show—

35

without evidence—that disclosure would be inadequate for the narrower category of cultivated meat.

If the concern is adulteration, contamination, growth media, cell-line authentication, genetic drift, or residues, Florida's ordinary food-safety tools address those concerns. Dr. Curran's own declaration confirms that the Department has inspection, testing, sanitation, and stop-sale authorities. Curran Decl. ¶ 14, ECF No. 127-2. Those are the tools food-safety regimes ordinarily use to address production-process risks. Simpson offers no evidence that those tools would fail here.

And if the concern is that a future cultivated-meat product might differ from the product FDA and USDA reviewed, Florida could require proof of federal review, state registration, or product-specific documentation before sale. That alternative would address the government's concern about future products without banning all cultivated meat from the State.

Simpson's evidence does not show otherwise. Dr. Curran asserts that labels do not stop consumption as effectively as a ban, that consumers may not understand labels, that labeling would require monitoring, and that companies offering free samples might disregard

36

labeling rules. Curran Decl. ¶¶ 15–18, ECF. No. 127-2. But he cites no consumer-comprehension study, no enforcement history, no testing or inspection data, and no empirical analysis showing that labeling, disclosure, registration, inspection, or testing would fail. These are conclusions, not proof. *Maine* required evidence that nondiscriminatory alternatives were inadequate. 477 U.S. at 141–47; *see also S.D. Farm Bureau*, 340 F.3d at 597 (finding state failed to carry burden on nondiscriminatory alternatives where it presented no evidence that suggests, evaluates, or critiques alternative solutions"). Simpson has provided none.

In the end, the government has shown only that Florida chose the most restrictive option available—and that it did so in service of a fundamentally illegitimate end. It has not shown that less discriminatory options would fail. That is fatal to Simpson's motion and to SB 1084.

## CONCLUSION

The Court should deny Defendant Simpson's motion for summary judgment. For the reasons stated in UPSIDE's opening brief and reply, the Court should grant UPSIDE's motion for summary judgment, declare

37

SB 1084 unconstitutional under the Dormant Commerce Clause, and enjoin its enforcement against UPSIDE.

Dated: June 15, 2026

Respectfully submitted,

INSTITUTE FOR JUSTICE

/s/ Paul M. Sherman
Paul M. Sherman (VA Bar No. 73410)
Suranjan Sen (TN Bar No. 038830)*
Samuel B. Gedge (VA Bar No. 80387)*
901 North Glebe Road, Suite 900
Arlington, VA 22203-1854
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: psherman@ij.org; ssen@ij.org;
        sgedge@ij.org

*Admitted *pro hac vice*

Ari Bargil (FL Bar No. 71454)
INSTITUTE FOR JUSTICE
2 South Biscayne Boulevard, Suite 3180
Miami, FL 33131
Tel: (305) 721-1600
Fax: (305) 721-1601
Email: abargil@ij.org

*Counsel for Plaintiff*

## LOCAL RULE 56.1(C) and (E) CERTIFICATE

Plaintiff's counsel hereby certifies that this document is typed in 14-point Century Schoolbook font and contains 7,128 words, excluding the parts of the brief exempted by Local Rule 7.1(F).


/s/ Paul M. Sherman
Paul M. Sherman (VA Bar No. 73410)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2026, the above captioned Plaintiff's Response to Defendant Simpson's Motion for Summary Judgment was filed with the clerk of the court via the ECF filing system, providing service on all attorneys of record.

/s/ Paul M. Sherman
Paul M. Sherman (VA Bar No. 73410)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203

*Counsel for Plaintiff*