# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

THE UPSIDE GROUP INC.
    Plaintiff,

v.

WILTON SIMPSON, in his official
capacity as Commissioner of the
Florida Department of
Agriculture and Consumer
Services, et al.
      Defendants.

Civil Action No.
4:24-cv-00316-MW-MAF

---

## PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

**INTRODUCTION**

This Court should grant UPSIDE's motion for summary judgment as to all defendants. As explained in UPSIDE's motion for summary judgment, SB 1084 is subject to rigorous scrutiny because it discriminates against interstate commerce in purpose or practical effect. The Ban removes cultivated meat–a product supplied entirely by out-of-state producers–from Florida's market, insulating Florida's conventional agriculture industry from competition. Pl.'s MSJ 6–18, ECF No. 129. And the record confirms that this was not accidental: Florida officials publicly defended the Ban as protecting in-state conventional agriculture, and the State Attorney Defendants admitted that "the conventional-meat industry is preserved by banning unconventional meat." State Attorney Defs.' Resp. to Pl.'s First Interrogs. No. 1, ECF No. 128-7. Defendants' response–or lack of response–changes none of this.[1]

---

[1] The State Attorney Defendants filed no response to UPSIDE's motion and did not join Simpson's response. They therefore have waived any argument against UPSIDE's motion. *See* Fed. R. Civ. P. 56(e); N.D. Fla. Loc. R. 56.1(C), (G).

1

As explained in Section I below, Simpson raises four flawed arguments in an effort to escape rigorous scrutiny. First, he argues that the "virtually per se rule of invalidity" applies only to facially discriminatory laws. Second, he argues that SB 1084 has no discriminatory practical effect because cultivated meat had not yet achieved large Florida sales and because the Ban treats all cultivated-meat producers alike. Third, he attacks Dr. Gerber's market evidence and says cultivated meat and conventional meat are not similarly situated. Fourth, he tries to discount the extensive evidence of discriminatory purpose as isolated, non-legislative, or not binding on him. All these arguments fail.

As explained in Section II, Simpson's attempts to survive rigorous scrutiny are no more successful. Simpson has produced no evidence that cultivated meat poses any threat to the public, let alone that it is "particularly likely" to pose such a threat, the standard required under Supreme Court precedent. Nor has Simpson shown that any health and safety concerns he does have could not be addressed through less discriminatory alternatives, such as disclosure requirements. The Court should grant UPSIDE's motion.

## ARGUMENT

### I. SB 1084 Is Subject to Rigorous Scrutiny Because It Discriminates in Purpose or Practical Effect.

Simpson's response confirms that the parties' dispute is legal, not factual. He does not deny that every cultivated-meat producer was outside Florida when SB 1084 took effect. He does not offer a market expert to rebut Dr. Gerber. He does not identify any in-state cultivated-meat producer burdened by the Ban. And he does not dispute that Florida's conventional agriculture industry may conduct sales of its product whereas the out-of-state cultivated meat industry is excluded. Instead, he offers four legal reasons why those facts supposedly do not trigger rigorous scrutiny. Each fails.

#### A. Rigorous scrutiny applies to laws that discriminate in purpose or practical effect, not only to facial discrimination.

Simpson first argues that the virtually per se rule of invalidity applies only to facially discriminatory laws. Def.'s Resp. 5, ECF No. 137. That is wrong. The Eleventh Circuit has recognized only two types of Dormant Commerce Clause claims: those involving laws that discriminate against interstate commerce, and those involving laws that do not. The first category includes any law that "directly regulates

or discriminates against interstate commerce, *or* has the effect of favoring in-state economic interests." *Fla. Transp. Servs., Inc. v. Miami-Dade County*, 703 F.3d 1230, 1243–44 (11th Cir. 2012) (emphasis added). If so, discrimination is "*per se* invalid" unless the government satisfies rigorous scrutiny by showing that it has no other means to advance a legitimate local interest. *Id.* at 1244. Only if the law has merely "indirect effects on interstate commerce" does *Pike* balancing apply. *Id.* There is no third track for laws that, though facially neutral, discriminate in purpose or practical effect.

*Florida Transportation Services* also answers Simpson's attempt to minimize the Supreme Court's ruling in *Carbone*. The Eleventh Circuit explained that *Carbone* "shows that even a facially neutral law can be discriminatory, so long as the purpose or effect of the law is to restrict outsiders' access to local markets." *Id.* at 1249–50. That view is not restricted to Justice O'Connor's concurrence in *Carbone. Contra* Def.'s Resp. 4, ECF No. 137. Indeed, as the *Carbone* majority explained, "[t]hough the Clarkstown ordinance may not in explicit terms seek to regulate interstate commerce, it does so nonetheless by its practical

4

effect and design." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 394 (1994).

Nor does *National Pork* help Simpson. The plaintiffs there "conceded that California's law does not implicate the antidiscrimination principle at the core of this Court's dormant Commerce Clause cases," so the Court applied the deferential principles that govern "[a]bsent discrimination." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369, 371–72 (2023). At the same time, the Court reaffirmed that the antidiscrimination principle lies at the core of dormant Commerce Clause doctrine and forbids economic protectionism–state measures designed to benefit in-state economic interests by burdening out-of-state competitors. *Id.* at 369. The case at bar is the discrimination case that *National Pork* was not.

### B. Simpson cannot avoid rigorous scrutiny by pointing to the Ban's facial neutrality or UPSIDE's current sales volume.

Simpson's second argument is that SB 1084 has no discriminatory effect because it treats all cultivated-meat producers alike and because cultivated meat had not yet achieved large Florida sales. Def.'s Resp. 2, 11–17, ECF No. 137. That framing is circular. Every product ban treats

all producers of the banned product alike. The relevant question is not whether Florida favored in-state cultivated-meat producers over out-of-state cultivated-meat producers; there were no in-state cultivated-meat producers to favor. The question is whether Florida has excluded an out-of-state commercial product, with a purpose or effect of insulating an in-state interest from competing with it. The answer is yes.

This is not an *Exxon*-style regulation of business structure. *Exxon* upheld Maryland's regulation because it created "no barriers whatsoever" to the flow of interstate commerce (*i.e.*, to gasoline entering Maryland). *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 126 (1978). SB 1084 does the opposite: It leaves UPSIDE no compliance path. Cultivated meat may not be manufactured, sold, offered for sale, held for sale, or distributed in Florida. That is market foreclosure, not a marginal compliance cost.

Nor does the newness of UPSIDE's Florida market make the burden de minimis. The Dormant Commerce Clause protects interstate competition; it does not wait until a new out-of-state substitute has already captured market share. If market size were dispositive, states could immunize the most effective protectionism by banning emerging

6

competitors before they gain customers and then invoking the absence of customers as a defense—and the Dormant Commerce Clause would, perversely, incentivize stifling innovation. *Bacchus* rejects that theory. There, the Court invalidated discrimination even though the favored product represented a tiny share of liquor sales, explaining that market volume goes to the extent of discrimination, not whether discrimination exists. *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 269–71 (1984).

*American Trucking* is consistent with that rule. The First Circuit required concrete evidence of a beyond-de-minimis competitive effect only because the plaintiffs there had not otherwise shown discrimination; on one claim, the court found no same-market competition at all. *Am. Trucking Ass'ns v. R.I. Tpk. & Bridge Auth.*, 123 F.4th 27, 39 (1st Cir. 2024). Here, Dr. Gerber supplies the market evidence, and the statute supplies the foreclosure. Moreover, *American Trucking* shows that the analysis does not turn on a raw calculation of lost profit but, instead, on whether "the burden it imposes on the out-of-state competitor sufficiently substantial and onerous for out-of-state interests that it could not 'be brushed aside as incidental.'" *Id.* at 45.

7

Here, again, UPSIDE is faced with a total prohibition on distributing or selling its product in Florida. That is not a de minimis effect.

### C. Dr. Gerber's evidence establishes that cultivated meat and conventional meat are similarly situated competitors.

Simpson's third argument attacks Dr. Gerber and says cultivated meat and conventional meat are not similarly situated. That argument fails because, in the Dormant Commerce Clause context, the similarly-situated inquiry turns on "actual or prospective competition" between the favored and disfavored commercial interests, *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 300 (1997)—and Dr. Gerber addressed precisely that question. She was retained to analyze the market overlap between cultivated meat and traditional meat, and she explains that products occupy the same market when they are reasonably interchangeable or substitutable from the buyer's perspective. Gerber Decl. ¶¶ 17–20, 71–78, ECF No. 128-3.

Dr. Gerber's conclusion is grounded elsewhere in the record. UPSIDE's cultivated chicken is made from chicken cells, designed to look, cook, and taste like conventional chicken, regulated under the federal poultry framework, served as chicken, and evaluated by consumers as chicken. Gerber Decl. ¶¶ 24–35, 47, 56, 75, ECF No. 128-

8

3; Valeti Decl. ¶¶ 25–26, 36–37, ECF No. 128-1. That is market evidence, not a legal conclusion. The Court supplies the law; Gerber supplies the factual predicate Simpson lacks.

Nor does *National Association of Optometrists* help Simpson. That was a standard *Exxon*-style case. California's laws burdened both in-state and out-of-state opticians in the same way, and no in-state optician class was favored. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1146–47 (9th Cir. 2012). The court also emphasized that optometrists and ophthalmologists were independently regulated medical professionals who primarily provided eye exams and prescriptions–services different from opticians' retail sale of eyewear. *Id.* at 1146–47, 1151–52. Here, by contrast, UPSIDE and conventional agriculture provide competing chicken protein for the consumer food market. The difference is production method, not market function.

**D. The purpose evidence confirms the Ban's discriminatory practical effect.**

Simpson's fourth argument is that Plaintiffs' evidence of discriminatory purpose is isolated, non-legislative, or not binding on him. Def.'s Resp. 9–10, ECF No. 137. But UPSIDE does not rely on stray remarks alone. It relies on statutory operation, unrebutted

9

market evidence, public statements by Florida officials (explaining the law to the public), and sworn discovery responses from official-capacity enforcement defendants. Purpose confirms the Ban's effect; it does not substitute for it.

The State Attorney Defendants' admissions are not "meaningless." *Contra* Def.'s Resp. 8, ECF No. 137. Simpson may be right that the admissions are not conclusive against him personally—but UPSIDE does not need them to be. They are binding against the State Attorney Defendants, who remain official-capacity enforcement defendants and did not oppose UPSIDE's motion, and they are probative of how Florida enforcement officials understood and defended the law: "[T]he conventional-meat industry is preserved by banning unconventional meat." State Attorney Defs.' Resp. to Pl.'s First Interrogs. No. 1, ECF No. 128-7. *Riberglass* holds only that one private defendant's admissions do not automatically bind another; it does not erase admissions that go to whether a state law was motivated in part by an illegitimate government motive. *See Riberglass, Inc. v. Techni-Glass Indus., Inc.*, 811 F.2d 565, 566–67 (11th Cir. 1987).

Nor does the State's avowed desire to "SAVE OUR BEEF" cease to matter because UPSIDE's current product is chicken. Even if beef producers were the primary intended beneficiaries of SB 1084, that does not mean SB 1084 lacked the purpose or effect of benefiting other in-state agricultural interests, including chicken producers. After all, SB 1084's language was not limited to cultivated beef: It bans cultivated meat across species. And certainly there is no reason to believe that the State had some secret, legitimate interest in banning cultivated chicken that differed from its avowed interest in protecting cattle ranchers from competition.

Finally, Simpson's good-faith cases do not require the Court to ignore this record. UPSIDE already addressed these cases in its response brief. Pl.'s Resp. to Simpson MSJ 20–27, ECF No. 138. Those cases reject reliance on stray remarks alone, often unconnected to the challenged legislation or made by members of the public. The record in this case is much stronger, consisting of repeated statements by members of the legislature and the executive branch—speaking directly to the public—explaining that a motivating purpose behind SB 1084, specifically, is to protect Florida's in-state agricultural interests from

11

competition. If those statements are not enough to show that discrimination was a motivating factor for the enactment of SB 1084, it is hard to imagine what evidence could ever show discriminatory purpose.

## II. SB 1084 Fails Rigorous Scrutiny.

Because SB 1084 discriminates in purpose and practical effect, Florida bears the burden to justify it. Simpson offers two responses. First, he says Florida may act based on uncertainty because cultivated meat is new. Second, he says no alternative would work because only a ban prevents consumption altogether. Neither response satisfies rigorous scrutiny.

### A. Simpson has not shown that cultivated meat is "particularly likely" to threaten public health or safety.

UPSIDE has produced extensive expert testimony that its product is safe and that there is no known or even hypothesized mechanism by which its product is less safe than conventional meat. Simpson's response is, essentially, that so long as there is any uncertainty about a product's safety—no matter how vague or inchoate—a state may ban that product from entering the state. Under this view, any professed uncertainty on the part of the state is an absolute trump card that

12

satisfies the first prong of ("rigorous") Dormant Commerce Clause scrutiny.

Supreme Court precedent—particularly the Court's ruling in *Maine*, on which Simpson relies—does not support this view. On the contrary, *Maine* shows that evidence is critical in establishing the nature or hypothetical risks and the danger that they will come to pass. There, the Supreme Court upheld a discriminatory baitfish ban only after an evidentiary record showed a concrete ecological pathway of harm: Imported live baitfish could introduce parasites and nonnative species into Maine waters, and available inspection alternatives could not adequately eliminate that risk. *Maine v. Taylor*, 477 U.S. 131, 141–52 (1986). The Court asked whether the excluded article was "particularly likely" to threaten health, safety, or natural resources. *Id.* at 148 n.19. "Imaginable" or "not entirely disproved" is not enough.

*Maine* also shows why Dr. Curran's expert opinion falls far short of the required showing. His declaration lists topics for further study–sanitation, genetic drift, immortalized cells, growth media, contamination, and long-term consumption–but identifies no evidence that UPSIDE's cultivated chicken (or any cultivated meat) has harmed

13

anyone, no evidence that cultivated meat is more dangerous to consume than conventional meat, and no suggestion of any harm in particular that would occur from consuming cultivated meat. Curran Decl. ¶ 10, ECF No. 127-2.

The remaining "evidence" of danger that Simpson gestures at similarly falls far short of the evidentiary record in *Maine*. The fact that a small number of other states have enacted similar bans does not help Simpson carry his burden. Other states' bans are political facts—the product of the very sort of political lobbying that produced SB 1084—not scientific evidence that cultivated meat is particularly likely to harm consumers. UPSIDE's tasting waivers and material-transfer agreements show ordinary caution around a new product; they do not establish a real-world risk pathway. And FDA's statement that manufacturers retain responsibility for compliance does not help Florida because that is true for food manufacturers generally. If Florida wants to ensure product-specific federal review, it can require proof of applicable FDA/USDA review before sale.

At base, Simpson's evidence of danger consists of nothing more than generalized anxiety about a new product that both the FDA and

the USDA have given the greenlight for sale in interstate commerce.

Under the Dormant Commerce Clause, that is not enough.

### B. Simpson has not shown that less discriminatory alternatives would fail.

Simpson's narrow-tailoring argument reduces to one proposition: A ban prevents consumption more completely than labeling, disclosure, registration, inspection, testing, or stop-sale authority. That will always be true. It cannot be the constitutional test. Otherwise, every discriminatory ban would justify itself because prohibition is always more absolute than regulation.

The point is that Florida has ordinary food-safety tools, short of a total ban. Curran acknowledges FDACS authority to inspect, analyze, and stop-sale dangerous, adulterated, insanitary, fraudulent, or otherwise noncompliant foods. Curran Decl. ¶ 14, ECF No. 127-2. If the concern is consumer confusion, then labeling and disclosure address that. If the concern is adulteration, then contamination, or process control, inspection, testing, sanitation, adulteration rules, and stop-sale authority address that. If the concern is future products, then Florida can require documentation of federal review before sale. Simpson offers no survey, no labeling study, no enforcement data, no inspection

15

analysis, and no evidence that those ordinary tools would fail. All he offers is the fact that cultivated meat is relatively novel—but novelty is not proof that every less discriminatory alternative is inadequate here.

Simpson's attempt to distinguish raw-food advisories only restates his uncertainty argument. *See* Def.'s Resp. 27–28, ECF No. 137. Florida allows sales of foods that carry *known* risks, with an advisory. An advisory can surely suffice here, considering that cultivated meat has *no known* risks.

The rejected disclosure amendment confirms the availability of less discriminatory alternatives. UPSIDE does not cite that amendment to interpret SB 1084's enacted text or legislative meaning. *Contra* Def.'s Resp. 28, ECF No. 137. Rather, UPSIDE cites the amendment for the straightforward point that disclosure, labeling, and federal-review requirements were available alternatives. That is precisely the inquiry rigorous scrutiny requires.

Simpson's position would invert the burden. Under the virtually per se rule of invalidity, Florida must justify its discriminatory ban. UPSIDE need not prove the absence of every conceivable unknown. Because Simpson has not shown that cultivated meat is particularly

16

likely to harm consumers or that less discriminatory alternatives would fail, SB 1084 cannot survive rigorous scrutiny.

## CONCLUSION

The material facts are undisputed. SB 1084 excludes cultivated meat from Florida's market; cultivated meat competes with conventional meat; the purpose evidence confirms that Florida intended to protect conventional agriculture from that competition; and Simpson has not carried the burden rigorous scrutiny imposes. The Court should grant UPSIDE's motion for summary judgment.


Dated: June 22, 2026

Respectfully submitted,

**INSTITUTE FOR JUSTICE**

/s/ Paul M. Sherman
Paul M. Sherman (VA Bar No. 73410)
Suranjan Sen (TN Bar No. 038830)*
Samuel B. Gedge (VA Bar No. 80387)*
901 North Glebe Road, Suite 900
Arlington, VA 22203-1854
Tel: (703) 682-9320
Fax: (703) 682-9321
Email: psherman@ij.org; ssen@ij.org;
        sgedge@ij.org

*Admitted *pro hac vice*

17

Ari Bargil (FL Bar No. 71454)
INSTITUTE FOR JUSTICE
2 South Biscayne Boulevard, Suite 3180
Miami, FL 33131
Tel: (305) 721-1600
Fax: (305) 721-1601
Email: abargil@ij.org


*Counsel for Plaintiff*

18

## LOCAL RULE 56.1(D) and (E) CERTIFICATE

Plaintiff's counsel hereby certifies that this document is typed in 14-point Century Schoolbook font and contains <u>3,024</u> words, excluding the parts of the brief exempted by Local Rule 7.1(F).

/s/ Paul M. Sherman
Paul M. Sherman (VA Bar No. 73410)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203

*Counsel for Plaintiff*

19

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2026, the above captioned Plaintiff's Reply in Support of Its Motion for Summary Judgment was filed with the clerk of the court via the ECF filing system, providing service on all attorneys of record.

/s/ Paul M. Sherman

Paul M. Sherman (VA Bar No. 73410)
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203

*Counsel for Plaintiff*